# SCARINCI HOLLENBECK
## —— ATTORNEYS AT LAW ——

New York | New Jersey | Washington, D.C.

**ROBERT E. LEVY** | Partner | Certified Civil and Criminal Trial Attorney
rlevy@scarincihollenbeck.com
Direct Phone: 201-623-1202 | Fax: 201-896-8660

September 25, 2015

***Via ECF Electronic Filing***
The Hon. Katharine S. Hayden, U.S.D.J.
United States District Court, District of New Jersey Newark
Frank R. Lautenberg U.S. P.O. & Courthouse Building
Room 311
Newark, NJ 07102

> RE: **American BD Company v. Local 863 I.B. of T. Pension Plan**
> **Docket No.: 2:13-cv-3699-KSH-CLW**
> **Our File No.: 12073.2000**

Dear Judge Hayden:

Our office represents the plaintiff, American B.D. Company in the above-captioned matter. As you are aware, both parties have filed Motions/Cross Motions for Summary Judgment which the Court has stayed pending a decision by the Third Circuit Court of Appeals in the IBT Local 863 Pension Fund v. C&S Wholesale Grocers, Inc., et al matter.

On September 16, 2015, the Third Circuit Court of Appeals issued its decision adopting Judge Linares' decision below, and holding in accord with the arguments we have made in support of summary judgment. The decision of the Third Circuit is Precedential.

Accordingly, please accept this letter and the enclosed copy of the Third Circuit opinion as supplemental to our Motion for Summary Judgment. We ask that the Court enter Summary Judgment on behalf of Plaintiff.

Respectfully submitted,

/s/ *Robert E. Levy*

ROBERT E. LEVY

REL/las
cc: Kenneth I. Nowak, Esq. – with enclosure (via e-filing)

4815-4824-6057, v. 1

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 14-1956 and 14-1957

———————

BOARD OF TRUSTEES OF THE IBT
LOCAL 863 PENSION FUND,
Appellant/Cross-Appellee

v.

C&S WHOLESALE GROCERS, INC.
WOODBRIDGE LOGISTICS LLC,
Appellees/Cross-Appellants

———————

Appeal from the United States District Court
For the District of New Jersey
(D.C. Civil Action Nos. 2-12-cv-07823, 2-12-cv-07824)
District Judge: Honorable Jose L. Linares

———————

Argued January 12, 2015

Before: MCKEE, *Chief Judge*, HARDIMAN and SCIRICA,
*Circuit Judges*

(Opinion Filed: September 16, 2015)

Thomas J. Hart, Esq. (Argued)
Slevin & Hart
1625 Massachusetts Ave., N.W.
Suite 450
Washington, D.C. 20036

Kenneth I. Nowak, Esq.
Zazzali Fagella Nowak Kleinbaum & Friedman
One Riverfront Plaza
Suite 320

Newark, NJ 07102

*Counsel for Appellant/Cross-Appellee*

Susan K. Hoffman, Esq. (Argued)
Matthew J. Hank, Esq.
Littler Mendelson
1601 Cherry Street
Suite 1400, Three Parkway
Philadelphia, PA 19102

*Counsel for Appellees/Cross-Appellants*

------------

### OPINION OF THE COURT

------------

McKEE, *Chief Judge*.

## I.   INTRODUCTION

This appeal arises from a disagreement between C&S Wholesale Grocers, Inc./Woodbridge Logistics LLC ("Woodbridge") and the Board of Trustees of the IBT Local 863 Pension Fund ("the Board") about the amount that Woodbridge should pay annually after withdrawing from the IBT Local 863 Pension Fund ("the Fund") in 2011.[1] At the time of its withdrawal from the Fund, Woodbridge was the largest wholesale grocery distributor by revenue in the United States. The Board administers the Fund, which is a multiemployer pension plan[2] subject to the provisions of the

------------

[1] As of September 1, 2011, the actuarial value of Fund assets was $202,865,255, while the accrued benefit liabilities totaled almost $400 million.

[2] As the name suggests, a multiemployer pension plan is one to which multiple employers contribute, usually under collective bargaining agreements. *Concrete Pipe & Prods. of Cal., Inc. v. Contr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 605, 605-06 (1993). Under such a plan, employers'

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Before withdrawing from the Fund, Woodbridge had been contributing to it pursuant to three collective bargaining agreements ("CBAs").[3]

As a result of amendments to ERISA in the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381-1461, employers cannot withdraw from multiemployer pension plans without consequence. Instead, they still must pay the share of the Fund's total unfunded vested benefits allocable to them. The parties here agree that the total amount that Woodbridge owes is $189,606,875. Because Woodbridge has elected to satisfy this "withdrawal liability" through annual payments instead of a lump sum, the amount of those payments is at the heart of this dispute.

One of the provisions added to ERISA by the MPPAA, 29 U.S.C. § 1399(c)(1)(C)(i), provides that the annual payments must be based on the "the highest contribution rate at which the employer had an obligation to contribute under the plan . . . ." The first point of disagreement between the parties is the meaning of "highest contribution rate." The Board seeks to select the single highest rate from the multiple contribution rates established in the three CBAs under which Woodbridge was contributing to the Fund. Woodbridge contends that it is

---

contributions are pooled in a general fund and can be used to satisfy any of the plan's obligations. *Id*. Multiemployer plans are advantageous to employers because of their cost and risk-sharing mechanisms. Simultaneously, these plans benefit employees because, among other things, they are able to work for any of the participating employers in any covered capacity without losing service credit toward pension benefits. *Id*. at 606-07.

[3] The three CBAs are: (1) the Warehouse CBA, (2) the Mechanics' CBA, and (3) the Porters' CBA. Participants in the Fund are current and former employees in the trucking and warehouse industry primarily located in New Jersey.

responsible only for a weighted average of all of the contribution rates it is obligated to pay under the CBAs. The second point of disagreement is whether Woodbridge's annual payment should include a 10 percent surcharge that Woodbridge had been paying pursuant to 29 U.S.C. § 1085(e)(7)(A) before withdrawing from the Fund. This subsection is part of another amendment to ERISA, the Pension Protection Act of 2006 ("PPA"), 29 U.S.C. § 1085. The Board claims this surcharge should be included in the annual payment that Woodbridge owes. Woodbridge disagrees.

After an unsuccessful attempt at arbitration, both parties filed suit in the District Court. Thereafter, the District Court partially granted and partially denied the parties' cross motions for summary judgment. The court ruled that the annual withdrawal liability payment should be based on the single highest contribution rate (rather than averaging the rates in Woodbridge's CBAs), but should not include the surcharge. For the reasons that follow, we affirm the District Court's order and hold that: (1) the "highest contribution" rate means the single highest contribution rate established under any of the three CBAs, and (2) the annual payment does not include the 10 percent surcharge.

## II.    STATUTORY BACKGROUND

Congress designed ERISA to regulate both single employer and multiemployer private pension plans. 29 U.S.C. § 1001 et seq. In enacting ERISA, Congress sought to guarantee that "if a worker has been promised a defined pension benefit upon retirement -- and if he has fulfilled whatever conditions are required to obtain a vested benefit -- he actually will receive it." *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 375 (1980). As mentioned above, this dispute focuses on multiemployer plans.

A significant drawback of multiemployer pension plans is that "the possibility of liability upon termination of a plan create[s] an incentive for employers to withdraw from weak multiemployer plans." *Concrete Pipe & Prods. of Cal., Inc. v. Contr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 605,

608 (1993).  When an employer withdraws from a pension plan before fully funding the amounts attributable to its employees, the plan's contribution base is reduced and the remaining contributing employers have no choice but to absorb the higher costs through increased contribution rates. *See Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 216 (1986).  This may jeopardize the plan's survival because the remaining employers have an increased incentive to also withdraw. *Id.*  The MPPAA was enacted to mitigate the incentives that employers would otherwise have to withdraw from multiemployer pension plans mired in financial difficulty. *See Concrete Pipe*, 508 U.S. at 608-09.

Under the MPPAA, when an employer completely withdraws from a multiemployer pension plan, it incurs withdrawal liability that corresponds to the value of the benefits in the plan that have vested and are attributable to its employees.[4]  29 U.S.C. § 1391(c)(3), provides the formula with which a plan's actuaries are to calculate the amount of this liability. [5]  In short, this liability is "the employer's

---

[4] A complete withdrawal is when an employer either "permanently ceases to have an obligation to contribute under the plan" or "permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a).

[5] Section 1391(c)(3)(B) directs that an employer's allocable amount of unfunded vested benefits be based on a fraction:

> (i) the numerator of which is the total amount required to be contributed by the employer under the plan for the last 5 plan years ending before the withdrawal, and

> (ii) the denominator of which is the total amount contributed under the plan by all employers for the last 5 plan years ending before the withdrawal, increased by any employer contributions owed with respect to earlier periods which were collected in those plan years, and decreased by any amount contributed to the plan during those plan years

5

proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984) (citing 29 U.S.C. §§ 1381 and 1391 in explaining that the withdrawal liability is "a fixed and certain debt to the pension plan"). An employer may make a one-time payment to satisfy its entire withdrawal liability or it may amortize the debt in equal annual payments under Section 1399(c)(1)(A).[6] The formula for calculating the amount of each of these annual payments is provided in 29 U.S.C. § 1399(c)(1)(C)(i):

> Except as provided in subparagraph (E), the amount of each annual payment shall be the product of—
>
> (I) the average annual number of contribution base units for the period of 3 consecutive plan years, during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest, and
>
> (II) the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs.

The contribution base units mentioned in Section 1399(c)(1)(C)(i)(I) are generally the compensable or paid

---

by employers who withdrew from the plan under this section during those plan years.

[6] The MPPAA provides that the balance of the employer's withdrawal liability is forgiven after it has made payments annually for 20 years. *See* 29 U.S.C. § 1399(c)(1)(B) ("In any case in which the amortization period . . . exceeds 20 years, the employer's liability shall be limited to the first 20 annual payments . . . .").

hours for which an employer contributes to the plan on behalf of its employees. *See Huber v. Casablanca Indus., Inc.*, 916 F.2d 85, 95 n.21 (3d Cir. 1990) (describing contribution base units as "e.g., hours worked, weeks worked, tons of coal"), *abrogated on other grounds by Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414 (1995). The term "obligation to contribute," in 29 U.S.C. § 1399(c)(1)(C)(i)(II), is defined in 29 U.S.C. § 1392(a) as an obligation arising either "(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law."

In 2006, Congress amended ERISA again. It enacted the PPA "to protect and restore multiemployer pension plans in danger of being unable to meet their pension distribution obligations in the near future." *Trs. of the Local 138 Pension Tr. Fund v. F.W. Honerkamp Co. Inc.*, 692 F.3d 127, 130 (2d Cir. 2012). Under Section 1085(b)(2)(A), which was added by the PPA, a multiemployer pension plan that is less than 65 percent funded is in "critical status." When a plan is in critical status, Section 1085(a)(2) requires the plan sponsor to adopt and implement a rehabilitation plan. This rehabilitation plan "must set forth new schedules of reduced benefits and increased contributions, from which participating employers and unions may choose when it is time to negotiate successor CBAs." *Honerkamp*, 692 F.3d at 131.

In addition to requiring a rehabilitation plan, the PPA imposes an automatic surcharge from 30 days after the employer has been notified that the plan is in critical status until the adoption of a new CBA in accordance with the rehabilitation plan. 29 U.S.C. § 1085(e)(7)(C)-(D). In the first year, the surcharge is equal to five percent of the contributions required under the CBA. *Id.* § 1085(e)(7)(A). In subsequent years, the surcharge is fixed at 10 percent of the contributions. *Id.* Under Section 1085(e)(7)(B), surcharges are "due and payable on the same schedule as the contributions on which the surcharges are based. Any failure to make a surcharge payment shall be treated as a delinquent contribution under [29 U.S.C. § 1145] . . .." Section 1085(e)(9)(B), in turn provides that "[a]ny surcharges under paragraph (7) shall be disregarded in determining the allocation of unfunded vested benefits to an employer under

7

section 1391, except for purposes of determining the unfunded vested benefits attributable to an employer under section 1391(c)(4) or a comparable method approved under section 1391(c)(5)."

On December 16, 2014, Congress passed the Multiemployer Pension Reform Act of 2014 ("MPRA"). Pub. L. No. 113-235, Div. O, 128 Stat. 2130, 2773-2822 (amending the PPA, 29 U.S.C. §§ 1084–1085 and 26 U.S.C. §§ 431–432, among other things). As amended by the MPRA, 29 U.S.C. § 1085(e)(9)(B) now states:

> Any surcharges under subsection (e)(7) shall be disregarded in determining the allocation of unfunded vested benefits to an employer under section 4211 and in determining the highest contribution rate under section 4219(c), except for purposes of determining the unfunded vested benefits attributable to an employer under section 4211(c)(4) or a comparable method approved under section 4211(c)(5).

This amendment does not affect the surcharges here as they accrued before December 31, 2014. Thus, unless specifically noted, the statutory references and language in this opinion refer to ERISA as it was before the MPRA.

## III.    FACTUAL AND PROCEDURAL HISTORY

In February 2011, Woodbridge completely withdrew from the Fund after closing its Northern New Jersey facilities for economic reasons. The three CBAs under which Woodbridge contributed to the Fund established multiple hourly contribution rates ranging from $1.50 to $3.69 per hour. Since the plan year beginning on September 1, 2008, the Fund had been in "critical status," as defined by Section 1085(b)(2)(A)(i) of the PPA. Accordingly, Woodbridge had been paying the Fund a surcharge for over two years before withdrawing. The surcharge was fixed at 10 percent of Woodbridge's contributions by the time Woodbridge withdrew.

Once Woodbridge withdrew from the Fund, it fell to the Board to determine the total amount of unfunded vested benefits that Woodbridge owed pursuant to Section 1391(c)(3). The parties do not dispute that the correct amount is $189,606,875. Because Woodbridge opted to make annual payments, rather than extinguishing the debt with a single payment, the Board also calculated the amount of these annual payments using the formula in Section 1399(c)(1)(C)(i). In interpreting "the highest contribution rate" mentioned in that subsection, the Board selected the single highest contribution rate in the CBAs. That rate was $3.69 per hour established in the Warehouse CBA. The Board also interpreted the text of 29 U.S.C. § 1392(a) and its definition of the "obligation to contribute" mentioned in Section 1399(c)(1)(C)(i)(II) as including the surcharge that Woodbridge had been paying. Thus, the Board added 10 percent to $3.69 per hour and arrived at a total contribution rate of $4.06 per hour. The resulting calculation pursuant to Section 1399(c)(1)(C)(i) resulted in an annual withdrawal liability payment of $8,553,551. This amount far exceeded the highest annual payment that Woodbridge had ever made before withdrawing from the Fund, $5,777,708.

Woodbridge disputed the Board's methodology. It argued that the Board should not have used the single highest contribution rate in all of the CBAs or included the 10 percent surcharge in calculating its withdrawal liability. Thus, the parties submitted the following issues to an arbitrator:[7]

> (1) Did the Fund comply with ERISA Section 4219(c)(1)(C) [29 U.S.C. § 1399(c)(1)(C)] and the regulations promulgated thereunder when it calculated Woodbridge's withdrawal liability payment schedule by taking into account the highest contribution rate at which Woodbridge was obligated to contribute to the Fund,

---

[7] 29 U.S.C. § 1401(a)(1) provides that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration."

9

> notwithstanding the fact that the last bargaining
> agreements in effect allowed lower contribution
> rates for some employee classifications?
>
> (2) Is the Fund's inclusion of Woodbridge's
> [automatic] surcharges in the calculation of the
> contribution rate used to determine
> Woodbridge's withdrawal liability payment
> schedule permissible under ERISA?

*Bd. of Trs. of the IBT Local 863 Pension Fund v. C&S
Wholesale Grocers Inc. Woodbridge Logistics LLC*, 5 F.
Supp. 3d 707, 713 (D.N.J. 2014) (second alteration in
original) (citation omitted).

The arbitrator found that the term "the highest
contribution rate" as used in Section 1399(c)(1)(C)(i)(II) was
ambiguous. He resolved this ambiguity by consulting
legislative history and the Pension Benefit Guaranty
Corporation's ("PBGC") Opinion Letter 90-2.[8] Based on
those two sources, he ruled that the Board should have
adopted a weighted average of the different contribution rates
established in each of the three CBAs, instead of selecting the
single highest contribution rate of $3.69.[9] The arbitrator

---

[8] In that letter dated April 20, 1990, the PBGC addressed a
situation similar to this one in which the employer was
contributing to the multiemployer plan pursuant to multiple
CBAs containing multiple contribution rates. (1990 WL
260108, at *3.) The question posed to the PBGC was
whether, under ERISA Section 4219(c)(1)(C)(i), the Board of
Trustees of the plan in question could use a "contract-by-
contract" approach to compute the employer's annual
withdrawal liability payment as "the sum of the products
described in Section 4219(c)(1)(C)(i) computed separately for
each of the employer's contracts." *Id.* The PBGC opined that
this approach was "reasonable and consistent with the intent
of the statute." *Id.*

[9] The arbitrator was also concerned that, as noted above, the
$8,553,551 annual payment that the Board calculated was
much greater than the highest annual payment of $5,777,708

rejected Woodbridge's challenge to inclusion of the 10 percent surcharge, reasoning that 29 U.S.C. § 1085(e)(7)(B) indicates that surcharges are contributions because they are treated as delinquent contributions.   He believed Section 1085(e)(9)(B) "reinforced the conclusion that surcharges paid by Woodbridge should be included in the highest contribution rate by negative implication." *IBT Local 863 Pension Fund*, 5 F. Supp. 3d at 715-16.

Both parties filed complaints in the District Court. The District Court reversed both of the arbitrator's rulings in an order resolving the parties' cross motions for summary judgment. The court held that the single highest contribution rate in the three CBAs (the $3.69 per hour rate in the Warehouse CBA) applied.  The court concluded that Section 1399(c)(1)(C)(i)(II) is plain and unambiguous in referring to a single contribution rate:  "the highest contribution rate at which the employer had an obligation to contribute under the plan." *See IBT Local 863 Pension Fund*, 5 F. Supp. 3d at 719 (citing Section 1399(c)(1)(C)(i)(II)).  Accordingly, the court declined to rely on sources beyond the statutory text.  The court interpreted the statute as contemplating multiple CBAs in directing that the highest contribution rate be used because the definition of "obligation to contribute" in 29 U.S.C. § 1392(a)(1) refers to "one or more" CBAs. *Id.* at 717.

The court also held that the arbitrator should not have included the surcharge in calculating Woodbridge's annual withdrawal liability payment.  The court reasoned that the "obligation to contribute" under Section 1392(a)(1) included only amounts arising under the CBAs and the CBAs in question did not include the surcharge.  The court recognized that, under Section 1392(a)(2), the "highest contribution rate" is also that at which the employer had an obligation to contribute "as a result of a duty under applicable labor-management relations law[.]"  It explained, however, that it was not aware of any such law and the Board had not argued that the surcharge arose under such a law.  The court also pointed out that, while contribution rates inform the value of contributions, contributions are separate from and do not

that Woodbridge had ever made before withdrawing from the Fund.

11

determine contribution rates. Thus, even if contributions and surcharges are one and the same, the court reasoned, the surcharge would not change the CBAs' underlying contribution rates.

This appeal and cross appeal followed. Woodbridge appeals the court's decision to apply the single highest contribution rate provided in the CBAs, and the Board appeals the court's decision to disallow the surcharge in calculating Woodbridge's annual withdrawal liability payment.[10]

## III. THE HIGHEST CONTRIBUTION RATE

We begin our analysis by discussing the meaning of "the highest contribution rate at which the employer had an obligation to contribute" under Section 1399(c)(1)(C)(i)(II) where there are multiple CBAs and multiple contribution

---

[10] The District Court had jurisdiction pursuant to 29 U.S.C. §§ 1401 and 1451. The parties claim that the District Court had jurisdiction under 29 U.S.C. § 1132. However, 29 U.S.C. § 1401(b)(2) states: "Upon completion of the arbitration proceedings in favor of one of the parties, any party thereto may bring an action, no later than 30 days after the issuance of an arbitrator's award, in an appropriate United States district court in accordance with section 1451 of this title to enforce, vacate, or modify the arbitrator's award." Section 1451(c), in turn, states: "The district courts of the United States shall have exclusive jurisdiction of an action under this section without regard to the amount in controversy, except that State courts of competent jurisdiction shall have concurrent jurisdiction over an action brought by a plan fiduciary to collect withdrawal liability."

We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of a District Court's grant of summary judgment is plenary. *See, e.g., Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000). We "apply the same standard as that used by the District Court." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 580-81 (3d Cir. 2009).

rates for different classes of employees. As discussed above, the District Court selected the single rate of $3.69 per hour which was the highest contribution rate under any of the employer's three CBAs. *See IBT Local 863 Pension Fund*, 5 F. Supp. 3d at 717-20. The court reasoned that Section 1392(a)(1)'s reference to "one or more collective bargaining (or related) agreements" shows that Congress contemplated the possibility of multiple CBAs in directing in Section 1399(c)(1)(C)(i)(II) that the single highest contribution rate be used. We agree. Accordingly, we hold that, even where there are multiple contribution rates under multiple CBAs, Section 1399(c)(1)(C)(i)(II) requires that the single highest rate determine the amount of an employer's annual withdrawal liability payment.

Woodbridge makes several unpersuasive arguments in support of its contrary position. First, Woodbridge contends that Section 1392 has no bearing on the meaning of "highest contribution rate" because it contains neither the term "highest contribution rate," nor "contribution rate." Woodbridge's reading is far too restrictive. Section 1399(c)(1)(C)(i)(II), plainly refers to "the highest contribution rate at which the employer had *an obligation to contribute* under the plan." Thus, the meaning of "obligation to contribute" is essential to understanding this subsection. Section 1392(a), defines "obligation to contribute" for purposes of Section 1399 and other provisions of ERISA relating to employer withdrawals. *See* 29 U.S.C. § 1392(a) (stating that it provides a definition "[f]or purposes of this part").

Second, Woodbridge argues that there is an ambiguity in the statute where multiple CBAs call for different contribution rates. In order to resolve this ambiguity, Woodbridge offers both the legislative history and the aforementioned PBGC Opinion Letter 90-2. It characterizes the PBGC letter as endorsing a "contract-by-contract" approach under which its annual withdrawal liability would be "the sum of the products described in Section 4219(c)(1)(C)(i) computed separately for each of the employer's contracts." (1990 WL 260108, at *3.) Woodbridge argues that when both the legislative history and the PBGC letter are read together, they establish that the

13

Board must consider the highest contribution rate for *each* class of employees, rather than the single highest contribution rate overall. Because we disagree that the statute is ambiguous, we are not at liberty to examine the legislative history and the PBGC letter.[11]  *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 259 (3d Cir. 2013) ("Legislative history has never been permitted to override the plain meaning of a statute.").

Statutory interpretation begins with the plain language of the statute and when the language is clear, the court "must enforce it according to its terms." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009). A statute is "ambiguous only where the disputed language is 'reasonably susceptible of different interpretations.'" *In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010). The mention of "one or more collective bargaining (or related) agreements" in Section 1392(a) makes clear that Congress contemplated a situation, such as the one before us, in which there would be multiple CBAs. In such a situation, Section 1399(c)(1)(C)(i)(II) expressly directs that "*the* highest contribution rate" be used. There is no ambiguity in the definite article "the." In short, when Sections 1392 and 1399 are read together, it is clear that Congress appreciated that an employer might contribute at different rates under multiple plans and designated "the highest" rate as the appropriate rate to apply in calculating annual payments of the withdrawal liability.

Woodbridge's last argument is that applying only the single highest contribution rate will lead to an unduly harsh

---

[11] It is noteworthy, however, that as the District Court pointed out, "the PBGC did not opine that an alternative approach could be forced on a board against its will." *IBT Local 863 Pension Fund*, 5 F. Supp. 3d at 718 n.5. Indeed, the PBGC opined merely that a contract-by-contract approach was "reasonable and consistent with the intent of the statute." (1990 WL 260108, at *3.) The PBGC did not suggest that plan administrators are required to employ a contract-by-contract approach in lieu of a literal application of Section 1399(c)(1)(C)(i)(II). (1990 WL 260108, at *3.)

result in which its annual withdrawal liability payment will be greater than the annual payments it was making when it was participating in the plan. We agree that that is the result but we do not agree that it is unduly harsh. Moreover, we must enforce a statute according to its terms. We are not at liberty to rewrite it to address Woodbridge's perceived inequity. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534, 538 (2004) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms. . . . Our unwillingness to soften the import of Congress's chosen words even if we believe the words lead to a harsh outcome is longstanding."). In addition, as we have just noted, we do not agree that the higher annual contributions following withdrawal are necessarily inequitable or that Congress was unaware that this could be the result of selecting the highest contribution rate of multiple CBAs. Woodbridge's equitable argument ignores the fact that under Section 1399(c)(1)(C)(i), its annual payments are capped at 20 years even if more than 20 annual payments would be required to completely satisfy Woodbridge's withdrawal liability. Thus, Woodbridge will not necessarily pay more following withdrawal than it would have had it remained in the fund. Yet the higher annual payment for 20 years clearly deters employers from withdrawing from multiemployer funds without fully funding their share of the liability.

We do not believe that Congress intended that a withdrawing employer pay only the amounts that would ordinarily be due under the pension plan. Indeed, the Supreme Court has noted that it is "not convinced that MPPAA aims to make withdrawing employers pay an actuarially perfect fair share, namely, a set of payments in amounts that, when invested, would theoretically produce (on the plan's actuarial assumptions) a sum precisely sufficient to pay (the employer's proportional share of) a plan's estimated vested future benefits." *Milwaukee Brewery*, 513 U.S. at 426. Features of the MPPAA, such as the statute's forgiveness of *de minimis* amounts under Section 1389 and the waiving of the balance after 20 years of annual payments under Section 1399(c)(1)(B), all indicate that Congress contemplated a scheme under which withdrawal payments would not correspond exactly to the employer's allocable unfunded

15

amounts under the plan. *See id.* (Also noting that these features mean that "if an employer's normal annual contribution was low compared to the withdrawal charge, the presence or absence of withdrawal-year interest (which shows up at the end of the payment schedule) will make no difference (for the last payments will never be made)."); *see also Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 196-97 (1997) ("Payments are set at a level that *approximates* the periodic contributions the employer had made before withdrawing from the plan. . . .") (emphasis added).

## IV. THE SURCHARGE

The remaining issue which we must resolve is whether "the highest contribution rate at which the employer had an obligation to contribute" includes the 10 percent surcharge imposed by Section 1085(e)(7)(A).[12] As discussed above, the District Court concluded that the surcharge should not be included in the annual withdrawal liability payment. Section 1392(a) expands on the sources of the "obligation to contribute," stating: "the term 'obligation to contribute' means an obligation to contribute arising-- (1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law . . . ." Thus, we must decide if the surcharge arises under either the CBAs or an "applicable labor-management relations law." We conclude that the surcharge does not arise under either.

### A. The Surcharge Does Not Arise Under the CBAs

The Board argues that, because Section 1085(e)(7)(B) makes surcharges "due and payable on the same schedule as the contributions" and provides that "failure to pay a surcharge shall be treated as a delinquent contribution" under Section 1145, the "statute regards both CBA and PPA-

---

[12] The parties do not dispute that the pension plan was in critical status and the surcharge is 10 percent of the contributions otherwise required under the applicable collective bargaining agreement.

mandated employer contributions, and their respective rates, in an identical manner." Appellant Br. 26. Section 1145 governs delinquent contributions and states that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall . . . make such contributions in accordance with the terms and conditions of such plan or such agreement." As the Supreme Court has observed, "[t]he text of [29 U.S.C. § 1145] plainly describes the employer's contractual obligation to make contributions but omits any reference to a noncontractual obligation." *Laborers Health & Welfare Tr. Fund for N. Cal. v. Advanced Lightweight Concrete Co., Inc.*, 484 U.S. 539, 546 (1988). Because surcharges are noncontractual obligations created by Section 1085(e)(7), they are not within the scope of Section 1145. Indeed, this is precisely why Section 1085(e)(7)(B) is necessary to ensure that surcharges are treated similarly to contributions when delinquent.

In addition, the phrase "treated as" in Section 1085(e)(7)(B) is telling. Congress would hardly need to inform a plan's actuaries that surcharges are to be "treated as" contributions when delinquent if surcharges and contributions were already identical for all purposes, including calculating annual withdrawal payments. In other words, if surcharges were contributions already, then Section 1085(e)(7)(B) would be rendered redundant and meaningless. It is well established, however, that "legislative enactments should not be construed to render their provisions mere surplusage." *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 472 (1997). In order to give effect to Section 1085(e)(7)(B), surcharges cannot be treated as contributions except when delinquent. Thus, the surcharge established in Section 1085 does not arise under the CBAs.

### B. The Surcharge Is Not Part of the "Highest Contribution Rate"

Under Section 1392(a)(2), an "obligation to contribute" may also arise "as a result of a duty under applicable labor-management relations law." Woodbridge argues that the only "applicable labor-management relations law" is the National Labor Relations Act ("NLRA"). The

17

Board contends that Section 1085 is also such a law.[13] Woodbridge also argues that the Board waived this argument. Assuming arguendo that the issue is not waived, the Board's position is not persuasive because it fails to distinguish between contributions and contribution rates. Even if, as the Board argues, the surcharge arises under the PPA and assuming that the PPA is an "applicable labor-management relations law," the surcharge cannot be added to Woodbridge's annual payments unless it is part of the highest contribution *rate*.

---

[13] Woodbridge is correct that the Supreme Court has concluded that the NLRA is an "applicable labor-management relations law." *See Advanced Lightweight Concrete Co.*, 484 U.S. at 545-46 ("[Obligation to contribute] is defined for the purposes of the withdrawal liability portion of the statute in language that unambiguously *includes* both the employer's contractual obligations and any obligation imposed by the NLRA.") (emphasis added). The Court has not concluded, however, that the NLRA is the only such law and indeed, has suggested that the phrase "applicable labor-management relations law" is meant generally. *Cf. Bay Area Laundry*, 522 U.S. at 196 n.1 ("An 'obligation to contribute' arises from either a collective-bargaining agreement *or more general labor-law prescriptions*. See 29 U.S.C. § 1392(a)." (emphasis added)). Furthermore, nothing in ERISA suggests that this Court should restrict the phrase "applicable labor-management relations law" to the NLRA. Indeed, had Congress meant only the NLRA, we presume it would have specified that Act. As the statutory background above makes clear, the PPA does address labor-management relations by specifying what employers must do—*e.g.*, comply with rehabilitation plans, or have the default schedules imposed upon them—when they underfund pension plans. *Cf. also* 29 U.S.C. § 1001a(a)(4)(A) (discussing congressional finding that "withdrawals of contributing employers from a multiemployer pension plan frequently result in substantially increased funding obligations for employers who continue to contribute to the plan, adversely affecting the plan, its participants and beneficiaries, *and labor-management relations*[.]") (emphasis added).

18

Section 1399(c)(1)(C)(i)(II), specifies that the annual payments be based on the highest contribution *rate* at which an employer has an obligation to contribute under the CBAs. "Contribution rate" is widely used throughout the statute, but never explicitly defined. *See, e.g.*, 29 U.S.C. §§ 1396(a)(1), 1425(f), & 1426(c)(2). It is clear, however, as a matter of common sense that contributions are distinct from contribution rates. As the District Court aptly explained:

> [T]he "contribution rates" set forth in an employer's CBAs with a multiemployer pension plan are distinct from the "contributions" that the employer generally pays to the plan. Although the contribution rates help determine the total value of the contributions, the contributions do not determine the contribution rates.

*IBT Local 863 Pension Fund*, 5 F. Supp. 3d at 722. A close reading of ERISA further reinforces our conclusion that contributions are not to be conflated with contribution rates. For example, Section 1085(e)(3)(C)(iii) states that "[a]ny failure to make *a contribution under a schedule of contribution rates* provided under this subsection shall be treated as a delinquent contribution under section 1145 of this title and shall be enforceable as such." (emphasis added). Were contributions the same as contribution rates, that provision would be redundant. Thus, the correct question is whether surcharges are part of contribution rates (not whether they constitute contributions) and we conclude that they are not.

This distinction is also evident from the fact that contribution rates are set by CBAs while surcharges are set by statute. Nothing in the statutory scheme suggests that surcharges, when applicable, amend the underlying terms of employers' CBAs. Yet, that is the result of considering surcharges as contribution rates set in the CBAs. In fact, the statute distinguishes between surcharges and contribution rates. *See, e.g.*, 29 U.S.C. § 1085(e)(7)(B) (making surcharges "due and payable on the same schedule as the *contributions* on which the surcharges are based") (emphasis

19

added); *Id.* § 1085(e)(7)(A) (obligating employers to pay a surcharge based on "10 percent of the *contributions* otherwise so required") (emphasis added). Furthermore, ERISA is a "comprehensive and reticulated" statute. *Nachman*, 446 U.S. at 361-62 (explaining at length that Congress passed ERISA "following almost a decade of studying the Nation's private pension plans" and making "detailed findings"). We appreciate that ERISA is not a model of clarity. It is, in fact, a bewilderingly complex statute. However, despite its many obfuscations, it is clear that Congress intended to distinguish between contribution rates and contributions, and we are not convinced by the Board's arguments to the contrary.

The Board notes that Section 1085(e)(9)(B) provides that "[a]ny surcharges under paragraph (7) shall be disregarded in determining the allocation of unfunded vested benefits to an employer" under Section 1391. Citing *Russello v. United States*, 464 U.S. 16, 23 (1983), the Board contends that the negative implication of this provision is that surcharges should not be disregarded for any other purpose and, consequently, they should be factored into annual withdrawal liability payments. In *Russello*, the Supreme Court explained that when Congress includes language in one section of a statute, but omits it in another, Congress is presumed to have acted intentionally. *Id.* at 23. The Board's reliance on this case is misplaced, however. As discussed above, surcharges are not part of the highest contribution rate on which the annual withdrawal liability payment is based under Section 1399(c)(1)(C)(i)(II). Accordingly, when Congress added Section 1085(e)(9)(B), there was no need for it to specify that surcharges are to be excluded from determining the annual withdrawal liability payment. The only issue before the Court was whether the calculation of unfunded vested benefits allocated to the employer contained in Section 1391 includes surcharges. Congress needed to clarify that surcharges are not included in that calculation because some of that section's provisions refer to "the total amount contributed under the plan" and "any amount contributed by an employer." In contrast, Sections 1392 and 1399 contain the phrase "obligation to contribute." Thus, Congress provided clarification in Section 1085(e)(9)(B). Therefore the discussion in *Russello* does not advance our inquiry here.

20

The Board also points to a 2008 amendment that changed the language of Section 1085(e)(9)(B) from "[a]ny surcharges . . . shall be disregarded in determining *an employer's withdrawal liability* under section 1391 of this title," 29 U.S.C. § 1085(e)(9)(B) (2006) (emphasis added), to "[a]ny surcharges . . . shall be disregarded in determining *the allocation of unfunded vested benefits* to an employer under section 1391 of this title," 29 U.S.C. § 1085(e)(9)(B) (2008) (emphasis added).   The Board again relies on negative implication in arguing that this change reveals that surcharges should be included in the annual withdrawal liability payment.   However, the District Court's explanation is far more plausible.   The court reasoned that since Section 1391 repeatedly speaks in terms of determining the employer's allocable "amount of unfunded vested benefits," Congress amended Section 1085(e)(9)(B) to match this language and eliminate any confusion.   *IBT Local 863 Pension Fund*, 5 F. Supp. 3d at 724.   This reasoning is reinforced by the text of Section 1381.    That provision states: "[t]he withdrawal liability of an employer to a plan is the amount determined under [29 U.S.C. § 1391] to be the allocable amount of unfunded vested benefits, *adjusted* [in accordance with other provisions of ERISA.]"    In other words, an employer's withdrawal liability and allocable amount of unfunded vested benefits are not synonymous.    It is likely that Congress enacted the amendment in an effort to clarify this very difficult statute.

The Board also points to the MPRA which, as noted earlier, became effective as of December 16, 2014.   It amends Section 1085 to require that automatic surcharges "be disregarded in determining the allocation of unfunded vested benefits to an employer under [29 U.S.C. § 1391] *and in determining the highest contribution rate* under [29 U.S.C. § 1399(c)]."    29 U.S.C. § 1085(g)(2) (2014) (emphasis added).   The Board argues that the prospective, rather than retroactive, nature of the MPRA amounts to a repeal of existing law.   Thus, it contends that the amendment would not have been necessary if Congress believed that the pre-MPRA provisions excluded surcharges in calculating annual withdrawal liability payments.

21

However, as the Supreme Court has cautioned: "we [must] begin with the oft-repeated warning that the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980) (internal quotation marks omitted). Indeed, the weight given subsequent legislation and whether it constitutes a clarification or a repeal is a context- and fact-dependent inquiry. *See Miss. Poultry Ass'n, Inc. v. Madigan*, 31 F.3d 293, 302-03 (5th Cir. 1994) ("Although subsequent legislation has been characterized as being anything from of 'great weight' or having 'persuasive value,' to being of 'little assistance' to the interpretative process, resolution of the proper weight to be accorded such legislation depends on the facts of each case.") (footnotes omitted).

Here, because of the dearth of legislative history for the MPRA and lack of clear statutory language, it would be a hazardous venture for us to draw any conclusions from the enactment of the MPRA. The Board argues that the Congress that enacted the MPRA included an effective date provision because it interpreted Section 1085(e)(9)(B) as *not* excluding surcharges from Section 1399(c)(1)(C)(i)(II)'s "highest contribution rate." Despite the Board's arguments, "it [remains] the function of the courts and not the Legislature . . . to say what an enacted statute means." *Pierce v. Underwood*, 487 U.S. 552, 566 (1988). We therefore conclude that the District Court correctly held that the 10 percent surcharge should not be included in Woodbridge's annual payment of its withdrawal liability.

## IV.   CONCLUSION

For the foregoing reasons, we will affirm the order of the District Court.