# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMERICAN B.D. COMPANY, | Civil Action  No. 2:13-cv-03699(KSH)(CLW) |
| **Plaintiff,** | |
| v. | |
| LOCAL    863    INTERNATIONAL BROTHERHOOD  OF  TEAMSTERS PENSION PLAN, | **ELECTRONICALLY FILED** |
| **Defendants.** | |

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

SCARINCI & HOLLENBECK, LLC
1100 Valley Brook Avenue
P.O. Box 790
Lyndhurst, New Jersey 07071-0790
Attorneys for Plaintiff

Robert E. Levy, Esq.
    On the Brief
    Of Counsel

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY...................................................... 3

ARGUMENT.................................................................................................................... 8

      BECAUSE THE PLAN HAS NO LEGITIMATE FACTUAL OR
      LEGAL FOUNDATION TO SUPPORT ADDITION OF A
      SURCHARGE TO AN EMPLOYER'S WITHDRAWAL
      LIABILITY, THE ARBITRATOR'S DECISION AFFIRMING
      THE PLAN ACTUARY'S WITHDRAWAL LIABILITY
      CALCULATIONS AND SCHEDULE OF PAYMENTS WHICH
      ARE IMPROPERLY INFLATED AND PLAINLY
      UNREASONABLE, SHOULD BE REJECTED ............................................................ 8

        (a)     The Comprehensive and Reticulated Provisions of ERISA, as
                  Amended, are Contrary to the Arbitrator's Findings............................................. 9

        (b)     The Fund's Actuary Did Not Perform Its Duties Reasonably Or In
                  Conformity With The Statutory Mandate ............................................................ 11

CONCLUSION.................................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Astrue v. Capato,
    132 S. Ct. 2021 (2012)............................................................................10

Bd. of Trs. v. C&S Wholesale Grocers, Inc.,
2015 U.S. App. LEXIS 16449 (3d Cir. Sept. 16, 2015)......................1, 7, 9, 16

Chicago Truck Drivers, Helpers, & Warehouse Workers Union (Independent) Pension
    Plan v. CPC Logistics, Inc.,
    698 F.3d 346 (7th Cir. 2012) ..........................................................9, 11

Concrete Pipe & Prods. of Calif., Inc. v. Construction Laborers Pension Trust,
    508 U.S. 608 (1993)........................................................................11

Great-West Life & Annuity Ins. Co. v. Knudson,
    534 U.S. 204 (2002)....................................................................1, 2, 10

Huber v. Casablanca Indus., Inc.
    916 F.2d 85 (3d Cir.), cert. denied, 506 U.S. 1088 (1993) ........................17

Keith Fulton & Sons, Inc. v. New Eng. Teamsters & Trucking Indus. Pension Plan, Inc.,
    762 F.2d 1137 (1st Cir. 1985).............................................................10

Laborers Health & Welfare Trust Fund for N. Calif. v. Advanced Lightweight Concrete
    Co.,
    484 U.S. 539 (1988)........................................................................14

Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.,
    513 U.S. 414 (1995)........................................................................17

Nestle Holdings, Inc. v. Central States, S.E. & S.W. Areas Pension Plan,
    342 F.3d 801 (7th Cir. 2003) ...........................................................2, 10

Silvernail v. Ameritech Pension Plan,
    439 F.3d 355 (7th Cir. 2006) ...........................................................1, 10

Textile Workers Pension Fund v. Standard Dye & Finishing Co.,
    725 F.2d 843 (2d Cir.), cert. denied sub nom. Sibley, Lindsay & Curr Co. v. Bakery,
    Confectionery & Tobacco Workers Int'l Union, 467 U.S. 1259 (1984) ................10

Whitman v. American Trucking Ass'ns, Inc.,
    531 U.S. 457 (2001)........................................................................11

ii

## STATUTES

26 U.S.C. §432...............................................................................................................12

26 U.S.C. §432(a)(9)(B)...............................................................................................17

26 U.S.C. §432(e)(7)(B)...............................................................................................13

26 U.S.C. §432(e)(9)(B).........................................................................................15, 16

29 U.S.C. §2.....................................................................................................................9

29 U.S.C. §186.................................................................................................................3

29 U.S.C. §1001...............................................................................................................9

29 U.S.C. §1085.............................................................................................................12

29 U.S.C. §1085(e)(9)(B).............................................................................................15

29 U.S.C. §1301(a)(3)......................................................................................................3

29 U.S.C. §1322...............................................................................................................9

29 U.S.C. §1381...............................................................................................................9

29 U.S.C. §1391.............................................................................................................16

29 U.S.C. §1391.......................................................................................................16, 17

29 U.S.C. §1392.........................................................................................................2, 16

29 U.S.C. §1392(a)...........................................................................................2, 14, 15, 16

29 U.S.C. §1393(a)(1)....................................................................................................11

29 U.S.C. §1399................................................................................................2, 12, 15, 16

29 U.S.C. §1399(c)........................................................................................................17

29 U.S.C. §1399(c)(1)(C)..............................................................................................12

29 U.S.C. §1399(c)(1)(C)(i).............................................................................................2

29 U.S.C. §4021...............................................................................................................9

**PRELIMINARY STATEMENT**

In this matter, defendant's pension plan ("Fund") has concocted a theory that, despite the lack of statutory and other authority, a surcharge exceeding $1,000,000.00 over a twenty-year payout period may be superimposed by the Fund on Plaintiff's employer's liability for withdrawal payments. This attempt to tack on such an unauthorized charge conspicuously disregards the express comprehensive statutory scheme established by Employee Retirement Income Security Act ("ERISA"), and appears to spring more from a design to extract more money from an employer for daring to withdraw from the plan in order to remedy the plan's fiscal condition. Defendant's theory has been expressly rejected by the Third Circuit Court of Appeals in a Precedential Decision in the case of Bd. of Trs. v. C&S Wholesale Grocers, Inc., 2015 U.S. App. LEXIS 16449 (3d Cir. Sept. 16, 2015).

The issue in this arbitration turns on a fundamental and threshold legal inquiry--the specific language used by Congress to prescribe the statutory formula for calculating the withdrawal liability payments owed by a withdrawing employer. The withdrawal liability is established by the specific language established by ERISA when enacted by Congress, and the specific language used in subsequent amendments. The Fund's calculation resulting in the superimposing of the surcharges and the arbitrator's findings, are a result of reading something into the law that does not exist and should be trumped by the text of the pertinent statutory provisions themselves.

In this context, the United States Supreme Court has repeatedly explained that ERISA is a "comprehensive and reticulated statute, the product of a decade of congressional study . . . ." Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 209 (2002). **Courts thus must interpret ERISA strictly according to its plain language.** See Silvernail v. Ameritech Pension

1

Plan, 439 F.3d 355, 358 (7th Cir. 2006); Nestle Holdings, Inc. v. Central States, S.E. & S.W. Areas Pension Plan, 342 F.3d 801, 804-05 (7th Cir. 2003).  Vague and broadly stated notions of the statute's "basic purposes are . . . inadequate to overcome the words of its text" regarding the specific issue under review.  Great-West Life, 534 U.S. at 220.

The calculation of annual withdrawal liability payments for a withdrawing employer is, by statute, the product of two variables:  the number of "contribution base units"; and the "contribution rate."  ERISA §4219, 29 U.S.C. §1399.  "Contribution base units" form the basis on which an employer contributes to a plan, e.g., hours, days or weeks worked.  The "contribution rate" implicates contributions and is thus the only variable with monetary implications.  Congress, however, chose to define the "contribution rate" not by reference to generic monetary inputs or contributions in fact made by the employer during the relevant period, but by reference to the "rate at which the employer had an obligation to contribute" under ERISA §4219(c)(1)(C)(i), 29 U.S.C. §1399(c)(1)(C)(i) --and, therefore, by reference to those and only those contributions that the employer had "an obligation to contribute" or make.  ERISA §4212, 29 U.S.C. §1392.

Congress expressly defined the "obligation to contribute" by reference not to ERISA, the pension law that is the source of the surcharge, but to "collective bargaining . . . agreements" and "dut[ies] under applicable labor-management relations law."  ERISA §4212(a), 29 U.S.C. §1392(a).  Because the surcharge imposed by the Fund arises neither from any collective bargaining agreement to which Plaintiff employer is or was a party nor from labor-management relations law, the surcharge imposed by the Fund here is not and, consistent with the statutory text, cannot become a component of the annual withdrawal liability payments due from a withdrawing employer.  To hold otherwise is to ignore the plain language of the very text of the statute being construed.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

American B. D. Company ("ABD"), formally known as American Beverage Distribution Company, is a family owned and operated wine and spirits company established in 1934 and headquartered in Glen Rock, New Jersey. The company operates distributorships in New Jersey and serves local restaurants, retailers, and wine shops there.

For over fifty years, ABD has been a party to many collective bargaining agreements with Local Union No. 863 of the International Brotherhood of Teamsters ("Local 863"). See Exhibit 1 attached to the Certification of Robert E. Levy, Esq. (hereafter "Levy Cert."). ABD employs approximately seventy members of Local 863.

Under a series of collective bargaining agreements with Local 863, ABD has been one of many employers to contribute to a defined benefit, multi-employer pension plan formed and maintained under ERISA, 29 U.S.C. §1301(a)(3), and designated as Local 863, International Brotherhood of Teamsters Pension Plan (again, the "Fund"). See Exhibit 2 attached to the Levy Cert. This defined benefit plan is one in which the individual employee's benefits are fixed, but are not based only on the amount contributed by or for the employee/local union member. Although the plan is jointly trusteed and administered under the requirements of the Labor Management Relations Act, 29 U.S.C. §186, the Fund is largely controlled by the union's management and trusted advisors when it comes to the important responsibilities associated with the Fund's obligations.

ABD has contributed to the Fund in its current or prior form for decades. During all those years, it dutifully and faithfully paid every required contribution negotiated in the pertinent

collection bargaining agreements.   Annual payments by ABD to the Fund had grown to approximately $470,000.00 a year by 2011. See Exhibit 15 attached to the Levy Cert. Over the years, ABD received periodic reports on the financial condition of the Fund.  See Exhibits 4, 5, 6, 7, & 9 attached to the Levy's Cert.

More particularly, pursuant to 2006 statutory amendments that introduced funding statutes classification and imposed notice requirements, ABD - along with other employers in the plan - received in September 2008 its first notice that the Fund was in the red zone or "critical status" for the fiscal year beginning September 1, 2008. See Exhibit 4 attached to the Levy Cert. Because of the Fund's financial condition, ABD was shocked when it received notice in 2008 that it was required to pay minimum funding deficiencies totaling approximately $5 million. These deficiencies were masked by the Fund's unsuccessful requests for funding waivers that delayed ABD's notice and knowledge of the Fund's financial deterioration until significant amounts of interest had accrued on the deficiencies, which only aggravated an already serious problem.  Worse yet, these additional costs were imposed (and not negotiated) on ABD just as the nation was sinking into the "Great Recession."

Concerned about the Fund's future, ABD then requested from the Fund in 2010 an estimate of the company's withdrawal liability. See Exhibit 8 attached to the Levy Cert.  ABD then received the Fund's withdrawal liability report in February 2011. See Exhibit 10 attached to the Levy Cert.

Commencing also in early 2011, ABD and Local 863 began negotiations on a successor collective bargaining agreement.  At that time, ABD learned that its withdrawal liability had grown from $6 million in 2006 to $15 million for the Fund year ending August 31, 2010. See Exhibit 12 attached to the Levy Cert.  After months of face-to-face negotiations and meetings with the Fund's actuaries, see Exhibit 11 attached to the Levy Cert, ABD provided notice of its

intention to withdraw from the Fund. See Exhibit 13 attached to the Levy Cert. By letter dated

August 26, 2011, ABD's counsel confirmed that:

> American B.D. has informed the union that it is implementing its final offer to include withdrawing from the Pension Plan, effective immediately. I am sure you understand that this means that no further contributions will be made to the plan on behalf of employees.
>
> Our client is prepared to immediately contribute $140,649 as the first of 20 quarterly installments as determined by Segal [the Fund actuary] as per your letter of February 23, 2011. Please advise me to whom this should be addressed and we will arrange that this payment be sent to such person forthwith. Future quarterly payments will be made on December 1st, March 1st, June 1st, and September 1st until paid in full.
>
> As per today's letter, our client is prepared to pay the minimum funding deficiency of $5,898,317.60 as of August 31, 2011 (as calculated in my Memo to you of July 12, 2011) on or before August 31st. Please also advise as to whom this should be sent.
>
> We will immediately file Form 5530, and our client will pay the excise tax to the IRS as required by law.

[Levy Cert, at Exhibit 14, at 1 & 2.]

ABD's union employees also received notice of these developments. See Exhibit 15 attached to

the Levy Cert.

On August 30, 2011, ABD transmitted its first quarterly payment of $140,649.00 to the

Fund. It also paid the minimum funding deficiency of $5,898,317.60. See Levy Cert., at

Exhibits 19, at 2, and Exhibit 14, at 2. And, on September 8, 2011, ABD paid to the Internal

Revenue Service the required excise tax. See Exhibit 19, at 2, attached to the Levy Cert.

Notwithstanding ABD's clear statement at the August 25 meeting (Levy Cert., Exhibit

13), which was confirmed in counsel's August 26th letter (Levy Cert., Exhibit 14), the Fund

refused to negotiate and cash the proffered withdrawal liability payment. Although the Fund

Trustees provided no explanation why the payment was not accepted and negotiated, ABD surmised that the Fund questioned whether the company had properly withdrawn.

By letter dated October 10, 2011, ABD's counsel again stated "[w]e previously notified you of our client's withdrawal from the Local 863 Pension Plan . . . as of August 25, 2011." See Levy Cert., at Exhibit 16, at 1. In the same letter, ABD further asserted that the Segal Company's calculation of ABD's withdrawal liability was flawed because, *inter alia*, it wrongly added a ten percent surcharge to the withdrawal payments due. See Levy Cert., Exhibit 16 at 1 to 3.

By letter of October 21, 2011, counsel for the Fund and Local 863 advised ABD of the Fund's position: the ten percent surcharge could be included in determining the company's annual payment for purposes of the withdrawal liability schedule. See Exhibit 17 attached to the Levy Cert.

In reply, ABD advised the union and the Fund by letter dated November 11, 2011, that it would proceed to submit the surcharge dispute to the New Jersey State Board of Mediation for arbitration. See Exhibit 18 attached to the Levy Cert. ABD stated in the letter reply that it had received a Fund invoice for the regular September payment by letter post-marked October 27, 2011, and that the invoice ignored the company's prior withdrawal notice. Further, ABD asked why its check for the first quarterly payment of withdrawal liability in the amount of $140,649.00 had not been cashed. See Levy Cert., Exhibit 18 at 2. The Fund never responded to that question.

ABD submitted the matter to arbitration by letter dated December 2, 2011. See Levy Cert, Exhibit 19. The State Board of Mediation confirmed receipt, assigned a case number to the matter, and named the arbitrator. See Levy Cert, Exhibit 20.

A disputed issue originally submitted for arbitration relating to the date of withdrawal by ABD from the Fund has been resolved.  Local 863 and ABD entered into a written stipulation that the company in fact withdrew from the Fund on August 25, 2011. See Levy Cert at Exhibits 21 (drivers and workhousemen) and 22 (helpers).  The new collective bargaining agreement ratified by the union confirms the stipulated withdrawal date.  See Levy Cert, Exhibit 23, at ¶21; Exhibit 24, at ¶17A.

Arbitration was held on April 5, 2013 before Arbitrator Nicholas J. Taldone, Esq. On May 16, 2013, the Arbitrator issued an Opinion and Award finding that the Pension Fund upheld "the Fund's view that the surcharge was properly included in the calculation of the annual payment due from the withdrawing employer". On June 3, 2013 the Arbitrator issued a Second Corrected Opinion and Award.  See Levy Cert, Exhibits 25, 26, 27.

On June 14, 2013 ABD filed a Complaint seeking to vacate the Opinion and Award.  On September 3, 2013 the Fund filed and Answer and Counterclaim, seeking to confirm the Opinion and Award.

Motions for Summary Judgment and Cross Motions for Summary Judgment were filed December 16, 2013.  The motions were terminated by the Court pending the Third Circuit Court of Appeals determination in Bd. of Trs. v. C&S Wholesale Grocers, Inc., supra.

## ARGUMENT

### BECAUSE THE PLAN HAS NO LEGITIMATE FACTUAL OR LEGAL FOUNDATION TO SUPPORT ADDITION OF A SURCHARGE TO AN EMPLOYER'S WITHDRAWAL LIABILITY, THE ARBITRATOR'S DECISION AFFIRMING THE PLAN ACTUARY'S WITHDRAWAL LIABILITY CALCULATIONS AND SCHEDULE OF PAYMENTS WHICH ARE IMPROPERLY INFLATED AND PLAINLY UNREASONABLE, SHOULD BE REJECTED

In response to a request made a year earlier, the Fund provided in late February 2011 calculations of ABD's estimated withdrawal liability. See Exhibit 8 attached to the Levy Cert. The Fund's actuary followed the mandated statutory calculation methodology in part by multiplying the highest consecutive three-year average time units by ABD (139,360 hours) by the highest contribution rate ($3.67 per hour) and arriving at an annual figure of $511,451.20. Next, however, the actuary added to the annual payment a ten percent surcharge of $51,145.12, thus increasing ABD's annual payment to $562,596.00. In other words, during the twenty-year (or eighty-quarter) payment period, ABD would pay an extra $12,786.28 per quarter, for a total of $1,022,902.40 in improper surcharges over the full payment period. See Levy Cert., Exhibit 10, at 10.

When it learned of the Fund's inflating methodology, ABD objected that the resultant withdrawal liability payment calculation was inconsistent with ERISA. See Exhibit 16 attached to the Levy Cert. The union and Fund's counsel replied that the addition of the surcharge was "proper, appropriate, and lawful to use for purposes of determining the annual payment for purposes of the withdrawal liability schedule."   See Levy Cert, Exhibit 17, at 1.   The Arbitrator's ruling affirms.

The Fund and the Arbitrator are misguided. No amount of reliance upon the rebuttable presumption of correctness that may serve as a gloss for the Fund actuary's calculations can

supplant the utter lack of authority on which the levy of a surcharge to an employer's annual withdrawal payment is based. Indeed, the Fund's and Arbitrator's findings which permit the appendage of the surcharge to withdrawal liability contradicts the express ERISA statutory provisions and substitutes their will for that of Congress in determining what is and what is not withdrawal liability from a multi-employer pension plan. *See* Bd. of Trs. v. C&S Wholesale Grocers, Inc., 2015 U.S. App. LEXIS 16449 (3d Cir. Sept. 16, 2015),

(a)   **The Comprehensive and Reticulated Provisions of ERISA, as Amended, are Contrary to the Arbitrator's Findings**

In 1974, Congress enacted the original ERISA statute, 29 U.S.C. §§1001 to 1322, also ERISA §§2 to 4021, to provide comprehensive federal regulation of employee benefits, including both pension and welfare plans such as health insurance. Six years later, Congress amended ERISA by passing the Multi-Employer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §§1381 to 1461, ERISA §§ 4201 to 4402, designed to tighten regulations of multi-employer plans and impose more stringent minimum funding requirements, especially on plans in financial difficulty.

With the intention of preventing withdrawals that would shift the burden of funding a pension plan to remaining employers and by doing so precipitate even more withdrawals, *see* Chicago Truck Drivers, Helpers, & Warehouse Workers Union (Independent) Pension Plan v. CPC Logistics, Inc., 698 F.3d 346, 347 (7th Cir. 2012), MPPAA directs plan trustees to collect exit fees or "withdrawal liability" from a departing employer equal to its *pro rata* share of the plan's shortfall or "unfunded vested benefits," *i.e.*, the difference between the present value of the plan's assets and the present value of its future obligations to covered employees. Congress further amended ERISA in 2006 with the provisions of the Pension Protection Act, P.L. 109-280

(Aug 17, 2006), that tweaked the withdrawal liability rules and required notice to a withdrawing employer of its proportional share of unfunded vested benefits to be paid according to an installment schedule. **The method of computing liability is carefully and fully set forth in the statute and forces a plan neither to assess the highest possible liability nor to punish a withdrawing employer or deter others from withdrawing.**

In this context, the United States Supreme Court has repeatedly explained that ERISA is a "comprehensive and reticulated statute, the product of a decade of congressional study . . . ." Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 209 (2002). Courts thus must interpret ERISA strictly according to its plain language. See Silvernail v. Ameritech Pension Plan, 439 F.3d 355, 358 (7th Cir. 2006); Nestle Holdings, Inc. v. Central States, S.E. & S.W. Areas Pension Plan, 342 F.3d 801, 804-05 (7th Cir. 2003). Vague and broadly stated notions of the statute's "basic purposes are . . . inadequate to overcome the words of its text" regarding the specific issue under review. Great-West Life, 534 U.S. at 220.

No plan has "unbridled discretion in fixing the amount of [withdrawal] liability." Keith Fulton & Sons, Inc. v. New Eng. Teamsters & Trucking Indus. Pension Plan, Inc., 762 F.2d 1137, 1141 (1st Cir. 1985). In the statutory scheme, plan trustees do not play an adjudicative role, but an administrative one by acting in accord with statutorily-mandated standards and procedures. Through its actuary, the plan is required to calculate a departing employer's debt obligations according to the **"detailed and explicit statutory guides."** (emphasis added) See Textile Workers Pension Fund v. Standard Dye & Finishing Co., 725 F.2d 843, 855 (2d Cir.), cert. denied sub nom. Sibley, Lindsay & Curr Co. v. Bakery, Confectionery & Tobacco Workers Int'l Union, 467 U.S. 1259 (1984).

Trustees cannot substitute their judgment for that of Congress and create a withdrawal rule based on hoped for statutory text. And neither can an arbitrator. Cf. Astrue v. Capato, 132 S.

Ct. 2021, 2034 (2012) (describing how a long-standing interpretation found in written regulations of the Social Security Administration may be entitled to deference, but not informal or unauthorized opinions that the statute's text scarcely supports). Courts interpreting federal statutory provisions are ever mindful that Congress "does not, one might say, hide elephants in mouseholes." See Whitman v. American Trucking Ass'ns, Inc., 531 U.S. 457, 468-69, & 472 (2001) (refusing to imply from certain sections of the Clean Air Act authorization to operate in areas addressed elsewhere in the statute, and commenting on the implausibility of Congress leaving a significant issue unaddressed and delegating its resolution to an agency or others without definitive guidance or clarity).

### (b)    The Fund's Actuary Did Not Perform Its Duties Reasonably Or In Conformity With The Statutory Mandate

ERISA §4213(a)(1), 29 U.S.C. §1393(a)(1), requires a fund actuary to exercise its independent and sound judgment and give its "best estimate" of an employer's withdrawal liability. See Concrete Pipe & Prods. of Calif., Inc. v. Construction Laborers Pension Trust, 508 U.S. 608, 634-36 (1993).

Here, the Fund actuary did not. Rather than assume the posture of a neutral and disinterested professional as it should have, see Chicago Truck Drivers, 698 Fed.3d, at 355, Segal Company, as the plan actuary, chose a calculation of the annual amount of withdrawal liability payments for ABD of $511,451.00 and then simply added ten percent to that amount to reflect a "[s]urcharge as required by PPA '06," resulting in a total annual amount of $562,596, or $140,649 a quarter. See Segal Company Report at ¶¶ 4 & 5., attached as Exhibit 10 to the Levy Cert.

In their analysis and calculations, however, the Fund and its actuary materially erred. The Fund documents and ERISA §4219, 29 U.S.C. §1399, each provides that the employer's annual withdrawal liability shall be calculated as the product of:

> (I)    the average annual number of contribution base units for the period of 3 consecutive plan years, during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is highest, and

> (II)    the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs.

[ERISA §4219(c)(1)(C), 29 U.S.C. §1399(c)(1)(C).]

See also Plan Document at §12.07, p. 43, attached as Exhibit 3 to the Levy Cert., and Collective Bargaining Agreement at §21, pp. 14 & 15, attached as Exhibit 1 to the Levy Cert.

Withdrawal liability amounts are based on contributions and contribution rates, not surcharges. Surcharges are added to negotiated contributions to multi-employer plans in the "red zone" or "critical status" under the Internal Revenue Code, 26 U.S.C. §432 (see parallel provision in ERISA §305, 29 U.S.C. §1085), pending possible renegotiation of employer contributions. As subparagraph (e)(7)(A) of that section states,

> [e]ach employer otherwise obligated to make a contribution for the initial critical year shall be obligated to pay to the plan for such year a *surcharge* equal to 5 percent of the contribution otherwise required under the applicable collective bargaining agreement (or other agreement pursuant to which the employer contributes). For each succeeding plan year in which the plan is in critical status for a consecutive period of years beginning with the initial critical year, the *surcharge* shall be 10 percent of the contribution otherwise so required.

[Emphasis added.]

As this provision and others make clear, the ten percent add-on is a "surcharge"; it is distinct from a "contribution" and not referred to as a contribution. The surcharge is described as a percentage of the contribution, but neither Congress nor the plan document deems it a "contribution." In fact, the operative collective bargaining agreement between ABD and Local 863 sets the pension contribution rate for employees at $3.67 an hour (or $146.80 a week for a forty-hour week), not 110% of the $3.67 hourly rate. See Levy Cert., Exhibit 1, at §21, pp. 14 & 15. ABD paid the assessed surcharge under section 432(e)(7)(A) quoted above because the Fund was in "critical status." By the terms of the statute, however, that payment was a surcharge, not a "contribution" on which withdrawal liability payments are calculated. Had Congress intended that the 10% [surcharge] be included in the calculation of the amounts of the periodic withdrawal liability payments, then it could have used the term 'contribution,' or the term 'additional contribution,' or the term 'contribution surcharge'. The heading of [section] 432(e)(7)(A) is 'Imposition of surcharge,'  not 'Increase in Contribution Rate' or 'Increase on Contribution amount.'  Yet, Congress didn't so describe the surcharge.

Subparagraph (B) of the Code, 26 U.S.C. §432(e)(7)(B), does speak of enforcing the addition of a surcharge:

> The surcharges under subparagraph (A) [see above quotation] shall be due and payable on the same schedule as the contributions on which the surcharges are based. Any failure to make a surcharge payment shall be treated as a delinquent contribution under Section 515 of the Employee Retirement Security Act of 1974 and shall be enforceable as such.

But this provision only bolsters the framework established by Congress:  surcharges must be paid on the same schedule as contributions, and they are to be treated as contributions when delinquent, but not otherwise.  Congress could have required surcharges to be treated as

contributions for all purposes, but did not. In all instances other than those specified by the statute, surcharges are not treated as contributions. Determining the payment schedule for withdrawal liability is such a situation where there is no statutory authority to treat a surcharge as a contribution, much less to equate a surcharge with a contribution.

The ten percent surcharge added by the Fund to ABD's withdrawal payments due to the former's "critical status" does not arise from any "obligation to contribute" defined by the statute. Under ERISA § 4212(a), 29 U.S.C. §1392(a),

> the term "obligation to contribute" means an obligation to contribute arising --
>
> (1)  under one or more collective bargaining (or related) agreements, or
> (2)  as a result of a duty under applicable labor-management relations law,
>
> but does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions.

Reviewing the definition of "obligation to contribute" found in clause (2) of this provision, the ten percent surcharge paid by ABD for the past several years due to the Fund's "critical status" arose not under any labor-management relations law, but exclusively under pension law. See Laborers Health & Welfare Trust Fund for N. Calif. v. Advanced Lightweight Concrete Co., 484 U.S. 539, 545-46 & n.11 (1988) (holding that the term "applicable labor-management relations law" refers to the National Labor Relations Act). With regard to clause (1) of the above provision, no collective bargaining agreement between ABD and Local 863 refers to a surcharge on contribution rates or withdrawal liability payments. See applicable collective bargaining agreement, attached as Exhibit 1 to the Levy Cert. To reiterate, the operative collective bargaining agreement specifies a contribution rate of $3.67 an hour based on

a forty-hour work week, not 110% of that hourly rate. Because the surcharge the Fund seeks to superimpose onto the payment schedule does not fall within the ambit of an "obligation to contribute," it cannot be a component of the withdrawal liability due from American B.D. as an employer.

The provisions of the plan document support this conclusion, as well. See Levy Cert., Exhibit 3 §§ 2.05 & 2.18, at pp. 3 & 4. That is, "employer payments" are those made under a collective bargaining agreement or the 1956 Agreement and Declaration of Trust (as amended), not those made as a "surcharge" or other amount mandated by statute. There is no written agreement between ABD and Local 863 or the Fund referencing the payment of, let alone obligating ABD to pay, surcharges to the Fund. Thus, again, a surcharge just does not constitute an "obligation to contribute" under ERISA §4212(a).

To parry this argument, ABD anticipates that the Fund will contend the Internal Revenue Code 26 U.S.C. §432(e)(9)(B)—see parallel provision in ERISA §305(e)(9)(B), 29 U.S.C. §1085(e)(9)(B)—commands omission of a surcharge in determining the employer's allocation fraction or proportional share of unfunded vested benefits owed by the Fund, but does not expressly extend this exclusion to other statutory provisions—including ERISA §4219, 29 U.S.C. §1399, that discusses withdrawal liability and payments. The Fund then apparently reasons, by negative implication that it is free to add a surcharge onto ABD's withdrawal liability payment schedule as it may choose. See October 21, 2011 letter from Fund's counsel, attached as Exhibit 17 to the Levy Cert.

This contention is unsupported by applicable law. The summary explanation found in the Preliminary Statement above is instructive. The withdrawal liability payment schedule for a withdrawing employer is the product of two variables which language is clear and unambiguous: the number of hours worked (or "contribution base units"); and the "contribution rate." ERISA

§4219, 29 U.S.C. §1399. **Congress defined the "contribution rate" not by reference to actual contributions made by the employer during the relevant period, but by reference to the "rate at which the employer had an obligation to contribute" -- i.e., by reference to those and only those contributions that the employer had "an obligation to contribute." ERISA §4212, 29 U.S.C. §1392. Congress then expressly defined the "obligation to contribute" by reference not to ERISA, but to "collective bargaining . . . agreements" and "dut[ies] under applicable labor-management relations law." ERISA §4212(a), 29 U.S.C. §1392(a).** In as much as the Fund's surcharge arises neither from any collective bargaining agreement to which ABD is or was a party nor from any labor-management relations law, the surcharge imposed by the Fund is not a proper component of the annual withdrawal liability payments due from ABD. Bd. of Trs. v. C&S Wholesale Grocers, Inc., 2015 U.S. App. LEXIS 16449 (3d Cir. Sept. 16, 2015).

Not only is this conclusion mandated by the specific statutory language and terms, including the "obligation to contribute," but the conclusion is also consistent with the other provisions of the pension law. For example, the pertinent portion of the Internal Revenue Code, 26 U.S.C. §432(e)(9)(B), expressly mandating the disregard of the surcharge, reads as follows:

> (B) SURCHARGES — Any surcharges under paragraph (7) shall be disregarded in determining the allocation of unfunded vested benefits to an employer under [ERISA] Section 4211 [29 U.S.C. §1391] of such Act. . . .

ERISA §4211, 29 U.S.C. §1391, in turn, is entitled "Methods for Computing Withdrawal Liability" of a withdrawing employer and specifically addresses both the amount of unfunded vested benefits allocable to the withdrawal employer and thereafter the factors to be used in

determining the withdrawal liability amount or proportional share of such unfunded vested benefits owed by the employer.  ERISA §4211, 29 U.S.C. §1391(a) to (d).

Hence, contrary to the Fund's anticipated claim that the surcharge is to be excluded only from the allocation fraction itself, the exclusion extends to the process of computing the components of that fraction: the basic allocation mechanism involves use of the fraction derived from using the employer's contributions over a certain time period as the numerator over a denominator composed of all employers' contributions over the same period.  See generally Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co., 513 U.S. 414, 416 et seq. (1995).  It is anomalous to reason —as the Fund apparently does—that the surcharge must be excluded from the component figures of the allocation fraction, but is effectively reintroduced into the calculation of the employer's withdrawal liability at the backend of the process.  Lost in the Fund's mental gymnastics is the understanding that withdrawal liability payments from an employer are meant to substitute for the lost stream of contributions that the employer had contractually agreed to pay.  See Huber v. Casablanca Indus., Inc. 916 F.2d 85, 94-95, & 96 (3d Cir.), cert. denied, 506 U.S. 1088 (1993).

ERISA §4219(c), 29 U.S.C. §1399(c), delineates the amortization schedule an employer must follow in paying the unfunded vested benefit amount allocated to that employer under ERISA §4211, 29 U.S.C. §1391.  In this context, the exclusion of the surcharge from the payment schedule calculations under ERISA §4219(c) is entirely consistent with the exclusionary language found in Internal Revenue Code, 26 U.S.C. §432(a)(9)(B), that refers to ERISA §4211, 29 U.S.C. §1391.

## CONCLUSION

Upon the foregoing principles and arguments a Summary Judgment should be entered on behalf of Plaintiff.

SCARINCI & HOLLENBECK, LLC

By: _s/ Robert E. Levy, Esq._　　　　　Dated: October 7, 2015
　　　Robert E. Levy Esq.
　　　Attorney for Plaintiff

4847-3712-1047, v. 2