SCARINCI & HOLLENBECK, LLC
1100 VALLEY BROOK AVENUE
P.O. BOX 790
LYNDHURST, NEW JERSEY 07071-0790
Telephone: (201) 896-4100
Attorneys for Plaintiffs, American B.D. Company
Our File No.: 12073.2000

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMERICAN B.D. COMPANY, | Civil Action No. 2:13-cv-03699(KSH)(CLW) |
| Plaintiff, | |
| v. | **CERTIFICATION OF** |
| | **ROBERT E. LEVY, ESQ.** |
| LOCAL 863 INTERNATIONAL BROTHERHOOD OF TEAMSTERS PENSION PLAN, | **ELECTRONICALLY FILED** |
| Defendants. | |

1.  I am an attorney-at-law of the State of New Jersey and a Partner with the firm of Scarinci & Hollenbeck, LLC, attorneys for Plaintiff, American B.D. Company, and as such, I am fully familiar with the facts set forth herein. I make this Certification in support of the Defendant's motion for Summary Judgment.

2.  Attached hereto as exhibits are true copies of the following documents:

| Exhibit | Description |
|---|---|
| 1. | Collective Bargaining Agreement between Local 863 IBT and American B.D. Company—2006-2011 (4/24/06) |
| 2. | Notice to all contributing employers re: Local Union No. 863, IBT, Pension Plan from Kenneth I. Nowak, Esq., re: Internal Revenue denial of Plan's application for a waiver of the minimum funding deficiencies for the Plan Years ending August 31, 2003, 2005 and 2006. (3/10/08) |
| 3. | Local Union No. 863 I.B. of T. Pension Plan Restated as of September 1, 2008. (9/1/08) |

4848-8804-2281, v. 1

| 4. | Notice of Critical Status of Local Union No. 863 I.B. of T. Pension Plan for plan starting September 1, 2008. (9/2/08) |
|---|---|
| 5. | Notice to All Contributing Employers from Plan Trustees re: obligation to pay a 5% surcharge on all contributions to plans in "critical status." (9/30/08) |
| 6. | Notice to All Contributing Employers re: Local Union No. 863, IBT re: critical status with July 31, 2009 reminder of increased surcharge to 10%. (7/31/09) |
| 7. | Letter to all participants, beneficiaries, contributing employers and Local Union 863 IBT from Local No. 863 Pension Fund Board of Trustees re: required information with accompanying annual funding notice. (12/09) |
| 8. | Letter to Kenneth I. Nowak, counsel to Fund, from Aaron C. Schlesinger, Esq., Pecker & Abramson, attys. for American B.D. Company, requesting estimate of withdrawal cost from pension fund. (3/1/10) |
| 9. | Notice of Critical Status of Local Union No. 863-I.B. of T. Pension Plan, with annual funding notice attached. (12/22/10) |
| 10. | Local Union No. 863 I.B. Pension Fund Report on employer's estimated withdrawal liability in year ending 8/31/11. (2/23/11) |
| 11. | Letter request for more information to Kenneth I. Nowak, Esq., from Gary S. Young, Esq., re: American BD and Local 863 Pension Fund; Teamsters Local 863. (3/23/11) |
| 12. | E-mail to Gary S. Young, Esq., from Kenneth I. Nowak, Esq., re: MBSBA Actuary Signature re: additional information requested and estimated $15M withdrawal liability. (4/12/11) |
| 13. | American B.D. Company and Local 863 Negotiation Meeting Notes. (8/25/11) |
| 14. | Letter to Kenneth I. Nowak, Esq., from Gary S. Young, Esq., re: American memorializing impasse in negotiations and notice of American B.D.'s withdrawal from Plan. (8/26/11) |
| 15. | Notice to Local 863 Bargaining Committee (American B.D.) and Bargaining Unit Members from American B.D. re: impasse and notice |

| | |
|---|---|
| | of withdrawal from Plan  (8/26/11) |
| 16. | Letter to Kenneth I. Nowak, Esq., from Gary S. Young, Esq., re: American BD's objection to withdrawal calculations of Local 863 Pension Fund. (10/10/11) |
| 17. | Letter response to Gary S. Young, Esq., from Kenneth I. Nowak, Esq., with Plan's response to objections to inclusion of surcharge in calculating annual withdrawal payments. (10/21/11) |
| 18. | Letter to Kenneth I. Nowak, Esq., from Gary S. Young, Esq., requesting explanation of Plan's failure to deposit September installment payment. (11/11/11) |
| 19. | Letter Demand For Arbitration on behalf of American B.D. to New Jersey State Board of Mediation, without attached copies of<br><br>(A)  Local 863 collection bargaining agreement 2006-2011 (document # 1 above),<br><br>(B)  Article XII of Pension Plan Restated as of September 1, 2008 (document # 3 above),<br><br>(C)  transcript of August 25, 2011 negotiations between representatives of Local 863 IBT and American B.D. (document # 13 above),<br><br>(D)  letter of August 26, 2011, memorializing impasse and withdrawal from Plan (document #14 above),<br><br>(E)  letter of October 10, 2011 objecting to withdrawal calculations (document # 16 above),<br><br>(F)  October 21, 2011 letter of response of union's and Plan's counsel to objections to inclusion of surcharge (document #17 above),<br><br>(G)  letter inquiry of November 11, 2011, regarding Plan's failure to deposit September 2011 installment payment (document #18 above), and<br><br>(H)  February 23, 2011 transmittal letter with Segal Company's report on employer's estimated withdrawal liability for Plan year ended August 31, 2011 (document #10 above).   (12/2/11) |

| 20. | Letter from N.J. State Board of Mediation assigning arbitration case number and arbitrator. (01/25/12) |
|-----|--------------------------------------------------------------------------------------------------------|
| 21. | Memorandum of agreement between American B.D. Company and Local Union No. 863 IBT covering the company's drivers and warehousemen. (11/19/12) |
| 22. | Memorandum of agreement between American B.D. Company and Local Union No. 863 IBT covering the company's helpers (11/19/12) |
| 23. | Collective bargaining agreement between American B.D. Company and Local 863 IBT, effective April 25, 2011, to April 24, 2014, regarding drivers and warehousemen and ratified on November 27, 2012 (11/27/12) |
| 24. | Collective bargaining agreement between American B.D. Company and Local 863 IBT, effective April 25, 2011, to April 24, 2014, regarding helpers and ratified on November 27, 2012 (11/27/12) |

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

SCARINCI & HOLLENBECK, LLC

By:    _s/ Robert E. Levy, Esq._          Dated: October 7, 2015
       Robert E. Levy Esq.
       Attorney for Plaintiff

4847-4564-0983, v. 1

4848-8804-2281, v. 1

1

*Finale*

## LOCAL 863
## UNION CONTRACT AGREEMENT
### 2006 - 2011

THIS AGREEMENT, BY AND BETWEEN AMERICAN B.D. COMPANY, HEREIN REFERRED TO AS THE "COMPANY" OR "EMPLOYER", AND LOCAL UNION NO. 863, TEAMSTERS, AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, HEREIN REFERRED TO AS THE "UNION".

### WITNESSETH:

THE COMPANY HEREBY AND HEREWITH recognizes the Union as the authorized Collective Bargaining Agent for all employees who are employed as Drivers and Warehousemen in respect to wages, hours and all other terms and conditions of employment during the entire term of this agreement.

THIS AGREEMENT shall apply to all present and future employees employed as Drivers and Warehousemen by the Company during the term of this Agreement.

1. UNION SECURITY

It shall be a condition of employment that all employees of the Employer covered by this Agreement and who are members of the Union in good standing on the effective date of this Agreement, or the execution date, whichever is later, shall after four hundred eighty (480) straight time working hours following the effective date or execution date, whichever is later, of this Agreement become and remain members in good standing in the Union. It shall also be a condition of employment that all employees covered by this Agreement, and hired on or after its effective date or execution date, whichever is later, shall after four hundred eighty (480) straight time working hours following the beginning of such employment become and remain members in good standing, in the Union.

The failure of any person to become a member of the Union at the required time shall obligate the Employer, upon written notice from the Union to such effect and to the further effect that Union membership was available to such person on the same terms and conditions generally available to other members to forthwith discharge such person. Any employee who fails to meet the requirements of Article 1 should not be retained in Company's Employ, provided that the Union notifies both the Company and the employee in writing of such default, and said employee fails to remedy same within ten (10) days after receipt of said written notice.

It is agreed that there shall be four (4) Union men in the warehouse at all times. Further, it is agreed that no supervisor shall perform any work which is normally done by drivers and warehousemen covered by this agreement unless unforeseen absenteeism requires it.

In the event of any change in the law during the term of this Agreement, the Employer agrees that the Union will be entitled to receive the maximum Union Security which may be lawfully permissible.

No provisions of this Article shall apply in any state to the extent that it may be prohibited by State law. If under applicable State law additional requirements must be met before any such provision may become effective, such additional requirements shall first be met.

If any provision of this Article is invalid under the law of any State wherein this Agreement is executed, such provision shall be modified in compliance with the requirements of State law or shall be renegotiated for the purpose of adequate replacements. If such negotiations shall not result in a mutually satisfactory Agreement, the Union shall be permitted all legal or economic recourse.

2.   PICKET LINE

A.   It shall not be a violation of this Agreement and it shall not be a cause for discharge or basis of any disciplinary action (except that any damage to property or person of Company shall be cause for immediate discharge) in the event an employee refuses to enter upon any property involved in a lawful primary labor dispute, or refuses to go through or work behind any lawful Primary Picket Line, including lawful Primary Picket Line of Union's party to this Agreement and including lawful primary Picket Lines at the Employer's places of business.

B.   There shall be no strikes on the part of the Union or the Employees during the term of this Agreement. A violation of this paragraph will constitute, at Company's option, a basis for termination of this Agreement.

C.   There shall be no lockouts on the part of the Company during the term of this Agreement.

3.   HOLIDAYS

The Following switch and non-switch holidays shall be observed and paid for at the straight time daily rate of each employee's current shift classification, even though no work is performed on said holiday.

\* Non-switch Holidays
\*\*Switch Holidays – Switch Holidays to remain Switch Days

| | | | |
|---|---|---|---|
| \* | New Year's Day | \*\* | Primary Election |
| \* | Lincoln's Birthday | \*\* | Personal Day |
| \* | President's Day | \*\* | Election Day |
| \* | Good Friday | \*\* | Veteran's Day |
| \* | Memorial Day | | |
| \* | Independence Day | | |
| \* | Labor Day | | |
| \* | Columbus Day | | |
| \* | Thanksgiving Day | | |
| \* | Day After Thanksgiving | | |
| \* | Christmas Day | | |

(The Employer shall have the right to designate the second Monday of February for the celebration of such Lincoln' Birthday).

A.   In order to be eligible for payment for Holidays not worked as hereinabove provided, a covered employee must work the scheduled working day before and the day after the Holiday unless excused by the Company, or unless the employee is prevented from working the day after the Holiday due to an act of God.

With respect to any employee whose regular work week is four (4) days, when any holiday falls on a Monday the employer shall have three (3) options as follows:

    (1)   substitute the following Tuesday for the holiday.
    (2)   if work is performed on the Tuesday, pay an additional (10) hours at the regular straight-time rate to each qualifying employee, or
    (3)   Substitute a personal day off for each qualifying employee.

Holidays that fall on a Sunday shall be observed on Monday and the three (3) option rule stated above shall apply. However, if option three (3) is exercised, the substitute day shall be a sick day.

B.   When an employee is required to work on the above-named non-switch Holiday, he shall be paid at the rate of double time, plus the day's pay.  When an employee is required to work on a switch Holiday, he shall be paid at the straight time rate, but shall receive another day off with straight time pay with 48 hours notice to Employer, except for the personal day, which will require no notice to the Employer.  There shall, however, be no accumulation of switch Holidays from one agreement year to the next, but all accumulated switch days shall be paid for at the end of each contractual year.  Switch Holidays are not to be taken as sick days and Personal day may not be taken in conjunction with another holiday unless previously approved by shift supervisor.

C.   Upon completion of work on Christmas Eve and New Year's Eve, an employee may leave work, but shall be entitled to be paid at the rate applicable to their job classification for that shift.

D.   On Christmas Eve and New Year's Eve, drivers shall have the option to return to yard by 4:00 P.M.

4.   WORK HOURS

A.   A work week for driver-warehousemen shall consist of two (2) shifts. Either one consisting of 10 hours per day, 40 hours per week, Tuesday through Friday guaranteed, or one consisting of 8 hours per day, 40 hours per week, Monday through Friday, guaranteed. The starting time for each shift will be 8 A.M. to 9 A.M.  There may be earlier starting time necessitated for long distance deliveries, warehouse pick-ups and truck loading.  In the event not enough 4x10 driver/ warehousemen accept Company's offer to work Mondays, the Company may thereupon require the least senior men to perform Monday work.

B. The choice of shift will be bid on a seniority basis for a one year period from contract date, and the 5x8 hour shift will be limited to 15 men. The 5x8 shift numbers will be determined on a yearly basis by the Employer.

C. Bid Routes to be capped at 12. Bid times to be capped at 3.

D. A work week for night warehousemen shall consist of ten (10) hours per day, forty (40) hours per week, Monday through Thursday, guaranteed. The night warehousemen's shift shall be from 9:00 P.M. to 7:30 A.M. A work week for day warehouse work shall consist of 8 hours per day, 40 hours per week Monday through Friday, guaranteed, and beginning at 8:00 A.M. A work week for mid shift warehouse work shall consist of 10 hours per day, 40 hours per week, Monday through Thursday, guaranteed and beginning at 2:00 pm.

E. There shall be a thirty (30) minute lunch period for each day for the drivers-warehousemen's shifts defined above. Such lunch period will not be paid by the company.

F. A driver may turn around after 12½ hours on his daily route.

G. Each driver and warehouseman shall be granted two designated fifteen (15) minute breaks each day.

H. Driver/Warehousemen will have the ability to bid by seniority for twelve (12) delivery bid routes and three (3) bid starting times with designated areas a minimum of one (1) time per year. The company shall have the exclusive right to select the Tuesday through Friday routes subject to bid. Any Monday routes will be assigned only by the Company. Night warehousemen will be allowed to bid by seniority for six (6) bid positions for a period of one (1) year from contract date.

5. OVERTIME

A. Overtime at the rate of time and one-half the regular driver-warehousemen rate, regardless of shift classification, shall be paid for any work performed by driver-warehousemen in excess of their daily shift hours.

B. Overtime at the rate of time and one-half the regular hourly rate shall be paid for any work performed by night warehousemen after ten (10) hours and at double time in excess of twelve (12) hours in any one work day. The Company will first offer to night warehousemen the opportunity to perform warehouse work on Sunday. If not enough night warehousemen accept the Company's offer of Sunday work, or if additional men are needed, the Company shall offer such work to other shifts based on seniority.

C. The Company may offer to warehousemen, based on seniority, the opportunity to perform work on Saturdays. In the event not enough warehousemen accept Company's offer to work overtime, Company may thereupon compel the least senior driver/warehouseman to perform Saturday work. In the event of circumstances beyond Company's control, such overtime offer may be cancelled upon 24 hours notice.

- 4 -

All bids for shutdown, Saturday, Sunday or Monday holiday work will be posted Wednesday afternoon and will be finalized by 7:30AM on Friday.

If a holiday falls Tuesday – Friday, the company will attempt to post bid within 48 hours prior to start of holiday week.

If an employee signs a bid sheet for shutdown, Saturday, Sunday, holiday work or a compelled day and fails to report on such day, the employee will be charged for an absence.

Such absence will be excused upon written proof or documentation to support the absence.

D.   If any employee performs any work on Sunday, the Employer shall pay for such work at the rate of double time and one-half the regular hourly rate of pay.

E.   Overtime performed by the 4 day X 10 hour shift class on any Monday, except a Holiday, will be paid at the rate of 1½ times their hourly pay rate. Any other overtime is one and one-half times the 40 hour rate.

F.   The Company has the right to require any employee to work at least one (1) hour overtime in warehouse if needed as long as two (2) hours verbal notice is given by Company.

G.   Yard switcher work for Saturdays will be bid by seniority.

6.   VACATIONS

A.   An employee's accrued time during first year at the time of the summer closing is as follows:

| LENGTH OF TIME ON EMPLOYER'S PAYROLL | VACATION ALLOWANCE |
|---|---|
| One (1) Year | 2 weeks |
| Five (5) Years | 3 weeks |
| Twelve (12) Years | 4 weeks |
| Twenty (20) Years | 5 weeks |

B.   Company will close for two weeks at the same time that the majority of the wholesalers close. Employees who are entitled to a vacation shall take their vacation during this period. If the Company requests the employee to work during this two-week vacation period, the employee shall be entitled to his vacation period at another time that is mutually agreed to by both Company and Employee. There shall, however, be no accumulation of vacation time from one Agreement year to the next, but all accumulated vacation time shall be paid for at the end of each contractual year at the rate of pay in effect during the contractual year the vacation time is accumulated. Further, vacation time shall not be utilized as sick days unless mutually agreed upon by both Company and Employee. The Company will post a vacation schedule. Employees may take vacation in days, mutually agreed upon by Employer and Employee. The Company will post a vacation schedule each January. All requests for vacation must be submitted by March 17 or the Friday preceding if on a weekend.

C.   An employee's vacation allowance will be based upon the length of time on the Company's payroll at the time of the summer closing.   An employee with less than one year's service shall receive a vacation allowance on a pro rate basis computed on the length of service with Company.  In the event that an employee either voluntarily resigns from the company due to gross misconduct or is discharged for gross misconduct, the employee shall receive only those vacation days that have accrued since the anniversary date of this contract.

Gross Misconduct - defined from those actions listed in Article 17(e) - use of narcotics, drinking any alcoholic beverages on the job, theft or conviction of a felony, being under the influence of narcotics, drugs or any alcoholic beverage, insubordination, assault, battery, defacing of company property, theft of company property, the failure of a driver to notify the employer of the fact that he is on the revoked list under the State Motor Vehicle laws, and the carrying by the employee of unauthorized passengers in a Company-owned vehicle.

7.   DEATH LEAVE

In the event of a death in an immediate family of any employee, the employee may have off with pay at his regular rate of pay per day, three days immediately following the day of death, provided these are regularly scheduled working days, and provided Company is notified of the death in the family so that Company can properly schedule or assign the employee's work. The employee shall furnish proof of death and proof of relationship if requested by Company.   In the event if any of the aforesaid three days are not regularly scheduled working days, then the employee shall be paid for only those of the above three days which are regularly scheduled working days. However, in the event that the three day period included only one or two regularly scheduled working days, but the funeral occurs on a regular scheduled working day thereafter, the employee shall be entitled to take off an additional working day with pay only for the purpose of attending the funeral. "Immediate family" means the employee's parents, spouse, children, brothers, sisters, mother-in-law and father-in-law. In addition, the employee shall receive one day off with pay at his regular rate of pay, which day shall be the day of the funeral for the employee's current spouse's brothers and sisters.   The employee shall receive two (2) days off with pay at his regular rate of pay for grandparents.

8.   SICK DAYS

A.   All employees covered by this Agreement shall be entitled to receive a total of seven (7) sick days for each year of the term of this Agreement.   There shall be no accumulation of sick days from one Agreement year to the next and all accumulated sick days shall be paid for at the end of the contractual year.   In the event that an employee takes three (3) or more consecutive sick days, he should present Company with a doctor's letter establishing the validity of his illness or injury, if Company so requests.  If an employee fails to present to Company the doctor's letter, employee shall not be entitled to compensation for the sick days taken in excess of two (2) sick days.   Sick days shall be pro rated from the date that the

- 6 -

employee is accepted into the Union. In the event that an employee either voluntarily resigns from the company due to gross misconduct or is discharged for gross misconduct, the employee shall receive only those sick days that have accrued since the anniversary date of this contract.

Gross Misconduct  defined from those actions listed in Article 17(a) - use of narcotics, drinking any alcoholic beverages on the job, theft or conviction of a felony, being under the influence of narcotics, drugs or any alcoholic beverage, insubordination, assault, battery, defacing of company property, theft of company property, the failure of a driver to notify the employer of the fact that he is on the revoked list under the State Motor Vehicle laws, and the carrying by the employee of unauthorized passengers in a Company-owned vehicle.

B. With respect to both day drivers/warehousemen and night warehousemen, on the day the employee is excused because of illness, it is the employees responsibility to notify the Company by 5:00 P.M. as to his intentions of attendance on his next scheduled shift. In the event the employee does not notify the Company of his intentions, the Company is not obligated to provide work for the employee on his next scheduled shift.

The employee must, for all absences, except absent for an emergency that prevents his/her doing so, should notify the Company of his/her absence, a minimum of one (1) hour before the normal starting time.

9. JURY DUTY

Employees serving on jury duty will be compensated by the Company for the difference between the money he receives for jury duty and his basic daily straight time pay, calculated at his hourly rate. This shall apply only to time lost by the employee during the regularly scheduled work week. Said payments, however shall not be made for any period exceeding more than two (2) weeks in any one (1) calendar year. Jury duty will only be approved by the company upon receipt of a jury duty service verification issued by the Court.

10. UNIFORMS

The Employer shall supply the employees with two (2) trousers, two (2) shirts and one (1) jacket or two (2) sweatshirts in May and October at no cost to employee. The drivers-warehousemen, however, have the option of receiving appropriate rain gear once a year in lieu of a jacket. All employees agree to wear all the provided uniforms during work hours and the failure to do so shall be the basis for suspension as defined in Article 17 of this Agreement.

11. WAGES

A. The Company shall establish and maintain through the term of this Agreement the following weekly rates of pay for the following job classifications:

-7-

DRIVERS/WAREHOUSEMEN & CURRENT NIGHT WAREHOUSEMEN

| 19.23 | 19.73 | 20.23 | 20.73 | 21.23 |
|-------|-------|-------|-------|-------|
| 4-24-05 | 4-24-07 | 4-24-08 | 4-24-09 | 4-24-10 |
| $769.20 | $789.20 | $809.20 | $829.20 | $849.20 |

DRIVER/WAREHOUSEMEN HIRED ON OR AFTER 4/24/06

```
Upon Hire. . . . . . . . .$600.00/per week  15,00
Upon going into Union. . .$620.00/per week  15,50
Year 2 . . . . . . . . . .$640.00/per week  16,00
Year 3 . . . . . . . . . .$660.00/per week
Year 4 . . . . . . . . . .$680.00/per week
Year 5 . . . . . . . . . .$720.00/per week
```

WAREHOUSEMEN HIRED ON OR AFTER 4/24/06

```
Upon Hire . . . . . . . $560.00/per week  14,00
Upon going into Union . $580.00/per week  14,50
Year 2 . . . . . . . . . $600.00/per week  15,00
Year 3 . . . . . . . . . $620.00/per week
Year 4 . . . . . . . . . $640.00/per week
Year 5 . . . . . . . . . $680.00/per week
```

All current night warehousemen shall be paid at the driver-warehousemen rate for each contractual year, plus a night bonus of $20.00 per week. Further, the categories relating to new hires shall remain distinct rates with a night differential of $20.00 per week. Midshift bonus to be $10.00.

12.   WELFARE

For the objects and purposes set forth in the Local 863 Agreement and Declaration of Trust, executed between certain Employers and the Union, and any amendments or supplements thereto, all of which are incorporated herein by reference, the Employer shall pay to the Local 863 Welfare Fund the sum of Two Hundred and Twenty dollars ($220.00) per week for each full-time employee covered by this Agreement effective January 1, 2005. The Employer will continue to pay the aforesaid sum of Two Hundred and Twenty dollars ($220.00) per week for each employee notwithstanding the fact that an employee may be out of work due to illness or injury. The said contributions shall continue on behalf of any sick or injured employee up to a maximum of six months.

All newly hired employees shall participate in the Welfare Plan (Plan 2) and payment shall be from the first day of employment.

Plan 2 rates: Effective 1/1/05 . . . . $170.00/week

Employees hired on or after April 24, 2006 shall go to 1st Tier Welfare Plan upon completion of three (3) full years from date of hire.

All other contractual language will conform, to the plan.

The Trustees of the Welfare Fund shall have the right to receive, collect, demand, sue and institute proceedings in any court or other tribunal for the purpose of enforcing payment of any of the contributions required to be made under the Welfare Fund, the delinquent Employer shall be further obligated to pay

the Welfare Fund all collection costs, court costs, attorney's fees and interest and any other expenses incurred by the Trustees in enforcing or attempting to enforce payment of any of the contributions required to be made under this Agreement.

Steady employees who have steady and continuous service and while in the employ of an Employer making contributions to the Fund shall be eligible to participate in the benefits provided for and purchased by the Fund after they have been so employed for the period of time specified by the Welfare Plan.  If an employee qualified to participate in the benefits provided for and purchased by the Fund shall cease to qualify due to lack of Employer contributions or for any other reason whatsoever, his and his dependents' rights to share in any benefits whatsoever, purchased and provided for by the Welfare Fund shall forthwith cease and terminate.  Whatever reasonable expenses are necessary, in the discretion of the Trustees, to maintain and administer the Fund shall be paid out of the Fund.  No employees shall have the option to receive, instead of the benefits provided for by the said Welfare Fund, any part of the amounts contributed by the Employer to the Fund, and no Employee shall have the right to assign any benefits to which he or his dependents may be entitled under any of the Agreements and Declarations of the Fund or to receive a cash consideration in lieu of the benefits established by the Fund either upon termination of the Fund created or through severance of his employment or likewise.

Title to all monies paid in the said Fund shall be vested in and remain exclusively in the Trustees and it is the intention of the parties hereto that said Fund shall constitute an irrevocable Trust and that no benefits of monies payable from this Fund shall be subject in any manner to alienation, sale, transfer, assignment, pledge, encumbrance or change and any attempt to do so shall be void.

The monies paid into said Fund shall not constitute or be deemed wages to the individual Employee nor shall said monies in any manner be liable for or subject to the debts, contracts, liabilities or torts of any of the Employees or parties entitled to such money, that is, any of the benefits provided for under the terms of this Agreement.

The Employer agrees that if the cost of the Health and Welfare insurance Coverage is increased, the Employer shall bear the increased coverage cost, upon notice by the Union of such increase, by remitting sufficient monies to the Fund, for said cost in addition to the regular contributions for each employee.

The Employer shall continue to make contributions on behalf of those employees who retire after the age of sixty-two (62) with a normal pension from the Local 863 Pension Fund.  The contributions shall continue until the retiree reaches the age of sixty-five (65) or becomes eligible for Medicare, whichever, comes first.

13.  CHECK-OFF SYSTEM FOR DUES

The Company agrees to deduct Union dues each and every month from the wages of each employee subject to this Agreement pursuant to a check-off authorization card by such employee to be delivered to the Company by the Union.  The Union dues shall

be the amount required to maintain the employee in good standing as a member of the Union. In the event there is a change in the amount necessary to maintain the employee in good standing in the Union, the Union will notify the Company forthwith of the correct amount and the Company herewith agrees to deduct the same.

14. GRIEVANCE PROCEDURE AND ARBITRATION

Any dispute, difference or grievance regarding the interpretation, application of the provisions of this Agreement, shall be settled by conference with the duly authorized officials of the Union and a representative of the Company.

In the event that such dispute, difference or grievance shall not have been satisfactorily adjusted between the parties in the manner provided above, then such dispute, difference or grievance regarding the interpretation, or application of the provisions of this Agreement may be submitted to Arbitration at the request of either party to the New Jersey State Board of Mediation who shall designate an Arbitrator. The Parties further agree that the expense of the Arbitrator shall be borne equally among them.

The Arbitrator shall decide cases in issue solely upon the provisions of this Agreement, and shall have no power to add to, delete from, modify or alter the provisions of this Agreement.

15. SENIORITY

The following rules shall govern the exercise of Seniority rights by the employee of the Company and the members of the Local Union No. 863.

A. Definition of Seniority

1. There shall be two (2) payroll seniority lists as follows: (1) all existing employees (no matter what job family he has been hired into) shall be deemed to have acquired seniority from his earliest date of hire in the Company: (2) all newly hired employees shall accumulate seniority from the date of hire in the job family that they are hired into. For the purpose of this Article, there shall be deemed to be two (2) job families, comprising of driver/warehousemen and night warehousemen. Each job family shall have their own separate seniority list.

2. Terminal Seniority is defined as the Seniority which an employee acquires from his earliest date of hire at a specific terminal or branch of the Company.

B. Opening New Branches:

1. When a new branch or terminal is opened at any location, the Company shall offer to all employees covered by this Agreement the opportunity to transfer to the new branch or terminal in order of their company or payroll Seniority.

2.     The transferred employee shall, for a period of thirty (30) days following the transfer, have an unqualified right to return to their old terminal and carry with them their Seniority at that old terminal.

C.     Closing of Branches:

1.     When a branch or terminal is closed and the work of the branch or terminal is eliminated, an employee who was formerly employed at another branch or terminal shall have the right to transfer back and exercise his seniority based on the date of hire at the branch or terminal into which he is transferring.

2.     When a branch or terminal is closed and the work of the branch or terminal is transferred to another branch or terminal, an employee employed at the closed-down branch or terminal shall have the right to transfer to the branch or terminal into which the work was transferred and to exercise his seniority on a company or payroll basis.

D.     Merger:

When two or more companies merge their operations, then the employees of the respective companies shall all be placed on one seniority roster in the order of the earliest date of hire of each of the employees with their respective Employer.

E.     Acquisition or Purchase:

When one company acquires or purchases controls of the business of another company, then the employees of the company so acquired or purchased shall be placed at the bottom of the acquiring or purchasing company's seniority roster in the order of their payroll of company seniority with the former company.

F.     Disputes Procedure:

If a dispute arises concerning the interpretation or application of the foregoing provisions, dealing with the Seniority, then the subject matter of such dispute may be taken up by the aggrieved party under the grievance arbitration procedure as provided herein.

16.   LAYOFF AND RECALL

A.     When it becomes necessary to reduce the working force, the last man on the appropriate seniority list should be laid off first and when the force is again increased, the men are to be returned to work in the reverse order in which they were laid off.

B.     In the event of a recall, the laid-off employee shall be given notice of recall by telegram, registered or certified mail, sent to the address last given the Employer by the Employee.     Within forty-eight (48) hours after tender of delivery at such address of the Employer's notice, the employee must notify the Employer by telegram, registered or certified mail, of his intent to return to work and must actually report to work within five (5) calendar days.     In the event the

- 11 -

employee fails to comply with the above provisions, he shall lose all seniority rights under this Agreement and shall be considered as a voluntary quit. After one hundred twenty (120) days from the date of layoff, the employee is considered to have been dropped from the seniority list. At that time, he loses all seniority rights and the Employer is under no obligation to recall him.

## 17. DISCHARGE OR SUSPENSION

The Employer shall not discharge nor suspend any employee without just cause. In all cases involving the discharge or suspension of any employee, the Company must immediately notify the employee in writing of his discharge or suspension and the reason therefore. Such written notice shall also be given to the shop steward, and a copy mailed to the Local Union Office, within one (1) working day from the time of the discharge or suspension.

A. With respect to all discharges or suspensions (other than immediate discharges as defined in paragraph 17 (e) below, the employee must have received from the Company at least two (2) warning notices within the previous ninety (90) working days, which notices need not necessarily be for the same offense. All discharges or suspensions under this paragraph shall be subject to the grievance procedures as defined by this Agreement.

B. Any employee discharged must be paid in full for all wages owed him by the Employer, including earned vacation pay, if any, within five (5) days from the date of discharge.

C. A discharged or suspended employee must advise his Local Union in writing, within two (2) working days after receiving notification of such action against him, of his desire to appeal the discharge or suspension. Notice of appeal from discharge or suspension must be made to the Employer in writing within five (5) days from the date of discharge or suspension and/or return to his home terminal, whichever is later.

D. Should it be proven that an injustice has been done to a discharged or suspended employee, he shall be fully reinstated in his position and compensated at his usual rate of pay for lost work opportunity. If the Union and the Employer are unable to agree as to the settlement of the case, then it may be referred to the grievance machinery as set forth in paragraph 14 within an agreed period of time between Employer and the Union.

E. Just cause of immediate discharge is hereby defined as a violation of the contract, violation of company rules, failure to meet work standards, use of narcotics, drinking any alcoholic beverages on the job, theft or conviction of a felony, being under the influence of narcotics, drugs or any alcoholic beverage, on or in Company property or that any of its customers, insubordination, assault, battery, defacing of company property, theft of time, unauthorized or excessive absenteeism, patterned absenteeism, misconduct, proven negligence in the use of company's equipment and property, the failure of a driver to notify the employer of the fact that he is on the revoked list under State Motor Vehicle laws, and/or the carrying by the Employee of unauthorized passengers in a

Company-owned vehicle. Unauthorized or excessive absenteeism will be construed to be:

10th day, verbal notice, 11th day, written notice, 12th day, one (1) day suspension without pay; and 13th day, discharge. Any disability must be filed and collected from State Disability Insurance, otherwise, any absence will be chargeable days.

F. Drivers will be required to use caution and exercise proper judgment in the operation of their vehicle and to avoid accidents and excessive unreported violations at all times. A continuous series of accidents and/or excessive unreported violations, traceable directly to negligence shall be just cause for dismissal.

G. Where damage or loss of goods occurs through negligence of a driver or warehouseman, he shall be responsible for the same. Breakage, unavoidable or not inconsistent with normal and usual careful operation by an employee, will not be chargeable.

H. Drivers assigned Company equipment are responsible for them. Any loss of or damage to Company equipment, due to a driver's/warehousemen's negligence, will be cause for the driver to pay for the replacement of said equipment. The employee shall have the option of utilizing either a Pager or Telephone to be supplied by the Company.

I. All drivers are required to call in at their specified times and are responsible for ascertaining the correct count on delivery. Delivering properly addressed invoices to the wrong account will also be cause for disciplinary action.

18.  SEVERANCE PAY

Employees shall be entitled to receive severance pay from the Company based upon one (1) week's pay for each year of employment by the Company up to a maximum of twenty-three (23) weeks. Severance pay shall be paid to an employee if:

A. The Company discontinues business.

B. The Company sells the Company's business or merges with another company and the employee is no longer necessary in the conduct of the merged business.

19.  DELIVERIES

A. The Company agrees that deliveries to customer's cellars and attics shall be required of the drivers only when absolutely required by the customer.

B. Upon a driver's written complaint stating a hazardous condition existing at a particular delivery, and after Employers inspection and concurrence of such condition existing, such attic or cellar delivery will not be required. Shop steward to accompany the employer for inspection.

C. It is mutually agreed that the Company may subcontract tractor trailer work provided all the Company's regular drivers

- 13 -

are working.   The Company will not replace laid off or terminated drivers with subcontractors.

D.    In the event of absenteeism of the Company's regular drivers, the Company can employ from the labor force available.

E.    Drivers will not be required to pick up any cash payments.

F.    The Employer shall provide one (1) load bar to each driver.

G.    Most senior Class A driver who is not signed to a bid route will receive first consideration for any trailer deliveries to accounts.

H.    All new purchased trucks are to be equipped with A/C.

20.   BONUS/LOAD

A.    Drivers shall be paid additional salary compensation for bonus loads under the following schedule, unless not delivered due to no fault of driver.

| (1) | # of Cases | Amount |
|-----|-----------|--------|
|     | 300       | $20.00 |
|     | 325       | $22.50 |
|     | 350       | $25.00 |
|     | 375       | $27.50 |
|     | 400       | $30.00 |
|     | 425       | $32.50 |
|     | 450       | $35.00 |

*   Club deliveries shall continue as per contractual schedule in effect prior to 4-24-01.

B.    The driver is entitled a helper at any time based on route condition and with supervisor approval. In the event that the driver's request for a helper is granted by the Company, the driver shall not be entitled to any additional salary compensation.

C.    Helpers for New York City deliveries shall continue as per present practice.

21.   PENSION FUND

For the objects and purposes set forth in a certain Agreement and Declaration of Trust executed between the certain Employers and the Union and any amendments or supplements thereto, which are incorporated herein by reference, the Fund shall receive from the Employer the sum of three dollars and sixty-seven cents ($3.67) per hour, based on a forty hour week, the sum of one hundred forty six dollars and eighty cents ($146.80) per week for each straight time hour for each Full Time Employee covered by the Agreement. The aforementioned pension rate includes seventeen cents (.17) per hour per employee which provides for 30 years and out for those employees only.

Pension - Employees hired on or after April 24, 2006

Year 1 . . . . . . . $2.52/hour
Year 2 . . . . . . . $3.02/hour
Year 3 . . . . . . . $3.52/hour

All other contractual language will conform to the plan.

The contributions to the Fund and all accumulations thereon, shall be used to provide for Pension or Retirement Benefits as provided in a Plan selected by the Trustees to the Fund and to be used for such other purposes set forth in the Administration of the Pension Fund.   No employee shall make or be required to make any contributions to the Pension Fund.

Payment shall be made from the first day of employment.

Trustees, in setting up a Pension Plan or Retirement Benefits, shall be the sole judges in determining the eligibility requirements and the right on any employee thereunder.

The Employer agrees to immediately join and concur with the Union and the Trustees, if necessary, in executing such petitions, applications and forms that are required to be filed with the State Governmental Agencies and agrees to provide such information as to the Trustees, Banking Institutions and Insurance Company may request in connection with the operation of the Pension Fund and Plan.

The Trustees of the Pension Fund or Plan shall have such rights and duties as set forth in the Plan and in the Agreement and Declaration of Trust and any supplements or amendments thereto.

It is agreed between the Employer and the Union that should the Employer fail to contribute the sum per straight time hour for each straight time hour worked for each employee, as required by this section, the Union shall have the right to order a work stoppage of the employees of the Employer, and that such a work stoppage shall not be a breach of this Labor Agreement.

If the Employer is delinquent for failure to make contributions due, the Employer shall be obligated to pay all court costs, collection costs and reasonable Attorney's fees, when the Union or the Fund is required to take action to recover the monies due.

22.  **D.O.T. DRUG TESTING**

All D.O.T. Drug Testing will be at Company's cost and Company's direction.  Drug testing to be on Company's time.  A company vehicle to be supplied if necessary. The substance abuse policy is attached as an addendum to this Agreement.

23. LEAVE OF ABSENCE

A.     The Company agrees that a leave of absence without pay may be granted for any good and sufficient personal reason (employee's illness or injury are not "personal reasons" and are treated separately), at a time the employee can be spared, as follows:

     5 Years and over         Maximum of four (4) weeks

B.     Leave of absence will not be granted for the purpose of allowing any employee to take another position temporarily, try out new work, or venture into business for himself.     An employee shall be entitled to only one leave of absence in any three year period.

C.     The employee shall not accrue any vacation, sick or personal time during leave of absence.

24.  MANAGEMENT RIGHTS CLAUSE

The operation of the Company's business and the direction of the working forces including but not limited to, the establishment of the opening and closing time of warehouses and departments, the right to hire, transfer, suspend, layoff, recall, promote, discharge for just cause, assign or discipline employees, to relieve employees from duty because of lack of work and to transfer employees from one location or classification to another, are vested exclusively in the Company, subject however to the provisions of this Agreement.

25.  CONTINUATION OF AGREEMENT

A.     Every employee shall continue to enjoy any and all benefits and working conditions heretofore enjoyed by him in connection with or pertaining to his job, and he shall not be deprived thereof as a result of or after the execution of this Agreement even though such benefits or working conditions are not expressly provided for herein.

B.     This agreement is binding upon successors and assigns. The Employer agrees to provide written notice to Local 863 and any purchaser as to this Agreement.

26.  TERM OF AGREEMENT

This Agreement shall become effective on the 24th day of April 2006, and shall continue in full force and effect for a period of five (5) years expiring on the 24th day of April 2011. It shall thereafter automatically renew itself for an additional one (1) year period unless either party gives the other party at least sixty (60) days' notice in writing, prior to the date fixed for the expiration herein, that said party does not desire said Contract to automatically renew itself for an additional one (1) year period.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED THIS
AGREEMENT, THIS 24TH DAY OF APRIL 2006.

LOCAL UNION NO. 863 TEAMSTER,
AFFILIATED WITH THE INTERNATIONAL
BROTHERHOOD OF TEAMSTER

BY: _____      ATTEST: _____
    ALPHONSE RISPOLI
    SECRETARY TREASURER
    LOCAL 863 I.B.T.


AMERICAN B.D. COMPANY

BY: _____      ATTEST: _____

- 17 -

**2**

03/12/2008 08 43 FAX

*Attn: Jeff Dantz — 2 pages*

## ZAZZALI, FAGELLA, NOWAK, KLEINBAUM & FRIEDMAN
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
ONE RIVERFRONT PLAZA, 3ᴿᴰ FLOOR
NEWARK, NJ 07102-5410
Telephone: (973) 623-1822
Telecopier: (973) 623-2209

ANDREW F ZAZZALI (1925-1969)

ANDREW F. ZAZZALI, JR.
ROBERT A. FAGELLA**
KENNETH I. NOWAK***
RICHARD A. FRIEDMAN
PAUL L. KLEINBAUM*
EDWARD H. O'HARE*

COUNSEL
KATHLEEN NAPRSTEK CERISANO

*Also admitted Pennsylvania
**Also admitted New York
***Also admitted New York & D.C.
■New York Only

JASON SOKOLOWSKI
COLIN M. LYNCH**
GENEVIEVE M. MURPHY-BRADACS**
EDWARD M. SUAREZ, JR.
CYNTHIA M. REVESZ ■
AILEEN M. O'DRISCOLL*
MICHAEL P. CHIACCHIO*

OF COUNSEL
JAMES R. ZAZZALI ***
WILLIAM A. PASCARELL ■

150 West Stote Street
Trenton, NJ 08608
Telephone: (609) 392-8172
Telecopier: (609) 392-8933

Please Reply to Newark

March 10, 2008

## TO ALL CONTRIBUTING EMPLOYERS

Re: **Local Union No. 863, IBT, Pension Plan**

This firm represents the Teamsters Local 863 Pension Plan. As you know, the Internal Revenue Service has recently denied the Plan's application for a waiver of the minimum funding deficiencies for the Plan Years ending August 31, 2003, August 31, 2005, and August 31, 2006. There is also a minimum funding deficiency for the Plan year ending August 31, 2007. As a result of these deficiencies, it is the obligation of the Trustees to send a notice to each contributing employer setting forth the amount of the deficiency allocable to that employer, plus interest, and to demand payment to the Plan. In addition, the contributing employers have an obligation to pay to the IRS an excise tax, which will be determined by the IRS, not the Plan, and will be payable to the IRS, not the Plan. The Trustees will not be involved in assessing or collecting that tax.

After receiving the denial of the waiver, the Trustees asked the IRS for its opinion as to the proper methodology for allocating the minimum funding deficiencies, given that they cover a multi-year period. On or about January 29, 2008, we received notice from the IRS that they recommend that the Trustees determine the amount attributable to each contributing employer for each year that the minimum funding deficiency occurred, based upon the required contributions for that year. As a result, the Plan's actuary is now calculating each contributing employer's allocable share of the minimum funding deficiency on that basis. We expect that calculation to be submitted to the Trustees at their next meeting. We expect that the Trustees will then authorize the Plan to send a formal notice of the amount of your allocable share of the minimum funding deficiency, with instructions for payment.

If you have any questions regarding the above, please feel free to contact me or Andrew F. Zazzali, Jr., Esq., also of this firm.

We also wish to advise you that several contributing employers have made, or are considering making, independent proposals to the Trustees to allow a "spin off" into a separate plan. This can be either to a new multiemployer plan with other contributing employers to this Plan, or to a single-employer plan.

03/12/2008 08 43 FAX

**ZAZZALI, FAGELLA, NOWAK, KLEINBAUM & FRIEDMAN**
TO ALL CONTRIBUTING EMPLOYERS
March 10, 2008
Page 2

Please be advised that all contributing employers shall be permitted to submit a proposal to the Trustees to spin-off into a multi- or single- employer plan, or to submit a comparable plan that satisfies all governmental and Plan requirements and is in the best interests of the participants. If you are interested in pursuing the possibility of a spin-off, you may request the relevant information regarding your own share of the liabilities and assets of the Plan. We will provide this information to you upon your request. It is necessary that you, or your attorneys/accountants/actuaries, inform us of the specific calculations that you need, and the Plan actuary will provide them. You can then formulate a proposal to the Trustees for their consideration, whether on behalf of yourself or with other employers who may be interested in a multiemployer spin-off.

Also, please be advised that any costs or fees incurred by the Plan in providing the calculations to you or your professionals, including any discussions or correspondence with them, will be charged to the requesting employer. This will apply as well to any legal and actuarial review of any proposal that you, or any group of you, may make. The Plan simply cannot bear the costs of fees and costs incurred as part of an employer's, or group of employers, efforts to leave the Plan, and will bill them to the employer on whose behalf the costs and fees are incurred.

While the form and substance of each proposal may vary depending upon each employer's share of Plan assets, liabilities, withdrawal liability obligations, and financial condition, as well as whether they expect to obtain a waiver of past and future minimum funding deficiencies from the IRS as part of, or a consequence of, the spin-off, there are certain minimum standards that any proposal must satisfy. At a minimum, each spin-off must be to a viable plan that will itself satisfy ERISA solvency tests for multiemployer plans, and an equivalent test for a single-employer spin-off; that the vested benefits of the employees be fully protected as required by ERISA and the Plan; that the spin-off meet all statutory requirements and receive all necessary government approvals; that all of an employer's obligations, including both the minimum funding deficiencies and withdrawal liability obligations, shall be taken or satisfied by the spinning-off employer; and that any proposal must be in the best interests of the participants and beneficiaries in the current Plan and in the spin-off. All proposals will be evaluated on their own.

I thank you for your attention in these matters.

Very truly yours,

Kenneth I. Nowak

KIN:hm

cc:    All Trustees

38630-000

53275 doc

3

LOCAL UNION NO. 863 I.B. OF T.

PENSION PLAN

RESTATED AS OF SEPTEMBER 1, 2008

## TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| **ARTICLE I** | | | 1 |
| **Preamble** | | | 1 |
| | | | |
| **ARTICLE II** | | | 2 |
| **Definitions** | | | 2 |
| | Section 2.01 | Accrued Benefit | 2 |
| | Section 2.02 | Actuarial Equivalent | 2 |
| | Section 2.03 | Actuary | 2 |
| | Section 2.04 | Administrator | 2 |
| | Section 2.05 | Agreement and Declaration of Trust | 3 |
| | Section 2.06 | Annuity Starting Date | 3 |
| | Section 2.07 | Applicable Interest Rate | 3 |
| | Section 2.08 | Applicable Mortality Table | 3 |
| | Section 2.09 | Beneficiary | 3 |
| | Section 2.10 | Break in Service | 3 |
| | Section 2.11 | Code | 3 |
| | Section 2.12 | Collective Bargaining Agreement | 3 |
| | Section 2.13 | Contributing Employer | 3 |
| | Section 2.14 | Covered Employee | 4 |
| | Section 2.15 | Covered Employment | 4 |
| | Section 2.16 | Credited Service | 4 |
| | Section 2.17 | Employee | 4 |
| | Section 2.18 | Employer Payments | 4 |
| | Section 2.19 | ERISA | 4 |
| | Section 2.20 | Hour of Service | 4 |
| | Section 2.21 | Normal Retirement Age | 5 |
| | Section 2.22 | Normal Retirement Date | 5 |
| | Section 2.23 | Participant | 5 |
| | Section 2.24 | Pension Fund and Fund | 6 |
| | Section 2.25 | Pension Plan or Plan | 6 |
| | Section 2.26 | Pensioner | 6 |
| | Section 2.27 | Plan Year | 6 |
| | Section 2.28 | Total and Permanent Disability | 6 |
| | Section 2.29 | Trustees | 6 |
| | Section 2.30 | Union | 6 |
| | Section 2.31 | Vested | 6 |
| | | | |
| **ARTICLE III** | | | 7 |
| **Eligibility, Participation and Credited Service** | | | 7 |
| | Section 3.01 | Participation Date | 7 |
| | Section 3.02 | Past Service Credit | 7 |
| | Section 3.03 | Future Service Credit | 7 |
| | Section 3.04 | Vested Credited Service | 7 |
| | Section 3.05 | Breaks in Service | 8 |
| | Section 3.06 | Family and Medical Leave | 8 |
| | Section 3.07 | Termination of Participation | 9 |
| | Section 3.08 | Reinstatement of Participation | 9 |
| | Section 3.09 | No Guarantee of Employment | 9 |

**ARTICLE IV**     10
    **Benefits**     10
       Section 4.01    Normal Retirement Benefit     10
       Section 4.02    Early Retirement Benefits     10
       Section 4.03    Deferred Vested Benefit     11
       Section 4.04    Standard Form of Benefit     12
       Section 4.05    Restrictions and Valuation of Distributions     12
       Section 4.06    Present Value of Vested Accrued Benefit (Lump Sum Option)     12
       Section 4.07    Accrued Benefit Vesting Schedule and Cash Vested Benefit     13
       Section 4.08    Cash Vested Benefit     14
       Section 4.09    Vesting of a Participant's Interest     14
       Section 4.10    Small Benefit Payment     14
       Section 4.11    Treatment of Amounts Not Distributed     15
       Section 4.12    Payment of Benefits Under the Plan     15
       Section 4.13    Automatic 100% Joint and Survivor Annuity     15
       Section 4.14    Optional 100% Joint and Survivor Annuity with Ten Year Certain     17
       Section 4.15    Elections of Lifetime and Ten Year Certain Option     17
       Section 4.16    Election of 50% Joint and Survivor Annuity     18
       Section 4.17    Right of Revocation     18
       Section 4.18    Pre-Retirement Survivor Annuity     18
       Section 4.19    Retroactive Annuity Starting Date     18
       Section 4.20    Required Beginning Date     19
       Section 4.21    Benefit Payments Generally     21
       Section 4.22    Bridging     21
       Section 4.23    Suspension of Benefits     22
       Section 4.24    Benefit Payments Following Suspension     23

**ARTICLE V**     25
    **Rollover Distributions and Qualified Domestic Relations Order**     25
       Section 5.01    Rollover Distributions     25
       Section 5.02    Qualified Domestic Relations Order Distribution     26
       Section 5.03    Encumbrance of Pension     26

**ARTICLE VI**     27
    **Administration of Plan**     27
       Section 6.01    Administration of the Plan     27
       Section 6.02    Actuarial Assumptions     27
       Section 6.03    Coverage and Eligibility Issues     27

**ARTICLE VII**     28
    **Mergers and Consolidations**     28
       Section 7.01    Mergers and Consolidations     28
       Section 7.02    Spinoff to WWEC Local 863 Pension Plan     28
       Section 7.03    Spinoff to Sysco Corporation Retirement Plan     28
       Section 7.04    Spinoff to Pathmark Stores, Inc. Pension Plan     29

**ARTICLE VIII**                                                                30
  **Miscellaneous**                                                   30
    Section 8.01  Revisions                        30
    Section 8.02  Construction                     30
    Section 8.03  Return of the Employer Payments   30
    Section 8.04  Incapacitated Pensioner           30
    Section 8.05  Location of Participant or Beneficiary Unknown   30
    Section 8.06  Execution of Receipts and Releases   31
    Section 8.07  Change in Address                 31
    Section 8.08  USERRA-Military Service Credit    31
    Section 8.09  Electronic Administration         31
    Section 8.10  Savings Clause                    31
    Section 8.11  Restriction to Prevent Discrimination   31
    Section 8.12  Prevention of Escheat             33

**ARTICLE IX**                                                                  34
  **Termination of the Plan**                                          34
    Section 9.01  Amendment                         34
    Section 9.02  Termination                       34
    Section 9.03  Vesting on Termination of Plan    34
    Section 9.04  Amendments Affecting Vested and/or Accrued Benefit   34

**ARTICLE X**                                                                   35
  **Participant's Rights, Claims Procedures and Appeals**               35
    Section 10.01  Limitation of Rights             35
    Section 10.02  Claims Procedure                 35
    Section 10.03  Authorized Representative        35
    Section 10.04  Denial of Claims                 35
    Section 10.05  Claims Appeal                    36
    Section 10.06  Administrative Record Keeping    37
    Section 10.07  Appeals from Board of Trustee Determination   37

**ARTICLE XI**                                                                  38
  **Death Benefit After Retirement**                                   38
    Section 11.01  Death Benefit                    38

**ARTICLE XII**                                                                 39
  **Termination of Employer and Withdrawal Liability**                 39
    Section 12.01  Termination of Employer          39
    Section 12.02  Partial Termination of Employer  39
    Section 12.03  Method of Computing Withdrawal Liability   40
    Section 12.04  Method of Computing Partial Withdrawal Liability   41
    Section 12.05  Employer Sale of Assets          41
    Section 12.06  Limitation on Withdrawal Liability, De Minimis Rule   42
    Section 12.07  Employer Withdrawal Liability Annual Payments, Payment
        Schedule, Limitation on Annual Payment and Default Rules   43
    Section 12.08  Employer Withdrawal Liability Notification Procedure   44
    Section 12.09  Information Furnished to Employers   45
    Section 12.10  Resolution of Dispute            46

**ARTICLE XIII**                                                                  48
   **Maximum Benefit Limitations**                                 48
      Section 13.01   Maximum Benefit Limitations   48

**ARTICLE XIV**                                                                   57
   **Top-Heavy Provisions**                                         57
      Section 14.01   Top-Heavy Provisions          57

**SIGNATURES**                                                                    62

**TABLE A**                                                                       63
**TABLE B**                                                                       65
**TABLE C**                                                                       68

-iv-

LOCAL UNION NO. 863 I.B.T.
RESTATED PENSION PLAN

## ARTICLE I

### Preamble

The original Pension Plan became effective as of May 23, 1957, pursuant to a Collective Bargaining Agreement between Local Union No. 863 of the International Brotherhood of Teamsters, Chauffeurs, Helpers, and Warehousemen of America and various Employer Associations or Groups and Independent Employers.

Said Pension Plan was amended, effective October 1, 1979, and subsequently there after, in order to enable said Plan to meet the requirements of the Employee Retirement Income Security Act of 1974 and subsequent applicable Federal Legislation.

The Plan was amended as of August 31, 1995, in order to conform with the Tax Reform Act of 1986 and subsequent tax laws.

The Plan was amended once again, effective September 1, 1997, in order to conform with the Small Business Job Protection Act of 1996 and subsequent tax laws.

The Plan was amended, effective September 1, 2001, in order to conform with the "GUST", legislation which includes the General Agreement on Trade and Tariffs of 1994, the Uniformed Services Employment and Reemployment Rights Act of 1994, the Small Business Job Protection Act of 1996, the Taxpayer Relief Act of 1997, the IRS Restructuring and Reform Act of 1998, and the Community Renewal Tax Relief Act of 2000. The Plan was also amended, effective September 1, 2002, to comply with the Economic Growth and Tax Relief Reconciliation Act of 2001 ("EGTRRA").

The Plan is now being amended, generally effective September 1, 2008, to conform with additional changes required by EGTRRA (with technical corrections made by the Job Creation and Worker Assistance Act of 2002), the Pension Funding Equity Act of 2004, the American Jobs Creation Act of 2004, the Katrina Emergency Tax Relief Act of 2005, the Gulf Opportunity Zone Act of 2005, the Pension Protection Act of 2006, the US Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007, other applicable changes in the law, as well as changes in Plan benefits and design as enacted by the Board of Trustees on August 11, 2008.

# ARTICLE II

## Definitions

**Section 2.01** "Accrued Benefit" shall be the Normal Retirement Benefit to which a Participant would be entitled as of his Normal Retirement Date, using the sum of the following:

(1) The Normal Retirement Benefit to which the Participant is entitled under this Plan as of August 31, 2008, taking into account the Employee's Credited Service up to a maximum of 35 years as of August 31, 2008 and the attached Schedule of Benefits (Table A) based on the final contribution category in effect as of August 31, 2008; and

(2) The Normal Retirement Benefit to which the Participant would be entitled under this Plan at his or her retirement, taking into account the Employee's Credited Service earned after August 31, 2008 (not to exceed the maximum of 35 years after taking into account Credited Service under (1) above) and the attached Schedule of Benefits (Table B) based on the final contribution category in effect at retirement.

In the event that a Participant has not participated in a contribution category for at least 12 months, the contribution category used for determining his benefit amount shall be the last contribution category prior to August 31, 2008, or retirement, as applicable, in which he participated.

The maximum of 35 years of Credited Service shall be based on those years that result in the highest Accrued Benefit. The Plan is authorized to accept contributions for years in excess of 35 years of Credited Service but shall not provide Credited Service for said contributions.

At Normal Retirement Age, the Normal Retirement Benefit is the total Accrued Benefit.

**Section 2.02** "Actuarial Equivalent" shall mean equivalence in value between two or more options, as determined on the basis of a mortality table and a specified interest rate. For purposes of the optional annuity forms described in Sections 4.13, 4.14, 4.15, and 4.16, the ten-year certain benefit described in Section 4.06, and the deferral of pension rules in Sections 4.03(2), 4.20 and 4.24, equivalence of value shall be determined on the basis of the mortality table in Revenue Ruling 95-6 and an annual interest rate of the lesser of eight percent (8%) or the Applicable Interest Rate.

Any distribution for which the Annuity Starting Date occurs in the one-year period commencing at the time a Plan amendment is effective that changes the time for determining the Applicable Interest Rate (including an indirect change as a result of a change in Plan Year), must use the interest rate as provided under the terms of the Plan after the effective date of the amendment, determined at either the date for determining the interest rate before the amendment or the date for determining the interest rate after the amendment, whichever results in the larger distribution.

**Section 2.03** "Actuary" shall mean the individual enrolled actuary or firm including one or more enrolled actuaries, selected by the Trustees to provide actuarial services in connection with the administration of the Plan.

**Section 2.04** "Administrator" shall mean the person or group assigned by Trustees to conduct the Fund's daily business, to make and retain Fund records, to coordinate Fund business and cooperate with Fund professionals.

**Section 2.05** "Agreement and Declaration of Trust" shall mean the instrument (including any amendments, revisions and modifications thereof), dated as of January 26, 1956, and as restated in the "Agreement and Declaration of Trust" executed by the Trustees, December 16, 1975.

**Section 2.06** "Annuity Starting Date" shall mean the first day of the first period for which an amount is paid as an annuity or in any other form. Specifically, it shall be the first day of the month following the month in which a Participant has fulfilled all requirements to be entitled to a pension under the Plan, including filing with the Fund a complete application for retirement and withdrawal from Covered Employment and such other procedures as determined by the Trustees or Administrator.

**Section 2.07** "Applicable Interest Rate" shall mean the interest rate for a Plan Year determined in accordance with Section 417(e)(3)(C) of the Code, as in effect from time to time. The Applicable Interest Rate to be used is for the fifth full calendar month preceding the first day of the Plan Year that contains the Participant's Annuity Starting Date. For distributions with an Annuity Starting Date after August 31, 2008, the Applicable Interest Rate is determined in accordance with IRS Notice 2007-81 and subsequent guidance. For distributions with an Annuity Starting Date before September 1, 2008, the Applicable Interest Rate is the annual interest rate on 30 year Treasury securities, as specified by the Internal Revenue Service, for the fifth full calendar month preceding the first day of the Plan Year that contains the Participant's Annuity Starting Date.

**Section 2.08** "Applicable Mortality Table" shall mean the mortality table prescribed by the Secretary of the Treasury pursuant to Section 417(e)(3)(B) of the Code, as in effect from time to time. For distributions with an Annuity Starting Date after August 31, 2008, the Applicable Mortality Table is determined in accordance with Revenue Ruling 2007-67 and subsequent guidance. For distributions with an Annuity Starting Date on or after December 31, 2002, and before September 1, 2008, the Applicable Mortality Table is the mortality table prescribed in Revenue Ruling 2001-62. For distributions with an Annuity Starting Date before December 31, 2002, the Applicable Mortality Table is the mortality table prescribed in Revenue Ruling 95-6.

**Section 2.09** "Beneficiary" shall mean the person designated to receive the benefits which are payable under the Plan upon or after the death of a Participant. Designation of a Participant's Beneficiary shall be made on forms approved by the Trustees and filed with the Administrator in accordance with Fund procedures.

**Section 2.10** "Break in Service" shall mean a Plan Year during which the Participant does not complete at least 160 Hours of Service with the Contributing Employer. Notwithstanding any other provision in the Plan to the contrary, an Employee who first becomes a Participant in the Plan on or after September 1, 2008, shall incur a Break in Service for a Plan Year if, during such year, the Employee does not complete more than 500 Hours of Service with the Contributing Employer.

**Section 2.11** "Code" shall mean the Internal Revenue Code of 1986 and amendments thereto.

**Section 2.12** "Collective Bargaining Agreement" shall mean a written labor agreement including any amendments, modifications and renewals thereof entered into between the Union and Contributing Employers, other participation agreements between an Employer and the Union requiring Employer Payments on behalf of their employees to the Pension Plan, remittance forms submitted by an Employer and the Fund for employees performing any work for the Employer, and all other writings which reflect or evidence an intent to employ employees who perform work within the Union's jurisdiction.

**Section 2.13** "Contributing Employer" shall mean any Employer in any industry who enters into an agreement with the Union which requires Employer Payments to this Pension Plan on behalf of its employees or is subject to a participation or project agreement requiring Employer Payments to the Fund,

3

or who submits remittance forms, or who is otherwise obligated for reasons set forth in prior Section 2.12. "Contributing Employer" shall also include Local Union 863 Corporation, the Trustees of the Local Union No. 863 Welfare Fund and the Trustees of the Local Union No. 863 Pension Plan to the extent, and not otherwise, that the Union or the Trustees, with respect to their employees, agrees to make Employer Payments to the Local Union No. 863 Pension Plan. An Employer shall remain a Contributing Employer, with the obligation to make Employer Payments to this Pension Plan, to the full extent of the law, and shall only cease to be obligated if it has fully complied with all legal requirements necessary to sever such obligation.

**Section 2.14** "Covered Employee" shall mean an employee working under a Collective Bargaining Agreement, Participation Agreement or project agreement, or other writings such as a remittance form for when Employer Payments are required.

**Section 2.15** "Covered Employment" shall mean employment of an Employee by a Contributing Employer as those terms are defined herein.

**Section 2.16** "Credited Service" shall mean hours, months and years of service used in determining the amount of the Pension Benefit payable to or on behalf of an Employee as described in Article III contained herein.

**Section 2.17** "Employee" shall mean and include the Contributing Employers' employees who have been, and who are, or who may hereafter be employed in a collective bargaining unit for whom Local Union No. 863 is the authorized representative for purposes of collective bargaining and for whom the Contributing Employer is obligated to make Employer Payments to the Local 863 Pension Plan, as well as those subject to any written agreement or remittance forms, and may also include the salaried employees of the Local Union No. 863 Pension Plan, the salaried employees of the Local Union No. 863 Corporation and the salaried employees of the Local Union No. 863 Welfare Fund, to the extent and in the amounts as the Pension Plan, Welfare Fund, or Union Corporation as the case may be, agree to make Employer Payments to the Pension Fund on their behalf pursuant to the terms of a participation agreement.

**Section 2.18** "Employer Payments" shall mean payments owed or made by Contributing Employers to the Pension Plan as required by an agreement and/or the Agreement and Declaration of Trust. Employer Payments shall be deemed property of the Pension Plan, and entitlement to them shall vest in the Pension Plan.

**Section 2.19** "ERISA" shall mean the Employee Retirement Income Security Act of 1974 and amendments thereto.

**Section 2.20** "Hour of Service" shall mean:

(1) Each hour for which an Employee is paid, or entitled to payment, for the performance of duties for the Contributing Employer and for which the Contributing Employer is obligated to make Employer Payments to the Pension Plan. These hours will be credited to the Employee for the computation period in which the duties are performed; and

(2) Each hour for which an Employee is paid, or entitled to payment, by the Contributing Employer on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence. Except as provided in Section 3.05 no more than 160 Hours of Service will be credited under this paragraph for any single continuous period (whether or not such period occurs in a single computation period); and

4

(3)     Each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by the Contributing Employer. The same Hours of Service will not be credited both under paragraph (1) or paragraph (2), as the case may be, and under this paragraph (3). These hours will be credited to the Employee for the computation period or periods to which the award or agreement pertains rather than the computation period in which the award, agreement or payment is made. Solely for purposes of determining whether a Break in Service, as defined in Section 2.10, for participation and vesting purposes has occurred in a computation period, an individual who is absent from work for maternity or paternity reasons, to the maximum extent permitted by law, shall receive credit for the Hours of Service which would otherwise have been credited to such individual but for such absence, or in any case in which such hours cannot be determined, 8 Hours of Service per day of such absence. For purposes of this paragraph, an absence from work for maternity or paternity reasons means an absence (a) by reason of the pregnancy of the individual, (b) by reason of a birth of a child of the individual, (c) by reason of the placement of a child with the individual in connection with the adoption of such child by such individual, or (d) for purposes of caring for such child for a period beginning immediately following such birth or placement. The Hours of Service credited under this paragraph shall be credited (i) in the computation period in which the absence begins if the crediting is necessary to prevent a Break in Service in the period, or (ii) in all other cases, in the following computation period. Hours under this Section shall be calculated and credited pursuant to Section 2530.200b-2 of the Department of Labor regulations, which are incorporated herein by this reference.

**Section 2.21** "Normal Retirement Age" shall mean:

(1)     any one of the following combinations of attained age and Credited Service:

   (a)     age 62 and 10 years of Credited Service,

   (b)     age 63 and 7 years of Credited Service,

   (c)     age 64 and 6 years of Credited Service,

   (d)     age 65 and 5 years of Credited Service,

   (e)     age 66 and 5 years of Credited Service,

   (f)     age 67 and 5 years of Credited Service, or

   (g)     age 68 or greater and 4 years of Credited Service.

(2)     for a Participant who participates based on an additional $0.17 per hour contribution rate provided for in the Collective Bargaining Agreement applicable to him, attainment of 30 years of Credited Service, if earlier than the ages described above, for the portion of his Accrued Benefit attributable to Credited Service earned before September 1, 2008, and age 62 for the portion of his Accrued Benefit attributable to his Credited Service earned after August 31, 2008.

**Section 2.22** "Normal Retirement Date" shall mean the first day of the month following the month in which the Participant attains Normal Retirement Age.

**Section 2.23** "Participant" shall mean a Pensioner or an Employee who meets the requirements for participation in the Plan as set forth in Article III.

**Section 2.24** "Pension Fund" and "Fund" shall mean the trust estate created by and defined in the Agreement and Declaration of Trust. The Fund shall be deemed to include all contributions paid or owed to the Fund, and all interest and investment earned or owed thereon.

**Section 2.25** "Pension Plan or Plan" shall mean the Plan herewith adopted by the Trustees and such amendments, modifications, revisions and other changes duly adopted by the Trustees.

**Section 2.26** "Pensioner" shall mean any person formerly an Employee who is retired under this Pension Plan and who is receiving pension benefits provided for herein.

**Section 2.27** "Plan Year" shall mean the twelve (12) month period beginning September 1 and ending August 31. The Plan Year shall also serve as the Plan's Fiscal Year.

**Section 2.28** "Total and Permanent Disability" shall mean the total and complete inability of a Participant, by reason of a physical, mental or emotional impairment, to perform each and every necessary activity related to the job assigned to the Participant by the Contributing Employer.

**Section 2.29** "Trustees" shall mean the Trustees of the Local No. 863 I. B. of T. Pension Plan designated in the Agreement and Declaration of Trust, together with their successor or successors, designated in the manner provided therein.

**Section 2.30** "Union" shall mean the Local Union No. 863 of the International Brotherhood of Teamsters, Chauffeurs, Helpers, and Warehousemen of America (I. B. of T) or any successors thereto.

**Section 2.31** "Vested" shall mean the nonforfeitable benefits to which a Participant is entitled under the terms of the Pension Plan upon attainment of Normal Retirement Age, or satisfaction of the Plan's Vesting Schedule, described in Section 4.07.

6

## ARTICLE III

### Eligibility, Participation and Credited Service

**Section 3.01    Participation Date**

Each Covered Employee who was a Participant in the Pension Plan for the Plan Year ending August 31, 2008, shall continue as a Participant under the terms and conditions of the restated Plan. Each other Covered Employee shall thereafter become a Participant on the date Employer Payments are required to be made on his/her behalf to the Pension Fund by a Contributing Employer.

**Section 3.02    Past Service Credit**

Credit for service prior to May 1, 1957, as determined by the Trustees, shall be computed on the basis of years and months, on behalf of a Covered Employee, for each year or portion thereof of employment with an Employee's present or prior Contributing Employer, provided such Employee was in a collective bargaining unit for whom the Union was the authorized representative for the purposes of collective bargaining at the time such service was rendered.

Past Service Credit for any Covered Employees or groups of Covered Employees commencing participation in the Pension Plan after January 1, 1967, may be granted by the Trustees in their sole discretion; however, such credit shall be limited to a maximum of 10 years Past Service Credit except as may be required under Article VII.

**Section 3.03    Future Service Credit**

Future Service Credit shall be granted for a Participant for all periods subsequent to May 1, 1957, on the basis of one month of Future Service Credit for each 160 Hours of Service for which Employer Payments are required to be made by a Contributing Employer to the Pension Fund, on behalf of such Participant.

Each 12 months of Future Service Credit shall equal one full Year of Future Service Credit.

Fractional Years of Future Service Credit shall be credited to the nearest one-twelfth.

Hours of Service earned in excess of 1,920 hours in any one Plan Year will be credited as fractional years of Future Service Credit. For Plan Years beginning on or after September 1, 2008, Hours of Service earned in excess of 1,920 hours will not be credited as fractional years of Future Service Credit.

**Section 3.04    Vested Credited Service**

For the purposes of qualifying an Employee for vesting of service credit in a Plan Year, an Employee who works 160 hours in Covered Employment or on whose behalf one month's Employer Payments are required to the Pension Fund during a Plan Year shall be credited with one full Year of Vested Credited Service. Notwithstanding any other provision in the Plan to the contrary, an Employee who first becomes a Participant in the Plan on or after September 1, 2008, shall be credited with one full Year of Vested Credited Service only if the Employee is credited with at least 1,000 Hours of Service in Covered Employment during a Plan Year.

An Hours of Service with the Contributing Employer shall be taken into account in determining a Participant's Years of Vested Credited Service and his or her right to a non-forfeitable percentage in the Employee's Cash Vested Benefit or Accrued Benefit EXCEPT:

7

(1)     Hours of Service before this Plan or a predecessor Plan were in effect;

(2)     Hours of Service before January 1, 1967, in excess of 10 years;

(3)     Hours of Service before the Effective Date of ERISA if such service would have been disregarded under the Break in Service rules of the prior Plans in effect from time to time before such date. For this purpose, Break in Service rules are rules which result in the loss of prior vesting or benefit accruals, or which deny an Employee eligibility to participate, by reason of separation or failure to complete a required period of service within a specified period of time.

## Section 3.05     Breaks in Service

Participants who incur a Break in Service for any period after September 1, 1976, shall lose their status as Participants and all rights to benefits under the Plan (except such rights as are already Vested) except if as a result of lack of employment due to the following:

(1)     Disabilities which are compensable under Workman's Compensation; and

(2)     Total and Permanent Disability, as determined by the Trustees, for such periods as an Employee is unable to continue with his current job;

(3)     Periods of military service in any of the Armed Forces of the United States shall be counted as Hours of Service for the purpose of determining whether a Break in Service has occurred, provided the Participant was working for a Contributing Employer at the time he entered military service and made himself available for work with a Contributing Employer within the time period prescribed by law after release from military duty. Such periods of military service shall be counted for purposes of Vested Credited Service and Credited Service if required under the Uniformed Services Employment and Reemployment Rights Act of 1994.

Solely for the purpose of determining whether a one-year Break in Service has occurred, if a Participant is absent from employment with a Contributing Employer by reason of (a) her pregnancy; (b) birth of a child of such Participant; (c) placement of a child with such Participant in connection with adoption of such child; (d) to care for such child for a period beginning immediately following such birth or placement, the Hours of Service that otherwise would have been credited to such Participant but for such absence or, where that cannot be determined, 8 hours of service per day of absence, shall be treated as Hours of Service hereunder to a maximum of 160 (501, for an Employee who first becomes a Participant on or after September 1, 2008) hours for each such pregnancy or placement. The hours so credited shall be applied to the year in which such absence begins if doing so will prevent the Participant from incurring a Break in Service in that year; otherwise they shall be applied to the immediately following year.

The Trustees may require, as a condition of granting such credit, that the Participant establish to the satisfaction of the Trustees that the absence is for one of the reasons specified and the number of days for which such absence occurred.

## Section 3.06     Family and Medical Leave

Periods of leave under the Family and Medical Leave Act of 1993 shall not be taken into account in determining whether the Participant has incurred a Break in Service.

8

### Section 3.07    Termination of Participation

A person who incurs a Break in Service shall cease to be a Participant as of the last day of the Plan Year which constituted the Break in Service, unless such Participant is a Pensioner, or has acquired the right to a pension, whether immediate or deferred.

### Section 3.08    Reinstatement of Participation

If a Participant who had Vested Credited Service incurs a Break in Service and is reemployed by a Contributing Employer within 5 years of the end of the Plan Year in which the Break in Service occurred, the Participant shall be permitted to apply all new Service Credits to the Vested Service Credit previously earned. This shall not be permitted if, prior to the expiration of the 5-year period, the Participant received any payments under Article IV, in which event, no prior Service Credit shall be used in connection with or in addition to new Service Credit. No Employee who incurs a Break in Service and did not have any Vested Credited Service at the time of the Break in Service shall be permitted to add or use that non-vested prior service in connection with reemployment by a Contributing Employer.

### Section 3.09    No Guarantee of Employment

Participation in the Plan does not constitute a guarantee or contract of employment with the Contributing Employer. Such participation shall in no way interfere with any rights the Contributing Employer would have in the absence of such participation to determine the duration of the Employee's employment therewith.

# ARTICLE IV

## Benefits

**Section 4.01     Normal Retirement Benefit**

Each Participant who has attained Normal Retirement Age, shall be entitled to receive a benefit at his or her Normal Retirement Date equal to his or her Accrued Benefit.

If a Participant who participates based on an additional $0.17 per hour contribution rate provided for in the Collective Bargaining Agreement applicable to him, retires after 30 years of Credited Service and before age 62, the portion of his benefit based on Credited Service earned before September 1, 2008, shall be unreduced for payment before age 62 and the portion of his benefit based on Credited Service earned after August 31, 2008, shall be reduced for payment before age 62 by 0.5% for each month (i.e., 6% per year) that the Participant's Annuity Starting Date is at or after his attainment of age 52 and before his attainment of age 62, and further reduced on an actuarial basis in accordance with Table C for each month that the Participant's Annuity Starting Date precedes his attainment of age 52. No unreduced benefits may be accrued under this Section on or after September 1, 2008.

**Section 4.02     Early Retirement Benefits**

**(1)     Early Retirement Benefit**

Each Participant who has a minimum of 10 years of Credited Service, at least 4 years of which is Future Credited Service, and who has attained the age of 52 through 61 may retire on an Early Retirement Benefit. The Early Retirement Benefit payable under this Section shall be a retirement benefit, deferred to commence at age 62 based upon the Participant's accumulated Credited Service prior to the date the Participant terminated Covered Employment or a retirement benefit commencing immediately but reduced by 0.5% for each month (6% per year) that the Participant's Annuity Starting Date precedes the Participant's Normal Retirement Age provided such benefit does not exceed that permitted herein.

**(2)     Special Early Retirement Benefit**

(a)     With the approval of the Board of Trustees, an Employee who (i) has retired under this section and has attained at least the age of 59 years, or (ii) has retired under this section on or before the first anniversary of a Change in Ownership of his Contributing Employer with a minimum of 26 years of Credited Service and an age of at least 57 years, may retire and the early retirement allowance, based upon Credited Service earned and accrued as of the date of retirement applicable to said Employee shall be a retirement allowance commencing immediately without reduction for the commencement of such early retirement before the Normal Retirement Age; provided, however, that the Contributing Employer shall be required to and shall pay to the Fund an amount established by the enrolled actuary for the Plan for each Employee who elects to retire under this provision in an amount equal to, (A) for Employees retiring upon a Change in Ownership under (ii) of this paragraph, the total of all pension payments the Contributing Employer would have made for all such retiring Employees as if they had remained in Covered Employment until attaining the earlier of age 62 or 30 years of Credited Service, said amount to be calculated on the basis of 1,920 hours per year at the rates in effect in each year, and said amount to be paid to the Fund quarterly in advance (these payments are not and shall not be deemed or construed as payment for, or result in, additional Credited Service beyond the Employee's retirement date), and (B) for all Employees

retiring hereunder, the present value at the date of commencement of the retirement allowance, using the actuarial assumptions of the 1983 GAM Table (Male) and a 7.0% annual interest rate, multiplied by 0.5% for each month (6% per year) that the Employee's early retirement under this provision precedes whichever of (i), (ii), or (iii) below is the applicable date:

    (i)    if the Employee is closer to age 62 than the date the Employee would have attained 30 years of Credited Service had the Employee continued in Covered Employment, the attainment of age 62,

    (ii)    if the Employee would attain age 62 within 24 months after the date the Employee would have attained 30 years of Credited Service had the Employee continued in Covered Employment, the date the Employee would have attained 30 years of Credited Service had the Employee continued in Covered Employment, or

    (iii)    if the Employee would attain age 62 on a date greater than 24 months after the date on which the Employee would have attained 30 years of Credited Service had the Employee continued in Covered Employment, the attainment of age 60.

(b)    The term "Change in Ownership" as used herein shall mean a purchase of assets and/or shares of a Contributing Employer or division of a Contributing Employer by a new employer in which the previous Contributing Employer or its affiliates have no direct or indirect ownership interest and where the new employer has assumed the Collective Bargaining Agreements in effect with the Union. In order to constitute a Change in Ownership, it must be determined that the purchaser is expected to continue operations so as not to cause a complete or partial termination to occur under Section 4201 of ERISA within the succeeding five years and that the purchaser either has assumed the Contributing Employer's contribution history in accordance with Section 4204(b) of ERISA or has otherwise agreed to assume full, complete and primary responsibility for any withdrawal liability which might occur as a result of the purchase of assets and/or shares, and the seller remains secondarily liable for withdrawal liability for those 5 years.

(c)    Notwithstanding anything in this Plan to the contrary, this Section 4.02(2) shall no longer apply effective July 1, 2009.

**Section 4.03    Deferred Vested Benefit**

(1)    The amount of the Deferred Vested Benefit payable at Normal Retirement Age shall be based on the formula in effect on the Participant's date of termination of Covered Employment. In no event, however, shall the benefit payable at Normal Retirement Age be less than the benefit that would have been payable if the Participant had terminated on March 31, 1998.

A Participant who completed 10 years of Credited Service of which at least 4 years was Future Credited Service and who terminated Covered Employment before April 1, 1998 for any reason shall be entitled to a benefit upon attaining Normal Retirement Age, based on the formula in effect on the Participant's Normal Retirement Date or the formula in effect on August 31, 2008 (whichever produces the larger benefit), computed as a Normal Retirement Benefit and based upon the Participant's Credited Service accumulated prior to the date of the Participant's termination of Covered Employment.

(2)   Upon reaching Normal Retirement Age, an employee upon termination of Covered Employment may elect to defer retirement benefits until a later date. In such event, the Normal Retirement Benefit at such later date shall be the Actuarial Equivalent of a single life annuity commencing at Normal Retirement Age. Other retirement option amounts such as the Ten Year Certain and Lifetime or Joint and Survivor options shall be determined in accordance with the increased normal benefit at the time benefits are to actually commence.

### Section 4.04   Standard Form of Benefit

The standard payment form for unmarried Participants on the Annuity Starting Date shall be a straight life annuity payable monthly for the life of the Participant and shall terminate upon the Participant's death. As set forth in Section 4.13, the standard payment form for Participants who are married on the Annuity Starting Date shall be a 100% Joint and Survivor Annuity.

### Section 4.05   Restrictions and Valuations of Distributions

To receive a pension under the Plan, a Participant must have separated from Covered Employment after fulfilling the requirements for receipt of a nonforfeitable pension, except as otherwise provided in Section 4.20.

The present value of any Accrued Benefit and the amount of any distribution, including a single sum, must not be less than the amount calculated using the Applicable Interest Rate as defined in Section 2.07, and the Applicable Mortality Table as defined in Section 2.08.

The present value of any optional form of benefit cannot be less than the present value of the Normal Retirement Benefit determined in accordance with the preceding paragraph.

The rules under this Section must also be used to compute the present value of the Accrued Benefit for purposes of determining whether consent for distribution is required under this Article IV.

### Section 4.06   Present Value of Vested Accrued Benefit (Lump Sum Option)

For Credited Service earned up to but not after August 31, 2008, a Participant, upon termination of Covered Employment, may elect to receive an immediate lump sum payment in lieu of the single life annuity or joint and survivor payment form payable at Normal Retirement Age, provided that payment of the Lump Sum Option is permitted by the Pension Protection Act of 2006. There shall be no Lump Sum Option for any benefit attributable to Credited Service earned on or after September 1, 2008. The Lump Sum Option shall be payable only with the written consent of the Participant's spouse made in accordance with Section 417(e) of the Code and the regulations promulgated thereunder and shall be the greater of the Cash Vested Benefit (as provided herein) and the then lump sum Actuarial Equivalent of the Participant's Vested Accrued Benefit payable at Normal Retirement Age. For this purpose, the Participant's Vested Accrued Benefit shall be based on the monthly Normal Retirement Benefit to which a Participant would be entitled during the Participant's last 10 years of consecutive contribution categories, as shown on the attached (or the then current) Schedule of Benefits, multiplied by the Employee's total Credited Service, past and future, up to a maximum of 35 years (prior to April 1, 1998, the maximum Credited Service was 30 years) as defined or explained in Sections 2.01 or 4.06, respectively.

This single lump sum benefit shall be payable to the Participant or, in the event of the Participant's death prior to termination of Covered Employment, or after termination of Covered Employment and prior to his or her receipt of said benefit, to his or her surviving spouse unless a benefit is payable pursuant to Section 4.18. In the event the Participant dies without a surviving spouse the benefit shall be payable to his or her surviving Beneficiary, designated on a form prescribed by the Plan, or in the absence of a

surviving Beneficiary, then to his or her estate. A Beneficiary of a Participant who would have been entitled to a lump sum benefit upon the death of the Participant, and who is not entitled to a surviving spouse benefit payable under Section 4.18, shall instead be entitled to a ten-year certain benefit, based on the Actuarial Equivalent of the Participant's Vested Accrued Benefit, beginning no later than the end of the calendar year following the calendar year in which the Participant's death occurs. Upon the death of the (or in the absence of a) designated Beneficiary, any remaining benefit shall be payable to the Participant's heirs in accordance with the intestate succession rules under New Jersey law, except that if there is no living person the remaining benefit shall be forfeited.

A Participant who terminates Covered Employment on or after September 1, 2008, and elects to receive a Lump Sum Option shall receive a lump sum payment based only on the Participant's Credited Service earned before September 1, 2008. Effective September 2, 2008, based upon distribution of the Notice of Critical Status, no lump sum shall be paid pursuant to this Section 4.06 to a Participant who is not in Covered Employment on or after September 2, 2008. No lump sum shall be paid pursuant to this Section 4.06 to any other Participant or to his or her surviving Beneficiary on or after September 2, 2008, except as provided in the first paragraph of Section 4.10, as long as the Plan is in critical status, as determined under the Pension Protection Act of 2006. If a Participant had an Annuity Starting Date within a period during which the Plan was subject to benefit restrictions so that a lump sum was not an available form of payment, the Participant may not modify his election at a later date once the benefit restrictions cease to apply to the Plan.

### Section 4.07  Accrued Benefit Vesting Schedule and Cash Vested Benefit

(1)  A Participant shall be vested in his or her Accrued Benefit and Cash Vested Benefit in accordance with the following table:

| Years of Vested Credited Service | Percentage of Accrued Benefit |
|---|---|
| Completion of 1 Year and 1 Day up to 2 Years | 25% |
| Completion of 2 Years and 1 Day up to 3 Years | 50% |
| Completion of 3 Years and 1 Day up to 4 Years | 75% |
| Completion of 4 Years and 1 Day or more | 100%. |

(2)  For a Participant whose Covered Employment commences on or after September 1, 2002, his or her Accrued Benefit and Cash Vested Benefit shall vest in accordance with the following table:

| Years of Vested Credited Service | Accrued Benefit |
|---|---|
| Completion of Less Than 5 Years | 0% |
| Completion of 5 Years and 1 Day or more | 100%. |

(3)  A Participant who separates from Covered Employment and is subsequently re-employed in Covered Employment prior to incurring a Break in Service will continue to vest, starting at the point in the vesting schedule where he or she left Covered Employment, in both the pre-separation and post-separation Accrued Benefit.

**Section 4.08    Cash Vested Benefit**

Cash Vested benefits consist of the accumulated Employer Payments made by Contributing Employers on behalf of the Participant, without interest. In the event an Employee, prior to accumulation of one year and one day of participation under the Plan, becomes Totally and Permanently Disabled, and sufficient proof of same is furnished to the Board of Trustees, payment will be made in the amount of 25% of the accumulated Cash Vested Benefit accrued by said Employee.

If a Participant terminates Covered Employment and elects to receive a Cash Vested Benefit, as hereinafter described, such Participant, upon waiving rights to any and all Pension Benefits under the Plan, shall be paid by the Board of Trustees the Employer Payments made on behalf of the Participant after January 1, 1965, subject to the vesting provision set forth in Section 4.07.

Such election shall be made by forwarding a written notice to the Board of Trustees within 90 days after the Participant terminates Covered Employment, provided, however, that if the Cash Vested Benefit exceeds $5,000, then such election shall be consented to in writing by both the Participant and his/her spouse or, if the Participant has died, then by the surviving spouse.

The Board of Trustees, following receipt of said written notice of the Participant's election, shall pay to the Participant in a lump sum, the vested percentage of Cash Vested Benefit payable to the Participant; provided, however, that in no event shall such Cash Vested Benefit be less than the present value of the Participant's Vested Accrued Benefit as of the date of termination from Covered Employment.

The above provisions of Section 4.08 ("Cash Vested Benefit") shall not apply to any Employee whose Covered Employment commences on or after September 1, 2002.

Notwithstanding anything in this Section 4.08 to the contrary, a Participant who terminates Covered Employment on or after September 1, 2008, and elects to receive a Cash Vested Benefit shall receive such benefit in an amount equal to the accumulated Employer Payments made by Contributing Employers on behalf of the Participant as of August 31, 2008. Effective September 2, 2008, based upon distribution of the Notice of Critical Status, a Cash Vested Benefit under this Section 4.06 shall no longer be payable to a Participant who is not in Covered Employment on or after September 2, 2008. No Cash Vested Benefit under this Section 4.06 shall be paid to any other Participant or to his or her surviving spouse on or after September 2, 2008, except as provided in the first paragraph of Section 4.10, as long as the Plan is in critical status, as determined under the Pension Protection Act of 2006.

**Section 4.09    Vesting of a Participant's Interest**

A Participant is fully Vested in the greater of the Actuarial Equivalent of his or her Accrued Benefit or the Cash Vested Benefit upon the occurrence of any of the following events:

(1)    Upon the termination or partial termination of this Plan (including the complete discontinuance of Employer Payments thereunder, but only to the extent the Plan is funded as of the date of Plan termination);

(2)    Upon the completion of the vesting schedule set forth in Section 4.07.

**Section 4.10    Small Benefit Payment**

If a Participant terminates Covered Employment, and the lump sum Actuarial Equivalent of the Vested Accrued Benefit or Cash Vested Benefit derived from Employer Payments is not greater than $5,000, the Trustees shall make a lump sum distribution of the value of the entire Vested portion of such Accrued

Benefit or Cash Vested Benefit in lieu of the regular monthly benefit otherwise payable, and the non vested portion will be treated as a forfeiture. Effective March 28, 2005, notwithstanding any provision of this Plan to the contrary, in the event of a mandatory distribution greater than $1,000 in accordance with the provisions of this paragraph of Section 4.10, if the Participant does not elect to have such distribution paid directly to an eligible retirement plan (as defined in Section 5.01(2)(d)) specified by the Participant in a direct rollover (as defined in Section 5.02(2)(a)) or to receive the distribution directly, the Trustees shall pay the distribution in a direct rollover to an individual retirement plan designated by the Trustees.

If a Participant terminates Covered Employment, and the lump sum Actuarial Equivalent of the Participant's Vested Accrued Benefit or Cash Vested Benefit derived from Employer Payments exceeds $5,000, the Participant may elect to receive a distribution of the lump sum Actuarial Equivalent of the entire Vested portion of such Accrued Benefit or Cash Vested Benefit provided, however; that such election shall be consented to in writing by both the Participant and his/her spouse, or if the Participant has died, the surviving spouse. Effective September 2, 2008, a lump sum payment of a Participant's Vested Accrued Benefit or Cash Vested Benefit derived from Employer Payments shall be suspended, reduced or eliminated in accordance with Sections 4.06 and 4.08, as applicable.

### Section 4.11   Treatment of Amounts Not Distributed

A Participant who terminates Covered Employment shall forfeit the non-vested portion of the Cash Vested Benefit or Actuarial Equivalent of his or her Accrued Benefit at the earlier of the distribution of his/her Cash Vested Benefit or Vested Accrued Benefit or the completion of a Break in Service. For this purpose, a nonvested Participant is deemed to have received a distribution of his or her Vested Accrued Benefit at the time of termination of employment, which will be restored if the Participant is rehired in Covered Employment prior to a 5-year Break in Service.

### Section 4.12   Payment of Benefits Under the Plan

Monthly retirement benefits shall begin on the Annuity Starting Date and payments shall be made on the first day of each month thereafter. Payments shall cease with the payment next preceding the death of the Pensioner, unless the "100% Joint and Survivor Annuity," "100% Joint and Survivor Annuity with Ten Years Certain," or "Ten Year Certain," or "50% Joint and Survivor Annuity" hereinafter described in this Article is in effect, in which event payments shall continue in accordance with the provisions of such options as may be applicable.

### Section 4.13   Automatic 100% Joint and Survivor Annuity

(1)     An Employee who becomes a Pensioner on or after his or her Normal Retirement Date shall receive a reduced benefit payable during the joint lifetime of the Pensioner and spouse and continuing during the lifetime of the survivor of them after the death of either the Pensioner or spouse, unless the Pensioner elects not to be covered by the 100% Joint and Survivor Annuity, in the manner hereinafter provided.

(a)     Such reduced benefit shall be an annuity for the life of the Pensioner with a survivor annuity for the life of the spouse which is equal in amount and payable during the joint lives of the Pensioner and spouse and which is the Actuarial Equivalent of a single annuity for the life of the Pensioner.

This 100% Joint and Survivor Annuity shall become effective on the Annuity Starting Date but shall not become effective unless the Pensioner and spouse shall have been married to each other throughout the one-year period ending on the Annuity Starting

Date. If the spouse of the Employee dies before the Annuity Starting Date, this 100% Joint and Survivor Annuity shall be canceled.

For purposes of the preceding paragraph, a Participant and the Participant's spouse shall be treated as married throughout the one-year period ending on the Participant's Annuity Starting Date even though they are married to each other for less than one year before the Annuity Starting Date if they remain married to each other for at least one year. The Participant will not be provided with a new or retroactive election and the spouse will not be provided with a new consent when the one-year period is satisfied. If the Participant and the spouse do not remain married for at least one year, the Participant shall be treated as having not been married on the Annuity Starting Date, the spouse shall lose any survivor benefit rights, and there shall be no retroactive correction of the amount paid the Participant.

(b)     An Employee may elect not to be covered by the 100% Joint and Survivor Annuity, herein set forth, provided he or she had obtained spousal consent, in writing, duly witnessed by a plan representative or notary public and by forwarding the election to the Fund Office during the 90-day period ending on the Annuity Starting Date or as otherwise permitted by Section 417(a)(7)(B) of the Code.

Any waiver of the 100% Joint and Survivor Annuity shall not be effective unless: (i) the Participant's spouse consents in writing to the election; (ii) the election designates a specific alternate beneficiaries, which may nor be changed without spousal consent (or the spouse expressly permits designations by the Participant without any further spousal consent); (iii) the spouse's consent acknowledges the effect of the election; and (iv) the spouse's consent is witnessed by a plan representative or notary public. Additionally, a Participant's waiver will not be effective unless the election designates a form of benefit payment which may not be changed without spousal consent (or the spouse expressly permits designations by the Participant without any further spousal consent).

The election provided for herein may be made and/or revoked at any time and any number of times during the 90-day period ending on the Annuity Starting Date but in no event shall any such election or revocation be changed after the Annuity Starting Date except as permitted by Section 417(a)(7)(B) of the Code.

The Fund Office shall, at least 30 days (and not more than 90 days) prior to the Participant's Annuity Starting Date, provide to the Employee a written explanation of (i) the terms and conditions of the Joint and Survivor Annuity, as well as the dollar and cents effect of such election, (ii) the Participant's right to make and the effect of an election to waive the 100% Joint and Survivor Annuity, (iii) the rights of a Participant's spouse, and (iv) the right to make, and the effect of, a revocation of a previous election to waive the 100% Joint and Survivor Annuity. The written notice shall include an explanation of the material terms of the available forms of payment, including effective for Annuity Starting Dates on or after January 1, 2007, the relative value of the optional payment forms. Effective September 1, 2007, the written notice shall also include a description of the Participant's right to defer a distribution, including a description of the consequences of failing to receipt of a distribution. Written consent of a Participant to a distribution (if required) may not be made before he receives such notice and must not be made more than 90 days before a distribution commences or is made. The written explanation may be provided less than 30 days prior to the first payment of benefits if the requirements of this Section would be satisfied if the date of the first payment is substituted for the Annuity Starting Date. The Plan will not fail to satisfy the 90-day timing rule merely because, due

solely to administrative delay, a distribution begins more than 90 days after the written explanation of the 100% Joint and Survivor Annuity is provided to the Participant.

(2) However, no spousal consent shall be required if it has been demonstrated to the satisfaction of the Trustees that:

(a) there is no spouse,

(b) the spouse cannot be located,

(c) the Participant and Spouse are divorced,

(d) the Participant has been abandoned by the spouse as confirmed by court order, or

(e) consent of the spouse cannot be obtained because of extenuating circumstances, as recognized in the Code.

(3) An Employee who becomes a Pensioner at age 52 through age 61 shall receive, unless he or she and his or her spouse make an election to the contrary, a reduced benefit payable during the joint lives of the Pensioner and his (her) spouse and continuing during the lifetime of the survivor after death of the Pensioner or spouse.

### Section 4.14    Optional 100 % Joint and Survivor Annuity with Ten Year Certain

A Participant who becomes a Pensioner may elect to receive a reduced benefit payable during the joint lifetime of the Pensioner and spouse and continuing during the lifetime of the survivor of them after the death of either the Pensioner or spouse. A Participant's election of the option under this Section requires his spouse's consent in accordance with the rules in Section 4.13. The surviving spouse shall be eligible for a survivor benefit only if the Participant and spouse were married for one year as of the date of the Participant's death.

Such reduced benefit shall be an annuity for the life of the Pensioner with a survivor annuity for the life of the spouse which is equal in amount and payable during the joint lives of the Pensioner and spouse, guaranteed for a period of 10 years, and which is the Actuarial Equivalent of a single annuity for the life of the Pensioner.

If the Pensioner and eligible spouse die prior to the expiration of a 10 year period beginning on the Annuity Starting Date, payments shall be continued to a designated Beneficiary for the remainder of the 10 year period or, in the absence of a surviving designated Beneficiary, the present value of such payments shall be paid to the deceased Pensioner's estate in a lump sum.

### Section 4.15    Election of Lifetime and Ten Year Certain Option

A Pensioner who does not have a spouse or who, together with his or her spouse makes an election in accordance with this Article not to take the Automatic 100% Joint and Survivor Annuity under Section 4.13, or who has not made an affirmative election in accordance with this Article for an Automatic 100% Joint and Survivor Annuity, and whose spouse has waived his or her right to such an annuity may elect the following option.

A Pensioner shall have the option to convert his (her) Normal Retirement Benefit into a reduced retirement benefit payable for the life of the Pensioner but guaranteed for a period of 10 years beginning on the Annuity Starting Date.

17

If the Pensioner dies prior to the expiration of the 10 year period, payments shall be continued to a designated Beneficiary for the remainder of the 10 year period or, in the absence of a surviving designated Beneficiary, the present value of such payments shall be paid to the deceased Pensioner's estate in a lump sum.

### Section 4.16    Election of 50% Joint and Survivor Annuity

Effective September 1, 2009, a Participant who becomes a Pensioner may elect to receive a reduced benefit payable under this Section if he and his spouse elect, in accordance with the rules in Section 4.13, not to take the Automatic 100% Joint and Survivor Annuity. Such reduced benefit shall be an annuity for the life of the Pensioner with a survivor annuity for the life of the spouse which is equal to 50% of the amount payable to the Pensioner and which is the Actuarial Equivalent of a single life annuity for the life of the Pensioner.

### Section 4.17    Right of Revocation

A Participant, prior to the Annuity Starting Date, may revoke any election described above made pursuant to this Article, provided that he or she has obtained spousal consent, in writing, duly witnessed by a plan representative or notary public, and by forwarding same by registered or certified mail notifying the Pension Fund of such election.

A Pensioner may not revoke an election made pursuant to this Article after the Annuity Starting Date except as permitted by Section 417(a)(7)(B) of the Code.

### Section 4.18    Pre-Retirement Survivor Annuity

If an Participant who is Vested dies prior to attaining age 52, and before the Annuity Starting Date, then a survivor benefit shall be paid to the surviving spouse of such Employee, provided they have been married to each other throughout the one-year period ending on the date of the Participant's death. Such survivor benefit shall be in an amount that would have been paid under the automatic 100% Joint and Survivor Annuity if the Employee had (a) separated from service on the day of death; (b) survived to the earliest retirement age (age 52); (c) retired with an immediate qualified joint and survivor annuity at the earliest retirement age; and (d) died on the day after the day on which he or she would have attained the earliest retirement age.

In the event that a Vested Participant age 52 or over dies before retirement the Participant's surviving spouse shall receive such survivor benefits as would have been payable by the Plan had the deceased Participant applied and qualified for retirement benefits during the month immediately preceding said Participant's death, provided they have been married to each other throughout the one-year period ending on the date of the Participant's death.

### Section 4.19    Retroactive Annuity Starting Date

(1)     The Plan may provide a retirement benefit based on a retroactive Annuity Starting Date if the requirements described in subsections (2) and (3) below are satisfied. A "retroactive Annuity Starting Date" is an Annuity Starting Date affirmatively elected by a Participant that occurs on or before the date the Plan provides the written explanation required by Section 4.13 to the Participant. The Participant shall receive a single payment to reflect any missed annuity payment(s) for the period beginning with the Annuity Starting Date to the date pension payments actually begin, with an appropriate adjustment for interest from the date of the retroactive Annuity Starting Date to the date of actual payment. The pension benefit determined as of the

retroactive Annuity Starting Date must satisfy the requirements of Article XIII, with the applicable interest rate and applicable mortality table determined as of that date. Future annuity payments for a Participant who elects a retroactive Annuity Starting Date shall be the same as the annuity payments that would have been paid if payments actually had begun on the retroactive Annuity Starting Date.

A Participant may not elect a retroactive Annuity Starting Date that is more than three months before the date the Participant files an application for benefits with the Board of Trustees or that precedes the date upon which the Participant otherwise could have started receiving a pension under the terms of the Plan in effect as of the retroactive Annuity Starting Date.

(2)    A Participant shall be permitted to elect to receive a pension based on a retroactive Annuity Starting Date only if the following requirements are met:

    (a)    The Participant's spouse, determined as of the date annuity payments begin (including an alternate payee who is treated as the spouse under a qualified domestic relations order), consents to the distribution in a manner that satisfies the requirements of Section 4.13. This spousal consent requirement does not apply if the amount of the spouse's survivor annuity payments under the form of pension benefits elected pursuant to the retroactive Annuity Starting Date election is no less than the amount that the survivor payments to such spouse would have been under an optional form of benefit that would satisfy the requirements to be a qualified joint and survivor annuity under Section 4.13 and that has an Annuity Starting Date after the date the explanation required by Section 4.13 was provided. If the Participant had a different spouse on the retroactive Annuity Starting Date than on the date pension benefits actually begin, consent of that former spouse is not needed to waive the 100% Joint and Survivor Annuity with respect to the retroactive Annuity Starting Date, unless otherwise provided under a qualified domestic relations order.

    (b)    The pension benefits, including appropriate interest adjustments, based on the retroactive Annuity Starting Date, satisfy the requirements of Article XIII, assuming that the date the benefit payments actually begin is substituted for the Annuity Starting Date for all purposes, including for purposes of determining the Applicable Interest Rate and the Applicable Mortality Table. However, satisfaction of the benefit limitations of Article XIII does not have to be demonstrated as of the date benefit payments actually begin if the payments begin no more than 12 months after the retroactive Annuity Starting Date.

(3)    The written explanation required by Section 4.13 generally must be provided no less than 30 days and no more than 90 days before the date pension benefits start. The election to receive the benefits must be made after the written explanation is provided and on or before the date of the first payment. The written explanation may be provided less than 30 days prior to the first payment of benefits if the requirements of Section 4.13 would be satisfied if the date of the first payment is substituted for the Annuity Starting Date. The Plan will not fail to satisfy the 90-day timing rule merely because, due solely to administrative delay, a distribution begins more than 90 days after the written explanation of the qualified joint and survivor annuity is provided to the Participant.

## Section 4.20    Required Beginning Date

Distributions of pension benefits, as provided herein, shall be made to Participants, or commence, not later than the earlier of (1) the April 1st following the calendar year in which the Participant retires, or (2) the April 1st following the calendar year in which the Participant attains age 70½. A Participant, subject to the distribution rules in the preceding sentence and the next two paragraphs, may elect in writing on a

form approved by the Trustees to continue to defer receipt of benefits (subject to an Actuarial Equivalent increase in his benefit in the manner described below) until the date on which he actually retires, even if such date is after the April 1st following the calendar year in which the Participant attains age 70½.

A Participant who attains age 70½ and who is still employed in Covered Employment on the April 1 of the calendar year following the calendar year in which he attains age 70½, shall begin to receive benefit payments under the Plan as of that date, unless he elects to defer receipt of his benefits until his actual retirement date. Such election shall be irrevocable. The Participant may elect payment in any of the forms of payment available under the Plan, including a lump sum, in accordance with the rules in this Article. Any and all subsequent payments to the Participant shall be made in the same form. If the Participant dies prior to his actual retirement date, the terms of the form of payment in effect as of his date of death shall determine whether any benefits are to be paid to his Beneficiary after his death. The amount of such benefit shall be calculated as if he had retired on the actual benefit commencement date. As of his actual retirement date, the amount of the benefit to be paid shall be recalculated under the benefit formula. The amount to be paid shall be equal to the recalculated amount, adjusted (if required under the Code) for the Actuarial Equivalent of additional benefits accrued under the benefit formula since the actual benefit commencement date, and reduced (but not below the amount of the monthly benefit then in effect or zero in the case of a prior lump sum distribution) by the Actuarial Equivalent of the total benefit distributions made to the Participant as of his actual retirement date. Regardless, the benefit reduction in the preceding sentence applies only to benefit accruals after June 30, 2009.

A Participant who attains age 70½, who is still employed in Covered Employment on the April 1 of the calendar year following the calendar year in which he attains age 70½, and who elects that payment of his retirement benefit not begin until he actually retires shall have his monthly retirement benefit increased actuarially consistent with Section 2.02 to take into account the period in which he could have been, but is not, receiving any benefits under the Plan. The actuarial increase shall begin on the April 1 following the calendar year in which the Participant attains age 70½, and end on the date on which benefits commence after retirement in an amount sufficient to satisfy Section 401(a)(9) of the Code. The amount of actuarial increase payable as of the end of the period for actuarial increases shall be no less than the Actuarial Equivalent of the Participant's retirement benefits that would have been payable as of the date the actuarial increases must commence, plus the Actuarial Equivalent of additional benefits accrued after the date, reduced by the Actuarial Equivalent of any distributions made after that date. The actuarial increase under this Section is generally the same as, and not in addition to, the actuarial increase under that same period under the Plan's assumptions in Section 2.02 for determining Actuarial Equivalents for purposes of satisfying Section 411 of the Code to reflect the delay in payments after Normal Retirement Date, except that the actuarial increase required under Section 401(a)(9)(C) of the Code must be provided even during the period during which a Participant is in ERISA Section 203(a)(3)(B) service. For purposes of Section 411(b)(1)(H) of the Code, the actuarial increase under this Section shall be treated as an adjustment attributable to the delay in distribution of benefits after the Participant reaches his Normal Retirement Date. Accordingly, to the extent permitted under Section 411(b)(1)(H) of the Code, the actuarial increase required under Section 401(a)(9)(C)(iii) of the Code may reduce the benefit accrual otherwise required under Section 411(b)(1)(H)(i) of the Code, except that suspension of benefit rules are not applicable.

In the event a Participant reaches age 70½ and continues in Covered Employment subsequent to age 70½, and has accrued the maximum Credited Service permitted under the Plan, all Employer Payments made on his behalf to the Plan thereafter shall inure to the Participant upon termination of Covered Employment. In the event the Participant dies prior to the receipt of said monies, the balance shall be paid to the Beneficiary in accordance with the applicable provisions of the Plan.

All distributions required under this Plan shall be determined and made in accordance with the regulations under Section 401(a)(9) of the Code, including the minimum distribution incidental benefit requirement of Section 1.401(a)(9)-2 of the Treasury regulations. In accordance with Section 401(a)(9)(G) for the

20

Code, any distribution required to satisfy the minimum distribution incidental benefit requirement shall be treated as a required distribution under Section 401(a)(9) of the Code. The provisions of this paragraph shall apply to any distribution of a Participant's benefit under this Plan and will take precedence over any distribution options in this Plan inconsistent with Section 401(a)(9) of the Code.

### Section 4.21    Benefit Payments Generally

Unless the Participant elects (or is deemed to elect) otherwise, the payment of benefits will begin not later than the 60th day after the later of the close of the Plan Year in which the Participant attains Normal

Retirement Age or the Participant terminates Covered Employment and has fully completed all necessary application forms.

### Section 4.22    Bridging

(1) (a)   Eligible employees of Allied Beverage ("Allied") in Covered Employment on August 31, 2008, who have 23 years and 7 months or more of Credited Service (at the additional $0.17 category) and who so elect in writing by September 30, 2008, shall be entitled to receive additional years of Credited Service under the Plan for each year of contiguous service with Allied after August 31, 2008 up to a maximum of 30 years of Credited Service. The rate of benefit accrual for all years of Credited Service earned before September 1, 2008 shall be at the accrual rate associated with Allied's contribution rate in effect on August 31, 2008, as provided in Table A of the Plan. The rate of benefit accrual for all years of Credited Service earned after August 31, 2008, shall be at the accrual rate associated with Allied's contribution rate in effect on August 31, 2008, as provided in Table B to the Plan. The monthly benefit upon retirement of such Participants who earn 30 years of Credited Service prior to retirement from Allied shall not be reduced on account of age at retirement. The monthly benefit upon retirement of such Participants who have not earned 30 years Credited Service prior to retirement from Allied shall be reduced pursuant to the reduction factors set out in the Plan. A person who has elected this option, and who continues in employment with Allied beyond 30 years of Credited Service, shall, after attainment of 30 years of Credited Service, no longer accrue benefits under this Plan, and shall commence participation in the Local 863 Retirement Savings Plan at the then-applicable rate for all service beyond 30 years and until his retirement.

In no event, however, shall any employee be entitled to a retirement benefit under the Plan until they have severed their employment with Allied and retired.

(1) (b)   Eligible Allied employees in Covered Employment on August 31, 2008, who have 23 years and 7 months or more of Credited Service and who elect in writing by September 30, 2008, to forgo accrual of benefits in the Fund pursuant to section (a)(1), above, and instead become participants in the Local 863 Retirement Savings Plan effective September 1, 2008 shall be awarded years of Credited Service, but only for eligibility purposes, for all years of contiguous service with Allied after August 31, 2008 up to a maximum of 30 years. Such persons who have 30 or more years of eligibility credit shall be entitled, upon retirement, to receive their Accrued Benefit as of August 31, 2008, without reduction on account of age. Such persons shall continue to participate in the Local 863 Retirement Savings Plan until their actual date of retirement, even if beyond 30 years. In no event, however, shall any employee be entitled to a retirement benefit under the Plan until they have severed their employment with Allied and retired.

(2)   Eligible employees of R&R Marketing ("R&R") in Covered Employment on August 31, 2008 who have 22 years and 7 months or more of Credited Service (at the additional $0.17 category) shall be entitled to receive additional years of Credited Service under the Plan for each year of

contiguous service with R&R after August 31, 2008, up to a maximum of 30 years of Credited Service. The rate of benefit accrual for all years of Credited Service earned before September 1, 2008, shall be at the accrual rate associated with R&R's contribution rate in effect on August 31, 2008, as provided in Table A of the Plan. The rate of benefit accrual for all years of Credited Service earned after August 31, 2008, shall be at the accrual rate associated with R&R's contribution rate in effect on August 31, 2008, as provided in Table B to the Plan. The monthly benefit upon retirement of such Participants who earn 30 years of Credited Service prior to retirement from R&R shall not be reduced on account of age at retirement. The monthly benefit upon retirement of such Participants who have not earned 30 years of Credited Service prior to retirement from R&R shall be reduced pursuant to the reduction factors set out in the Plan. Any such employee, who having reached 30 years of Credited Service, continues in employment with R&R, shall at that point cease accruing benefits under this Plan and become a participant in the Local 863 Retirement Savings Plan at the rate applicable in the contract with the Union, but shall not be permitted to receive his pension from or based upon the Plan benefits until his actual date of termination of service from R&R.

(3)     The Trustees may amend the Plan to adopt a change to the Plan's benefit structure, similar to that in (a) or (b) above, pursuant to an agreement between the Union and a Contributing Employer that is completely withdrawing from the Plan, as long as the Trustees establish the amount to be paid by the Contributing Employer in a single payment to the Plan for such additional benefits and the Contributing Employer makes such payment.

**Section 4.23     Suspension of Benefits**

(1)     This Section applies only to benefit accruals after June 30, 2009. Notwithstanding anything in this Section to the contrary, benefits shall not be suspended (pursuant to the provisions of this Section below) beyond the April 1 following the calendar year in which the Participant reaches age 70½, subject to the rules of Section 4.20 of this Plan.

(2)     If the Participant has not yet attained Normal Retirement Age, his monthly benefit shall be suspended for any month in which the Participant is Retired (i.e., has separated from Covered Employment after fulfilling all of the requirements for receipt of a Vested benefit), and is reemployed in Disqualifying Employment before he has attained Normal Retirement Age.

(3)     If the Participant has attained Normal Retirement Age, his monthly benefit shall be suspended for any month in which he was reemployed, or continued to work and was paid for 40 or more hours in Disqualifying Employment. Paid non-work time shall be counted toward the measure of 40 hours if paid for vacation, holiday, illness or other incapacity, layoff, jury duty, or other leave of absence or other entitlement pay.

(4)(a)  "Disqualifying Employment" means employment or self-employment that is (i) in an industry covered by the Plan when the Participant's pension payments began; (ii) in the geographic area covered by the Plan when the Participant's pension payments began; or (iii) in any occupation in which the Participant worked under the Plan at any time or any occupation or craft covered by the Plan at the time the Participant's pension payments began. For this purpose, the term "industry covered by the Plan" means any industry or business engaged in by any Contributing Employer, and the term "the geographic area covered by the Plan" means any state in which contributions were made or required to be made by or on behalf of a Contributing Employer and the remainder of any Metropolitan Statistical Area which falls in part within that state.

(4)(b)  "Suspension of Benefits" for a month means non-entitlement to benefits for the month. If benefits were paid for a month for which benefits were later determined to be suspended, the

22

overpayment shall be recoverable through deductions from future pension payments, pursuant to subsection (6)(b) and in accordance with this Section.

(5)     Notices.

(a)     Upon commencement of pension payments, the Trustees shall notify the Pensioner of the Plan rules governing Suspension of Benefits. If benefits have been suspended and payment resumed, a new notice shall, upon resumption, be given to the Participant if there has been any material change in the suspension rules.

(b)     A Pensioner shall notify the Trustees in writing within 30 days after starting any work of any type that is or may be Disqualifying Employment under the provisions of the Plan and without regard to the number of hours or such work (that is, whether or not less than 40 hours in a month). If a Pensioner has worked in Disqualifying Employment in any month and has failed to give timely notice to the Trustees of such employment, the Trustees shall presume that he worked for at least 40 hours in such month and any subsequent month until the Participant gives notice that he has ceased Disqualifying Employment. The Participant shall have the right to overcome such presumption by establishing that his work was not in fact an appropriate basis, under the Plan, for suspension of his benefits.

(c)     A Pensioner whose pension has been suspended shall notify the Trustees when Disqualifying Employment has ended. The Trustees shall have the right to hold back benefit payments until such notice is filed with the Trustees and verified by the Trustees.

(d)     A Participant may ask whether a particular employment will be disqualifying. The Trustees shall provide the Participant with its determination.

(e)     The Trustees shall inform a Participant of any suspension of his benefits by notice given by personal delivery or first class mail, to the address at which the Participant was receiving benefits, during this first calendar month in which his benefits are withheld. Such notice shall include a description of the specific reasons for the suspension, a copy of the relevant provisions of the Plan, reference to the applicable regulation of the U.S. Department of Labor, and a statement of the procedure for securing a review of the suspension. In addition, the notice shall describe the procedure for the Participant to notify the Plan when his Disqualifying Employment ends. If the Trustees intend to recover prior overpayments by offset under subsection (6)(b), the suspension notice shall explain the offset procedure and identify the amount expected to be recovered, and the periods of employment to which they relate.

(6)     Resumption of Benefit Payments.

(a)     Benefits shall be resumed after the last month for which benefits were suspended, with payments beginning no later than the third month after the last calendar month for which the Participant's benefit was suspended, provided the Participant has complied with the notification requirements of paragraph (5)(b) above.

(b)     Overpayments attributable to payments made for any month or months for which the Participant had Disqualifying Employment shall be deducted from pension payments subsequent to the period of suspension. A deduction from a monthly benefit for a month after the Participant attained Normal Retirement Age shall not exceed 25% of the pension amount (before deduction), except for the first pension payment made upon resumption

23

after a suspension. If a Pensioner dies before a recoupment of overpayments has been completed, deductions shall be made from the benefits payable to his Beneficiary or contingent annuitant, subject to the 25% limitation on the rate of deduction.

**Section 4.24    Benefit Payments Following Suspension**

(1)    The amount of a Pensioner's benefit when resumed following suspension shall be calculated in accordance with Article IV. In instances where the Pensioner's benefit is recalculated because he earned additional Credited Service during his re-employment, his recalculated benefit shall be reduced by the Actuarial Equivalent of the benefits already paid to the Pensioner. Notwithstanding the foregoing, in no event shall the recalculated monthly benefit be less than the benefit payable before suspension. Further, the Pensioner:

    (a)    shall be entitled to any benefit increases applicable to active Employees up to his or her date of subsequent termination from Covered Employment; and

    (b)    shall not be entitled to any retiree increases applicable to the period between his reemployment and his subsequent termination of Covered Employment.

(2)    The form of benefit in effect immediately prior to Suspension of Benefits shall remain effective if the Pensioner's death occurs while his benefits are in suspension. However, the benefit payable to the surviving spouse or Beneficiary (if any) will be computed in accordance with subsection (1) above, determined as if the Pensioner's benefit resumed as of the day before his death.

(3)    A Pensioner shall not be entitled to a new election as to the form of benefit payable with respect to any additional benefit earned by virtue of his re-employment.

# ARTICLE V

**Rollover Distributions and Qualified Domestic Relations Orders**

**Section 5.01    Rollover Distributions**

(1)    <u>Election</u>. Notwithstanding any provision of the Plan to the contrary that would otherwise limit a distributee's election under this Section, a distributee may elect, at the time and in the manner prescribed by the Administrator, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(2)    <u>Definitions</u>.

    (a)    Direct Rollover:

        A direct rollover is a payment by the Plan to the eligible retirement plan specified by the distributee.

    (b)    Distributee:

        A distributee includes an employee or former employee. In addition, the employee's or former employee's surviving spouse and the employee's or former employees spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Section 414(p) of the Code, are distributees with regard to the interest of the spouse or former spouse.

    (c)    Eligible Rollover Distribution:

        An eligible rollover of all or a portion of the balance of the lump sum benefit payable to the credit of the distributee is applicable with regard to the present value of the Vested Accrued Benefit or the Cash Vested Benefit, as the case may be. However, it does not include any distribution to the extent such distribution is required under Section 401(a)(9) of the Code. If a direct trustee-to-trustee transfer of any portion of a distribution from an eligible retirement plan of a deceased employee is made after December 31, 2007, to an individual retirement account or annuity described in Section 408(a) or (b) of the Code that is established for the purpose of receiving the distribution on behalf of a designated beneficiary who is a nonspouse beneficiary, the transfer is treated as a direct rollover of an eligible rollover distribution and the individual retirement account or annuity of the nonspouse beneficiary is treated as an inherited IRA with the meaning of Section 408(d)(3)(C) of the Code.

    (d)    Eligible Retirement Plan:

        An eligible retirement plan as it applies to a Participant is provided through the appropriate section of the Code as follows:

        (i)    Section 408(a)/Individual Retirement Account.

        (ii)    Section 408(b)/Individual Retirement Annuity.

(iii) Section 403(a) and (b)/An Annuity Plan.

(iv) Section 401(a)/A Qualified Trust that accepts a distributee's eligible rollover distribution.

(v) Section 457(b) governmental plan/ An Eligible Plan

For distributions after December 31, 2007, an eligible retirement plan shall also mean a Roth IRA described in Section 408A of the Code but only if the distribution is a qualified rollover contribution under Section 408(e)(2) of the Code.

**Section 5.02    Qualified Domestic Relations Order Distribution**

Notwithstanding anything in this Plan to the contrary, all rights and benefits, including elections, provided to a Participant in this Plan shall be subject to the rights afforded to any "alternate payee" under a "qualified domestic relations order." Furthermore, a distribution to an "alternate payee" shall be permitted if such distribution is authorized by a "qualified domestic relations order," even if the affected Participant has not separated from service and has not reached the earliest retirement age. For purposes of this Section, "alternate payee" and "qualified domestic relations order" shall have the meaning set forth under Section 414(p) of the Code. If the Trustees or the Administrator determine that a document does not constitute a "qualified domestic relations order," the Trustees may decline to make any payments unless and until a court issues an order declaring the document to be a "qualified domestic relations order."

**Section 5.03    Encumbrance of Pension**

No Employee or Pensioner hereunder shall have the right to assign, alienate, transfer, sell, hypothecate, mortgage, encumber, pledge, commute, or anticipate any retirement payments and such payments shall not in any way be subject to legal process to levy execution upon or attachment or garnishment proceedings against the same for payment of any claim against any Employee or Pensioner nor shall such payments he subjected to the jurisdiction of any bankruptcy court or insolvency proceedings by operation of the law or otherwise. The foregoing shall not preclude the enforcement of a federal tax levy made pursuant to Section 6331 of the Code or collection by the United States on a judgment resulting from an unpaid tax assessment pursuant to Section 1.401(a)-13(b)(2) of the Treasury regulations or payments under Section 5.02, or as otherwise permitted by law.

# ARTICLE VI

## Administration of Plan

### Section 6.01   Administration of the Plan

The general administration of the Plan and the responsibility for carrying out the provisions hereof is placed in the Board of Trustees, the members of which shall be selected in accordance with the terms of the Agreement and Declaration of Trust.

### Section 6.02   Actuarial Assumptions

The Board of Trustees shall adopt from time to time service and mortality tables and a rate(s) of interest for use in all actuarial calculations required in connection with the Plan, and shall appoint an Actuary from time to time to serve at its pleasure to make annual actuarial valuations of the assets and liabilities of the Plan. Notwithstanding anything herein to the contrary, the amount of benefits that will be provided shall not exceed the benefits actually available on the basis of such annual actuarial valuations.

### Section 6.03   Coverage and Eligibility Issues

The determination of the Trustees as to the interpretation and application of this Plan on all factual and legal issues shall be binding, final and conclusive on all Participants, Beneficiaries and other parties, it being intended that the Board of Trustees shall have the most extensive discretionary authority and deference allowed by law. The Board of Trustees shall have full and exclusive discretion and authority to determine all questions of coverage and eligibility for benefits and the amount of such benefits; to promulgate rules and regulations governing the Plan and to interpret and construe all terms and conditions of the Plan and its rules and regulations and all decisions of the Trustees in this regard shall be final and binding subject to the right of review as set forth in the Plan and applicable federal law.

The Board of Trustees shall have full power to administer this Plan and to adopt forms and rules governing said administration.

## ARTICLE VII

### Mergers and Consolidations

**Section 7.01    Mergers and Consolidations**

Except to the extent exempt from Section 414(l) of the Code, in the event of any merger or consolidation with, or transfer of assets or liabilities to, any other Plan after September 2, 1974, each Participant in the Plan shall, if the Plan is terminated, receive the right to a benefit immediately after the merger, consolidation or transfer which is equal to or greater than the benefit the Participant would have been entitled to receive immediately before the merger, consolidation, or transfer if the Plan had terminated.

**Section 7.02    Spinoff to WWEC Local 863 Pension Plan**

Wakefern Food Corporation, East Coast Warehouse Distributors, Inc., and Wuhl Brothers have agreed through collective bargaining with the Union to establish a multiemployer pension plan, the WWEC Local 863 Pension Plan, to be spun off from this Plan. These companies will cease contributions to this Plan, and cease to be Contributing Employers, effective August 31, 2008. Their Covered Employees will no longer be in Covered Employment under this Plan after August 31, 2008. Certain assets and liabilities will be transferred to the WWEC Local 863 Pension Plan in a transaction that satisfies the requirements of Section 4231 of ERISA. The parties have entered into a Spinoff and Withdrawal Liability Agreement ("Agreement") effective as of August 31, 2008. The rights of former Participants under this Plan whose benefits are transferred to the WWEC Local 863 Pension Plan shall generally be determined under the terms of that plan and the Agreement. The Agreement is incorporated by this reference into the Plan. The only benefit obligations for said Participants retained under this Plan after August 31, 2008, shall be for the payment in lump sum form of benefits accrued before September 1, 2008 of such Participants whose Covered Employment under this Plan ceases on or after August 31, 2008. Any such obligations under this Plan are subject to suspension, reduction or elimination, as provided in Sections 4.07 and 4.09 of this Plan. The WWEC Local 863 Pension Plan shall have the obligation for payment in lump sum form of all other benefits. Effective August 31, 2008, the Plan shall not have any obligations of any nature to the former Participants or to the WWEC Local 863 Pension Plan for any of the benefits or pensions of any former Participants of this Plan who were or are transferred to the WWEC Local 863 Pension Plan, regardless of when the Credited Service was accrued or contributions had been made.

**Section 7.03    Spinoff to Sysco Corporation Retirement Plan**

Sysco Foods of Metro New York LLC ("Sysco"), has agreed through collective bargaining with the Union to spin off liabilities from this Plan to the Sysco Corporation Retirement Plan ("Sysco Plan"), an existing single-employer plan, and to amend the Sysco Plan consistent with the Agreement as set forth below. Pursuant to the terms of the agreement with the Union, Sysco will cease contributions to this Plan, and cease to be a Contributing Employer, effective August 31, 2008 and its Covered Employees will no longer be in Covered Employment under this Plan after August 31, 2008. The parties have entered into a Spinoff and Withdrawal Liability Agreement ("Agreement") effective as of August 31, 2008. The rights of former Participants under this Plan whose benefits are transferred to the Sysco Plan shall be determined under the terms of that plan and the Agreement without any reduction in benefits from those in effect in this Plan as of August 31, 2008. The Agreement is incorporated by this reference into the Plan. Effective August 31, 2008, the Plan shall not have any obligations of any nature to the former Participants or to the Sysco Plan for the benefits or pensions of any former Participants of this Plan who were or are transferred to the Sysco Corporation Plan, regardless of when the Credited Service was accrued or contributions had been made.

**Section 7.04    Spinoff to Pathmark Stores, Inc. Pension Plan**

Grocery Haulers, Inc. ("GHI") has agreed through collective bargaining with the Union to spin off assets and liabilities from this Plan to the Pathmark Stores, Inc. Pension Plan ("GHI Plan"), an existing single-employer plan. GHI will cease contributions to this Plan, and cease to be a Contributing Employer, effective August 31, 2008. Its Covered Employees will no longer be in Covered Employment under this Plan after August 31, 2008. The parties have entered into a Spinoff and Withdrawal Liability Agreement ("Agreement") effective as of August 31, 2008. The rights of former Participants under this Plan whose benefits are transferred to the GHI Plan shall be determined under the terms of that plan and the Agreement. The Agreement is incorporated by this reference into the Plan. Effective August 31, 2008, the Plan shall not have any obligations of any nature to the former Participants or to the GHI Plan for the benefits or pensions of any former Participants of this Plan who were or are transferred to the GHI Plan, regardless of when the Credited Service was accrued or contributions had been made.

# ARTICLE VIII

## Miscellaneous

### Section 8.01    Revisions

In the event that any revision in the Plan is necessary to retain the tax-exempt status of the Plan and related trust so that Contributing Employer payments are deductible thereunder, the Trustees shall be required to make such necessary revisions, adhering as closely as possible to the intent of the parties hereto as expressed in this Plan.

### Section 8.02    Construction

The provisions of the Plan shall be construed, regulated and administered under the laws of the United States and the State or New Jersey, to the extent not otherwise preempted.

### Section 8.03    Return of the Employer Payments

At no time shall it be possible for the Plan assets to be used for, or diverted to, any purpose other than for the exclusive benefit of the Participants and their Beneficiaries, except that Employer Payments may be returned to a Contributing Employer if:

(1)    the Employer Payments were made due to a mistake of fact or law, the Employer demands payment, in writing, within six months of the mistaken payment of the contribution and the return satisfies the requirements detailed below; or

(2)    the Employer Payment was conditioned on its deductibility, the deduction is disallowed, the Employer Payment to the extent disallowed is returned within one year of the disallowance of the deduction and the return satisfies the requirements detailed below.

The return of the Employer Payments to the Contributing Employer pursuant to subsections (1) and (2) above satisfies the requirements of this Section if the amount so returned (a) does not exceed the amount which would have been contributed had there been no mistake or error in determining the deduction, as the case may be, (b) does not include the earnings attributable to such Employer Payment, and (c) does not include Employer Payments for a Covered Employee who has obtained or commenced receipt of a benefit under Article IV.

### Section 8.04    Incapacitated Pensioner

In the event it is determined that a Pensioner is unable to care for his (her) affairs because of illness, accident, or incapacity, either mental or physical, any payments due may, unless claim shall have been made therefore by a duly appointed guardian, committee or other legal representative, be paid to the spouse or such other person or institution having custody of the Pensioner as the Trustees shall determine, excepting, however, if the joint-survivorship annuity described in this Article is in effect.

### Section 8.05    Location of Participant or Beneficiary Unknown

In the event that all, or any portion, of the distribution payable to a Participant or his or her Beneficiary hereunder shall, at the later of the Participant's attainment of age 62 or his or her Normal Retirement Age, remain unpaid solely by reason of the inability of the Administrator, after sending a registered letter, return receipt requested, to the last known address, and after further diligent efforts, to ascertain the

whereabouts of such Participant or his or her Beneficiary, the amount so distributable shall be forfeited and shall be used to reduce the cost of the Plan. In the event a Participant or Beneficiary is located subsequent to his or her benefit being forfeited, such benefit shall be restored, but without earnings attributable to the period after a forfeiture was declared.

### Section 8.06  Execution of Receipts and Releases

Any payment to any Participant, or to his or her legal representative or Beneficiary, in accordance with the provisions of this Plan, shall to the extent thereof be in full satisfaction of all claims hereunder against the Plan. The Administrator may require such Participant, legal representative, or Beneficiary, as a condition precedent to such payment, to execute receipt and release therefore in such form as it shall determine.

### Section 8.07  Change in Address

A Pensioner or other individual receiving benefit payments under the Plan who fails to notify the Plan or Fund of a valid current address or a change of address shall have all benefit payments which are undeliverable held without interest unless and until a claim therefore is made.

### Section 8.08  USERRA – Military Service Credit

Notwithstanding any provisions of this Plan to the contrary, contributions, benefits and service with respect to qualified military service will be provided in accordance with Section 414(u) of the Code.

### Section 8.09  Electronic Administration

In its rules and procedures for the administration of the Plan (including without limitation in procedures covering claims procedures), the Administrator or Trustees may provide for the use of electronic communications and other media in accordance with applicable law.

### Section 8.10  Savings Clause

If any provision of this Plan shall be held to be unlawful, or unlawful as to any individual or instance, such fact shall not affect adversely any other provision contained within the Plan or the application of such provision to any other individual or instance unless and until such illegality shall make impossible the administration of this Plan.

### Section 8.11  Restriction to Prevent Discrimination

In the event of Plan termination, the benefit of any highly compensated employee (as defined in Section 414(q) of the Code) is limited to a benefit that is nondiscriminatory under Section 401(a)(4) of the Code. Notwithstanding anything in this Plan to the contrary, the portion of this Plan that benefits collective bargained employees (within the meaning of Section 1.410(b)-9 of the Treasury regulations) is treated as automatically satisfying these requirements.

Benefits distributed to a Participant who is among the 25 most highly compensated active employees and highly compensated former employees are restricted such that the annual payments are not greater than an amount equal to the payment that would be made on behalf of the Participant under a single life annuity that is the Actuarial Equivalent of the sum of the Participant's Accrued Benefit and the Participant's other benefits under the Plan.

The preceding paragraph shall not apply if: (1) after payment of the benefit to a Participant described in the preceding paragraph, the value of Plan assets equals or exceeds 110% of the value of current liabilities, as defined in Section 412(1)(7) of the Code; (2) the value of the benefits payable to a Participant described in the preceding paragraph is less than 1% of the value of current liabilities (before distribution); or (3) the value of the benefits payable to a Participant described in the preceding paragraph does not exceed the amount described in Section 411(a)(11)(A) of the Code.

For the purpose of this Section, benefit includes Participant loans in excess of the amount set forth in Section 72(p)(2)(A) of the Code, any periodic income, any withdrawal values payable to a living employee, and any death benefits not provided for by insurance on the Participant's life.

Regardless, if a Participant's benefit payments are restricted under the preceding paragraphs of this Section, nevertheless, the Participant's full benefit under the Plan may be paid in accordance with the method of payment selected by the Participant if the Participant enters into a security arrangement with the Administrator to secure repayment to the Plan of any amount necessary for the distribution of Plan assets in the event of a Plan termination to satisfy Section 401(a)(4) of the Code. During a Plan Year, the amount that may be required to be repaid to the Plan is the restricted amount. For purposes of this Section, the restricted amount is the excess of the accumulated amount of distributions made to the Participant over the accumulated amount of the Participant's nonrestricted limit. The Participant's nonrestricted limit is equal to the payments that could have been distributed to the Participant, commencing when distribution commenced to the Participant, had the Participant received payments in a single life annuity. An accumulated amount is the amount of a payment increased by a reasonable amount of interest from the date the payment was made (or would have been made) until the date for the determination of the restricted amount.

Prior to receipt of a distribution, a Participant must agree that upon distribution the Participant will promptly deposit in escrow with an acceptable depositary property having a fair market value equal to at least 125% of the restricted amount. The obligation of a Participant under the repayment agreement alternatively can be secured or collateralized by posting a bond equal to at least 100% of the restricted amount. For this purpose, the bond must be furnished by an insurance company, bonding company or other surety approved by the U.S. Treasury Department as an acceptable surety for federal bonds. The Participant's obligation under the repayment agreement can be secured by a bank letter of credit in an amount equal to at least 100% of the restricted amount.

If there is an escrow agreement, the escrow agreement shall provide that amounts in the escrow account in excess of 125% of the restricted amount may be withdrawn for the Participant. Similar rules apply to the release of any liability in excess of 100% of the restricted amount where the repayment obligation has been secured by a bond or a letter of credit. If the market value of the property in the escrow account falls below 110% of the restricted amount, the Participant is obligated to deposit additional property to bring the value of the property held by the depositary up to 125% of the restricted amount. A Participant has the right to receive any income from the property placed in escrow, subject to the obligation to maintain the value of the property as described.

A depositary may not redeliver to a Participant any property held under an agreement, other than amounts in excess of 125% of the restricted amount, and a surety or bank may not release any liability on a bond or letter of credit unless the Administrator certifies to the depositary, surety or bank that the Participant (or the Participant's estate) is no longer obligated to repay any amount under the agreement. The Administrator will make such a certification if at any time after the distribution commences either (a) the value of Plan assets equals or exceeds 110% of the value of current liabilities; (b) the value of the Participant's future nonrestricted limit constitutes less than 1% of the value of current liabilities; (c) the value of the Participant's future nonrestricted limit does not exceed the amount described in Section 411(a)(11)(A) of the Code; or (d) the Plan has terminated and the benefit received by the Participant is

32

nondiscriminatory. Such a certification by the Administrator terminates the agreement between the Participant and the Administrator.

### Section 8.12   Prevention of Escheat

If the Trustees cannot ascertain the whereabouts of any person to whom a payment is due under the Plan, and if, after 3 years from the date such payment is due, a notice of such payment due is mailed to the last known address of such person, as shown on the records of the Trustees, and within 3 months after such mailing such person has not made written claim therefore, the Trustees, if they so elect, may direct that such payment and all remaining payments otherwise due to such person be canceled on the records of the Plan and, upon such cancellation, the Plan shall have no further liability therefore, except that, in the event such person later notifies the Trustees of his whereabouts at any time before termination and liquidation of the Plan and requests the payment or payments due to him under the Plan, the amount so applied shall be paid to him as provided in Article IV (including past due payments without interest).

# ARTICLE IX

## Amendment and Termination of the Plan

### Section 9.01   Amendment

The Trustees reserve the right to change in whole or in part any or all of the provisions of the Plan at any time.

In addition, the Trustees reserve the right to amend the Plan where deemed necessary to maintain the tax-qualified status of the Plan and Fund or to otherwise comply with applicable federal statutes and guidance thereto. Moreover, in the event that any revision in the Plan is necessary to retain the tax-exempt status of the Plan and related Trust, so that Contributing Employer payments are deductible thereunder, the Trustees shall be required to make such necessary revisions, adhering as closely as possible to the intent of the parties hereto as expressed in the Plan.

An amendment should be in writing and executed by the Trustees, filed by the Trustees as part of the records and minutes of the Trustees, and a copy provided to the Union and the Contributing Employers.

### Section 9.02   Termination

The Trustees shall have the right to terminate this Plan.  Upon a complete termination of the Plan, the Trustees shall take such steps as they deem necessary or desirable to comply with Sections 4041A and 4281 of ERISA.

### Section 9.03   Vesting on Termination of Plan

Upon termination or partial termination of the Plan,  the rights of each Employee to benefits accrued, to the date of such termination, to the extent funded, shall be fully Vested and nonforfeitable.

### Section 9.04   Amendments Affecting Vested and/or Accrued Benefits

No amendment to the Plan (including a change in the actuarial basis for determining optional or early retirement benefits) shall be effective to the extent that it has the effect of decreasing a Participant's Accrued Benefit. Notwithstanding the preceding sentence, suspensions, reductions, or eliminations of adjustable benefits may be made in accordance with Section 432(e)(8) of the Code. Additionally, a Participant's Accrued Benefit may be reduced to the extent permitted under Section 412(c)(8) of the Code. For purposes of this paragraph, a Plan amendment which has the effect of (1) eliminating or reducing an early retirement benefit or a retirement-type subsidy, or (2) eliminating an optional form of benefit, with respect to benefits attributable to service before the amendment shall be treated as reducing Accrued Benefits. In the case of a retirement-type subsidy, the preceding sentences shall apply only with respect to a Participant who satisfies (either before or after the amendment) the pre-amendment conditions for the subsidy. In general, a retirement-type subsidy is a subsidy that continues after retirement, but does not include a qualified disability benefit, a medical benefit, a social security supplement, a death benefit (including life insurance).

Furthermore, if the vesting schedule of the Plan is amended, in the case of an Employee who is a Participant as of the later of the date such amendment is adopted or the date it becomes effective, the nonforfeitable percentage (determined as of such date) of such Employee's Accrued Benefit shall not be less than the percentage computed under the Plan without regard to such amendment.

## ARTICLE X

### Participants' Rights, Claims Procedures and Appeals

#### Section 10.01 Limitation of Rights

Participation hereunder shall not grant any Participant the right to be retained in the service of the Contributing Employer or any other rights or interest in the Plan or Trust Assets other than those specifically herein set forth. Participation in the Plan does not constitute a guarantee or contract of employment with the Contributing Employer. Such participation shall in no way interfere with any rights the Contributing Employer would have in the absence of such participation to determine the duration of the Employee's employment therewith.

#### Section 10.02 Claims Procedure

All claims for benefits shall be made in writing and mailed or hand delivered to the Fund Office at 209 Summit Road, Mountainside, New Jersey 07092. The Trustees or their designee shall make all determinations as to the right of any person to a benefit. The Trustees may require a Participant to complete and file a formal application for a benefit and all other forms approved by the Trustees, and to furnish pertinent information required by the Trustees.

#### Section 10.03 Authorized Representative

Claimants may designate in writing an authorized representative of a claimant to act on behalf of the claimant in pursuing a benefit claim or appeal of claim denial. A representative is authorized to act on behalf of a claimant if he or she is:

(1) spouse of the claimant; or

(2) a representative designated by a mentally competent adult claimant (over 21 years of age) in writing; or

(3) a representative appointed by a court of competent jurisdiction to act on behalf of, and in the best interests of, an eligible claimant.

The authorized representative of the claimant may be required to provide the Plan with the following information: (a) current address; (b) date of birth; (c) day and evening telephone numbers; (d) employer; and (e) employer's address and telephone number.

The Plan may request any additional information from either the claimant or his or her proposed representative reasonably necessary to assist the Plan in its determination as to whether the representative may be authorized to act on behalf of a claimant pursuant to the criteria set forth herein. The Plan shall not be liable or responsible for any actions, omissions or decisions of the representative.

#### Section 10.04 Denial of Claims

If a claim is wholly or partially denied, the Trustees or their designee shall notify the claimant or the representative in writing of the Plan's denial within a reasonable period of time, but no later than 90 days after receipt of the claim by the Plan, unless the Trustees or their designee determine that special circumstances require an extension of time for processing.

35

If it is determined that special circumstances require an extension of time for processing a claim, written notice of the extension shall be furnished to the claimant or representative prior to the termination of the initial 90 day period. The extension shall not exceed a period of 90 days from the end of such initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the Plan expects to render the determination.

Notification of a claim denial shall set forth:

(1)     The specific reason or reasons for the adverse benefit determination;

(2)     Reference to the specific Plan provision on which the determination is based;

(3)     A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(4)     A description of the Plan's review procedures and the time limits applicable    to    such procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following an adverse benefit determination review.

### Section 10.05   Claims Appeal

Upon receipt of a notice of a denied claim, claimants (or their authorized representative) of the Plan may request an appeal of the claim denial in writing within 60 days of receipt of notice of the claim denial. A claimant shall be provided, upon request and free of charge, reasonable access to, and copies of all documents, records, and other information relevant to the claimant's claim for benefits. A claimant may submit written comments, documents, records, and other information relating to the claim for benefits which shall be taken in account on appeal of the claim denial regardless of whether such information was submitted or considered in the initial benefit determination.

A determination of a claim denial upon review shall be made no later than the date of the meeting of the appropriate committee or Board of Trustees that immediately follows the Plan's receipt of the request for review, unless the request for review is filed within 30 days preceding the date of such meeting. In such a case, a determination shall be made no later than the date of the second meeting following the Plan's receipt of the request for review unless special circumstances exist requiring an extension of time.

If special circumstances require a further extension of time for processing, a benefit determination on review shall be rendered no later than the third meeting of the appropriate committee or Board of Trustees following receipt of the request for review. Prior to the commencement of the extension, written notice shall be provided the claimant or representative describing the special circumstances and the date as of which the determination shall be made. The Trustees or their designee will then notify the claimant or representative of the determination within 5 days of the determination.

The Trustees or their designee shall provide the claimant or representative with written notification of a Plan's benefit determination on review. If a claim is denied after review, the notification shall set forth:

(1)     The specific reason or reasons for the claim denial;

(2)     Reference to the specific provision on which the claim denial was based;

(3)     A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of: all documents, records, and other information relevant to the claimant's claim for benefits; and

(4)     A statement describing any voluntary appeal procedures offered by the Plan, the claimant's right to obtain information about such procedures, and a statement of the claimant's right to bring a civil action in accordance with Section 502(a) of ERISA.

### Section 10.06     Administrative Record Keeping

All reviews of claim denials shall be placed in the minutes of the meeting of the Board of Trustees at which the review was considered. The minutes shall identify the date of the review, the relevant Plan provision(s) under consideration, the documents or other materials considered by the Board of Trustees during its deliberations, and a statement of the basis of the Board of Trustee's decision. Copies of the minutes at which reviews of adverse benefit determinations were conducted shall be maintained at the Plan offices and sorted by the Plan provision at issue on appeal and the date of decision.

Where appropriate, the Trustees or their designees may review the minutes in making a determination on a claim of benefits, or a review of an adverse benefit determination. Prior decisions of the Board of Trustees are to be considered persuasive authority with respect to future claims or reviews of adverse benefit determinations. Such minutes and the basis of prior determinations, however, are not binding on either the Administrator, the Board of Trustees, or their designees.

### Section 10.07     Appeals from Final Board of Trustee Determination

If the claimant seeks any further review of the decision of the Board of Trustees, any suit or legal action initiated by a claimant under the Plan must be brought by the claimant no later than 1-year following a final decision on the claim for benefits under these claims procedures. The 1-year period of limitations on suits for benefits shall apply in any forum where a claimant initiates such suit or legal action. If a civil action is not filed within this period, the claimant's benefit claim will be deemed permanently waived and abandoned, and the claimant will be precluded from reasserting it.

## ARTICLE XI

### Death Benefit After Retirement

**Section 11.01   Death Benefit**

Upon the death of a Pensioner, a Death Benefit in the amount of $3,000 shall be payable in a lump sum to the Pensioner's Beneficiary. In the absence of a surviving designated Beneficiary said lump sum payment shall be paid to the deceased Pensioner's estate. Death Benefits shall not be payable In the event the cause of death of a Pensioner was due to an act of war.

# ARTICLE XII

## Termination of Employer and Withdrawal Liability

### Section 12.01   Termination of Employer

(1)     An Employer shall be considered a "Withdrawn Employer" if the Employer (a) permanently ceases to have an obligation to contribute to the Plan arising under one or more collective bargaining agreements with the Union or separate participation agreements with the Trustees or (b) ceases all covered operations under the Plan.

(2)     The date of withdrawal shall be that set by ERISA, as interpreted by the courts. A Withdrawn Employer shall be liable to the Plan for Withdrawal Liability as set forth in this Article.

(3)     A change in corporate structure or form; or a change from a partnership, incorporation, limited liability corporation, or incorporation to another such form; or a merger or participation in a joint venture; or a sale wherein the Employer retains any assets, shares, or interest, shall not be deemed a termination and shall not release or excuse the Employer from its obligation for Employer Contributions or, in the event of a Withdrawal, from primary liability for Withdrawal Liability.

(4)     If the purpose of any transaction is to evade or avoid liability, Article XII shall be applied and liability shall be determined and collected without regard to such transaction.

(5)     In the event of a sale of assets or shares, the selling Employer shall, in addition to its obligations and duties under all Federal and State Laws, post a bond for the full amount of its share of Withdrawal Liability as of the date of the sale, and shall maintain and renew the bond for 5 years in that same amount. If the purchaser incurs a Withdrawal Liability within 5 years of the sale, the Plan shall have the absolute right to seek payment under the bond, and the seller shall have a right of subrogation to the extent that the Plan recovers from the purchaser an amount which, when added to the seller's bond, exceeds the Withdrawal Liability and all fees and costs incurred by the Plan. In the event the Employer fails to post a bond, or posts it for less than the full amount, the seller agrees that the Plan may seek to recover the Withdrawal Liability from it, as if it were primarily liable, for a period of five years from the sale, for the Withdrawal Liability amount as of the date of the sale.

### Section 12.02   Partial Termination of Employer

An Employer shall be considered a "Partially Withdrawn Employer" if:

(1)     there is a partial cessation of the Employer's contribution obligation to the Plan if, during a Plan Year;

(2)     the Employer permanently ceases to have an obligation to contribute under one or more but fewer than all Collective Bargaining Agreements under which the Employer has been obligated to contribute under the Plan but continues to perform work in the jurisdiction of the Collective Bargaining Agreements of the type for which contributions were previously required or transfers such work to another location, or to an entity or entities owned or controlled by the Employer (with respect to work transferred on or after August 17, 2006);

(3)     an Employer permanently ceases to have an obligation to contribute under the Plan with respect to work performed at one or more but fewer than all of its facilities, but continues to perform work at the facility of the type for which the obligation to contribute ceased; or

(4)     there is a 70% contribution decline. A 70% contribution decline will be determined as of the last day of any Plan Year if during each Plan Year in the Three Year Testing Period the hours worked for which the Employer was required to contribute to the Plan do not exceed 30% of the Employer's hours for the two Plan Year period in the five Plan Year period prior to the Three Year Testing Period.

The date of partial withdrawal is the last day of the Plan Year during which the above described event occurs. A Partially Withdrawn Employer shall be liable to the Plan for a partial withdrawal liability as set forth in this Article.

For purposes of this Article, the term "Three-Year Testing Period" shall mean the period consisting of the Plan Year and the immediately preceding 2 Plan Years.

### Section 12.03   Method of Computing Withdrawal Liability

A Withdrawn Employer's withdrawal liability shall be the Employer's "Unfunded Vested Benefits," adjusted or limited as described in Section 12.05 and 12.06 below. The method of computing the Unfunded Vested Benefits applicable to a Withdrawn Employer, prior to any adjustments or limitations, shall be as follows:

(1)     The amount of the "Unfunded Vested Benefits" allocable to a Withdrawn Employer is the product of:

(a)     the Plan's Unfunded Vested Benefits as of the end of the Plan Year preceding the Plan Year in which the Employer withdraws, less the value as of the end of such year of all outstanding claims for withdrawal liability which can reasonably be expected to be collected from Employers withdrawing before such year; multiplied by

(b)     a fraction -

(i)     the numerator of which is the total amount required to be contributed by the Employer under the Plan for the last 5 Plan Years ending before its withdrawal, and

(ii)    the denominator of which is the total amount contributed under the Plan by all Employers for the last 5 Plan Years ending before the withdrawal, increased by any Employer contributions owed with respect to earlier periods which were collected in those Plan Years, and decreased by any amount contributed to the Plan during those Plan Years by Employers who withdrew from the Plan under this Article during those Plan Years.

(2)     For purposes of this Article, the term "Unfunded Vested Benefits" means the amount by which the value of Nonforfeitable Benefits under the Plan, as defined for purposes of this Article, exceeds the value of the assets of the Plan. For purposes of this Article, the term "Nonforfeitable Benefits" means Vested benefits under this Plan plus, for Plan Years beginning on or after September 1, 2008, any adjustable benefit that has been reduced by the Board of Trustees pursuant to Section 305(e)(8) of ERISA and Section 432(e)(8) of the Code that would otherwise have been included as a Vested benefit. For Plan Years beginning on or after September 1,

40

2008, the numerator and denominator of the fraction in Section 12.03(1)(b) shall be determined without regard to amounts that constitute an "automatic employer surcharge" under Section 305(e)(7) of ERISA or Section 432(e)(7) of the Code.

### Section 12.04    Method of Computing Partial Withdrawal Liability

A Partially Withdrawn Employer's withdrawal liability shall be the Employer's Unfunded Vested Benefits adjusted as described in Section 12.06 below, The amount of Unfunded Vested Benefit allocable to a Partially Withdrawn Employer is the amount determined in Section 12.03 multiplied by one (1) minus a fraction -

(1)     the numerator of which is the hours worked for which the Employer was required to contribute to the Plan for the Plan Year following the Plan Year in which the Partial Withdrawal occurred, and

(2)     the denominator of which is the average of the hours worked for which the Employer was required to contribute to the Plan for: (a)  in the case of a Partial Withdrawal relating to a bargaining unit or facility take-out, the 5 Plan Years immediately preceding the Plan Year in which the Partial Withdrawal occurs, or (b) in the case of, a Partial Withdrawal relating to a 70% contribution decline, the 5 Plan Years immediately preceding the beginning of the Three-Year Testing Period.

### Section 12.05    Employer Sale of Assets

An Employer shall not be primarily liable upon the withdrawal or partial withdrawal of the Employer (hereinafter in this Section referred to as the "Seller") if such withdrawal or partial withdrawal occurs solely because, as a result of a bona fide, arm's-length sale of assets to an unrelated party as defined in Section 4204(d) of ERISA (hereinafter in this Section referred to as the "Purchaser"), the Seller ceases covered operations, and if:

(1)     the Purchaser has an obligation to contribute to the Fund with respect to the operations for substantially the same hours worked for which the Employer was required to contribute to the Plan for which the Seller had an obligation to contribute to the Fund, as determined by the Trustees.

(2)     the Purchaser provides to the Fund, for a period of 5 Plan Years commencing with the first Plan Year beginning after the sale of assets, a bond issued by a corporate surety that is an acceptable surety for purposes of Section 412 of ERISA, or an amount held in escrow by a bank or similar financial institution satisfactory to the Trustees, in an amount equal to the greater of:

    (a)     the average annual contribution required to be made with respect to the operations under the Fund for the 3 Plan Years preceding the Plan Year in which the sale of the Seller's assets occurs; or

    (b)     the annual contribution that the Seller was required to make with  respect to the operations under the Fund for the last Plan Year before the Plan Year in which the sale of the Seller's assets occurs;

which bond or escrow shall be paid to the Fund if the Purchaser withdraws  in a withdrawal or partial withdrawal from the Fund, or fails to make a contribution to the Fund when due, at any time during the first 5 Plan Years beginning after such sale, and

(3)     the contract for sale provides that if the Purchaser withdraws in a complete withdrawal or partial withdrawal with respect to operations during such first 5 Plan Years, the Seller is secondarily liable for any withdrawal liability it would have had to the Fund with respect to the operations (but for this Section) if the liability of the Purchase with respect to the Fund is not paid.

(4)     if the Purchaser withdraws before the last day of the fifth Plan Year beginning after the sale, and fails to make any withdrawal liability payment when due, then the Seller shall pay to the Fund the payments that would have been due from the Seller but for this subsection.

(5)     if all, or substantially all, of the Seller's assets are distributed, or if the Seller is liquidated before the end of the fifth Plan Year, then the Seller shall provide a bond or amount in escrow equal to the present value of the withdrawal liability the Seller would have had but for this subsection. If only a portion of the Seller's assets are distributed during such period, then a bond or escrow shall be required in accordance with regulations prescribed by the PBGC.

(6)     the liability of the party furnishing a bond or escrow under this subsection shall be reduced, upon payment of the bond or escrow to the Fund, by the amount thereof. For the purposes of this subsection, the liability of the Purchaser shall be determined as if the Purchaser were the Seller and had been required to contribute to the Fund the amount the Seller was required to contribute.

## Section 12.06   Limitation on Withdrawal Liability, De Minimis Rule

The following adjustments and limitations shall apply to an Employer's withdrawal liability, as applicable.

(1)     De Minimis Rule. The amount of the Unfunded Vested Benefit allocated to a withdrawn Employer or Partially Withdrawn Employer under Section 12.03 or Section 12.04 shall be reduced by the lesser of:

   (a)     3/4% of 1% of the Plan's Unfunded Vested Liability determined as of the end of the Plan Year before the date of withdrawal, or

   (b)     $50,000 reduced by the amount, if any, the Unfunded Vested Benefits allocable to the Withdrawn Employer, without regard to this subsection, exceeds $100,000.

(2)     Subsection (1) will not apply:

   (a)     to an Employer who withdrawals in a Plan Year in which substantially all Employers withdraw from the Plan, or

   (b)     to an Employer who withdraws pursuant to an agreement or arrangement to withdraw in which substantially all Employers withdraw from the Plan during a period of one or more Plan Years.

In any action or proceeding to determine or collect withdrawal liability, if substantially all Employers have withdrawn from the Plan within a period of 3 Plan Years, an Employer who has withdrawn from the Plan during such period shall be presumed to have withdrawn from the Plan pursuant to an agreement or arrangement, unless the Employer provides otherwise by a preponderance of the evidence.

(3)     In the case of bona fide sale of all or substantially all of the Employer's assets in an arm's length transaction to an unrelated party, the Unfunded Vested Benefits allocated to an Employer after the application of the above other than an Employer undergoing reorganization under title 11, United States Code, or similar provisions of State law, shall not exceed the greater of:

42

(a)     a portion of the liquidation or dissolution value of the Employer, determined after the sale or exchange of such assets, as set forth in ERISA Section 4225(a)(2) (as amended by Section 204(a)(1) of the Pension Protection Act of 2006 for sales occurring on or after January 1, 2007), or

(b)     the Unfunded Vested Benefits attributable to Employees of the Employer.

(4)     In the case of an insolvent Employer undergoing liquidation or dissolution, the Unfunded Vested Benefits allocable to that Employer shall not exceed an amount equal to the sum of:

(a)     50% of the Unfunded Vested Benefits allocable to the Employer, determined without regard to this Section, and

(b)     that portion of 50% of the Unfunded Vested Benefits allocable to the Employer as determined under subsection (3) above which does not exceed the liquidation or dissolution value of the Employer determined.

(i)     as of the commencement of liquidation or dissolution, and

(ii)    after reducing the liquidation or dissolution value of the Employer by the amount determined under subsection (3).

### Section 12.07  Employer Withdrawal Liability Annual Payments, Payment Schedule, Limitation on Annual Payment and Default Rules

The amount of each annual payment made by the Withdrawing Employer toward the Withdrawal Liability shall be the product of:

(1)     the average annual number of hours of contributions for the period of 3 consecutive Plan Years, during the period of 10 consecutive Plan Years ending before the Plan Year in which the withdrawal occurs, in which the number of hours worked for which the Employer was required to contribute to the Plan for which the Employer had an obligation to contribute under the plan is the highest, and

(2)     the highest contribution rate at which the Employer had an obligation to contribute under the Plan during the 10 Plan Years ending with the Plan Year in which the withdrawal occurs. For the purposes of a partial withdrawal, the withdrawal shall be deemed to occur on the first day of the Three Year Testing Period.

(3)     In the case of a partial withdrawal the amount of each annual payment shall be the product of:

(a)     the amount determined above multiplied by

(b)     the fraction determined in Section 12.04.

(4)     Except as provided below, an Employer shall pay the amount determined over the period of years necessary to amortize the amount in level annual payments calculated as if the first payment were made on the first day of the Plan Year following the Plan Year in which the withdrawal occurs and as If each subsequent payment were made on the first day of each subsequent Plan Year.

(5)     The determination of the amortization period shall be based on the assumption used for the most recent actuarial valuation for the Plan.

43

(6)  In any case in which the amortization period exceeds 20 years, the Employer's liability shall be limited to the first 20 annual payments. Each annual payment shall be payable in 4 equal installments due quarterly, or at other intervals as agreed upon between the Trustees and the Withdrawn Employer. If a payment is not made when due, interest on the payment shall accrue from the due date until the date on which the payment is made.

(7)  If the Plan terminates by the withdrawal of every Employer from the Plan, or substantially all the Employers withdraw from the Plan pursuant to an agreement or arrangement to withdraw from the Plan:

(a)  the liability of each such Employer who has withdrawn shall be determined (or redetermined) without regard to the 20 year payment limitation noted above, and

(b)  notwithstanding any other provision of this Article, the total Unfunded Vested Benefits of the Plan shall be fully allocated among all such Employers in a consistent manner. If the Plan terminates by mass withdrawal (or by withdrawals of substantially all Employers pursuant to an agreement or arrangement to withdraw) that occur on or after January 29, 2009, the Plan's reallocation liability shall be determined based on the new allocation fraction prescribed by the PBGC in Section 4219.15(c) of its regulations.

(8)  The Withdrawn Employer shall be entitled to prepay the outstanding amount of the unpaid annual withdrawal liability payments plus accrued interest, if any, in whole or in part, without penalty. If the prepayment is made pursuant to a withdrawal which is later determined to be part of a withdrawal described in Section 12.06(2), the withdrawal liability of the Employer shall not be limited to the amount of the prepayment.

(9)  In the event of a default, the Trustees may require immediate payment of (1) the outstanding amount of a Withdrawn Employer's withdrawal liability, (2) the interest due on withdrawal liability payments, and (3) the greater of (a) accrued interest at rates based on prevailing market rates for comparable obligations on the total outstanding liability from the due date of the first payment which was not timely made or (b) liquidated damages in an amount not to exceed 20% of the outstanding liability.

(10)  For purposes of this Section, the term default means:

(a)  the failure of an Employer to make, when due, any payment under this Section, if the failure is not cured within 60 days after the Employer receives written notification from the plan sponsor of such failure, and

(b)  any other event defined in rules adopted by the Trustees which indicates a substantial likelihood that an Employer will be unable to pay its withdrawal liability.

In the case of a Plan termination, an Employer's obligation to make payments under this Section ceases at the end of the Plan Year in which the assets of the Plan (exclusive of withdrawal liability claims) are sufficient to meet all obligations of the Plan, as determined by the PBGC.

## Section 12.08  Employer Withdrawal Liability Notification Procedure

(1)  An Employer shall, within 30 days after a written request from the Trustees, furnish such information as the Trustees reasonably determine to be necessary to enable the Trustees to comply with the requirements of this Section:

44

(2)   As soon as practicable after an Employer's complete or partial withdrawal, the Trustees shall notify the Employer of:

    (a)   the amount of the liability, and

    (b)   the schedule of liability payments, and

    (c)   demand payment in accordance with the schedule.

(3)   No later than 90 days after the Employer receives the notice described above, the Employer:

    (a)   may ask the Trustee to review any specific matter relating to the determination of the Employer's liability and the schedule of payments,

    (b)   may identify any inaccuracy in the determination of the amount of the Unfunded Vested Benefits allocable to the Employer, and

    (c)   may furnish any additional relevant information to the Trustees.

(4)   After a reasonable review of any matter raised, the Trustees shall notify the Employer of:

    (a)   the Trustees' decision,

    (b)   the basis for the decision, and

    (c)   the reason for any change in the determination of the Employer's liability or schedule liability payment.

(5)   Withdrawal liability shall be payable in accordance with the schedule set forth by the Trustees in Section 12.07, beginning no later than 60 days after the date of the demand of the amount of such liability or of the schedule, notwithstanding any request for review by the withdrawn employer.

## Section 12.09   Information Furnished to Employers

The Trustees shall, upon written request, furnish to any Employer who has an obligation to contribute to the Plan a notice of:

    (a)   the estimated amount which would be the amount of such Employer's Withdrawal Liability if such Employer withdrew on the last day of the Plan Year preceding the date of the request, and

    (b)   an explanation of how such estimated liability amount was determined, including the actuarial assumptions and methods used to determine the value of the Plan liabilities and assets, the data regarding Employer contributions, unfunded vested benefits, annual changes in the Plan's unfunded vested benefits, and the application of any relevant limitations on the estimated withdrawal liability.

For purposes of subparagraph (b) the term "Employer contribution" means, in connection with a participant, a contribution made by an employer as an employer of such participant.

Any notice required to be provided shall be provided within 180 days, and may be provided in written, electronic, or other appropriate form to the extent such form is reasonably accessible to Employers to whom the information is required to be provided.

In no case shall an Employer be entitled to receive more than one notice during any one 12-month period. The person required to provide such notice may make a reasonable charge to cover copying, mailing, and other costs of furnishing such notice.

### Section 12.10   Resolution of Disputes

(1)     Any dispute between an Employer and the Trustees concerning a determination made under this Article shall be resolved through arbitration under the jurisdiction of the New Jersey State Board of Mediation. Either party may initiate the arbitration proceeding within a 60-day period after the earlier of:

    (a)     the date of notification to the Employer under Section 12.08(4), or

    (b)     120 days after the date of the Employer's request under Section 12.08(3).

The parties may jointly initiate arbitration within the 180-day period after the date of the Trustees' demand under Section 12.08. If no request for arbitration is made within the above-prescribed time limits, the Trustees' determination of withdrawal liability or partial withdrawal liability shall be final and binding upon the Employer.

(2)     An arbitration proceeding under this Section shall be conducted in accordance with 29 C.F.R. §§ 4221.1 through 4221.13.

(3)     For the purposes of any proceeding under Article 12, any determination made by the Trustees under this Article is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous.

(4)     In the case of the determination of a Plan's Unfunded Vested Benefits for a Plan Year, the determination is presumed correct unless a party contesting the determination shows by a preponderance of evidence that:

    (a)     the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the Plan and reasonable expectations), or

    (b)     the Plan's actuary made a significant error in applying the actuarial assumptions or methods.

(5)     If no review or arbitration proceeding has been initiated, the entire amount demanded by the Trustees shall be due and owing on the schedule set forth by the Trustees. The Trustees may bring an action in a State or Federal court of competent jurisdiction for collection.

(6)     Upon completion of the arbitration proceedings in favor of one of the parties, any party thereto may bring an action, no later than 30 days after the issuance of an arbitrator's award, in an appropriate United States district court to enforce, vacate, or modify the arbitrator's award.

(7)   Any arbitration proceedings under this Section shall be conducted in the same manner, subject to the same limitations, carried out with the same powers (including subpoena power), and enforced in United States courts as an arbitration proceeding carried out under Title 9, United States Code. The arbitration shall be submitted to, and conducted under the rules of, the New Jersey State Board of Mediation.

(8)   In any such proceeding there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct. Payment shall he made by an Employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination. If the Employer fails to make timely payment in accordance with such final decision, the Employer shall be treated as being delinquent in the making of a contribution required under the Plan.

(9)   In any action by the Trustees to compel an Employer to pay withdrawal liability, any failure of the Employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution within the meaning of Section 515 of ERISA and shall be liable for the remedies available to the Trustees under Section 502(g)(2) of ERISA.

## ARTICLE XIII

### Maximum Benefit Limitations

### Section 13.01    Maximum Benefit Limitations

Benefits under the Plan shall be limited in accordance with Code Section 415 and the Treasury regulations thereunder. The limitations of this Section shall apply in Limitation Years (as defined in Section 13.01(d)(5)) beginning after December 31, 2007, except as otherwise provided herein.

(a)    The Annual Benefit otherwise payable to a Participant at any time will not exceed the Maximum Permissible Benefit. If the benefit the Participant would otherwise accrue in a Limitation Year would produce an Annual Benefit in excess of the Maximum Permissible Benefit, the benefit shall be limited (or the rate of accrual reduced) to a benefit that does not exceed the Maximum Permissible Benefit.

(b)    The application of the provisions of this Section shall not cause the Maximum Permissible Benefit for any Participant to be less than the Participant's accrued benefit under all the defined benefit plans of the Employer or a Predecessor Employer as of the end of the last Limitation Year beginning before January 1, 2008, under the provisions of the plans that were both adopted and in effect before April 5, 2007. The preceding sentence applies only if the provisions of such defined benefit plans that were both adopted and in effect before April 5, 2007, satisfied the applicable requirements of statutory provisions, regulations, and other published guidance relating to Code Section 415 in effect as of the end of the last Limitation Year beginning before January 1, 2008, as described in Section 1.415(a)-l(g)(4) of the Treasury regulations.

(c)    The limitations of this Section shall be determined and applied taking into account the rules in Section 13.01(c) (1) to (6) below.

(1)    If a defined benefit plan maintained by the Employer has terminated with sufficient assets for the payment of benefit liabilities of all plan participants and a participant in the plan has not yet commenced benefits under the plan, the benefits provided pursuant to the annuities purchased to provide the participant's benefits under the terminated plan at each possible Annuity Starting Date shall be taken into account in applying the limitations of this Section. If there are not sufficient assets for the payment of all participants' benefit liabilities, the benefits taken into account shall be the benefits that are actually provided to the participant under the terminated plan.

(2)    If a participant's benefits under a defined benefit plan maintained by the Employer are transferred to another defined benefit plan maintained by the Employer and the transfer is not a transfer of distributable benefits pursuant to Section 1.411(d)-4, Q&A-3(c) of the Treasury regulations, the transferred benefits are not treated as being provided under the transferor plan (but are taken into account as benefits provided under the transferee plan). If a participant's benefits under a defined benefit plan maintained by the Employer are transferred to another defined benefit plan that is not maintained by the Employer and the transfer is not a transfer of distributable benefits pursuant to Section 1.411(d)-4, Q&A-3(c) of the Treasury regulations, the transferred benefits are treated by the Employer's plan as if such benefits were provided under annuities purchased to provide benefits under a plan maintained by the Employer that terminated immediately prior to the transfer with sufficient assets to pay all participants' benefit liabilities under the plan. If a participant's benefits under a defined benefit plan maintained by the

48

Employer are transferred to another defined benefit plan in a transfer of distributable benefits pursuant to Section 1.411(d)-4, Q&A-3(c) of the Treasury regulations, the amount transferred is treated as a benefit paid from the transferor plan.

(3)    A Formerly Affiliated Plan of the Employer shall be treated as a plan maintained by the Employer, but the Formerly Affiliated Plan shall be treated as if it had terminated immediately prior to the cessation of affiliation with sufficient assets to pay participants' benefit liabilities under the plan and had purchased annuities to provide benefits.

(4)    If the Employer maintains a defined benefit plan that provides benefits accrued by a participant while performing services for a Predecessor Employer, the participant's benefits under a plan maintained by a Predecessor Employer shall be treated as provided under a plan maintained by the Employer. However, for this purpose, the plan of the Predecessor Employer shall be treated as if it had terminated immediately prior to the event giving rise to the Predecessor Employer relationship with sufficient assets to pay participants' benefit liabilities under the plan, and had purchased annuities to provide benefits; the Employer and Predecessor Employer shall be treated as if they were a single employer immediately prior to such event and as unrelated employers immediately after the event; and if the event giving rise to the predecessor relationship is a benefit transfer, the transferred benefits shall be excluded in determining the benefits provided under the plan of the Predecessor Employer.

(5)    The limitation of this Section shall be determined and applied taking into account the rules in Section 1.415(f)-1(d), (e), and (h) of the Treasury regulations.

(6)    The following aggregation rules shall apply for purposes of this Section:

(A)    A multiemployer plan, as defined in Code Section 414(f), is not aggregated with other multiemployer plans for purposes of this Section.

(B)    If the Employer maintains a multiemployer plan, only the benefits under the multiemployer plan that are provided by the Employer shall be treated as benefits provided under a plan maintained by the Employer for purposes of this Section, in accordance with the election described in Treasury regulations Section 1.415(f)-1(g)(2). Thus, if an Employer maintains both a plan that is not a multiemployer plan and a multiemployer plan, only the benefits under the multiemployer plan that are provided by the Employer are aggregated with benefits under the Employer's plans other than multiemployer plans (in lieu of including benefits provided by all Employers under this multiemployer plan pursuant to the generally applicable rule of Treasury regulations Section 1.415(a)-1(e)). If an Employer maintains both a plan that is not a multiemployer plan and a multiemployer plan, any reduction required by the limits in this Section shall be made in the benefits in the plan that is not a multiemployer plan.

(C)    A multiemployer plan shall be disregarded for purposes of applying the compensation limitation of Code Section 415(b)(1)(B) to a plan which is not a multiemployer plan.

(d)    For the purpose of determining the benefit limitations set forth in this Section, the following terms are defined:

(1)     "Annual Benefit" means a benefit that is payable annually in the form of a Straight Life
Annuity.  Except as provided below, where a benefit is payable in a form other than a
Straight Life Annuity, the benefit shall be adjusted to an actuarially equivalent Straight
Life Annuity that begins at the same time as such other form of benefit and is payable on
the first day of each month, before applying the limitations of this Section.  For a
Participant who has or will have distributions commencing at more than one Annuity
Starting Date, the Annual Benefit shall be determined as of each such Annuity Starting
Date (and shall satisfy the limitations of this Section as of each such date), actuarially
adjusting for past and future distributions of benefits commencing at the other Annuity
Starting Dates.  For this purpose, the determination of whether a new Annuity Starting
Date has occurred shall be made without regard to Section 1.401(a)-20, Q&A-10(d), and
with regard to Section 1.415(b)-1(b)(1)(iii)(B) and (C) of the Treasury regulations.

No actuarial adjustment to the benefit shall be made for (A) survivor benefits payable to a
surviving spouse under a qualified joint and survivor annuity to the extent such benefits
would not be payable if the Participant's benefit were paid in another form; (B) benefits
that are not directly related to retirement benefits (such as a qualified disability benefit,
preretirement incidental death benefits, and post-retirement medical benefits); or (C) the
inclusion in the form of benefit of an automatic benefit increase feature, provided the
form of benefit is not subject to Code Section 417(e)(3) and would otherwise satisfy the
limitations of this Section, and the Plan provides that the amount payable under the form
of benefit in any Limitation Year shall not exceed the limits of this Section applicable at
the Annuity Starting Date, as increased in subsequent years pursuant to Code Section
415(d).  For this purpose, an automatic benefit increase feature is included in a form of
benefit if the form of benefit provides for automatic periodic increases to the benefits paid
in that form.

The determination of the Annual Benefit shall take into account Social Security
supplements described in Code Section 411(a)(9), but shall disregard benefits attributable
to employee contributions or rollover contributions.

Effective for distributions after December 31, 2003, the determination of actuarial
equivalence of forms of benefit other than a Straight Life Annuity shall be made in
accordance with (i) or (ii) below, as applicable:

(i)     The Straight Life Annuity that is actuarially equivalent to the Participant's form
of benefit shall be determined under this (i) if the form of the Participant's benefit
is either (1) a nondecreasing annuity (other than a Straight Life Annuity) payable
for a period of not less than the life of the Participant (or, in the case of a
qualified preretirement survivor annuity, the life of the surviving spouse), or (2)
an annuity that decreases during the life of the Participant merely because of (a)
the death of the survivor annuitant (but only if the reduction is not below 50% of
the benefit payable before the death of the survivor  annuitant), or (b) the
cessation or reduction of Social Security supplements or qualified disability
payments (as defined in Code Section 401(a)(11)).

For Limitation Years beginning before January 1, 2008, the actuarially equivalent
Straight Life Annuity is equal to the annual amount of the Straight Life Annuity
commencing at the same Annuity Starting Date that has the same actuarial
present value as the Participant's form of benefit computed using whichever of
the following produces the greater annual amount:

50

A.  the interest rate and the mortality table (or other tabular factor) specified in the Plan for adjusting benefits in the same form; and

B.  a 5% interest rate assumption and the Applicable Mortality Table (as defined in Section 2.08 of the Plan) for that Annuity Starting Date.

For Limitation Years beginning after December 31, 2007, the actuarially equivalent Straight Life Annuity is equal to the greater of:

A.  the annual amount of the Straight Life Annuity (if any) payable to the Participant under the Plan commencing at the same Annuity Starting Date as the Participant's form of benefit; and

B.  the annual amount of the Straight Life Annuity commencing at the same Annuity Starting Date that has the same actuarial present value as the Participant's form of benefit, computed using a 5% interest rate assumption and the Applicable Mortality Table (as defined in Section 2.08 of the Plan) for that Annuity Starting Date.

(ii)  The Straight Life Annuity that is actuarially equivalent to the Participant's form of benefit shall be determined under this (ii) if the form of the Participant's benefit is other than a benefit form described in (i) above.  In this case, the actuarially equivalent Straight Life Annuity shall be determined as follows:

I.  If the Annuity Starting Date of the Participant's form of benefit is in a Plan Year beginning after 2005, the actuarially equivalent Straight Life Annuity is equal to the greatest of:

A.  the annual amount of the Straight Life Annuity commencing at the same Annuity Starting Date that has the same actuarial present value as the Participant's form of benefit, computed using the interest rate and the mortality table (or other tabular factor) specified in the Plan for adjusting benefits in the same form;

B.  the annual amount of the Straight Life Annuity commencing at the same Annuity Starting Date that has the same actuarial present value as the Participant's form of benefit, computed using a 5½% interest rate assumption and the Applicable Mortality Table (as defined in Section 2.08 of the Plan); and

C.  the annual amount of the Straight Life Annuity commencing at the same Annuity Starting Date that has the same actuarial present value as the Participant's form of benefit, computed using the Applicable Interest Rate (as defined in Section 2.07) and the Applicable Mortality Table (as defined in Section 2.08 of the Plan), divided by 1.05.

II.  If the Annuity Starting Date of the Participant's form of benefit is in a Plan Year beginning in 2004 and 2005, the actuarially equivalent Straight Life Annuity is equal to the annual amount of the Straight Life Annuity commencing at the same Annuity Starting Date that has the same

51

actuarial present value as the Participant's form of benefit, computed using whichever of the following produces the greater annual amount:

A.   the interest rate and the mortality table (or other tabular factor) specified in the Plan for adjusting benefits in the same form; and

B.   a 5.5% interest rate assumption and the Applicable Mortality Table (as defined in Section 2.08 of the Plan).

(2)     "Defined Benefit Dollar Limitation" means $185,000, automatically adjusted under Code Section 415(d), effective January 1 of each year, as published in the Internal Revenue Bulletin, and payable in the form of a Straight Life Annuity. The new limitation shall apply to Limitation Years ending with or within the calendar year of the date of the adjustment, but a Participant's benefits shall not reflect the adjusted limit prior to January 1 of that calendar year. The automatic annual adjustment of the Defined Benefit Dollar Limitation under Code Section 415(d) shall apply to Participants who have had a Severance from Employment.

(3)     "Employer" means a Contributing Employer that adopts this Plan, and all members of a controlled group of corporations (as defined in Code Section 414(b), as modified by Code Section 415(h)), all commonly controlled trades or businesses (as defined in Code Section 414(c), as modified except in the case of a brother-sister group of trades or businesses under common control, by Code Section 415(h)), or affiliated service groups (as defined in Code Section 414(m)) of which the adopting Contributing Employer is a part, and any other entity required to be aggregated with the Contributing Employer pursuant to Code Section 414(o).

(4)     "Formerly Affiliated Plan" means a plan that, immediately prior to the cessation of affiliation, was actually maintained by the Employer and immediately after the cessation of affiliation is not actually maintained by the Employer. For this purpose, cessation of affiliation means the event that causes an entity to no longer be considered the Employer, such as the sale of a member of a controlled group of corporations, as defined in Code Section 414(b), as modified by Code Section 415(h), to an unrelated corporation, or that causes a plan to not actually be maintained by the Employer, such as a transfer of plan sponsorship outside a controlled group.

(5)     "Limitation Year" means the 12 consecutive month period ending on each December 31.

(6)     "Maximum Permissible Benefit" means the Defined Benefit Dollar Limitation as adjusted where required, as provided below.

(A)    If the Participant has less than 10 Years of Participation in the Plan, the Defined Benefit Dollar Limitation shall be multiplied by a fraction, (i) the numerator of which is the number of Years of Participation (or part thereof, but not less than one year) in the Plan, and (ii) the denominator of which is 10.

(B)    The Defined Benefit Dollar Limitation shall be adjusted if the Pension Starting Date of the Participant's benefit is before age 62 or after age 65. If the Annuity Starting Date is before age 62, the Defined Benefit Dollar Limitation shall be adjusted under (B)(i) below, as modified by (B)(iii) below. If the Annuity Starting Date is after age 65, the Defined Benefit Dollar Limitation shall be adjusted under (B)(ii) below, as modified by (B)(iii) below.

(i)     If the Annuity Starting Date for the Participant's benefit is prior to age 62 and occurs in a Limitation Year beginning before January 1, 2008, the Defined Benefit Dollar Limitation for the Participant's Annuity Starting Date is the annual amount of a benefit payable in the form of a Straight Life Annuity commencing at the Participant's Annuity Starting Date that is the Actuarial Equivalent of the Defined Benefit Dollar Limitation (adjusted under (A) above for Years of Participation less than 10, if required) with actuarial equivalence computed using whichever of the following produces the smaller annual amount: (I) the interest rate and the mortality table (or other tabular factor) specified in the Plan for purposes of determining actuarial equivalence for early retirement benefits; or (II) a 5% interest rate assumption and the Applicable Mortality Table (as defined in Section 2.08 of the Plan). To the extent the Plan does not specify an interest rate and mortality table (or other tabular factor) or for ages for which no tabular factor is specified, a 5% interest rate and the Applicable Mortality Table (as defined in Section 2.08 of the Plan) shall be used to determine actuarial equivalence.

If the Annuity Starting Date for the Participant's benefit is prior to age 62 and occurs in a Limitation Year beginning after December 31, 2007, and the Plan does not have an immediately commencing Straight Life Annuity payable at both age 62 and the age of benefit commencement, the Defined Benefit Dollar Limitation for the Participant's Pension Starting Date is the annual amount of a benefit payable in the form of a Straight Life Annuity commencing at the Participant's Annuity Starting Date that is the Actuarial Equivalent of the Defined Benefit Dollar Limitation (adjusted under (A) above for Years of Participation less than 10, if required) with actuarial equivalence computed using a 5% interest rate assumption and the Applicable Mortality Table (as defined in Section 2.08 of the Plan) for the Annuity Starting Date (and expressing the Participant's age based on completed calendar months as of the Annuity Starting Date).

If the Annuity Starting Date for the Participant's benefit is prior to age 62 and occurs in a Limitation Year beginning after December 31, 2007, and the Plan has an immediately commencing Straight Life Annuity payable at both age 62 and the age of benefit commencement, the Defined Benefit Dollar Limitation for the Participant's Annuity Starting Date is the lesser of the limitation determined under the preceding paragraph and the Defined Benefit Dollar Limitation (adjusted under (A) above for Years of Participation less than 10, if required) multiplied by the ratio of the annual amount of the immediately commencing Straight Life Annuity under the Plan at the Participant's Annuity Starting Date to the annual amount of the immediately commencing Straight Life Annuity under the Plan at age 62, both determined without applying the limitations of this Section.

Notwithstanding any other provision of this (i), the age adjusted Defined Benefit Dollar Limitation applicable to a Participant does not decrease on account of an increase in age or the performance of additional service.

(ii)   If the Annuity Starting Date for the Participant's benefit is after age 65 and occurs in a Limitation Year beginning before January 1, 2008, the Defined Benefit Dollar Limitation for the Participant's Annuity Starting Date is the annual amount of a benefit payable in the form of a Straight Life Annuity commencing at the Participant's Annuity Starting Date that is the Actuarial Equivalent of the Defined Benefit Dollar Limitation (adjusted under (1) above for Years of Participation less than 10, if required) with actuarial equivalence computed using whichever of the following produces the smaller annual amount: (I) the interest rate and the mortality table (or other tabular factor) specified in the Plan for purposes of determining actuarial equivalence for late retirement benefits; or (II) a 5% interest rate assumption and the Applicable Mortality Table (as defined in Section 2.08 of the Plan).

If the Annuity Starting Date for the Participant's benefit is after age 65 and occurs in a Limitation Year beginning after December 31, 2007, and the Plan does not have an immediately commencing Straight Life Annuity payable at both age 65 and the age of benefit commencement, the Defined Benefit Dollar Limitation at the Participant's Annuity Starting Date is the annual amount of a benefit payable in the form of a Straight Life Annuity commencing at the Participant's Annuity Starting Date that is the Actuarial Equivalent of the Defined Benefit Dollar Limitation (adjusted under (A) above for Years of Participation less than 10, if required) with actuarial equivalence computed using a 5% interest rate assumption and the Applicable Mortality Table (as defined in Section 2.08 of the Plan) for that Annuity Starting Date (and expressing the Participant's age based on completed calendar months as of the Annuity Starting Date).

If the Annuity Starting Date for the Participant's benefit is after age 65 and occurs in a Limitation Year beginning after December 31, 2007, and the Plan has an immediately commencing Straight Life Annuity payable at both age 65 and the age of benefit commencement, the Defined Benefit Dollar Limitation at the Participant's Annuity Starting Date is the lesser of the limitation determined under the preceding paragraph and the Defined Benefit Dollar Limitation (adjusted under (A) above for Years of Participation less than 10, if required) multiplied by the ratio of the annual amount of the adjusted immediately commencing Straight Life Annuity under the Plan at the Participant's Annuity Starting Date to the annual amount of the adjusted immediately commencing Straight Life Annuity under the Plan at age 65, both determined without applying the limitations of this Section. For this purpose, the adjusted immediately commencing Straight Life Annuity under the Plan at the Participant's Annuity Starting Date is the annual amount of such annuity payable to the Participant, computed disregarding the Participant's accruals after age 65 but including actuarial adjustments even if those actuarial adjustments are used to offset accruals; and the adjusted immediately commencing Straight Life Annuity under the Plan at age 65 is the annual amount of such annuity that would be payable under the Plan to a hypothetical Participant who is age 65 and has the same accrued benefit as the Participant.

54

(iii)    Notwithstanding the other requirements of this (B), no adjustment shall be made to the Defined Benefit Dollar Limitation to reflect the probability of a Participant's death between the Annuity Starting Date and age 62, or between age 65 and the Annuity Starting Date, as applicable, if benefits are not forfeited upon the death of the Participant prior to the Annuity Starting Date. To the extent benefits are forfeited upon death before the Pension Starting Date, such an adjustment shall be made. For this purpose, no forfeiture shall be treated as occurring upon the Participant's death if the Plan does not charge Participants for providing a qualified joint and survivor annuity, as defined in Code Section 417(c) upon the Participant's death.

(C)    Notwithstanding anything else in this definition to the contrary, the benefit otherwise accrued or payable to a Participant under this Plan shall be deemed not to exceed the Maximum Permissible Benefit if:

    (i)    the retirement benefits payable for a Limitation Year under any form of benefit with respect to such Participant under this Plan and under all other defined benefit plans (without regard to whether a plan has been terminated) ever maintained by the Employer do not exceed $10,000 multiplied by a fraction, (1) the numerator of which is the Participant's number of years of Credited Service (or part thereof, but not less than 1 year) for benefit accrual purposes with the Employer (or a Predecessor Employer) (not to exceed 10), and (2) the denominator of which is 10; and

    (ii)    the Employer (or a Predecessor Employer) has not at any time maintained a defined contribution plan in which the Participant participated (for this purpose, mandatory employee contributions under a defined benefit plan, individual medical benefit accounts under Code Section 401(h), and accounts for post-retirement medical benefits established under Code Section 419A(d)(1) are not considered a separate defined contribution plan).

    The minimum benefit rule in this (C) applies to a Participant in a multiemployer plan described in Code Section 414(f) without regard to whether that Participant ever participated in 1 or more plans maintained by an Employer who also maintains the multiemployer plan, provided that none of such other plans were maintained as a result of collective bargaining involving the same employer representative and the multiemployer plan.

(7)    "Predecessor Employer" means, with respect to a Participant, a former employer if the Employer maintains a plan that provides a benefit which the Participant accrued while performing services for the former employer. Predecessor Employer also means, with respect to a Participant, a former entity that antedates the Employer if, under the facts and circumstances, the Employer constitutes a continuation of all or a portion of the trade or business of the former entity.

(8)    "Severance from Employment" means an employee has ceased to be an employee of the Employer maintaining the plan. An employee does not have a Severance from Employment if, in connection with a change of employment, the employee's new

employer maintains the plan with respect to the employee.   A Participant in a multiemployer plan (as defined in Code Section 414(f)) is not treated as having incurred a Severance from Employment with the Employer maintaining the multiemployer plan if the Participant continues to be an employee of another employer maintaining the multiemployer plan.

(9)    "Straight Life Annuity" means an annuity payable in equal installments for the life of the Participant that terminates upon the Participant's death.

(10)   "Year of Participation" means 1 year (computed to fractional parts of a year) for each Plan Year for which the following conditions are met:

(A)    the Participant is credited with 1 year of Pension Service for benefit accrual purposes, and

(B)    the Participant is included as a Participant under the eligibility provisions of the Plan for at last one (1) day of the Plan Year.

If these 2 conditions are met, the portion of a Year of Participation credited to the Participant shall equal the amount of Pension Service credited to the Participant for such Plan Year.  A Participant who is totally and permanently disabled within the meaning of Code Section 415(c)(3)(C)(i) for a Plan Year shall receive a Year of Participation with respect to that period.  In addition, for a Participant to receive a Year of Participation (or part thereof) for a Plan Year, the Plan must be established no later than the last day of such Plan Year.  In no event will more than 1 Year of Participation be credited for any 12 month period.

(e)    The Trustees shall be entitled to rely on a representation by a Contributing Employer that the pension payable to a Participant under this Plan, to the extent attributable to employment with that Contributing Employer, does not, together with any other pension payable to him under any other defined benefit pension plan maintained by that Contributing Employer (and to the extent attributable to employment with that Contributing Employer), exceed the limitations of Code Section 415.

56

## ARTICLE XIV

### Top-Heavy Provisions

**Section 14.01    Top-Heavy Provisions**

If the Plan is or becomes a Top-Heavy Plan, the provisions of this Section will supersede any conflicting provisions in the Plan. However, the requirements of Section 14.01(b) and (c) shall not apply with respect to any employee included in a unit of employees covered by an agreement which the Secretary of Labor finds to be a collective bargaining agreement between employee representatives and 1 or more Contributing Employers if there is evidence that retirement benefits were the subject of good faith bargaining between such employee representatives and such Contributing Employer or Employers.

(a)    Top-Heavy Definitions

    (1)    Key Employee: Any employee or former employee including any deceased employee) who at any time during the Plan Year that includes the Determination Date was an officer of a Contributing Employer if such individual's annual Compensation exceeds $130,000 (as adjusted under Section 415(a)(i)(I) of the Code for Plan Years beginning after December 31, 2002), a 5-percent owner of a Contributing Employer, or a 1-percent owner of a Contributing Employer who has an annual Compensation of more than $150,000. For this purpose, no more than 50 Employees (or, if lesser, the greater of 10% of 3 of the Employees) shall be treated as officers. For this purpose of this Plan, the term "5% owner" means: if the Employer is a corporation, any person who owns (or is considered as owing within the meaning of Section 318 of the Code) more than 5% of the outstanding stock of the corporation, or stock possessing more than 5% of the total combined voting power of all stock of the corporation, or if the Employer is not a corporation, any person who owns more than 5% of the capital or profits interest in the Employer. For purposes of this Section, the term "1% owner" means any person who would be described above if "1%" were substituted for "5%" each place it appears above. The determination of who is a Key Employee will be made in accordance with Section 416(i)(1) of the Code and the applicable Treasury regulations and other guidance of general applicability thereunder.

    (2)    Non-Key Employee: shall mean any Employee who is not a Key Employee.

    (3)    Top Heavy Plan: For any Plan Year, this Plan is Top-Heavy if any of the following conditions exist:

        (i)    If the Top-Heavy Ratio for this Plan exceeds 60% and this Plan is not part of any Required Aggregation Group or Permissive Aggregation Group.

        (ii)    If this Plan is a part of a Required Aggregation Group but not part of a Permissive Aggregation Group and the Top-Heavy Ratio for the group of Plans exceeds 60%.

        (iii)    If this Plan is part of a Required Aggregation Group and part of a Permissive Aggregation Group and the Top-Heavy Ratio for the Permissive Aggregation Group exceeds 60%.

(4)     Top-Heavy Ratio:

(i)     If a Contributing Employer maintains one or more defined benefit plans and the Contributing Employer has not maintained any defined contribution plans (including any Simplified Employee Pension Plan) which during the 1-year period ending on the Determination Date(s) has or has had account balances, the Top-Heavy Ratio for this Plan alone or for the Required or Permissive Aggregation Group as appropriate is a fraction, the numerator of which is the sum of the present value of Accrued Benefits of all Key Employees as of the Determination Date(s) (including any part of any Accrued Benefit distributed in the 1-year period ending on the Determination Date(s), and the denominator of which is the sum of the present value of Accrued Benefits (including any part of any Accrued Benefits distributed in the 1-year period ending on the Determination Date(s) determined in accordance with Section 416 of the Code and the regulations thereunder. In the case of a distribution made for a reason other than severance from employment, death, or disability, the preceding sentence shall be applied by substituting "5-year period" for "1-year period."

(ii)    If a Contributing Employer maintains one or more defined benefit plans and the Contributing Employer maintains or has maintained one or more defined contribution plans including any Simplified Employee Pension Plan) which during the 1-year period ending on the Determination Date(s) has or has had any account balances, the Top-Heavy Ratio for any Required or Permissive Aggregation Group, as appropriate, is a fraction, the numerator of which is the sum of the present value of Accrued Benefits under the aggregated defined benefit plan or plans for an Key Employees, determined in accordance with (i) above, and the sum of account balances under the aggregated defined contribution plan or plans for all Key Employees as of the Determination Date(s), and the denominator of which is the sum of the present value of Accrued Benefits under the defined benefit plan or plans for all Participants, determined in accordance with (i) above, and the account balances under the aggregated defined contribution plan or plans for all Participants as of the Determination Date(s), all determined in accordance with Section 416 of the Code and the regulations thereunder. The account balances under a defined contribution plan in both the numerator and denominator of the Top-Heavy Ratio are adjusted for any distribution of an account balance made in the 1-year period ending on the Determination Date. In the case of a distribution made for a reason other than severance from employment, death, or disability, the preceding sentence shall be applied by substituting "5-year period" for "1-year period."

(iii)   For purposes of (i) and (ii) above the value of account balances and the present value of Accrued Benefits will be determined as of the most recent Valuation Date that falls within or ends with the 12-month period ending on the Determination Date, except as provided in Section 416 of the Code and the regulations thereunder for the first and second plan years of a defined benefit Plan. The account balances and Accrued Benefits of a Participant (1) who is not a Key Employee but who was a Key Employee in a prior year, or (2) who has not been credited with at least one Hour of Service with any Employer maintaining the Plan at any time during the 1-year period ending on the Determination Date will be disregarded. The calculation of the Top-Heavy Ratio, and the extent to which distributions, rollovers, and transfers are taken into account will be made in accordance with Section 416 of the Code and the regulations thereunder. When

aggregating plans, the value of account balances and Accrued Benefits will be calculated with reference to the Determination Dates that fall within the same calendar year.

Solely for purposes of determining if the Plan or any other plan included in a Required Aggregation Group of which is the Plan is a part, is a Top-Heavy Plan, the Accrued Benefit of a Participant other than a Key Employee shall be determined under (1) the method, if any, that uniformly applies for benefit accrual purposes under all defined benefit plans maintained by a Contributing Employer, or (2) if there is no the method, as if such benefit accrued not more rapidly than the slowest accrual rate permitted under the fractional rule of Section 411(b)(1)(C) of the Code.

(5) Permissive Aggregation Group: Any other plan of a Contributing Employer which, when considered as a group with the Required Aggregation Group, would continue to satisfy the requirements of Sections 401(a)( 4) and 410 of the Code with such plan being taken into account.

(6) Required Aggregation Group: (i) Each qualified plan of a Contributing Employer in which at least one Key Employee participates, and (ii) any other qualified plan of the Contributing Employer which enables a plan described in (i) to meet the requirements of Sections 401(a)(4) or 410 of the Code.

A part of a plan that covers collectively bargained employees and includes a Key Employee of the Contributing Employer must be included in the Required Aggregation Group. A part of a plan the covers collectively bargained employees that does not include a Key Employee of the Contributing Employer may be included in a Permissive Aggregation Group.

(7) Determination Date: For any Plan Year subsequent to the first Plan Year, the last day of the preceding Plan Year. For the first Plan Year of the Plan, the last day of that year.

(8) Valuation Date: The date, January I of each Plan Year, on which account balances or Accrued Benefits are valued for purposes of calculating the Top-Heavy Ratio.

(9) Present Value: Present value shall be based only on the interest and mortality rates specified in Section 2.02 of this Plan.

(10) Compensation: Compensation is defined in Section 414(q)(4) of the Code.

(11) Contributing Employer: Except where otherwise specifically provided, for purposes of this Article, means a Contributing Employer under this Plan and any corporation or unincorporated business which is controlled by, or under common control with, a Contributing Employer under this Plan as described in Section 414(b) and (c) of the Code or a member of the same affiliated service group as the Contributing Employer under this Plan as described in Section 414(m) of the Code or any entity required to be aggregated with a Contributing Employer under Section 414(o) of the Code and the regulations thereunder.

(12) Treatment of beneficiaries: The terms "employee" and "Key Employee" include their beneficiaries.

(b)     Minimum Accrued Benefit

(1)     Notwithstanding any other provision in this Plan except (3), (4) and (5) below, for any Plan Year in which this Plan is Top-Heavy, each Participant (other than a collectively bargained employee) who is a Non-Key Employee and has completed 1,000 Hours of Service will accrue a benefit (to be provided solely by employer contributions and expressed as a life annuity commencing at Normal Retirement Age) of not less than 2% of his or her highest average compensation for the 5 consecutive years for which the Participant had the highest Compensation multiplied by his or her years of Credited Service. The aggregate Compensation for the years during such 5-year period in which the Participant was credited with a year of Credited Service will be divided by the number of such years in order to determine average annual Compensation. The minimum accrual is determined without regard to any Social Security contribution. The minimum accrual applies even though under other Plan provisions the Participant would not otherwise be entitled to receive an accrual, or would have received a lesser accrual for the year because (i) the Employee fails to make mandatory contributions to the Plan, (i) the Employee's Compensation is less than a stated amount, (iii) the Employee is not employed on the last day of the accrual computation period, or (iv) the Plan is integrated with Social Security. Credited Service shall be disregarded to the extent that such service occurs during a Plan Year when the Plan benefits (within the meaning of Section 410(b) of the Code) no Key Employee or former Key Employee.

(2)     If the form of benefit is other than a single life annuity, the Employee must receive an amount that is the Actuarial Equivalent of the minimum single life annuity benefit. If the benefit commences at a date other than at Normal Retirement Age, the Non-Key Employee must receive at least an amount that is the Actuarial Equivalent of the minimum straight life annuity benefit commencing at Normal Retirement Age.

(3)     No additional benefit accruals shall be provided pursuant to (1) above to the extent that the total accruals on behalf of the Participant attributable to employer contributions will provide a benefit expressed as a life annuity commencing at Normal Retirement Age that equals or exceeds 20% of the Participant's highest average Compensation for the 5 consecutive years for which the Participant has the highest Compensation.

(4)     If at any time a Participant in this Plan is also a participant in a defined contribution plan sponsored by a Contributing Employer, the top heavy minimum required pursuant to Code section 416 and this Section shall be provided under the terms of this Plan.

(5)     All accruals of employer derived benefits, whether or not attributable to years for which the Plan is Top-Heavy, may be used in computing whether the minimum accrual requirements of paragraph (3) above are satisfied.

(6)   The minimum Accrued Benefit required (to the extent required to be nonforfeitable under Section 416(b) may not be forfeited under Section 411(a)(3)(B) or 411 (a)(3)(D).

(c)   Minimum Vesting Schedule

For any Plan Year in which this Plan is a Top-Heavy Plan, the minimum vesting schedule below will automatically apply to all benefits within the meaning of Section 411 (a)(7) of the Code, except those attributable to employee contributions, including benefits accrued before the effective date of Section 416 and benefits accrued before the Plan became a Top-Heavy Plan. No decrease in a Participant's nonforfeitable percentage may occur in the event the Plan ceases to be a Top-Heavy Plan in any subsequent Plan Year. However, this Section does not apply to the Accrued Benefit of a Participant who does not have an Hour of Service after the Plan has initially become a Top-Heavy Plan and such Participant's Accrued Benefit will be determined without regard to this Section.

For a Plan Year in which the Plan is a Top-Heavy Plan, should a Participant (other than a collectively bargained employee) shall have a nonforfetiable interest in his or her Contributing Employer-derived Accrued Benefit equal to the percentage determined in accordance with the following table:

| NUMBER OF YEARS OF VESTED CREDITED SERVICE | PERCENTAGE VESTED |
|---|---|
| 1 | 0% |
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 100%. |

If the Plan's vesting schedule is amended or the Plan is amended in any way that directly or indirectly affects the computation of a Participant's nonforfeitable percentage, or the Plan is deemed amended by an automatic change to or from a Top-Heavy Plan vesting schedule, each Participant with at least 3 Years of Vested Credited Service with a Contributing Employer may elect within a reasonable period after the adoption of the amendment or change, to have his or her nonforfeitable percentage computed under the Plan without regard to such amendment or change.

IN WITNESS WHEREOF the undersigned have set their hands

UNION TRUSTEE

MANAGEMENT TRUSTEE

UNION TRUSTEE

MANAGEMENT TRUSTEE

UNION TRUSTEE

MANAGEMENT TRUSTEE

DM 153787

## L O C A L   8 6 3
### SUMMARY OF CONTRIBUTORY GROUPS AND MONTHLY RETIREMENT
### A L L O W A N C E S   D U R I N G   T H E   P L A N   Y E A R S
### SEPTEMBER 1, 2001 THROUGH AUGUST 31, 2008
### TABLE A

| Hourly Rate of Contribution | | Monthly Benefit Per Year of Service | Minimum 10 Years | | 30 Years | Maximum 35 Years |
|---|---|---|---|---|---|---|
| (1) | (2) | | | | | |
| | .200 | | $ 103.30 | 120.00 | $ 309.90 | $ 361.55 |
| .250 | .420 | $ 10.33 | 138.00 | | 360.00 | 420.00 |
| .300 | .470 | 12.00 | 155.30 | | 414.00 | 483.00 |
| .350 | | 13.80 | 172.00 | | 465.90 | 543.55 |
| .400 | .570 | 15.53 | 190.00 | | 516.00 | 602.00 |
| .450 | .620 | 17.20 | 208.30 | | 570.00 | 665.00 |
| .500 | .670 | 19.00 | 225.00 | | 624.90 | 729.05 |
| .550 | .720 | 20.83 | 243.30 | | 675.00 | 787.50 |
| .600 | .770 | 22.50 | 260.00 | | 729.90 | 851.55 |
| .650 | .820 | 24.33 | 278.30 | | 780.00 | 910.00 |
| .700 | .870 | 26.00 | 295.00 | | 834.90 | 974.05 |
| .750 | .920 | 27.83 | 313.30 | | 885.00 | 1,032.50 |
| .800 | .970 | 29.50 | 330.00 | | 939.90 | 1,096.55 |
| .850 | 1.020 | 31.33 | 348.30 | | 990.00 | 1,155.00 |
| .900 | 1.070 | 33.00 | 365.80 | | 1,044.90 | 1,219.05 |
| .950 | 1.120 | 34.83 | 383.30 | | 1,097.40 | 1,280.30 |
| 1.000 | 1.170 | 36.58 | 400.00 | | 1,149.90 | 1,341.55 |
| 1.050 | 1.220 | 38.33 | 418.30 | | 1,200.00 | 1,400.00 |
| 1.100 | 1.270 | 40.00 | 435.00 | | 1,254.90 | 1,464.05 |
| 1.150 | 1.320 | 41.83 | 453.30 | | 1,305.00 | 1,522.50 |
| 1.200 | 1.370 | 43.50 | 461.00 | | 1,359.90 | 1,586.55 |
| 1.225 | 1.395 | 45.33 | 470.00 | | 1,383.00 | 1,613.50 |
| 1.250 | 1.420 | 46.10 | 488.30 | | 1,410.00 | 1,645.00 |
| 1.300 | 1.470 | 47.00 | 496.30 | | 1,464.90 | 1,709.05 |
| 1.325 | 1.495 | 48.83 | 505.00 | | 1,488.90 | 1,737.05 |
| 1.350 | 1.520 | 49.63 | 523.30 | | 1,515.00 | 1,767.50 |
| 1.400 | 1.570 | 50.50 | 531.30 | | 1,569.90 | 1,831.55 |
| 1.425 | 1.595 | 52.33 | 540.00 | | 1,593.90 | 1,859.55 |
| 1.450 | 1.620 | 53.13 | 558.30 | | 1,620.00 | 1,890.00 |
| 1.500 | 1.670 | 54.00 | 575.00 | | 1,674.90 | 1,954.05 |
| 1.550 | 1.720 | 55.83 | 593.30 | | 1,725.00 | 2,012.50 |
| 1.600 | 1.770 | 57.50 | 610.00 | | 1,779.90 | 2,076.55 |
| 1.650 | 1.820 | 59.33 | 628.30 | | 1,830.00 | 2,135.00 |
| 1.700 | 1.870 | 61.00 | 645.00 | | 1,884.90 | 2,199.05 |
| 1.750 | 1.920 | 62.83 | 663.30 | | 1,935.00 | 2,257.50 |
| 1.800 | 1.970 | 64.50 | 673.00 | | 1,989.90 | 2,321.55 |
| 1.830 | 2.000 | 66.33 | 680.00 | | 2,019.00 | 2,355.50 |
| 1.850 | 2.020 | 67.30 | 698.30 | | 2,040.00 | 2,380.00 |
| 1.900 | 2.070 | 68.00 | 715.00 | | 2,094.90 | 2,444.05 |
| 1.950 | 2.120 | 69.83 | 732.00 | | 2,145.00 | 2,502.50 |
| 2.000 | 2.170 | 71.50 | 750.00 | | 2,196.00 | 2,562.00 |
| 2.050 | 2.220 | 73.20 | 760.00 | | 2,250.00 | 2,625.00 |
| 2.080 | 2.250 | 75.00 | 767.00 | | 2,280.00 | 2,660.00 |
| 2.100 | 2.270 | 76.00 | 778.00 | | 2,301.00 | 2,684.50 |
| 2.130 | 2.300 | 76.70 | 785.00 | | 2,334.00 | 2,723.00 |
| 2.150 | 2.320 | 77.80 | 802.00 | | 2,355.00 | 2,747.50 |
| 2.200 | 2.370 | 78.50 | 820.00 | | 2,406.00 | 2,807.00 |
| 2.250 | 2.420 | 80.20 | | | 2,460.00 | 2,870.00 |
| | | 82.00 | | | | |

Notes:

(1) Retirement at age 62

(2) Retirement after 30 years of service

63

LOCAL 863
SUMMARY OF CONTRIBUTORY GROUPS AND MONTHLY RETIREMENT
ALLOWANCES DURING THE PLAN YEAR
SEPTEMBER 1, 2001 THROUGH AUGUST 31, 2008
TABLE A

| Hourly Rate Of Contribution | | Monthly Benefit Per Year of Service | Minimum 10 Years | 30 Years | Maximum 35 Years |
|---|---|---|---|---|---|
| (1) | (2) | | | | |
| 2.300 | 2.470 | 83.70 | 837.00 | 2,511.00 | 2,929.50 |
| 2.325 | 2.495 | 84.60 | 846.00 | 2,538.00 | 2,961.00 |
| 2.330 | 2.500 | 84.80 | 848.00 | 2,544.00 | 2,968.00 |
| 2.350 | 2.520 | 85.50 | 855.00 | 2,565.00 | 2,992.50 |
| 2.400 | 2.550 | 86.50 | 865.00 | 2,595.00 | 3,027.50 |
| 2.425 | 2.570 | 87.20 | 872.00 | 2,616.00 | 3,052.00 |
| 2.430 | 2.595 | 88.10 | 881.00 | 2,643.00 | 3,083.50 |
| 2.480 | 2.600 | 88.30 | 883.00 | 2,649.00 | 3,099.50 |
| 2.480 | 2.650 | 90.00 | 900.00 | 2,700.00 | 3,150.00 |
| 2.500 | 2.670 | 90.70 | 907.00 | 2,721.00 | 3,174.50 |
| 2.525 | 2.695 | 91.60 | 916.00 | 2,748.00 | 3,150.00 |
| 2.530 | 2.700 | 91.80 | 918.00 | 2,754.00 | 3,175.50 |
| 2.550 | 2.720 | 92.50 | 925.00 | 2,775.00 | 3,206.00 |
| 2.580 | 2.750 | 93.50 | 935.00 | 2,805.00 | 3,213.00 |
| 2.600 | 2.770 | 94.20 | 942.00 | 2,826.00 | 3,237.50 |
| 2.630 | 2.800 | 95.30 | 953.00 | 2,859.00 | 3,297.00 |
| 2.680 | 2.820 | 95.90 | 959.00 | 2,877.00 | 3,335.50 |
| 2.700 | 2.850 | 97.00 | 970.00 | 2,910.00 | 3,395.00 |
| 2.730 | 2.870 | 97.70 | 977.00 | 2,931.00 | 3,419.50 |
| 2.750 | 2.900 | 98.80 | 988.00 | 2,964.00 | 3,458.00 |
| 2.700 | 2.920 | 99.50 | 995.00 | 2,985.00 | 3,542.00 |
| 2.830 | 2.970 | 101.20 | 1,012.00 | 3,036.00 | 3,580.50 |
| 2.850 | 3.000 | 102.30 | 1,023.00 | 3,069.00 | 3,605.00 |
| 2.880 | 3.020 | 103.00 | 1,030.00 | 3,090.00 | 3,640.00 |
| 2.900 | 3.050 | 104.00 | 1,040.00 | 3,120.00 | 3,664.50 |
| 2.930 | 3.070 | 104.70 | 1,047.00 | 3,141.00 | 3,685.50 |
| 2.950 | 3.100 | 105.30 | 1,053.00 | 3,159.00 | 3,701.25 |
| 2.980 | 3.120 | 105.75 | 1,057.50 | 3,172.50 | 3,722.25 |
| 3.000 | 3.170 | 106.80 | 1,063.50 | 3,190.50 | 3,738.00 |
| 3.030 | 3.200 | 107.40 | 1,068.00 | 3,204.00 | 3,759.00 |
| 3.050 | 3.220 | 107.80 | 1,074.00 | 3,222.00 | 3,773.00 |
| 3.100 | 3.270 | 108.90 | 1,087.00 | 3,234.00 | 3,811.50 |
| 3.130 | 3.300 | 109.50 | 1,089.00 | 3,267.00 | 3,832.50 |
| 3.150 | 3.320 | 109.90 | 1,095.00 | 3,285.00 | 3,846.50 |
| 3.200 | 3.370 | 111.00 | 1,099.00 | 3,297.00 | 3,885.00 |
| 3.230 | 3.400 | 111.60 | 1,110.00 | 3,330.00 | 3,906.00 |
| 3.300 | 3.470 | 113.10 | 1,116.00 | 3,348.00 | 3,958.50 |
| 3.330 | 3.500 | 113.70 | 1,131.00 | 3,393.00 | 3,979.50 |
| 3.350 | 3.520 | 114.10 | 1,137.00 | 3,411.00 | 3,993.50 |
| 3.400 | 3.570 | 114.10 | 1,141.00 | 3,423.00 | 3,993.50 |
| 3.430 | 3.600 | 114.10 | 1,141.00 | 3,423.00 | 3,993.50 |
| 3.450 | 3.620 | 114.10 | 1,141.00 | 3,423.00 | 3,993.50 |
| 3.500 | 3.670 | 114.10 | 1,141.00 | 3,423.00 | 3,993.50 |
| 3.530 | 3.700 | 114.10 | 1,141.00 | 3,423.00 | 3,993.50 |

Notes:

(1)  Retirement at age 62

(2)  Retirement after 30 years of service

## Local 863 Union No. 863 I.B.T. Pension Fund

### Table B

#### Monthly Retirement Benefit Table

| Hourly Contribution Rate of Contribution | | Monthly Benefit Per Year of Service |
|---|---|---|
| (1) | (2) | |
| $0.200 | | $5.17 |
| 0.250 | $0.420 | 6.00 |
| 0.300 | 0.470 | 6.90 |
| 0.350 | | 7.77 |
| 0.400 | 0.570 | 8.60 |
| 0.450 | 0.620 | 9.50 |
| 0.500 | 0.670 | 10.42 |
| 0.550 | 0.720 | 11.25 |
| 0.600 | 0.770 | 12.17 |
| 0.650 | 0.820 | 13.00 |
| 0.700 | 0.870 | 13.92 |
| 0.750 | 0.920 | 14.75 |
| 0.800 | 0.970 | 15.67 |
| 0.850 | 1.020 | 16.50 |
| 0.900 | 1.070 | 17.42 |
| 0.950 | 1.120 | 18.29 |
| 1.000 | 1.170 | 19.17 |
| 1.050 | 1.220 | 20.00 |
| 1.100 | 1.270 | 20.92 |
| 1.150 | 1.320 | 21.75 |
| 1.200 | 1.370 | 22.67 |
| 1.225 | 1.395 | 23.05 |
| 1.250 | 1.420 | 23.50 |
| 1.300 | 1.470 | 24.42 |
| 1.325 | 1.495 | 24.82 |
| 1.350 | 1.520 | 25.25 |
| 1.400 | 1.570 | 26.17 |
| 1.425 | 1.595 | 26.57 |
| 1.450 | 1.620 | 27.00 |
| 1.500 | 1.670 | 27.92 |
| 1.550 | 1.720 | 28.75 |
| 1.600 | 1.770 | 29.67 |
| 1.650 | 1.820 | 30.50 |
| 1.700 | 1.870 | 31.42 |
| 1.750 | 1.920 | 32.25 |
| 1.800 | 1.970 | 33.17 |
| 1.830 | 2.000 | 33.65 |

Notes:

65

(1) Retirement at age 62

(2) Retirement after 30 years of service, if participation is based on an additional seventeen cent ($0.17) per hour contribution rate

## Local 863 Union No. 863 I.B.T. Pension Fund

### Table B

#### Monthly Retirement Benefit Table

| Hourly Contribution Rate of Contribution | | Monthly Benefit Per Year of Service |
|---|---|---|
| (1) | (2) | |
| 1.850 | 2.020 | 34.00 |
| 1.900 | 2.070 | 34.92 |
| 1.950 | 2.120 | 35.75 |
| $2.000 | $2.170 | $36.60 |
| 2.050 | 2.220 | 37.50 |
| 2.080 | 2.250 | 38.00 |
| 2.100 | 2.270 | 38.35 |
| 2.130 | 2.300 | 38.90 |
| 2.150 | 2.320 | 39.25 |
| 2.200 | 2.370 | 40.10 |
| 2.250 | 2.420 | 41.00 |
| 2.300 | 2.470 | 41.85 |
| 2.325 | 2.495 | 42.30 |
| 2.330 | 2.500 | 42.40 |
| 2.350 | 2.520 | 42.75 |
| 2.380 | 2.550 | 43.25 |
| 2.400 | 2.570 | 43.60 |
| 2.425 | 2.595 | 44.05 |
| 2.430 | 2.600 | 44.15 |
| 2.480 | 2.650 | 45.00 |
| 2.500 | 2.670 | 45.35 |
| 2.525 | 2.695 | 45.80 |
| 2.530 | 2.700 | 45.90 |
| 2.550 | 2.720 | 46.25 |
| 2.580 | 2.750 | 46.75 |
| 2.600 | 2.770 | 47.10 |
| 2.630 | 2.800 | 47.65 |
| 2.650 | 2.820 | 47.95 |
| 2.680 | 2.850 | 48.50 |
| 2.700 | 2.870 | 48.85 |
| 2.730 | 2.900 | 49.40 |
| 2.750 | 2.920 | 49.75 |
| 2.800 | 2.970 | 50.60 |
| 2.830 | 3.000 | 51.15 |
| 2.850 | 3.020 | 51.50 |
| 2.880 | 3.050 | 52.00 |
| 2.900 | 3.070 | 52.35 |

Notes:

(1) Retirement at age 62

(2) Retirement after 30 years of service, if participation is based on an additional seventeen cent ($0.17) per hour contribution rate

Local 863 Union No. 863 I.B.T. Pension Fund

Table B

Monthly Retirement Benefit Table

| Hourly Contribution Rate of Contribution | | Monthly Benefit Per Year of Service |
|---|---|---|
| (1) | (2) | |
| 2.930 | 3.100 | 52.65 |
| 2.950 | 3.120 | 52.88 |
| 2.980 | 3.150 | 53.18 |
| 3.000 | 3.170 | 53.40 |
| 3.030 | 3.200 | 53.70 |
| 3.050 | 3.220 | 53.90 |
| $3.100 | $3.270 | $54.45 |
| 3.130 | 3.300 | 54.75 |
| 3.150 | 3.320 | 54.95 |
| 3.200 | 3.370 | 55.50 |
| 3.230 | 3.400 | 55.80 |
| 3.300 | 3.470 | 56.55 |
| 3.330 | 3.500 | 56.85 |
| 3.350 | 3.520 | 57.05 |
| 3.400 | 3.570 | 57.05 |
| 3.430 | 3.600 | 57.05 |
| 3.450 | 3.620 | 57.05 |
| 3.500 | 3.670 | 57.05 |
| 3.530 | 3.700 | 57.05 |

Notes:

(1) Retirement at age 62

(2) Retirement after 30 years of service, if participation is based on an additional seventeen cent ($0.17) per hour contribution rate

## Local 863 Union No. 863 I.B.T. Pension Fund

### Table C

Reduction Factors to be Applied to the Benefit at Age 52 for Participants with the "30 and Out" Pension for Accrued Benefits Earned After September 1, 2008

| Age | 11 | 10 | 9 | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
|-----|------|------|------|------|------|------|------|------|------|------|------|------|
| | | | | | | Months | | | | | | |
| 51 | 0.9932 | 0.9865 | 0.9797 | 0.9729 | 0.9661 | 0.9594 | 0.9526 | 0.9458 | 0.9390 | 0.9323 | 0.9255 | 0.9187 |
| 50 | 0.9126 | 0.9064 | 0.9002 | 0.8941 | 0.8879 | 0.8817 | 0.8756 | 0.8694 | 0.8633 | 0.8571 | 0.8509 | 0.8448 |
| 49 | 0.8392 | 0.8335 | 0.8279 | 0.8223 | 0.8167 | 0.8111 | 0.8055 | 0.7998 | 0.7942 | 0.7886 | 0.7830 | 0.7774 |
| 48 | 0.7723 | 0.7671 | 0.7620 | 0.7569 | 0.7518 | 0.7466 | 0.7415 | 0.7364 | 0.7313 | 0.7261 | 0.7210 | 0.7159 |
| 47 | 0.7112 | 0.7065 | 0.7019 | 0.6972 | 0.6925 | 0.6878 | 0.6831 | 0.6784 | 0.6738 | 0.6691 | 0.6644 | 0.6597 |
| 46 | 0.6554 | 0.6512 | 0.6469 | 0.6426 | 0.6383 | 0.6340 | 0.6297 | 0.6255 | 0.6212 | 0.6169 | 0.6126 | 0.6083 |
| 45 | 0.6044 | 0.6005 | 0.5966 | 0.5926 | 0.5887 | 0.5848 | 0.5809 | 0.5769 | 0.5730 | 0.5691 | 0.5652 | 0.5613 |

Assumptions:
7.50% interest
RP-2000 Combined Healthy Mortality Table projected with Scale AA to 2010 weighted 100% male

Notes:

(1) Retirement at age 62

(2) Retirement after 30 years of service, if participation is based on an additional seventeen cent ($0.17) per hour contribution rate

**4**

# LOCAL NO. 863 PENSION FUND



209 SUMMIT ROAD     Tel: (908) 654-3361    MOUNTAINSIDE, N.J. 07092

ALPHONSE RISPOLI, JR.
SECRETARY



Notice of Critical Status

Local Union No. 863 I.B. of T. Pension Plan

Participants, Beneficiaries, Contributing Employers and Local Union 863 I.B. of T.:

This is to inform you that on September 2, 2008, the actuary for the Local Union No. 863 I.B. of T. Pension Plan (the "Fund") certified to the U.S. Department of the Treasury and to the Board of Trustees that the Fund is in critical status for the Plan year beginning September 1, 2008. Federal law requires that you receive this notice.

## Introduction

The Pension Protection Act ("Act"), signed into law in 2006, is intended to improve the financial condition of pension funds. The Act introduced several formal safeguards and added notification requirements for Trustees to share more information about a fund's financial circumstances with participants, contributing employers, and others directly related to the pension plan.

Many of the Act's safeguards relate to funding, which, in simplest terms, is how much a pension plan has coming in, going out, and what is in reserve (or "in the bank") for the future. The safeguards are intended to prevent future funding problems and correct those that have already developed.

The Act requires us to test the Fund annually to determine its official funding status. Standardized measurements were established for classifying pension plans. Funds that are in "seriously endangered" or "endangered" status (commonly known as yellow zone) or "critical" status (or, red zone) must notify all fund participants, beneficiaries, unions, and contributing employers of the fund's status, as well as take corrective action to restore the fund's financial health. These categories take effect for the Local 863 Plan as of September 1, 2008. It is therefore necessary that we inform interested parties what zone or status the Plan is in. This does not mean that the Plan's status or funding has substantially changed from the recent past. Rather the PPA now requires that the Plan state what zone the Plan is in under the terminology in the PPA.

## Fund's Status – Red Zone

The Fund is in critical status (red zone) as of September 1, 2008 based on the actuary's determination that the Fund is projected to have an accumulated funding deficiency for the 2008 plan year. What this means is that contributions are not expected to be high enough to meet government standards for funding promised benefits plus those that participants are currently earning.

## Rehabilitation Plan and Possibility of Reduction in Benefits

The Act requires that a fund in the red zone adopt a Rehabilitation Plan designed to improve its funded position so that, over time, it will be able to meet the statutory funding requirements. The Rehabilitation Plan, which will be adopted by July 27, 2009, will consist of one or more "schedules" of recommended contribution rate increases and possible reductions in benefits. The bargaining parties will be provided with these schedules for consideration in negotiations in new or renewed collective bargaining agreements. Of course, since the Plan recently made changes to and reductions in the benefits as described in the Notice sent August 15, 2008, this will be taken into account in determining whether future reductions in benefits will still be needed. In addition to revising the formula for future benefit accruals and making similar changes, under the Act, a Rehabilitation Plan may eliminate or reduce "adjustable benefits". Adjustable benefits include:

annuities), optional forms including the lump sum and 10-year certain guarantee, cash vested benefits, and similar benefits; and

- Early retirement benefits or retirement-type subsidies.

The level of benefits you have already earned that are payable at normal retirement age as a single life or qualified joint and survivor annuity cannot and will not be reduced under the Act's rules. Any reductions pursuant to the Rehabilitation Plan will apply only to participants and beneficiaries whose benefit commencement date is after September 2, 2008. You will be notified before any further benefit reductions are put into effect, if any.

## Benefit Restrictions

Effective on the date of this notice, the Fund is not permitted to pay lump sum benefits or any other payment in excess of the monthly amount paid under a single life annuity (except for the payout of benefits which are less than $5000) while the Plan is in critical status. This includes the payment of the Lump Sum Benefit and Cash Vested Benefit.

## Employer Surcharge

Just as the PPA will not permit payment of a lump sum benefit while the Plan is in critical status, it likewise imposes obligations upon the contributing employers, even before a Rehabilitation Plan is adopted. Thus the law requires that all contributing employers pay to the Fund a surcharge to help correct the Fund's financial situation, beginning 30 days after the employer is notified that the plan is in critical status.

The surcharge is a percentage of the employer's negotiated contribution rate. A 5% surcharge is applicable the first Plan year in critical status. The surcharge goes up to 10% for each succeeding Plan year in which the Fund is in critical status, until the employer agrees to a collective bargaining agreement that implements one of the schedules in the Rehabilitation Plan. These surcharges are separate requirements and are in addition to the obligation of the contributing employers to pay their regular contributions and their share of accumulated funding deficiencies.

For the remainder of the first Plan year of critical status, the 5% surcharge is due for any contribution actually paid on or after October 2, 2008, even if the obligation to the Fund arose earlier. For subsequent Plan years, i.e., beginning September 1, 2009, the 10% surcharge will apply to contributions actually paid on and after that date.

The surcharge amount will be in paid in a separate check made payable to the Teamsters Local 863 Pension Fund, with the notation "surcharge". These surcharges will be disregarded in determining the rate of benefit accruals and potential employer withdrawal liability allocations, as required by the law.

## What's Next

We understand that legally required notices like this one can create concern about the Fund's future. Be assured that the Board of Trustees takes very seriously its obligation to preserve the financial viability of the Fund. With the assistance of the Fund's actuary, counsel and other professionals, and working with the contributing employers and the Union, the Trustees will develop a Rehabilitation Plan that addresses these issues. You should know that we expect that both contribution increases and benefit reductions will improve the Fund's financial condition and help to secure your pensions. As a final note, since the Fund is influenced by economic and financial variables beyond our control (such as market volatility and changes in employment and/or the number of contributing employers), unexpected developments can affect the Fund's status and any future corrective actions needed.

For more information about this notice or the Fund, you may contact the Fund Office at the address or phone number listed at the top of this letter.

Sincerely,
The Board of Trustees

Date: September 2, 2008

*As required by law, this notice is being provided to the Pension Benefit Guaranty Corporation (PBGC) and the Department of Labor.*

**5**

# LOCAL NO. 863 PENSION FUND

209 SUMMIT ROAD                    MOUNTAINSIDE, N.J. 07092
Tel. (908) 654-3361

ALPHONSE RISPOLI, JR.
Secretary 



TO ALL CONTRIBUTING EMPLOYERS:

This letter is to remind you of your obligation to pay a 5% surcharge on all contributions that are paid on or after October 2, 2008, pursuant to the Notice of Critical Status.

On September 2, 2008, the Local 863 Pension Plan sent you a Notice of Critical Status, which explained that the Plan certified to the Department of Treasury that it was in a critical status, and explaining to you the resulting implications and requirements of the federal Pension Protection Act. Included in that Notice was a section explaining that under the Pension Protection Act, the law requires each contributing employer to pay to the Plan a "surcharge" to help correct the Plan's financial situation, commencing with all payments submitted on or after October 2, 2008.

The surcharge for this year is 5% of the contributions your company pays. This is to be paid on a monthly basis as you remit your normal contributions. **Therefore, for all contributions for which you submit a check for payment on or after October 2, 2008, you must also include a separate check for 5% of that total amount. Though this should be by separate check, it should be remitted along with the payment of the contribution.**

This is not a fee or charge imposed by the Trustees. Rather, it is mandated by federal law.

Sincerely,
Board of Trustees:

September 30, 2008

**6**

*8/09*

# LOCAL NO. 863 PENSION FUND
209 SUMMIT ROAD                                    MOUNTAINSIDE, N.J. 07092
                    Tel. (908) 654-3361



ALPHONSE RISPOLI, JR.
    Secretary                         25

To:     Contributing Employers and Local Union No. 863 I.B of T.:

As you know, on September 2, 2008, our Plan Actuary issued a Notice which determined and certified that the Local Union No. 863 I.B of T. Pension Plan (the "Fund") is in "Critical" status (also known as the "red zone") for the Plan Year commencing September 1, 2008. Accordingly, as explained in that Notice, the Fund is required by the Pension Protection Act of 2006 (the "PPA") to adopt a Rehabilitation Plan, which has the goal of enabling the Fund to emerge from Critical status within the statutory timeframe required by the PPA.

The purpose of this letter is to notify you that the Trustees adopted the Rehabilitation Plan on July 24, 2009. Attached are the applicable Rehabilitation Plan contribution rate "schedules" with their associated plan provisions. One schedule is called the Preferred Schedule, which is to be negotiated and implemented as part of future collective bargaining agreements between the union and contributing employers entered into or renewed on or after August 24, 2009. The other schedule is called the Default Schedule. This Schedule will be applied to an employer who does not agree in collective bargaining to the Preferred Schedule.

Here is an example of how the contribution rate schedules would work. Let's say an employer's contract expires November 15, 2010. The current contribution rate is $3.50 per hour and a new 4-year contract is negotiated in accordance with the "Preferred" schedule. On November 15, 2010, which is the beginning of Year 1 for this employer, the contribution rate increases to $7.50 per hour (that is, $3.50 plus $4.00) and remains at that level for 3 years. On November 15, 2013 (beginning of Year 4), the contribution rate increases to $8.80 ($3.50 plus $4.00 plus $1.30). On November 15, 2014, a new contract will be negotiated that is consistent with the schedules that are in effect on that date.

The employer contribution surcharge, which is currently 5% of the employer's negotiated contribution rate, will be increasing to 10% for any contribution actually paid on or after September 1, 2009. The surcharge continues until the employer agrees to a collective bargaining agreement that implements one of the schedules in the Rehabilitation Plan. In the above example, the surcharge ends on November 15, 2010. *Optional sentence for employers who already agreed:* [Note, since you have already agreed to an additional contribution of [$3.00/$4.00] per hour, that additional amount is due for any contribution actually paid on or after September 1, 2009. Upon implementation of that additional amount, the surcharge will no longer be required.]

Each year, the Fund's actuary will review and certify the status of the Fund under the PPA funding rules and whether the Fund is making the scheduled progress in meeting the requirements of the Rehabilitation Plan. If we determine that it is necessary in light of the updated information, we will update the Rehabilitation Plan and provide you with revised schedules. Notwithstanding subsequent changes in the schedules, however, the schedule you adopt shall remain in effect for the duration of the collective bargaining agreement. Any

subsequent collective bargaining agreement will need to include terms consistent with the schedules in effect at the time of the renewal or extension.

In the event you have questions or would like additional information, you may contact the Trustees at the address listed above.

Sincerely,

The Board of Trustees

August 24, 2009

Attachments: Rehabilitation Plan Schedules

<u>Rehabilitation Plan adopted July 24, 2009</u>

<u>PREFERRED SCHEDULE</u>

<u>Affected Participants</u>

The benefit changes described in this schedule apply to participants retiring or terminating employment after the later of the date the Preferred Schedule is adopted and the date that benefits can be eliminated allowing for legally required advance notification and whose employer elected this schedule.

<u>Benefit Changes</u>

None

<u>Contribution Schedule for Preferred Schedule</u>

*For employers who already negotiated an additional $3.00 or $4.00 per hour*
The additional $3.00 or $4.00 per hour will be due for work on or after September 1, 2009

*For all employers:*

| Effective Date, Beginning of Contract Year in | Additional Contribution Rate For Employers Already Paying Additional $3.00 per Hour | Additional Contribution Rate For Employers Already Paying Additional $4.00 per Hour | Additional Contribution Rate For All Other Employers |
|---|---|---|---|
| Year 1 | $1.00 | 0 | $4.00 |
| Year 2 | 1.00 | 0 | 4.00 |
| Year 3 | 1.00 | 0 | 4.00 |
| Year 4 | 2.30 | $1.30 | 5.30 |
| Year 5 | 2.30 | 1.30 | 5.30 |
| Year 6 | 2.30 | 1.30 | 5.30 + 1.30 |
| Year 7 | 3.60 | 2.60 | 6.60 |
| Year 8 | 3.60 | 2.60 | 6.60 |
| Year 9 | 3.60 | 2.60 | 6.60 + 1.30 |
| Year 10 | 4.90 | 3.90 | 7.90 |
| Year 11 | 4.90 | 3.90 | 7.90 |
| Year 12 | 4.90 | 3.90 | 7.90 |
| Year 13 | 6.20 | 5.20 | 9.20 + 1.30 |
| Year 14 | 6.20 | 5.20 | 9.20 |
| Year 15 | 6.20 | 5.20 | 9.20 |

This schedule of contribution rates, provided by the Trustees and relied upon by the bargaining parties in negotiating a collective bargaining agreement, shall remain in effect for the duration of that collective bargaining agreement. This Preferred Schedule may be amended from time to time and any collective bargaining agreement entered, renewed, or extended after the date of any changes to this Schedule shall be subject to the Schedule then in effect at the time of such entry, renewal or extension.

### Rehabilitation Plan adopted July 24, 2009

### DEFAULT SCHEDULE

### Affected Participants

The benefit changes described in this schedule apply to participants retiring or terminating employment after the later of the date the Default Schedule is adopted or imposed and the date that benefits can be eliminated allowing for legally required advance notification and whose employer elected this schedule.

### Benefit Changes

The current plan of benefits, but including:
- Elimination of the pre-retirement death benefit for unmarried participants
- Elimination of the $3000 lump sum post-retirement death benefit

### Contribution Schedule for Default Schedule

*For employers who already negotiated an additional $3.00 per hour*
The additional $3.00 per hour will be due for work on or after September 1, 2009

*For all employers:*

| Effective Date, Beginning of Contract Year in | Additional Contribution Rate For Employers Already Paying Additional $3.00 per Hour | Additional Contribution Rate For All Other Employers |
|---|---|---|
| Year 1 | $0.90 | $3.90 |
| Year 2 | 0.90 | 3.90 |
| Year 3 | 0.90 | 3.90 |
| Year 4 | 2.20 | 5.20 |
| Year 5 | 2.20 | 5.20 |
| Year 6 | 2.20 | 5.20 |
| Year 7 | 3.50 | 6.50 |
| Year 8 | 3.50 | 6.50 |
| Year 9 | 3.50 | 6.50 |
| Year 10 | 4.80 | 7.80 |
| Year 11 | 4.80 | 7.80 |
| Year 12 | 4.80 | 7.80 |
| Year 13 | 6.10 | 9.10 |
| Year 14 | 6.10 | 9.10 |
| Year 15 | 6.10 | 9.10 |

This schedule of contribution rates, provided by the Trustees and relied upon by the bargaining parties in negotiating a collective bargaining agreement, shall remain in effect for the duration of that collective bargaining agreement. This Default Schedule may be amended from time to time and any collective bargaining agreement entered, renewed, or extended after the date of any changes to this Schedule shall be subject to the Schedule then in effect at the time of such entry, renewal or extension.

# LOCAL NO. 863 PENSION FUND

209 SUMMIT ROAD                         MOUNTAINSIDE, N.J. 07092

Tel. (908) 654-3361



ALPHONSE RISPOLI, JR.
    Secretary               

TO ALL CONTRIBUTING EMPLOYERS:

As you know, on September 2, 2008, the Local 863 Pension Plan sent you a Notice of Critical Status, which explained that the Plan certified to the Department of Treasury that it was in a critical status (i.e., was in the "red zone"), and explained to you the resulting implications and requirements of the federal Pension Protection Act. Included in that Notice was a section explaining that under the Pension Protection Act, the law requires each contributing employer to pay to the Plan a "surcharge" to help correct the Plan's financial situation, commencing with all payments submitted on or after October 2, 2008.

The surcharge for Plan Year 2008-09 was 5% of the contributions your company pays. However, the Pension Protection Act requires that for the second Plan Year after declaration of Critical status, the surcharge increases to 10%. **Therefore, commencing with all contributions for which you submit a check for payment on or after September 1, 2009, you must also include a separate check for 10% of that total amount. Though this should be by separate check, it should be remitted along with the payment of the contribution.**

The only exception to the requirement to pay this 10% surcharge commencing with contributions made on or after September 1, 2009, is if your company has already agreed in a collective bargaining agreement with the Union to pay an additional contribution of either $3 or $4 per hour above the contractual rate, and you have actually commenced payment of that amount. If you do not fall within this category, then beginning September 1, 2009, you must remit to the Plan an additional 10% of all contributions.

This is not a fee or charge imposed by the Trustees. Rather, it is mandated by federal law. Accordingly, your compliance with the 10% surcharge is not discretionary. The Trustees will enforce payment of the surcharge under the Plan's Permanent Arbitration procedures if payment is not made.

Please note that if during the Plan year 2009-2010, your company enters into a new or modified contract with the Union that complies with the Rehabilitation Plan, as it must, then you will cease to have an obligation to pay the 10% surcharge.

Sincerely,
Board of Trustees
July 31, 2009

7

# LOCAL NO. 863 PENSION FUND

209 SUMMIT ROAD         MOUNTAINSIDE, N.J. 07092
Tel: (908) 654-3361



ALPHONSE RISPOLI, JR.
Secretary

December, 2009

To: All Participants, Beneficiaries, Contributing Employers and Local Union 863 I.B. of T.

As you know from previous communications, the Pension Protection Act of 2006 (PPA) requires that notices be sent each year to all participants, beneficiaries, participating unions, contributing employers and other interested parties regarding the Plan's funding status.

What follows is a brief description of *two* PPA-required notices – the 2009 Zone Certification Notice and the new Annual Funding Notice – that are enclosed with this letter. We are providing these additional details to help you understand the complex information contained in each.

1. The *2009 Zone Certification Notice* "looks forward" at the Plan's 2009 financial status and describes the Plan's "critical status" ("red" zone) certification. Please note that this is unchanged from the Plan's 2008 critical status certification. This "Notice of Critical Status" also provides background on the Pension Protection Act's funding requirements, details about the Rehabilitation Plan adopted by the Trustees, benefit restrictions and reductions required by PPA for red zone plans, and more.

2. The new *Annual Funding Notice* "looks back" at the **2008** Plan Year. This more detailed notice replaces both the funding notices and the Summary Annual Reports that you received in past years. It reports on the assets and liabilities of the Fund for 2008, the Plan's funded percentage, funding and investment policies, along with details on the Pension Benefit Guaranty Corporation and how to request a copy of the Form 5500 annual report.

The Board of Trustees takes its fiduciary responsibility very seriously. We will continue to work closely with our professionals to help ensure the Plan's return to a strong funded status. Significant progress in restoring the Plan's funding status has been made over the past year, and we will continue these efforts.

Please take the time to read the enclosed notices carefully. If you have any questions, feel free to contact the Fund Office at (908) 654-3361.

Sincerely,

The Board of Trustees

# LOCAL NO. 863 PENSION FUND

209 SUMMIT ROAD     MOUNTAINSIDE, N.J. 07092
Tel: (908) 654-3361



ALPHONSE RISPOLI, JR.
Secretary



## ANNUAL FUNDING NOTICE

### Local Union No. 863 I.B.T. Pension Fund

#### Introduction

This notice includes important funding information about your pension plan ("the Plan"). This notice also provides a summary of federal rules governing multiemployer plans in reorganization and insolvent plans and benefit payments guaranteed by the Pension Benefit Guaranty Corporation (PBGC), a federal agency. This notice is for the plan year beginning September 1, 2008 and ending August 31, 2009 ("Plan Year").

#### Funded Percentage

The funded percentage of a plan is a measure of how well that plan is funded. This percentage is obtained by dividing the Plan's assets by its liabilities on the valuation date for the plan year. In general, the higher the percentage, the better funded the plan. The Plan's funded percentage for the Plan Year and 2 preceding plan years is set forth in the chart below, along with a statement of the value of the Plan's assets and liabilities for the same period.

|  | 2008 Plan Year | 2007 Plan Year | 2006 Plan Year |
|---|---|---|---|
| Valuation Date | September 1, 2008 | N/A | N/A |
| Funded percentage | 50.1% | N/A | N/A |
| Value of Assets | $184,838,969 | N/A | N/A |
| Value of Liabilities | $368,917,464 | N/A | N/A |

#### Transition Data

For a brief transition period, the Plan is not required by law to report certain funding related information because such information may not exist for plan years before 2008. The Plan has entered "N/A" in the chart above to identify the information it does not have. In lieu of that information, however, the Plan is providing you with comparable information that reflects the funding status of the Plan under the law then in effect. For the 2007 Plan Year, the Plan's "funded current liability percentage" was 21.4%, the Plan's assets were $177,116,803, and Plan liabilities were $827,786,728. For the 2006 Plan Year, the Plan's "funded current liability percentage" was 23.7%, the Plan's assets were $187,070,482, and Plan liabilities were $789,997,869. You can see that the Plan's funding percentage, viewed based upon the

1

information available within each of the Plan Years listed above, improved from 21.4% in Plan Year 2007 to 50.1% in Plan Year 2008.

## Fair Market Value of Assets

Asset values in the chart above are actuarial values, not market values. Market values tend to show a clearer picture of a plan's funded status as of a given point in time. However, because market values can fluctuate daily based on factors in the marketplace, such as changes in the stock market, pension law allows plans to use actuarial values for funding purposes. While actuarial values fluctuate less than market values, they are estimates. As of August 31, 2009, the preliminary fair market value of the Plan's assets was $152,618,601. As of August 31, 2008, the fair market value of the Plan's assets was $181,575,777. As of August 31, 2007, the fair market value of the Plan's assets was $175,464,251.

## Participant Information

The total number of participants in the plan as of the Plan's valuation date was 3,225. Of this number, 1,494 were active participants, 1,014 were retired or separated from service and receiving benefits, and 717 were retired or separated from service and entitled to future benefits.

## Funding & Investment Policies

The law requires that every pension plan have a procedure for establishing a funding policy to carry out the plan objectives. A funding policy relates to the level of contributions needed to pay for benefits promised under the plan currently and over the years. The Plan is funded by contributions made by employers pursuant to collective bargaining agreements with the union that represents the Plan's participants.

Once money is contributed to the Plan, the money is invested by plan officials called fiduciaries. Specific investments are made in accordance with the Plan's investment policy. Generally speaking, an investment policy is a written statement that provides the fiduciaries who are responsible for plan investments with guidelines or general instructions concerning various types or categories of investment management decisions. The investment policy of the Plan is to create moderate capital growth with some focus on income. Specifically, the Plan seeks to achieve an average annual return of 7.5%. In order to minimize risk, the plan diversifies its investments by targeting an asset allocation of 65% equity investments, 30% fixed income investments, and 5% cash. The Trustees review the Plan's actual allocation versus the target allocation no less frequently than each calendar quarter and, if the Plan's investment consultant so recommends, the Trustees rebalance the actual allocation to meet the target allocation. The investment consultant also advises the Trustees regarding modifications to the target allocation based on periodic changes in market conditions. The Trustees hire numerous investment managers to invest the Plan's assets within each discrete asset class. These managers are selected through a search process conducted by the Plan's investment consultant and, after a manager is appointed, the Trustees monitor the performance of the manager on a regular basis but in no case less frequently than each calendar quarter. In addition, the Trustees give each manager a set of objectives and restrictions to follow in the execution of their investment duties. If certain managers underperform or violate these restrictions, the Plan's investment consultant so advises the Trustees and, with the advice of the consultant, the Trustees determine whether to terminate the manager and, in the case of a terminated manager, whether to appoint a replacement manager or place the assets with existing managers.

2

In accordance with the Plan's investment policy, the Plan's assets were allocated among the following categories of investments, as of the end of the Plan Year. These allocations are percentages of total assets:

| Asset Allocations | Percentage |
|---|---|
| 1. Interest-bearing cash | 31 |
| 2. U.S. government securities | 6 |
| 3. Corporate debt instruments (other than employer securities): | |
|     Preferred | 7 |
|     All other | |
| 4. Corporate stocks (other than employer securities): | |
|     Preferred | 24 |
|     Common | |
| 5. Partnership/joint venture interests | 4 |
| 6. Real estate (other than employer real property) | |
| 7. Loans (other than to participants) | |
| 8. Participant loans | |
| 9. Value of interest in common/collective trusts | |
| 10. Value of interest in pooled separate accounts | |
| 11. Value of interest in master trust investment accounts | |
| 12. Value of interest in 103-12 investment entities | |
| 13. Value of interest in registered investment companies (e.g., mutual funds) | |
| 14. Value of funds held in insurance co. general account (unallocated contracts) | |
| 15. Employer-related investments: | |
|     Employer Securities | |
|     Employer real property | |
| 16. Buildings and other property used in plan operation | 28 |
| 17. Other | |

## Critical or Endangered Status

Under federal pension law a plan generally will be considered to be in "endangered" status if, at the beginning of the plan year, the funded percentage of the plan is less than 80 percent or in "critical" status if the percentage is less than 65 percent (other factors may also apply). If a pension plan enters endangered status, the trustees of the plan are required to adopt a funding improvement plan. Similarly, if a pension plan enters critical status, the trustees of the plan are required to adopt a rehabilitation plan. Rehabilitation and funding improvement plans establish steps and benchmarks for pension plans to improve their funding status over a specified period of time.

The Plan was in critical status in the Plan Year because of the accumulated funding deficiency as of August 31, 2008. In an effort to improve the Plan's funding situation, the trustees adopted revised plan provisions effective September 1, 2008 as well as a rehabilitation plan detailing the required employer contribution rate increases that are intended to enable the Plan to emerge from critical status by September 1, 2024, based on reasonable assumptions. To date, the Trustees

3

have successfully collected nearly 90% of the minimum funding deficiencies that were due, and are continuing efforts to collect the remainder due.

You may obtain a copy of the Plan's rehabilitation plan and the actuarial and financial data that demonstrate any action taken by the plan toward fiscal improvement by contacting the plan administrator.

### Right to Request a Copy of the Annual Report

A pension plan is required to file with the US Department of Labor an annual report (i.e., Form 5500) containing financial and other information about the plan. Copies of the annual report are available from the US Department of Labor, Employee Benefits Security Administration's Public Disclosure Room at 200 Constitution Avenue, NW, Room N-1513, Washington, DC 20210, or by calling 202.693.8673. Or you may obtain a copy of the Plan's annual report by making a written request to the plan administrator.

### Summary of Rules Governing Plans in Reorganization and Insolvent Plans

Federal law has a number of special rules that apply to financially troubled multiemployer plans. Under so-called "plan reorganization rules," a plan with adverse financial experience may need to increase required contributions and may, under certain circumstances, reduce benefits that are not eligible for the PBGC's guarantee (generally, benefits that have been in effect for less than 60 months). If a plan is in reorganization status, it must provide notification that the plan is in reorganization status and that, if contributions are not increased, accrued benefits under the plan may be reduced or an excise tax may be imposed (or both). The law requires the plan to furnish this notification to each contributing employer and the labor organization.

Despite the special plan reorganization rules, a plan in reorganization nevertheless could become insolvent. A plan is insolvent for a plan year if its available financial resources are not sufficient to pay benefits when due for the plan year. An insolvent plan must reduce benefit payments to the highest level that can be paid from the plan's available financial resources. If such resources are not enough to pay benefits at a level specified by law (see Benefit Payments Guaranteed by the PBGC, below), the plan must apply to the PBGC for financial assistance. The PBGC, by law, will loan the plan the amount necessary to pay benefits at the guaranteed level. Reduced benefits may be restored if the plan's financial condition improves.

A plan that becomes insolvent must provide prompt notification of the insolvency to participants and beneficiaries, contributing employers, labor unions representing participants, and PBGC. In addition, participants and beneficiaries also must receive information regarding whether, and how, their benefits will be reduced or affected as a result of the insolvency, including loss of a lump sum option. This information will be provided for each year the plan is insolvent.

### Benefit Payments Guaranteed by the PBGC

The maximum benefit that the PBGC guarantees is set by law. Only vested benefits are guaranteed. Specifically, the PBGC guarantees a monthly benefit payment equal to 100 percent of the first $11 of the Plan's monthly benefit accrual rate, plus 75 percent of the next $33 of the accrual rate, times each year of credited service. The PBGC's maximum guarantee, therefore, is $35.75 per month times a participant's years of credited service.

*Example 1:* If a participant with 10 years of credited service has an accrued monthly benefit of $500, the accrual rate for purposes of determining the PBGC guarantee would be determined by dividing the monthly benefit by the participant's years of service ($500/10), which equals $50. The guaranteed amount for a $50 monthly accrual rate is equal to the sum of $11 plus $24.75 (.75 x $33), or $35.75. Thus, the participant's guaranteed monthly benefit is $357.50 ($35.75 x 10).

*Example 2:* If the participant in Example 1 has an accrued monthly benefit of $200, the accrual rate for purposes of determining the guarantee would be $20 (or $200/10). The guaranteed amount for a $20 monthly accrual rate is equal to the sum of $11 plus $6.75 (.75 x $9), or $17.75. Thus, the participant's guaranteed monthly benefit would be $177.50 ($17.75 x 10).

The PBGC guarantees pension benefits payable at normal retirement age and some early retirement benefits. In calculating a person's monthly payment, the PBGC will disregard any benefit increases that were made under the plan within 60 months before the earlier of the plan's termination or insolvency (or benefits that were in effect for less than 60 months at the time of termination or insolvency). Similarly, the PBGC does not guarantee pre-retirement death benefits to a spouse or beneficiary (e.g., a qualified pre-retirement survivor annuity) if the participant dies after the plan terminates, benefits above the normal retirement benefit, disability benefits not in pay status, or non-pension benefits, such as health insurance, life insurance, death benefits, vacation pay, or severance pay.

<u>Where to Get More Information</u>

For more information about this notice, you may contact the following:

Board of Trustees
Local Union No. 863 I.B.T. Pension Plan
209 Summit Road
Mountainside, New Jersey 07092
(908) 654-3361

For identification purposes, the official plan number is 001 and the plan sponsor's employer identification number or "EIN" is 22-1598194. For more information about the PBGC and benefit guarantees, go to PBGC's website, www.pbgc.gov, or call PBGC toll-free at 1-800-400-7242 (TTY/TDD users may call the Federal relay service toll free at 1-800-877-8339 and ask to be connected to 1-800-400-7242).

# LOCAL NO. 863 PENSION FUND

209 SUMMIT ROAD          MOUNTAINSIDE, N.J. 07092
Tel: (908) 654-3361



ALPHONSE RISPOLI, JR.
Secretary

## Notice of Critical Status

### Local Union No. 863 I.B. of T. Pension Plan

To: Participants, Beneficiaries, Contributing Employers and Local Union 863 I.B. of T.

This is to inform you that on November 25, 2009, as required by federal law, the actuary for the Local Union No. 863 I.B. of T. Pension Plan (the "Fund") certified to the U.S. Department of the Treasury and to the Board of Trustees that the Fund is in critical status for the Plan year beginning September 1, 2009. That same federal law requires that you receive this notice.

Introduction
The Pension Protection Act ("Act"), signed into law in 2006, is intended to improve the financial condition of pension funds. The Act introduced several formal safeguards and added notification requirements for Trustees to share more information about a fund's financial circumstances with participants, contributing employers, and others directly related to the pension plan. Many of the Act's safeguards relate to funding, which, in simplest terms, is how much a pension plan has coming in, going out, and what is in reserve (or "in the bank") for future obligations. The safeguards are intended to prevent future funding problems and correct those that have already developed.

The Act requires us to test the Fund annually to determine its official funding status. The federal law has adopted specific phrases to classify a fund's status at the time of the report and these have come to be identified with a "color code". Funds that are labeled as "seriously endangered" or "endangered" status (commonly known as yellow zone) or "critical" status (or, red zone) must notify all fund participants, beneficiaries, unions, and contributing employers of the fund's status, as well as take corrective action to restore the fund's financial health. These categories took effect for the Local 863 Plan as of September 1, 2008. We previously informed you of the Fund's "critical" status for the 2008 Plan year. It is now necessary that we update you on the Fund's status for the 2009 Plan year.

Fund's Status – Red Zone
The Fund is, once again, in critical status (red zone) as of September 1, 2009, based on the actuary's determination that the Fund is projected to have an accumulated funding deficiency for the 2009 plan year. What this means is that during the 2009 plan year, contributions are not expected to be high enough to meet government standards for funding promised benefits plus those that participants are currently earning.

Rehabilitation Plan and Possibility of Reduction in Benefits
The Act requires that a fund in the red zone adopt a Rehabilitation Plan designed to improve its funded position so that, over time, it will be able to meet the statutory funding requirements. Pursuant to this requirement, on July 24, 2008, the Trustees adopted a Rehabilitation Plan, which

consists of two "schedules" of recommended contribution rate increases and possible reductions in benefits. Please note that all of the possible reductions in benefits, except for possible elimination of certain death benefits under certain conditions, were already adopted by the Trustees in August 2008 and were communicated to you by a Notice dated August 15, 2008. The bargaining parties have been provided with these schedules for consideration in negotiations in new or renewed collective bargaining agreements. The "preferred schedule" reflects the Plan changes and reductions in the benefits as described in the Notice sent August 15, 2008. No further plan changes are incorporated in the "preferred schedule". The "default schedule" includes elimination of certain death benefits that will be applicable to groups who elect this schedule. Both schedules include the contribution rate increases that are required to enable the Plan to emerge from critical status within the statutory timeframe contemplated by the Act.

In addition to revising the formula for future benefit accruals and making similar changes, under the Act, a Rehabilitation Plan may eliminate or reduce "adjustable benefits". Adjustable benefits include:

- Plan benefits, rights, and features, including pre-retirement death benefits (other than qualified joint and survivor annuities), optional forms including the lump sum and 10-year certain guarantee, cash vested benefits, and similar benefits; and

- Early retirement benefits or retirement-type subsidies.

The level of benefits you have already earned that are payable at normal retirement age as a single life or qualified joint and survivor annuity cannot and will not be reduced under the Act's rules.

Benefit Restrictions
Due to the federal Pension Protection Act (PPA), effective on September 2, 2008, the Fund is not permitted to pay lump sum benefits or any other payment in excess of the monthly amount paid under a single life annuity (except for the payout of benefits with a value that is less than $5000) while the Plan is in critical status. This includes the payment of the Lump Sum Benefit and Cash Vested Benefit.

Employer Surcharge
Just as the PPA will not permit payment of a lump sum benefit while the Plan is in critical status, it likewise imposes obligations upon the contributing employers, even before a Rehabilitation Plan is adopted.  Thus the law requires that all contributing employers pay to the Fund a surcharge to help correct the Fund's financial situation, beginning 30 days after the employer is notified that the plan is in critical status.

The surcharge is a percentage of the employer's negotiated contribution rate. A 5% surcharge was applicable the first Plan year in critical status. The surcharge went up to 10% for each succeeding Plan year in which the Fund is in critical status, until the employer agrees to a collective bargaining agreement that implements one of the schedules in the Rehabilitation Plan. These surcharges are separate requirements and are in addition to the obligation of the contributing employers to pay their regular contributions and their share of accumulated funding deficiencies. The 10% surcharge applies to contributions actually paid on or after September 1, 2009.

The surcharge amount is paid in a separate check made payable to the Teamsters Local 863 Pension Fund, with the notation "surcharge". These surcharges will be disregarded in determining the rate of benefit accruals and potential employer withdrawal liability allocations, as required by the law. However, they will be reflected in the determination of the annual payment for any withdrawal liability allocation.

What's Next

We understand that legally required notices like this one can create concern about the Fund's future. Be assured that the Board of Trustees takes very seriously its obligation to preserve the financial viability of the Fund. With the assistance of the Fund's actuary, counsel and other professionals, and working with the contributing employers and the Union, the Trustees have developed a Rehabilitation Plan that addresses these issues. You should know that we expect that the benefit reductions already implemented in conjunction with contribution increases under the Rehabilitation Plan "schedules" will improve the Fund's financial condition and help to secure your pensions. In fact, due to the surcharges, the reduction in benefits, as well as the spin-offs and buy-outs that have occurred over the past two years, the Fund's funding status has improved significantly. As a final note, since the Fund is influenced by economic and financial variables beyond our control (such as market volatility and changes in employment and/or the number of contributing employers), unexpected developments can affect the Fund's status and any future corrective actions needed.

For more information about this notice or the Fund, you may contact the Fund Office at the address or phone number listed at the top of this letter.

Sincerely,

The Board of Trustees
Date: December 2009

*As required by law, this notice is being provided to the Pension Benefit Guaranty Corporation (PBGC) and the Department of Labor.*

**8**



# Peckar & Abramson

A Professional Corporation • Attorneys & Counselors at Law

70 Grand Avenue
River Edge, NJ 07661
tel. 201.343.3434
fax 201.343.6306

**Aaron C. Schlesinger**
*Partner*

Direct Dial: (201) 441-4996
E-Mail Address: aschlesinger@pecklaw.com

New York

San Francisco

Los Angeles

Orange County

Miami

Fort Lauderdale

Washington, D.C.

Chicago

London

www.pecklaw.com

*Via Facsimile (973-623-2209) and Regular Mail*

March 1, 2010

Kenneth I. Nowak, Esq.
Zazzali, Fagella, Nowak,
Kleinbaum & Friedman
1 Riverfront Plaza
Newark, New Jersey 07102

RE:   **American B.D. Company**
      **Our File No. 1862/83940**

Dear Mr. Nowak:

As you are aware, this firm is counsel to American B.D. Company. In addition to my letter dated February 24, 2010, please take this letter as a formal request that American B.D. be provided with an estimate of what it would cost to withdraw from the current Pension Fund. If possible, please also provide me with an estimate of what the cost will be for the calculation to be derived.

I look forward to hearing from you.

Very truly yours,

AARON C. SCHLESINGER
ACS:fac
cc:  Ms. Dina Opici (via electronic mail)
     Jeffrey M. Daitz, Esq.
312732.1/03/01/10



a member of the
ICLA International
Construction Law
Alliance

**9**



Copy 12/22/10

# LOCAL NO. 863 PENSION FUND

209 SUMMIT ROAD          MOUNTAINSIDE, N.J. 07092
Tel: (908) 654-3361

ALPHONSE RISPOLI, JR.
Secretary

### Notice of Critical Status

### Local Union No. 863 I.B. of T. Pension Plan

To: Participants, Beneficiaries, Contributing Employers and Local Union 863 I.B. of T.

This is to inform you that on November 29, 2010, as required by federal law, the actuary for the Local Union No. 863 I.B. of T. Pension Plan (the "Fund") certified to the U.S. Department of the Treasury and to the Board of Trustees that the Fund is in critical status for the Plan year beginning September 1, 2010. That same federal law requires that you receive this notice.

Introduction
The Pension Protection Act ("Act"), signed into law in 2006, is intended to improve the financial condition of pension funds. The Act introduced several formal safeguards and added notification requirements for Trustees to share more information about a fund's financial circumstances with participants, contributing employers, and others directly related to the pension plan. Many of the Act's safeguards relate to funding, which, in simplest terms, is how much a pension plan has coming in, going out, and what is in reserve (or "in the bank") for future obligations. The safeguards are intended to prevent future funding problems and correct those that have already developed.

The Act requires us to test the Fund annually to determine its official funding status. The federal law has adopted specific phrases to classify a fund's status at the time of the report and these have come to be identified with a "color code." Funds that are labeled as "endangered" status (commonly known as yellow zone) or "critical" status (or, red zone) must notify all fund participants, beneficiaries, unions, and contributing employers of the fund's status, as well as take corrective action to restore the fund's financial health. These categories took effect for the Local 863 Plan as of September 1, 2008. We previously informed you of the Fund's "critical" status for the 2008 and 2009 Plan years. It is now necessary that we update you on the Fund's status for the 2010 Plan year.

Fund's Status – Red Zone
The Fund is, once again, in critical status (red zone) as of September 1, 2010, based on the actuary's determination that the Fund is projected to have an accumulated funding deficiency for the 2010 plan year. What this means is that during the 2010 plan year, contributions are not expected to be high enough to meet government standards for funding promised benefits plus those that participants are currently earning.

These surcharges are separate requirements and are in addition to the obligation of the contributing employers to pay their regular contributions and their share of accumulated funding deficiencies. The 10% surcharge applies to contributions actually paid on or after September 1, 2009.

The surcharge amount is paid in a separate check made payable to the Teamsters Local 863 Pension Fund, with the notation "surcharge." These surcharges will be disregarded in determining the rate of benefit accruals and potential employer withdrawal liability allocations, as required by the law. However, they will be reflected in the determination of the annual payment for any withdrawal liability allocation.

## What's Next

We understand that legally required notices like this one can create concern about the Fund's future. Be assured that the Board of Trustees takes very seriously its obligation to preserve the financial viability of the Fund. With the assistance of the Fund's actuary, counsel and other professionals, and working with the contributing employers and the Union, the Trustees have developed a Rehabilitation Plan that addresses these issues. You should know that we expect that the benefit reductions already implemented in conjunction with contribution increases under the Rehabilitation Plan "schedules" will improve the Fund's financial condition and help to secure your pensions. In fact, due to the surcharges, the reduction in benefits, as well as the spin-offs and buy-outs that have occurred over the past several years, the Fund's funding status has improved significantly. As a final note, since the Fund is influenced by economic and financial variables beyond our control (such as market volatility and changes in employment and/or the number of contributing employers), unexpected developments can affect the Fund's status and any future corrective actions needed.

For more information about this notice or the Fund, you may contact the Fund Office at the address or phone number listed at the top of this letter.

Sincerely,

The Board of Trustees
Date: December 2010

*As required by law, this notice is being provided to the Pension Benefit Guaranty Corporation (PBGC) and the Department of Labor.*

7358462v1/06664.515

# LOCAL NO. 863 PENSION FUND

209 SUMMIT ROAD          MOUNTAINSIDE, N.J. 07092
Tel: (908) 654-3361



ALPHONSE RISPOLI, JR.
Secretary

## ANNUAL FUNDING NOTICE

Local Union No. 863 I.B.T. Pension Fund

### Introduction

This notice includes important funding information about your pension plan ("the Plan"). This notice also provides a summary of federal rules governing multiemployer plans in reorganization and insolvent plans and benefit payments guaranteed by the Pension Benefit Guaranty Corporation (PBGC), a federal agency. This notice is for the plan year beginning September 1, 2009 and ending August 31, 2010 ("2009 Plan Year").

### Funded Percentage

The funded percentage of a plan is a measure of how well that plan is funded. This percentage is obtained by dividing the Plan's assets by its liabilities on the valuation date for the plan year. In general, the higher the percentage, the better funded the plan. The Plan's funded percentage for the Plan Year and 2 preceding plan years is set forth in the chart below, along with a statement of the value of the Plan's assets and liabilities for the same period.

|  | 2009 Plan Year | 2008 Plan Year | 2007 Plan Year |
|---|---|---|---|
| Valuation Date | September 1, 2009 | September 1, 2008 | N/A |
| Funded percentage | 51.9% | 50.1% | N/A |
| Value of Assets | $195,779,537 | $184,838,969 | N/A |
| Value of Liabilities | $377,102,553 | $368,917,464 | N/A |

### Transition Data

For a brief transition period, the Plan is not required by law to report certain funding related information because such information may not exist for plan years before 2008. The Plan has entered "N/A" in the chart above to identify the information it does not have. In lieu of that information, however, the Plan is providing you with comparable information that reflects the funding status of the Plan under the law then in effect. For the 2007 Plan Year, the Plan's "funded current liability percentage" was 21.4%, the Plan's assets were $177,116,803, and Plan liabilities were $827,786,728. Please note that the funding ratio increased from 21.4% in Plan Year 2007 to 51.9% in Plan Year 2009.

In accordance with the Plan's investment policy, the Plan's assets were allocated among the following categories of investments, as of the end of the Plan Year. These allocations are percentages of total assets:

| Asset Allocations | Percentage |
|---|---|
| 1. Interest-bearing cash | 24 |
| 2. U.S. government securities | 11 |
| 3. Corporate debt instruments (other than employer securities): | |
|     Preferred | |
|     All other | 10 |
| 4. Corporate stocks (other than employer securities): | |
|     Preferred | |
|     Common | 22 |
| 5. Partnership/joint venture interests | |
| 6. Real estate (other than employer real property) | 3 |
| 7. Loans (other than to participants) | |
| 8. Participant loans | |
| 9. Value of interest in common/collective trusts | |
| 10. Value of interest in pooled separate accounts | |
| 11. Value of interest in master trust investment accounts | |
| 12. Value of interest in 103-12 investment entities | |
| 13. Value of interest in registered investment companies (e.g., mutual funds) | |
| 14. Value of funds held in insurance co. general account (unallocated contracts) | |
| 15. Employer-related investments: | |
|     Employer Securities | |
|     Employer real property | |
| 16. Buildings and other property used in plan operation | |
| 17. Other | 30 |

## Critical or Endangered Status

Under federal pension law a plan generally will be considered to be in "endangered" status if, at the beginning of the plan year, the funded percentage of the plan is less than 80 percent or in "critical" status if the percentage is less than 65 percent (other factors may also apply). If a pension plan enters endangered status, the trustees of the plan are required to adopt a funding improvement plan. Similarly, if a pension plan enters critical status, the trustees of the plan are required to adopt a rehabilitation plan. Rehabilitation and funding improvement plans establish steps and benchmarks for pension plans to improve their funding status over a specified period of time.

The Plan was in critical status in the Plan Year because of the accumulated funding deficiency as of August 31, 2009. In an effort to improve the Plan's funding situation, the trustees adopted revised plan provisions effective September 1, 2008 as well as a rehabilitation plan detailing the required employer contribution rate increases that are intended to enable the Plan to emerge from critical status by September 1, 2028, based on reasonable assumptions. To date, the Trustees

*Example 1:* If a participant with 10 years of credited service has an accrued monthly benefit of $500, the accrual rate for purposes of determining the PBGC guarantee would be determined by dividing the monthly benefit by the participant's years of service ($500/10), which equals $50. The guaranteed amount for a $50 monthly accrual rate is equal to the sum of $11 plus $24.75 (.75 x $33), or $35.75. Thus, the participant's guaranteed monthly benefit is $357.50 ($35.75 x 10).

*Example 2:* If the participant in Example 1 has an accrued monthly benefit of $200, the accrual rate for purposes of determining the guarantee would be $20 (or $200/10). The guaranteed amount for a $20 monthly accrual rate is equal to the sum of $11 plus $6.75 (.75 x $9), or $17.75. Thus, the participant's guaranteed monthly benefit would be $177.50 ($17.75 x 10).

The PBGC guarantees pension benefits payable at normal retirement age and some early retirement benefits. In calculating a person's monthly payment, the PBGC will disregard any benefit increases that were made under the plan within 60 months before the earlier of the plan's termination or insolvency (or benefits that were in effect for less than 60 months at the time of termination or insolvency). Similarly, the PBGC does not guarantee pre-retirement death benefits to a spouse or beneficiary (e.g., a qualified pre-retirement survivor annuity) if the participant dies after the plan terminates, benefits above the normal retirement benefit, disability benefits not in pay status, or non-pension benefits, such as health insurance, life insurance, death benefits, vacation pay, or severance pay.

<u>Where to Get More Information</u>

For more information about this notice, you may contact the following:

Board of Trustees
Local Union No. 863 I.B.T. Pension Plan
209 Summit Road
Mountainside, New Jersey 07092
(908) 654-3361

For identification purposes, the official plan number is 001 and the plan sponsor's employer identification number or "EIN" is 22-1598194. For more information about the PBGC and benefit guarantees, go to PBGC's website, www.pbgc.gov, or call PBGC toll-free at 1-800-400-7242 (TTY/TDD users may call the Federal relay service toll free at 1-800-877-8339 and ask to be connected to 1-800-400-7242).

# 10

# ZAZZALI, FAGELLA, NOWAK, KLEINBAUM & FRIEDMAN

## A PROFESSIONAL CORPORATION
### ATTORNEYS AT LAW

ANDREW F. ZAZZALI (1925-1969)

ANDREW F. ZAZZALI, JR.
ROBERT A. FAGELLA**
KENNETH I. NOWAK***
RICHARD A. FRIEDMAN
PAUL L. KLEINBAUM*
EDWARD H. O'HARE*
SIDNEY H. LEHMANN*
COLIN M. LYNCH**

·COUNSEL
JAMES R. ZAZZALI***

*Also admitted Pennsylvania
**Also admitted New York
***Also admitted New York & D.C
‡New York Only

ONE RIVERFRONT PLAZA, SUITE 320
NEWARK, NJ. 07102-5410
Telephone: (973) 623-1822
Telecopier: (973) 623-2209

150 West State Street
Trenton, New Jersey 08608
Telephone. (609) 392-8172
Telecopier (609) 392-8933

www.zazzali-law.com

**Please Reply to Newark**

GENEVIEVE M. MURPHY-BRADACS**
EDWARD M. SUAREZ, JR.
CYNTHIA REVESZ‡
AILEEN M. O'DRISCOLL*
MARISSA A. McALEER**

OF COUNSEL
KATHLEEN NAPRSTEK CERISANO
JASON E. SOKOLOWSKI
WILLIAM A. PASCARELL (1934-2010)

February 23, 2011

Gary S. Young, Esq.
Herrick Feinstein LLP
One Gateway Center
Newark, New Jersey 07102

Re:   Teamsters Local 863 Pension Fund and American BD Company

Dear Mr. Young:

Enclosed please find Local Union No. 863 I.B.T. Pension Fund's Report on Employer's Estimated Withdrawal Liability For Withdrawal Assumed in the Year Ended August 31, 2011 for American BD Company.

Thank you for your attention in this matter.

Very truly yours,

Kenneth I. Nowak

KIN:hm
Enclosure

38630-000

97635 doc

# ZAZZALI, FAGELLA, NOWAK, KLEINBAUM & FRIEDMAN

A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

ANDREW F. ZAZZALI (1925-1969)

ANDREW F. ZAZZALI, JR.
ROBERT A. FAGELLA**
KENNETH I. NOWAK***
RICHARD A. FRIEDMAN
PAUL L. KLEINBAUM*
EDWARD H. O'HARE*
SIDNEY H. LEHMANN*
COLIN M. LYNCH**

COUNSEL
JAMES R. ZAZZALI***

ONE RIVERFRONT PLAZA, SUITE 320
NEWARK, N.J. 07102-5410
Telephone: (973) 623-1822
Telecopier: (973) 623-2209

150 West State Street
Trenton, New Jersey 08608
Telephone: (609) 392-8172
Telecopier (609) 392-8933

www.zazzali-law.com

GENEVIEVE M. MURPHY-BRADACS**
EDWARD M. SUAREZ, JR.
CYNTHIA REVESZ‡
AILEEN M. O'DRISCOLL*
MARISSA A. McALEER**

OF COUNSEL
KATHLEEN NAPRSTEK CERISANO
JASON E. SOKOLOWSKI
WILLIAM A. PASCARELL (1934-2010)

*Also admitted Pennsylvania
**Also admitted New York
***Also admitted New York & D.C
‡New York Only

**Please Reply to Newark**

February 23, 2011

Gary S. Young, Esq.
Herrick Feinstein LLP
One Gateway Center
Newark, New Jersey 07102

Re:   Teamsters Local 863 Pension Fund and American BD Company

Dear Mr. Young:

Enclosed please find Local Union No. 863 I.B.T. Pension Fund's Report on Employer's Estimated Withdrawal Liability For Withdrawal Assumed in the Year Ended August 31, 2011 for American BD Company.

Thank you for your attention in this matter.

Very truly yours,

Kenneth I. Nowak

KIN:hm
Enclosure

38630-000

97635.doc

LOCAL UNION NO. 863
I. B. T.
PENSION FUND

Report On Employer's Estimated
Withdrawal Liability

For Withdrawal Assumed in the
Year Ended August 31, 2011

American B & D

Copyright © 2011
The Segal Group, Inc.
The Parent of The Segal Company
All Rights Reserved

# ZAZZALI, FAGELLA, NOWAK, KLEINBAUM & FRIEDMAN
### A PROFESSIONAL CORPORATION
### ATTORNEYS AT LAW

ANDREW F. ZAZZALI (1925-1969)

ANDREW F. ZAZZALI, JR.
ROBERT A. FAGELLA**
KENNETH I. NOWAK***
RICHARD A. FRIEDMAN
PAUL L. KLEINBAUM*
EDWARD H. O'HARE*
SIDNEY H. LEHMANN*
COLIN M. LYNCH**

·COUNSEL
JAMES R. ZAZZALI***

*Also admitted Pennsylvania
**Also admitted New York
***Also admitted New York & D.C
‡New York Only

ONE RIVERFRONT PLAZA, SUITE 320
NEWARK, NJ. 07102-5410
Telephone: (973) 623-1822
Telecopier. (973) 623-2209

150 West State Street
Trenton, New Jersey 08608
Telephone. (609) 392-8172
Telecopier (609) 392-8933

www.zazzali-law.com

**Please Reply to Newark**

GENEVIEVE M. MURPHY-BRADACS**
EDWARD M. SUAREZ, JR.
CYNTHIA REVESZ‡
AILEEN M. O'DRISCOLL*
MARISSA A. McALEER**

OF COUNSEL
KATHLEEN NAPRSTEK CERISANO
JASON E. SOKOLOWSKI
WILLIAM A. PASCARELL (1934-2010)

February 23, 2011

Gary S. Young, Esq.
Herrick Feinstein LLP
One Gateway Center
Newark, New Jersey 07102

Re:   Teamsters Local 863 Pension Fund and American BD Company

Dear Mr. Young:

Enclosed please find Local Union No. 863 I.B.T. Pension Fund's Report on Employer's Estimated Withdrawal Liability For Withdrawal Assumed in the Year Ended August 31, 2011 for American BD Company.

Thank you for your attention in this matter.

Very truly yours,

Kenneth I. Nowak

KIN:hm
Enclosure

38630-000

97635.doc

# TABLE OF CONTENTS

Page

I.     General - Amount of Withdrawal Liability ....................................................     3

II.    Actuary's Assumptions and Methods for Withdrawal Liability Valuations .     4

III.   Present Value of Vested Benefits for Withdrawal Liability Purposes ...........     6

IV.    Calculation of the Unfunded Present Value of Vested Benefits for
       Withdrawal Liability Purposes ......................................................................     7

V.     Estimated Withdrawal Liability Calculated Under the Plan's Formula ........     8

VI.    Application of De Minimis Deductible ..........................................................     9

VII.   Determining Payment and Length of Payment Period ...........................     10

These calculations were performed under the supervision of Nicholas J. Laccetti, FCA. MAAA and Diane Gleave. ASA, FCA, MAAA, Enrolled Actuaries.

## American B & D
## Local Union No. 863 I. B. T. Pension Fund

### I. GENERAL - AMOUNT OF WITHDRAWAL LIABILITY

When an employer withdraws, the plan's trustees must determine the amount of the employer's withdrawal liability. This is based essentially on the extent of the plan's unfunded vested benefits at the time of withdrawal. The withdrawal formula assigns a share of that unfunded liability to the employer that has withdrawn.

The Trustees of the Local Union No. 863 I. B. T. Pension Fund have adopted the "one pool" alternative provided in the Multi-employer Pension Plan Amendments Act of 1980.

This alternative makes no distinction between newly participating employers and existing employers. Upon withdrawal, the liability attributable to a withdrawing employer is a portion of all of the plan's then-current unfunded liability for vested benefits, less the value as of the end of such year of all outstanding claims for withdrawal liability which can reasonably be expected to be collected from employers withdrawing before such year. That proration is based on the employer's percentage share of contributions in the preceding five years.

For example, an employer who terminates in year ending August 31, 2011 will share in the plan's unfunded vested liability calculated as of August 31, 2010.

II.  ACTUARY'S ASSUMPTIONS AND METHODS FOR WITHDRAWAL
     LIABILITY VALUATIONS

The actuarial assumptions to be used are the valuation assumptions used for plan funding, except for the investment return rate and the expense charge. To the extent that assets, valued at market, cover the vested benefits, benefits will be valued at an investment return rate consistent with current annuity rates; the portion of the benefit that is not yet funded will be valued on the interest assumptions used for plan funding.

Specifically, the withdrawal liability valuation assumptions and methods are:

1.   **Investment Return**

  (a)  To the extent vested benefits are matched by the market value of plan assets on hand: Interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Part 4044 for terminating single-employer plans and multiemployer plans following mass withdrawal, which are in effect for the applicable withdrawal liability valuation date. At August 31, 2010, the PBGC select and ultimate interest rates are 4.93% for the first 20 years and an ultimate rate of 4.66%.

  (b)  The portion of the vested benefits that is not matched by plan assets (at market) is valued on the interest assumption used by plan funding, as of the applicable withdrawal liability valuation date.

  (c)  The portion of the vested benefits that is matched by assets will be determined by comparing the total present value of benefits — at PBGC rates as determined in (a) above — with the total market value of assets; each vested benefit will be treated as covered by assets to the same extent as all other vested benefits.

4

2.    Expenses

A separate expense charge only for that portion of the benefits that is matched by assets. For that portion, an expense load equal to that prescribed in PBGC Reg. Appendix C to Part 4044 is used.

3.    Valuation of assets

At market value.

4.    Mortality

RP- 2000 Combined Healthy Mortality Table projected with Scale AA to 2011

5.    Retirement Rates for Actives

| Age | Rate |
|---|---|
| Less than 52 | 0%* |
| 52-61 | 5%* |
| 62 | 30% |
| 63-69 | 25% |
| 70 and over | 100% |

*   *If the participant works for an employer with the additional seventeen cents contribution category and years of credited service are greater than or equal to 30, then retirement probability is 25%.*

6.    Retirement Age for Inactive Vesteds

62

7.    Unknowns

Participants with unknown age and/or service are assumed to have same as those exhibited by participants with similar known characteristics. If not specified, participants are assumed to be male.

## PRESENT VALUE OF VESTED BENEFITS FOR WITHDRAWAL LIABILITY PURPOSES

alculations were made with respect to the data supplied to us by the Administrator as to : employees, pensioners, beneficiaries, inactive vested employees and financial data red by the Fund Auditor. The calculations were done using the methodology and iptions outlined in the actuarial certification and the plan of benefits in effect as of the :ion date.

stimated present values of vested benefits for the year ended August 31, 2010 are shown . These are estimates based on the data and assumptions used in the September 1, actuarial valuation but adjusted for updated assets at the end of the year, updated ⊃ interest rates and the passage of time.

|  | Assumptions | |
|---|---|---|
|  | Plan Funding | PBGC rates |
| For all participants | $364,636,600 | $479,753,385 |
| Expense load | N/A | 4,138,482 |
| Total present value of vested benefits | $364,636,600 | $483,391,867 |

2.   **Expenses**

A separate expense charge only for that portion of the benefits that is matched by assets. For that portion, an expense load equal to that prescribed in PBGC Reg. Appendix C to Part 4044 is used.

3.   **Valuation of assets**

At market value.

4.   **Mortality**

RP-2000 Combined Healthy Mortality Table projected with Scale AA to 2011

5.   **Retirement Rates for Actives**

| Age | Rate |
|---|---|
| Less than 52 | 0%* |
| 52-61 | 5%* |
| 62 | 30% |
| 63-69 | 25% |
| 70 and over | 100% |

\*   *If the participant works for an employer with the additional seventeen cents contribution category and years of credited service are greater than or equal to 30, then retirement probability is 25%.*

6.   **Retirement Age for Inactive Vesteds**

62

7.   **Unknowns**

Participants with unknown age and/or service are assumed to have same as those exhibited by participants with similar known characteristics. If not specified, participants are assumed to be male.

## III.  PRESENT VALUE OF VESTED BENEFITS FOR WITHDRAWAL LIABILITY PURPOSES

The calculations were made with respect to the data supplied to us by the Administrator as to active employees, pensioners, beneficiaries, inactive vested employees and financial data prepared by the Fund Auditor.  The calculations were done using the methodology and assumptions outlined in the actuarial certification and the plan of benefits in effect as of the valuation date.

The estimated present values of vested benefits for the year ended August 31, 2010 are shown below.  These are estimates based on the data and assumptions used in the September 1, 2009 actuarial valuation but adjusted for updated assets at the end of the year, updated PBGC interest rates and the passage of time.

|   |   | Assumptions | |
|---|---|---|---|
|   |   | Plan Funding | PBGC rates |
| 1. | For all participants | $364,636,600 | $479,753,385 |
| 2. | Expense load | N/A | 4,138,482 |
| 3. | Total present value of vested benefits | $364,636,600 | $483,391,867 |

IV.   CALCULATION OF THE ESTIMATED UNFUNDED PRESENT VALUE OF
      VESTED BENEFITS FOR WITHDRAWAL LIABILITY PURPOSES

The unfunded present value of vested benefits for withdrawal liability purposes determined
under the method described in Section II for the year ended August 31, 2010 is outlined below:

1.   Estimated present value of vested benefits at
     funding investment return rate ................................................................... $364,636,600

2.   Estimated present value of vested benefits at
     PBGC interest rates .................................................................................... 483,891,867

3.   Assets at market value* ............................................................................. 177,529,520

4.   Weighting factor (3) ÷ (2) .......................................................................... 0.3669

5.   Estimated present value of vested benefits for
     withdrawal liability purposes (4) x (2) +
     (1. - (4)) x (1)........................................................................................... 408,388,793

6.   Estimated unfunded present value of vested benefits
     for withdrawal liability purposes
     (5) - (3) ..................................................................................................... 230,859,273

_____
\* Based on an unaudited financial statement

V.   ESTIMATED WITHDRAWAL LIABILITY UNDER THE PLAN'S FORMULA
     FOR AMERICAN B & D

     Withdrawal assumed in year ending August 31, 2011

1.   Estimated August 31, 2010 unfunded present value of
     vested benefits ............................................................................... $230,859,273

2.   Total contributions of withdrawing employer*
     September 1, 2005 – August 31, 2010 ........................................   2,343,900

3.   Total contributions of all employers**
     September 1, 2005 – August 31, 2010 ........................................   35,719,220

4.   Allocable share of liability
     (1) x (2) ÷ (3)................................................................................   15,149,016

5.   Outstanding collectibles ..............................................................   2,297,991

6.   Allocable share of collectibles
     (5) x (2) ÷ (3)................................................................................   150,794

7.   Estimated total withdrawal liability
     (4) - (6) .......................................................................................   14,998,222

8.   De Minimis deductible ................................................................   0

9.   Estimated net withdrawal liability (7) - (8) ............................... $14,998,222

---

\*   Contribution information supplied by the Administrator.
\*\* Net of previously withdrawn employers

8

## VI.  APPLICATION OF DE MINIMIS DEDUCTIBLE

The amount of liability allocable to the withdrawn employer is reduced by the smaller of

(1)     3/4 of 1% of the plan's unfunded present value of vested benefits (determined as of the end of the plan year ending before the date of withdrawal).

or

(2)     $50,000

Reduced by the amount if any by which the unfunded vested benefits allocable to the employer exceeds $100,000.   Since the total estimated withdrawal liability before reduction is $14,998,222, the De Minimis amount is $0.

VII. Determining Payment and Length of Payment Period for American B & D

1.  Total hours for year ended August 31:

| 2001 | 118,318 | 2006 | 127,798 |
|------|---------|------|---------|
| 2002 | 124,512 | 2007 | 123,614 |
| 2003 | 142,593 | 2008 | 133,232 |
| 2004 | 140,895 | 2009 | 139,535 |
| 2005 | 134,591 | 2010 | 136,922 |

2.  Highest consecutive 3 year average units ................................................139,360

3.  Highest contribution rate...............................................................$3.67

4.  Surcharge as required under PPA'06 ........................................... 10%

5.  Required annual payment (2) x (3) x [ 1.00 + (4) ] ............................$562,596

6.  Estimated withdrawal liability .......................................................$14,998,222

7.  Plan funding investment return assumption.............................................7.50%

8.  Amount of quarterly payments (4) ÷ 4 quarters....................................$140,649

9.  Number of full payments ..................................................................................80

Payment Schedule:

$140,649 per quarter for 80 quarters

Lump sum present value of payment schedule[1] = $5,994,115

7398784v1/06664.011

---

[1] The present value of the payments is based on the long-term funding interest rate of 7.5%

10

# 11

# HERRICK

NEW YORK
NEWARK
PRINCETON

GARY S. YOUNG
PARTNER
Direct Tel:  973.274.2035
Direct Fax:  973.274.6435

Email:  gyoung@herrick.com

March 23, 2011

<u>Sent by email (knowak@zazzali-law.com) and Regular Mail</u>

Kenneth I. Nowak, Esq.
Zazzali, Fagella, Nowak, Kleinbaum & Friedman
One Riverfront Plaza, Suite 320
1037 Raymond Boulevard
Newark , NJ 07102

Re: American BD and Local 863 Pension Fund; Teamsters Local 863

Dear Ken:

Consistent with our last meeting at Segal, we have been formulating our pension proposals for the 2011 contract negotiations.  Presently, the concept of transferring the liabilities for accrued benefits for all American BD employees, past and future, to a new single employer plan appears to offer the best opportunity for our client to manage and contain the enormous (and unsustainable) liabilities created by the Local 863 multiemployer plan.

In order to make sure that our assumptions and possible plan for a solution are based upon correct numbers and ideas, we find that we need further information from the Pension Fund:

1.      We have previously requested Schedule MB for the PYE 8/31/09 (see our December 23rd letter).  We renew our request for this information.  We would also request that the 5500 for the PYE 8/31/10 be provided to us as soon as available (4/15/11?).

2.      We are sure that you will agree that liability of the Minimum Funding Deficiency must be addressed.  It is our hope that we will be able to net that amount out of any transfer of assets and liabilities to the new plan.  Would you please provide a demonstration as to the precise amount and how it was calculated?  We would appreciate seeing any information that was provided to the IRS at the time that the request for waivers was denied in 2008, 2009.

3.      The February 23rd demonstration of the American BD estimated withdrawal liability prepared by Segal revealed total liabilities of $364,636,600 (using plan funding rates) against assets of $177,529,520 at "market value."  There is no indication of when this market value was fixed for the asset value.  We need to know whether the asset values have changed as of the most recent date.  We, of course, realize that any such valuation is a moving

HERRICK, FEINSTEIN LLP
A New York limited
liability partnership
including New York
professional corporations

ONE GATEWAY CENTER, NEWARK, NJ 07102 · TEL 973.274.2000 · FAX 973.274.2500 · www.herrick.com
HF 6403358 v.1 #14968/0001 03/23/2011 12:22 PM

HERRICK

March 23, 2011
Page 2

target that will only be fixed on the date of transfer, but we need to make sure that the numbers are as accurate as possible. Please understand that I know that the liability was re-characterized for purposes of calculating withdrawal liability but that should not apply for purposes of this exercise.

4. We discussed at Segal the concept of a "net" transfer of assets and liabilities to the new single employer plan. As already noted, this should be a very different calculation than the estimated withdrawal liability. Would you please ask Segal to provide its estimate of this amount? (Yes, I know that there will be a charge so please provide an estimate of Segal's charge). I would like to know the liability of all American BD accrued benefits as of April 24, 2011 (projected). Against this would be the allocable share of Trust assets that may be transferred to the new plan net of the minimum funding deficiency. We will need to see a demonstration of how all of this is calculated with adequate back-up to prove the numbers.

Once we have been provided with these requested facts and figures, we should be able to refine American BD's position for purposes of the negotiations. This process will also require our interaction with the IRS and the PBGC.

I wish to assure you that our client regards this to be a serious matter that requires its undivided attention. As this also involves the plan participants and beneficiaries, I am sure that we can anticipate your full cooperation and timely responses.

Thank you for your anticipated professional cooperation and courtesies.

Very truly yours,

HERRICK, FEINSTEIN LLP

By: _____
Gary S. Young

GSY:ias

cc:     Dina Opici, Esq., CEO
        Philip s. Mortensen, Esq.
        John Bury, E.A.

## Saez, Ingrid

| | |
|---|---|
| F | Saez, Ingrid [Isaez@herrick.com] |
| **Sent:** | Wednesday, March 23, 2011 12:52 PM |
| **To:** | knowak@zazzali-law.com |
| **Cc:** | opicid@opici.com; batpension@aol.com; pmortensen@bartonesq.com; Young, Gary S. |
| **Subject:** | American BD and Local 863 Pension Fund; Teamsters Local 863 |
| **Attachments:** | Letter to K. Nowak, Esq. - 3_23_11.PDF |

Dear Mr. Nowak:

Please see attached correspondence.


Thank you

Ingrid A. Saez
Legal Assistant to Gary S. Young,
  Glenn L. Stein and Daniel B. Kessler
Herrick, Feinstein LLP
One Gateway Center
Newark, NJ 07102

Phone:  (973) 274-2045
saez@herrick.com

3/23/2011

# 12

## Young, Gary S.

| | |
|---|---|
| **From:** | Ken Nowak [knowak@zazzali-law.com] |
| **Sent:** | Tuesday, April 12, 2011 12:48 PM |
| **To:** | Young, Gary S. |
| **Subject:** | MBSBActuarySignature.pdf - Adobe Acrobat Standard |
| **Attachments:** | MBSBActuarySignature.pdf |

Gary:

Please see attached. Also, in answer to your prior requests for information, please be advised of the following:

Am B&D has 70 active participants, 9 terminated vested participants, 14 retirees, and 3 beneficiaries.

On the basis of the Segal assumptions, the vested liability attributable to theses participants is approximately $11.3 million as of 8/31/10.

Assuming a 2011 withdrawal, the withdrawal liability would be $15 million. In accordance with ERISA 4211(e), the net withdrawal liability would be approximately $3.7 million. This would included American B&D's allocable share of orphan liability.

In other words, the Fund would transfer all liability obligations for the American B&D participants to a new single employer plan, no assets would go to the single employer plan, and American B&D would owe to the Local 863 Plan approximately $3.7 million.

The funding of the newly created single employer plan would be based upon the assumptions and laws prescribed for such plans.

These calculations were based upon the results and assumptions used in 2009 valuation, but adjusted to 2010.

The accumulated funding deficiencies attributable to Am. B&D, with interest to date, is $5,758,532. This would be transferred to the newly created plan, and how they are addressed would likely be between the new plan and the IRS, but we make no representations as to what the government would require, whether there would be waivers, or the like.

Segal    Same as within

**13**

AMERICAN B.D. COMPANY
LOCAL 863
Negotiations
August 25, 2011

FOR COMPANY: Phil Mortensen, Gary Young, D. Opici, Ray Dempsey, Tom
Deregibus

FOR UNION:     Charles ("Chuck") O'Mara (Business Agent), Ralph Pollo
Steward), Jeff Lindeguard (Assistant Steward), Gerard
Tanguay, Joe Constantini, Eduardo Cuartero, Ed Halloway
(helper), Gregory Prunty

SCHEDULED:     10:00 AM

COMPANY REPS: 10:10 AM

UNION REPS:    11:00 AM

C/B BEGAN:     11:13 AM

PSM – [distributed document showing open items in Company proposals]

> This shows where we were as of our meeting on June 8, 2011. But, we
> dropped our drug testing proposal from where we were then. I will turn
> our presentation regarding the pension issue over to Gary.

GY  - The Company has been making its contractual pension contribution all along
plus a 10% surcharge. This past year, the Company paid approximately
$470,000 including the surcharge. Unfortunately, those contributions are
not enough because this plan is in what is called the "red zone". The plan
has only about 28% of the funds necessary to fund the vested benefits.
With the withdrawal of other employers from the plan, there are no longer
enough employers to fund it. In short, the plan is in serious trouble.

> Two years ago, the Company received a letter from the fund that there was
> a "minimum funding deficiency". As an example, suppose we have $30 million
> being paid out in benefits but we are taking in only $10 million. This is what
> creates a minimum funding deficiency. This is not the fault of American B.D.
> The Company has been making its contributions as required by the contracts
> it has had with Local 863. Despite that, the Company now has to pay $6
> million by next week, something this Company had not planned on spending.

1

What this represents is about $41 per hour for a full year for every member of the bargaining unit. Plus there is an excise tax that can be levied by the federal government. All of the other employers in this plan have the same problem.

We asked the fund to calculate what our unfunded withdrawal liability will be. We've been told that that will be $15 million, on top of the $6 million we owe for the minimum funding deficiency. And, it will only get worse. So, we can't afford to stay in the plan.

At first, during these negotiations, we thought of taking the liabilities and assets and moving them to a new single employer plan – but we couldn't work that out with the funds. We ended up with having no choice but to withdraw completely from the fund. What we estimate this is going to cost us is about $562,000 per year, plus potentially another $6 million in excise tax. We feel we have no other choice but to get out now. If we stay in the fund much longer, it could put the Company in financial trouble. It is tough dealing with a $21 million liability that the Company did not bargain for.

PSM – So, we are proposing to withdraw from the plan immediately and offer a 401(k) with no specific Company contribution at this time.

CO   - Are we talking a 5 year contract?

PSM – You had proposed a 5 year contract. We have proposed a 3 year deal, with a freeze on wages in the first year, with increases in the second and third years, and new rates for new employees.

[discussion]

CO   - Give us a few minutes – caucus [11:38 AM – 11:50 AM]

Everyone has heard what you had to say about the pension plan. What are you going to do for the guys? What are you going to be doing with the $3.67 per hour you have been contributing into the pension plan?

DO   - We're still going to be paying it as part of our withdrawal liability.

CO   - We're definitely not interested in a 401(k). We have a savings plan here with no liability to you.

DO   - We are offering a defined contribution plan. There is no hidden pot of gold. We will be paying the equivalent of $41 per hour for the minimum funding deficiency. And, $5.08 per hour into the cost of withdrawing from the plan.

I realize that none of this goes to you but we still have to pay this out.

2

We have proposed some increases in the second and third years. If you would prefer to move some of that to the savings plan, that is OK. We can move money around but there is only so much money.

The reason we proposed a 3 year contract is that we have to be conservative. We just don't know where we will be after 3 years, let alone 5.

CO - So, of the 35 cents, you want to make some of it a raise and some goes into savings?

DO - Yes.

EC - We still want to know where the $3.67 is going.

PSM – I can understand your frustration. We are frustrated too. The sad thing is that we are going to be paying out all this money and you won't be getting the benefit of it.

[considerable discussion]

GY - These liabilities were not created by the Company. What we have to pay next week comes to $85,000 per employee.

[discussion}

DO - [discussed family members personally guaranteeing the load for next week's payment.]

We're trying to make this work so we don't go bankrupt; trying to make sure we all have jobs.

GY - We are trying to survive; not trying to hurt anyone. We are trying to solve a problem and preserve your jobs.

[discussion]

CO - Give us some time – caucus [12:32 PM – 1:57 PM]

[During the union's caucus, CO asked PSM for a side-bar. I told CO that, to move forward, he should come back to us after the caucus and propose his savings plan and give us something. We certainly are not expecting all of our proposals.]

On your proposals.

First, on your #2, on union security, we want 160 hours – about 30 days and

3

6 union men -- you had 4.

Your #3 -- this is a big substitution -- no.

#4 -- we don't want to change any of this.

#5 -- we had proposed 10 + 5 bids -- no change from this.  We reject the rest.

#6 -- regarding overtime -- no.

#7 -- no.

#9 -  we'll talk about it [i.e., wages] -- now is not the time.

#10 -- leave as is.

#12 -- We might be able to do something on the grievance issue.

PSM -- We had originally proposed a whole new grievance and arbitration procedure. We finally withdrew that but want some sort of time limit to file and appeal grievances.  We discussed 14 days.

[discussion; RD gave the example of an employee filing a grievance about a payroll matter months after the time was worked.]

CO  - [apparently OK with a time limit for payroll grievances]

#13 -- reject.

#14 -- reject.

#16 -- pension we looked into.

PSM -- So, you're giving me the 14 day time limit on payroll grievances?

CO  - Maybe.

On the 160 hour proposal

[discussion]

PSM -- That's it?

CO  - We still want $2 an hour per year in wage increases.

All present employees go to the top rate on welfare.

4

All van drivers into the union.

All helpers into the union.

You said you will train employees.

On our #9 – maybe 5 [i.e., 4 trailer me and a warehouse man who is capable of Driving.

[so, basically no change from the union's last proposal in June, other than, for example, adding the entirely new proposal to put all helpers in the union.]

PSM – caucus [2:32 PM – 3:45 PM]

We have reviewed where we are and where we've come since we started these negotiations last March. Quite frankly, we are very disappointed. We have told you in detail about the financial problems we have encountered because of the pension issue – not a problem we created. And, you still come back without budging on your monetary demands which you presented months ago – totally ignoring the financial realities. It appears quite obvious that we're getting no where. Everytime you respond to our proposals, you say you don't want to change anything. And, then, at the 11th hour, you add new stuff [e.g., adding all helpers to the union].

We could continue doing this forever and get no closer to reaching an agreement. We have accepted what proposals of yours that we could and rejected what we could not. We dropped what proposals of ours that we could and modified others in an attempt to satisfy you. And, we're still getting no closer.

So, what we have left on the table is our last, best and final offer. We are withdrawing from the pension plan and will implement our final offer next Monday.

[at this point, CO left the meeting room and the Company's representatives also packed up and left.]

5