# 14

# HERRICK

NEW YORK
NEWARK
PRINCETON

GARY S. YOUNG
PARTNER
Direct Tel:   973.274.2035
Direct Fax:  973.274.6435

Email:  gyoung@herrick.com

August 26, 2011

**Sent by email (knowak@zazzali-law.com) and Regular Mail**

Kenneth I. Nowak, Esq.
Zazzali, Fagella, Nowak, Kleinbaum & Friedman
One Riverfront Plaza, Suite 320
1037 Raymond Boulevard
Newark , NJ 07102

### Re: American BD and Local 863 Pension Fund; Teamsters Local 863

Dear Ken:

As you know, our client, American B.D. has struggled to resolve and rationalize the impositions created by federal law relating to its long-standing participation in the Local 863 Pension Fund. Since March, our client has attempted in negotiations with the union, your office and Segal to know what would be the "right" way to resolve and fulfill the substantial liabilities flowing from the plan.

Yesterday, we attended negotiations at Local 863 and reached impasse. At all times, the issue of what to do with the pension going forward has been a cornerstone of the negotiations for our client. As we discussed at our last meeting at Segal, we have concluded that American B.D. must cease current and future contributions and withdraw from the plan as the known $21.0 million liability already threatens the company's economic existence.

As our client today reached impasse in negotiations with Teamsters Local 863, American B.D. has informed the union that it is implementing its final offer to include withdrawing from the Pension Fund, effective immediately. I am sure that you understand that this means that no further contributions will be made to the plan on behalf of employees.

Our client is prepared to immediately contribute $140,649 as the first of 20 quarterly installments as determined by Segal as per your letter of February 23, 2011. Please advise me to whom this should be addressed, and we will arrange that this payment be sent to such person forthwith. Future quarterly payments will be made on December 1st, March 1st, June 1st and September 1st until paid in full.

HERRICK, FEINSTEIN LLP
A New York limited
liability partnership
including New York
professional corporations

ONE GATEWAY CENTER, NEWARK, NJ 07102 • TEL 973.274.2000 • FAX 973.274.2500 • www.herrick.com

HERRICK

August 26, 2011
Page 2

As per today's letter, our client is prepared to pay the minimum funding deficiency of $5,898,317.60 as of August 31, 2011 (as calculated in my Memo to you on July 12, 2011) on or before August 31st. Please also advise to whom this should be sent.

We will immediately file Form 5530, and our client will pay the excise tax to the IRS as required by law.

In making these payments, our client reserves all rights that it may have under ERISA including, but not limited to, challenging the calculation of such liabilities.

Very truly yours,

**HERRICK, FEINSTEIN LLP**

By: _____
Gary S. Young

GSY:ias

cc:   Dina Opici, Esq., CEO
      Philip S. Mortensen, Esq.
      John Bury, E.A.

## Saez, Ingrid

| | |
|---|---|
| **From:** | Saez, Ingrid |
| **Sent:** | Friday, August 26, 2011 10:02 AM |
| **To:** | 'knowak@zazzali-law.com' |
| **Cc:** | 'opicid@opici.com'; 'pmortensen@bartonesq.com'; 'batpension@yahoo.com'; Young, Gary S. |
| **Subject:** | American BD & Local 863 Pension Fund; Teamsters Local 863 |
| **Categories:** | Filed To Worksite |

**Attachments:** Letter to K. Nowak, Esq. - Aug. 26/11.PDF

Please see attached correspondence.


*Thank you*

Ingrid A. Saez, Legal Assistant
  to Gary S. Young and Glenn L. Stein
Herrick, Feinstein LLP
One Gateway Center
Newark, NJ 07102

Phone:  (973) 274-2045
isaez@herrick.com

# 15

**Hand Delivered**

August 26, 2011

Dear Local 863 Bargaining Committee (American B.D.) and Bargaining Unit Members:

Yesterday, the Bargaining Committee for American B.D. (the "Company") conducted negotiations with your Local 863 Bargaining Representatives. Since March, our Committee has met with Local 863 many times to include traveling to New York City to meet with representatives of the Pension Fund.

Despite our good faith efforts, the negotiations have now reached an impasse. The core negotiations issue for the Company has been to resolve the excessive and damaging costs associated with past and current participation in the Local 863 Pension Fund ("Fund").

The Fund has significant financial problems which only became painfully clear to the Company in 2008. It was then that the Company was notified that it owed the Fund an extra $3.2 million over and above all other amounts contributed under current and past contracts. The letter was received in April of 2008 and payment was demanded to be made within 30 days. This demand was made because the Fund had "minimum funding deficiencies" through no fault of any employer. Even so, all contributing employers were told that they must pay in. Please understand that, at the time of this demand, the Company was already contributing about $400,000 each year towards your pensions.

Since then, the Company's annual contributions have increased to $470,000 because the Fund is classified under federal pension law as being in the dangerously underfunded "Red Zone."

In 2009, the Company once again received another demand letter for an additional $1.2 million for minimum funding deficiencies. Not that the timing would ever be good for "surprises" like this, but these demands were coming in just at the time that the American economy was crashing and your Company was suffering the effects of a bad economy. After struggling in these tough times to find the financial resources to meet these surprise obligations (which have now grown with interest to $5.8 million), the Company is about to pay this huge sum to the Fund. To make this payment, members of the Opici family were forced to borrow this money, and the loan is secured by the Company's building and the personal guarantees of the family.

To give you some perspective on what this means, this $5.8 million represents $82,857.14 for each bargaining unit member, or $41.43/hour for each Local 863 bargaining unit member for an entire year! It should not be surprising, therefore, that the Company's current bargaining proposals have been modest as the Company does not have unlimited resources to pay for such previously unknown (and unplanned) liabilities.

But this is not where the difficulty ends. As of the last Form 5500 filed with the IRS by the Fund for the Plan Year ending August 31, 2010, the Fund had assets of $163,149,614 and liabilities of $524,199,626. Actuarial projections for 2011 show payments from the Fund of $24,613,168

1

and expected contributions in of $10,062,795. Projected funding deficiencies are expected to significantly increase each year going forward.

The Company requested and received a calculation of the amount that it will owe as a "withdrawal liability" to the Fund. Basically, this is the amount that the Company must pay if and when it ceases making contributions to the Fund. The Company was informed in February that this would be $15.0 million. The problem is that this liability will probably grow and get even worse if the Company were to continue contributing to the Fund beyond August 31st as many employers (including most recently C&S) have already withdrawn from the Fund and recent stock market losses may negatively affect Fund asset values.

We started these negotiations in March hoping to "solve" both the minimum funding deficiency and withdrawal liability in a creative way that would be good for all affected parties. Unfortunately, the parties to the negotiations failed to resolve these significant issues.

It is our good faith belief that the Company really has no other choice but to withdraw from the Fund **now**. This decision will cost the Company approximately $562,596 per year for the next 20 years (it could even be more if there is a "mass withdrawal" of all employers as defined by the law). These withdrawal payments will cost the equivalent of approximately $4.02/hour for each bargaining unit member for each of the next 20 years.

We regret that, instead of going to the benefit of our employees, these payments must now go to pay for liabilities that none of us bargained for. In these times of high unemployment and severe economic distress and in light of these extraordinary financial impositions to the Fund, the Company does not find itself in a position to presently increase wages and benefits as demanded by the Union.

We regret that the negotiations have ended in impasse as we have enjoyed a good and stable bargaining relationship with the Union for 50 years. Despite our good faith, we fear that you will now hear bad things about the Company. We have put these thoughts in writing to you so that you can know our reasons for our actions.

We remain committed to keeping the Company strong so that bargaining unit members and all other employees may continue to look to the Company for employment and economic well-being now and into the future.

Respectfully,

Management Bargaining Committee
American B.D.

# 16



GARY S. YOUNG
PARTNER
Direct Tel:  973.274.2035
Direct Fax:  973.274.6435

Email:  gyoung@herrick.com

New York
Newark
Princeton

October 10, 2011

**Sent by email (knowak@zazzali-law.com) and Regular Mail**

**Kenneth I. Nowak, Esq.**
Zazzali, Fagella, Nowak, Kleinbaum & Friedman
One Riverfront Plaza, Suite 320
1037 Raymond Boulevard*
Newark , NJ 07102

**Re: American BD and Local 863 Pension Fund; Teamsters Local 863**

Dear Ken:

     We previously notified you of our client's withdrawal from the Local 863 Pension Fund ("Fund" or "Plan") as of August 25, 2011.  Contemporaneously with the giving of such notice, our client forwarded the first quarterly installment of the withdrawal liability as calculated by the Segal Company.  Also at that time, the Fund was further advised that any payment was being made under reservation of rights.

     The purpose of this letter is to advise you that American BD Company (the "Company") believes that the withdrawal liability calculation is not consistent with the proper method for calculating liability for withdrawal under Sections 4203 and 4205 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  Specifically, the Company disputes the application of the automatic employer surcharge (the "Surcharge") under Section 305(e)(7) of ERISA and Section 432(e)(7) of the Internal Revenue Code of 1986, as amended (the "Code"), in the calculation of withdrawal liability.

     Around the time that the collective bargaining negotiations commenced in March of this year, the Company requested and received a withdrawal liability calculation from the Plans' actuary, the Segal Company ("Segal").  In calculating the Company's annual payments of withdrawal liability under the purported terms of the Plan and Section 4211 of ERISA, Segal applied the additional 10% Surcharge that the Company has been paying to the Plan under the provisions of Section 305(e)(7) of ERISA and Section 432(e)(7) of the Code.

HERRICK, FEINSTEIN LLP
A New York limited
liability partnership
including New York
professional corporations

ONE GATEWAY CENTER, NEWARK, NJ 07102 • TEL 973.274.2000 • FAX 973.274.2500 • www.herrick.com
HF 6870298 v.1 #14968/0001 10/10/2011 12:21 PM

HERRICK

October 10, 2011
Page 2

Congress added Section 305(e)(7) of ERISA and Section 432(e)(7) of the Code pursuant to the Pension Protection Act of 2006. Specifically, the parallel provisions of ERISA and the Code provide, in relevant part, that:

> "Each employer otherwise obligated to make a contribution for the initial critical year shall be obligated to pay to the plan for such year a surcharge equal to 5 percent of the contribution otherwise required under the applicable collective bargaining agreement (or other agreement pursuant to which the employer contributes). For each succeeding plan year in which the plan is in critical status for a consecutive period of years beginning with the initial critical year, the surcharge shall be 10 percent of the contribution otherwise so required."

Beginning in 2008 and once again on or about September 1, 2010, the Fund notified participants, beneficiaries and contributing employers that it was in critical status (within the meaning of Section 432 of the Code) thereby justifying the additional Surcharge contribution. Section 432(e)(7) of the Code further provides that the Surcharge will cease upon the effective date of a new collective bargaining agreement that incorporates a rehabilitation plan consistent with the requirements of Section 432(e) of the Code. As you know, the Company and Local 863 have not adopted any new collective bargaining agreement that incorporates any such rehabilitation plan.

To our knowledge, there is no Plan provision that authorizes the assessment of such 10% Surcharge. Indeed, the Plan document specifically states that an employer's withdrawal liability shall be determined **without regard to the automatic employer surcharge.**

The relevant denominator for purposes of determining an employer's allocable share of unfunded vested benefits under Section 4211 of ERISA, and for purposes of determining an employer's annual payment of withdrawal liability under Section 4219(c) of ERISA, is the amount of the employer's "obligation to contribute" under the plan. Section 4212(a) of ERISA defines an employer's "obligation to contribute" as an obligation to contribute arising under one or more collective bargaining agreements or as a result of a duty under applicable labor-management relations law.

Clearly, if Congress had intended for the Surcharge under Section 432(e)(7) to be considered as part of an employer's "obligation to contribute" and considered for purposes of calculating withdrawal liability and the annual payments thereof, it would have said so.

Section 305(e)(9) of ERISA provides that Surcharges under Section 305(e)(7) of ERISA shall be disregarded in calculating withdrawal liability under Section 4211 of ERISA, except for purposes of determining unfunded vested benefits under Section 4211(c)(4) or a comparable method approved under Section 4211(c)(5). Section

HERRICK

October 10, 2011
Page 3

4211(c)(4) allocates unfunded vested benefits based on participants service with the employer; a factor not used by the Plan. Section 4211(c)(5) generally requires that a plan request approval, by amendment of the plan, for an alternate method of allocating unfunded vested benefits; a procedure that has not been used by the Union. In other words, in situations where the provisions of Section 4211(c)(4) and (c)(5) of ERISA are not applicable, Section 305(e)(9) of ERISA specifically provides that automatic employer Surcharge shall be disregarded.

Based on the foregoing, we respectfully request that Segal recalculate the withdrawal liability as it appears evident that the Surcharge should not be included in the calculation of withdrawal liability of a withdrawing employer.

Section 4221 of ERISA provides a dispute resolution procedure for disputes between a plan sponsor and an employer concerning withdrawal liability. Before resorting to such measures, however, we hereby request Segal and the Trustees' reconsideration. Under our previously noted reservation of rights, our client wishes to preserve its right to seek third party resolution of this issue if such becomes necessary.

We would appreciate receiving the Trustees' response after conferring with Segal.

Very truly yours,

**HERRICK, FEINSTEIN LLP**

By: _Gary S. Young_
    Gary S. Young

GSY:ias

cc:   Dina Opici, Esq., President
       American BD Company
       Philip S. Mortensen, Esq.
       John Bury, E.A.

## Saez, Ingrid

| | |
|---|---|
| **From:** | Saez, Ingrid |
| **Sent:** | Monday, October 10, 2011 12:25 PM |
| **To:** | 'knowak@zazzali-law.com' |
| **Cc:** | 'opicid@opici.com'; 'pmortensen@bartonesq.com'; John Bury; Young, Gary S. |
| **Subject:** | American BD and Local 863 Pension Fund; Teamsters Local 863 |

**Attachments:** Letter to K. Nowak, Esq. - 10_10_11.PDF

Dear Mr. Nowak:

Please see attached correspondence.

Ingrid A. Saez, Legal Assistant
  to Gary S. Young and Glenn L. Stein
Herrick, Feinstein LLP
One Gateway Center
Newark, NJ 07102

Phone: (973) 274-2045
isaez@herrick.com

# 17

# ZAZZALI, FAGELLA, NOWAK, KLEINBAUM & FRIEDMAN
## A PROFESSIONAL CORPORATION
### ATTORNEYS AT LAW

ANDREW F. ZAZZALI (1925-1969)

ANDREW F. ZAZZALI, JR.
ROBERT A. FAGELLA**
KENNETH I. NOWAK***
RICHARD A. FRIEDMAN
PAUL L. KLEINBAUM*
EDWARD H. O'HARE*
SIDNEY H. LEHMANN*
COLIN M. LYNCH**

COUNSEL
JAMES R. ZAZZALI***

*Also admitted Pennsylvania
**Also admitted New York
***Also admitted New York & D.C.
‡New York Only

ONE RIVERFRONT PLAZA, SUITE 320
NEWARK, N.J. 07102-5410
Telephone: (973) 623-1822
Telecopier: (973) 623-2209

150 West State Street
Trenton, New Jersey 08608
Telephone: (609) 392-8172
Telecopier (609) 392-8933

www.zazzali-law.com

Please Reply to Newark

GENEVIEVE M. MURPHY-BRADACS**
EDWARD M. SUAREZ, JR.
CYNTHIA REVESZ‡
AILEEN M. O'DRISCOLL*
MARISSA A. McALEER**
FLAVIO L. KOMUVES*

OF COUNSEL
KATHLEEN NAPRSTEK CERISANO
JASON E. SOKOLOWSKI
WILLIAM A. PASCARELL (1934-2010)

October 21, 2011

Gary S. Young, Esq.
Herrick Feinstein LLP
One Gateway Center
Newark, New Jersey 07102

Re:   **American BD Company and IBT Local 863 Pension Plan**

Dear Gary:

This is in response to your letter of October 10, 2011, in which you question the Plan's use of the surcharge for purposes of calculating the annual payment for the withdrawal liability payment schedule. To briefly summarize your position, you posit that the Plan's own documents state that withdrawal liability will be calculated without regard to the surcharge, that Section 4211 excludes the surcharge from a withdrawal liability allocation, and that under Section 4219, which determines the annual payment, the surcharge should also be excluded.

Please be advised that the Trustees, like many other Pension Plans, have determined that the surcharges shall not be used in determining the withdrawal liability allocation under Section 4211, but that it is proper, appropriate and lawful to use it for purposes of determining the annual payment for purposes of the withdrawal liability schedule. Your reference to the Plan documents is to a section which addresses the allocation, not the calculation of the annual payment, and is thus not relevant.

Accordingly, the Plan will not agree to recalculate the annual payment schedule to exclude the surcharge. As you point out in your letter, you are aware of your rights to contest this determination.

ZAZZALI, FAGELLA, NOWAK, KLEINBAUM & FRIEDMAN
Gary S. Young, Esq.
October 21, 2011
Page 2

      Thank you for your attention in this matter.

                            Very truly yours,

                            Kenneth I. Nowak

KIN:hm
cc:     Vanessa Walters
        Diane Gleave
        Nick Laccetti
        Thomas Hart, Esq.

38630-263

109584.doc

# 18

# HERRICK

NEW YORK
NEWARK
PRINCETON

GARY S. YOUNG
PARTNER
Direct Tel:        973.274.2035
Direct Fax:       973.274.6435

Email: gyoung@herrick.com

November 11, 2011

Sent by email (knowak@zazzali-law.com) and Regular Mail

Kenneth I. Nowak, Esq.
Zazzali, Fagella, Nowak, Kleinbaum & Friedman
One Riverfront Plaza, Suite 320
1037 Raymond Boulevard
Newark, NJ 07102

Re:   American BD and Local 863 Pension Fund; Teamsters Local 863
        Notice of Submission to Arbitration

Dear Ken:

       This letter is in response to your letter dated October 21, 2011.  We will now proceed to submit the disputed matter addressed in your October 21st letter (and in our previous letter dated October 10, 2011) to the New Jersey State Board of Mediation in accordance with the procedures outlined in Section 12.10 of the Pension Plan.

       Additionally, we note that our client received a September Pension Fund Invoice by letter post-marked October 27, 2011.  This invoice ignores this office's previous notice of withdrawal as of August 25, 2011.  Written Notification of Withdrawal was thereafter followed by a letter from American B.D. to the Trustees of the Pension Fund enclosing its first quarterly payment of withdrawal liability in the amount of $140,649.

       Normally, we would take this presentation of invoice from the Pension Fund to be an inadvertent act, but our client now notices that its September check in the amount of $140,649 has not been negotiated by the Trustees.  As we now approach the time for our client to pay the second quarterly installment, the reason for this check remaining un-deposited must be clarified.

HERRICK, FEINSTEIN LLP
A New York limited
liability partnership
including New York
professional corporations

ONE GATEWAY CENTER, NEWARK, NJ 07102 • TEL 973.274.2000 • FAX 973.274.2500 • www.herrick.com

HERRICK ·

November 11, 2011
Page 2

It is our sincere hope that there is no reason other than inadvertence.  In such case, we urge the Trustees to negotiate the earlier check, and American B.D. will send its second quarterly installment on or about December 1st.  If the Trustees have refused to accept withdrawal liability payment for any affirmative reason, we think that the failure to promptly object is inexplicable.  In any event, please provide us with the Trustees' position.

If this act was intentional, please be advised:

1.  American B.D. will make no further monthly contributions to the Pension Fund;

2.  American B.D. will continue to pay quarterly withdrawal installments and place all such contributions into an interest-bearing escrow account; it should be understood that while our client will seek to obtain a reasonable rate of interest that can be obtained without undue risk, it will not be responsible for the Pension Fund's assumed interest pre-retirement interest rate of 7.5%; and

3.  American B.D. will submit this additional withdrawal liability dispute to arbitration in accordance with Section 12.10 of the Plan.

We sincerely hope that this second submission to arbitration will not be necessary.

Respectfully submitted,

HERRICK, FEINSTEIN LLP

Gary S. Young

cc:   Ms. Dina Opicl, President
      American B.D. Company
      Phillip S. Mortensen, Esq.
      Patricia M. Graham, Esq.

HF 7048235 v.1  #14968/0001 11/11/2011 11:04 AM

# 19

# HERRICK

NEW YORK
NEWARK
PRINCETON

PATRICIA M. GRAHAM
COUNSEL
Direct Tel:    609.452.3816
Direct Fax:   609.452.6337

Email:  pgraham@herrick.com

December 2, 2011

**VIA FEDERAL EXPRESS MAIL**

New Jersey State Board of Mediation
John Fitch Plaza, 12ᵗʰ Floor
P.O. Box 110
Trenton, New Jersey 08625-0110

Re:    **DEMAND FOR ARBITRATION:**
       **American B.D. Company v. Local Union No. 863, Teamsters,**
       **Affiliated with the International Brotherhood of Teamsters**

Dear Sir/Madam:

      We represent American B.D. Company (the "Company" or "Employer"), which is party to a Collective Bargaining Agreement (the "CBA") with Local Union No. 863, Teamsters, Affiliated with the International Brotherhood of Teamsters ("Local 863" or the "Union"). Pursuant to Section 4221 of ERISA, as well as the CBA and the Plan (defined below) the Company hereby seeks arbitration with respect to the withdrawal liability issues described herein. Both the CBA and the Plan expressly provide for arbitration of such disputes by the New Jersey State Board of Mediation. Copies of the relevant pages of the CBA and the Plan are annexed hereto as Exhibits A and B.

## Background

### A.    *The Company's Withdrawal from the Plan*

      The Company had been a contributing employer to the defined benefit plan sponsored by Local 863, a multiemployer plan within the meaning of Section 3(37) of ERISA (the "Plan"). In 2008, the Company was notified that it was required to pay minimum funding deficiencies totaling almost $5 million. Commencing in early 2011, the parties began negotiations for a successor collective bargaining agreement. At about that time, the Company also learned that its withdrawal liability had grown from $6 million in 2006 to $15 million for the Plan Year that ended August 31, 2010. At all times during such negotiations, the issue of what to do with the Plan was the primary point of the Company's proposals in the negotiations. After months of face-to-face negotiations that included at least three meetings with the Plan's Actuaries where the Company's alternative options were actively discussed, the Company

HERRICK, FEINSTEIN LLP
A New York limited
liability partnership
including New York
professional corporations

210 CARNEGIE CENTER, PRINCETON, NJ 08540 • TEL 609.452.3800 • FAX 609.520.9095 • www.herrick.com
HF 7086838v.1 #14968/0001

H ERRICK

New Jersey State Board of Mediation
December 2, 2011
Page 2

concluded that it must withdraw from the Plan.  At a meeting with the Union August 25, 2011, the Company declared an impasse in the negotiations and provided notice of its intention to withdraw from the Plan.  (Exhibit C)  By letter dated August 26, 2011, counsel for the Company confirmed that as a result of the parties' impasse:

> American B.D. has informed the union that it is implementing its final offer to include withdrawing from the Pension Fund, effective immediately.  I am sure you understand that this means that no further contributions will be made to the plan on behalf of employees.

> Our client is prepared to immediately contribute $140,649 as the first of 20 quarterly installments as determined by Segal as per your letter of February 23, 2011.  Please advise me to whom this should be addressed and we will arrange that this payment be sent to such person forthwith.  Future quarterly payments will be made on December 1st, March 1st, June 1st, and September 1st until paid in full.

> As of today's letter, our client is prepared to pay the minimum funding deficiency of $5,898,317.60 as of August 31, 2011 (as calculated in my memo to you of July 12, 2011) on or before August 31st. Please also advise as to whom this should be sent.

> We will immediately file Form 5530, and our client will pay the excise tax to the IRS as required by law.

(Ex. D at 1-2)  Notice of these developments was provided to the Company's union employees.

On August 30, 2011, the Company sent, by Federal Express for next day delivery, the first quarterly payment of $140,649 to the Plan.  The Company also paid the minimum funding deficiency of $5,898,317.60.  And, on September 8, 2008, the Company paid the required excise tax.  Notwithstanding the Company's clear statement at the August 25 meeting, which was confirmed in counsel's August 26th letter, the Plan refused to negotiate and cash the proffered withdrawal liability payment.  Although the Plan Trustees have not provided any explanation as to why the payment was not negotiated, it would be the Company's surmise that the Plan's position is that the Company has not withdrawn.

By letter dated October 10, 2011, the Company's counsel again stated "[w]e previously notified you of our client's withdrawal from the Local 863 Pension Fund ... as of August 25, 2011."  (Exhibit E)  Counsel further stated that it is the Company's position that the Segal calculation of the Company's withdrawal liability was flawed because, *inter alia*, it

HERRICK

New Jersey State Board of Mediation
December 2, 2011
Page 3

wrongly included the 10% Surcharge that was imposed under the Pension Plan Amendments of
2006. *Id*; *see* subsection B below.

By letter dated October 21, 2011, Kenneth Nowak, counsel for the Plan and the
Union, advised the Company of the Plan Trustees' position that the 10% Surcharge could be
included for purposes of determining the Company's annual payment for purposes of the
withdrawal liability schedule. (Exhibit F)

In response, by letter dated November 11, 2011, counsel for the Company advised
the Union and the Plan Trustees that it would proceed to submit the disputed matter to the New
Jersey State Board of Mediation for arbitration. (Exhibit GI) Counsel also advised the Company
had received a September Pension Fund Invoice by letter post-marked 27, 2011, and that the
invoice ignored the Company's prior notice of withdrawal. (Id.) Furthermore, the Company
asked for an explanation as to why its check for the first quarterly payment of withdrawal
liability, in the amount of $140,649, had not been cashed and further stated:

If this act was intentional, please be advised:

1.     American B.D. will make no further monthly contributions
to the Pension Fund;

2.     American B.D. will continue to pay quarterly withdrawal
installments and place all such contributions into an interest-
bearing escrow account; it should be understood that while our
client will seek to obtain a reasonable rate of interest that can be
obtained without undue risk, it will not be responsible for the
Pension Fund's assumed interest pre-retirement interest rate of
7.5% and

3.     American B.D. will submit this additional withdrawal
liability dispute to arbitration in accordance with Section 12.10 of
the Plan.

(Id. at 2)

### B.     Calculation of Withdrawal Liability

At the time that the collective bargaining negotiations commenced, the Company
requested and received a withdrawal liability calculation (the "Segal Report") from the Plan's
Actuary. A copy of the Segal Report and the February 23, 2011 letter with which it was sent are
annexed hereto as Exhibit H. In calculating the Company's annual payments of withdrawal
liability under the purported terms of the Plan and Section 4211 of ERISA, the Plan's Actuary
applied the additional 10% Surcharge that the Company was paying to the Plan under the

HERRICK

New Jersey State Board of Mediation
December 2, 2011
Page 4

provisions of Section 305(e)(7) of ERISA and Section 432(e)(7) of the Code. This inclusion of the 10% Surcharge violates ERISA.

Congress added Section 305(e)(7) of ERISA and Section 432(e)(7) of the Code pursuant to the Pension Protection Act of 2006. Specifically, the parallel provisions of ERISA and the Code provide, in relevant part, that:

> Each employer otherwise obligated to make a contribution for the initial critical year shall be obligated to pay to the plan for such year a surcharge equal to 5 percent of the contribution otherwise required under the applicable collective bargaining agreement (or other agreement pursuant to which the employer contributes). For each succeeding plan year in which the plan is in critical status for a consecutive period of years beginning with the initial critical year, the surcharge shall be 10 percent of the contribution otherwise so required.

As of the plan year beginning September 1, 2010, the Plan notified participants, beneficiaries and contributing employers, including the Plan's sponsor, that the Plan was in critical status (within the meaning of Section 432 of the Code). Section 432(e)(7) of the Code further provides that the Surcharge will cease upon the effective date of a new collective bargaining agreement that incorporates a rehabilitation plan consistent with the requirements of Section 432(e) of the Code. The Company and the Union have not adopted any new collective bargaining agreement that incorporates such a rehabilitation plan.

Furthermore, there is no Plan provision that authorizes the assessment of such 10% Surcharge. The Plan specifically states that an employer's withdrawal liability shall be determined **without regard to the automatic employer surcharge**. *See* Ex. B at Section 12.03(2).

The relevant denominator for purposes of determining an employer's allocable share of unfunded vested benefits under Section 4211 of ERISA and for purposes of determining an employer's annual payment of withdrawal liability under Section 4219(c) of ERISA, is the amount of the employer's "obligation to contribute" under the plan. Section 4212(a) of ERISA defines an employer's "obligation to contribute" as an obligation to contribute arising under one or more collective bargaining agreements or as a result of a duty under applicable labor-management relations law. Clearly, if Congress had intended for the surcharge under Section 432(e)(7) to be considered as part of an employer's "obligation to contribute" and considered for purposes of calculating withdrawal liability and the annual payments thereof, it would have said so.

More specifically, Section 305(e)(9) of ERISA provides that Surcharges under Section 305(e)(7) of ERISA shall be disregarded in calculating withdrawal liability under

H ᴇ ʀ ʀ ɪ ᴄ ᴋ

New Jersey State Board of Mediation
December 2, 2011
Page 5

Section 4211 of ERISA, except for purposes of determining unfunded vested benefits under Section 4211(c)(4) or a comparable method approved under Section 4211(c)(5). Section 4211(c)(4) allocates unfunded vested benefits based on participants service with the employer; a factor not used by the Plan. Section 4211(c)(5) generally requires that a plan request approval, by amendment of the plan, for an alternate method of allocating unfunded vested benefits; a procedure that has not been used by the Union. In other words, in situations where the provisions of Section 4211(c)(4) and (c)(5) of ERISA are not applicable, Section 305(e)(9) of ERISA specifically provides that automatic employer Surcharge shall be disregarded.

Therefore, except as provided in Section 305(e)(9) of ERISA, the automatic employer Surcharge, imposed on employers under Section 305(e)(7) of ERISA and Section 432(e)(7) of the Code, shall not be included in the calculation of withdrawal liability pursuant to Sections 4211 and 4219 of ERISA of a withdrawing employer.

### Issues For Arbitration

The Company hereby requests arbitration of the following issues:

1.      Whether the Company lawfully withdrew from the Plan on or before August 31, 2011?

2.      Is the withdrawal liability calculation prepared by the Plan Actuary flawed and incorrect because, among other things, the inclusion of the 10% Surcharge in the withdrawal liability calculation is contrary to ERISA and/or the Plan?

3.      What is the withdrawal liability of the Company?

Accordingly, we respectfully request that an arbitration of the issues be conducted pursuant to the rules of the New Jersey State Board of Mediation. I understand that we should expect to receive from you a list of proposed arbitrators. Given the nature of the dispute here, the Company respectfully requests that the proposed arbitrators have experience with withdrawal liability issues.

The Union and the Plan Trustees may be contacted at the office of their attorney:

Kenneth I. Nowak, Esq.
Zazzali, Fagella, Nowak, Kleinbaum & Friedman
One Riverfront Plaza, Suite 320
Newark, New Jersey 07102-5410
Tel.: 973-392-8172
Fax: 973-623-2209

The Company may be contacted through me at

H ᴇ ʀ ʀ ɪ ᴄ ᴋ

New Jersey State Board of Mediation
December 2, 2011
Page 6

        Patricia M. Graham, Esq.
        Herrick, Feinstein LLP
        210 Carnegie Center
        Princeton, New Jersey 08502
        Tel.: 609-452-3816
        Fax: 609-452-6337

        If you need any further information, please contact me.  Thank you.

                Respectfully submitted,

                HERRICK, FEINSTEIN LLP
                *Attorneys for Claimant American B.D.*
                *Company*

        By: Patricia M. Graham
                Patricia M. Graham

cc:    Kenneth Nowak, Esq. (Via Federal Express)
        Gary S. Young, Esq.

# 20

01/18/2013  09:27   689-292-0478        DEPT. OF LABOR                    PAGE  02/02

*New Jersey State Board of Mediation*
*P. O. Box 110 - 12th Floor*
*Trenton, NJ 08625 - 0110*
*(609) 984-7676    Fax (609) 292-0478*

January 25, 2012

Patricia M. Graham, Esq.
Herrick, Feinstein LLP
210 Carnegie Center
Princeton NJ 08502

Kenneth I. Nowak, Esq.
Zazzali Fagella Nowak et al
One Riverfront Plaza, Suite 320
Newark, NJ 07102-5410

Case No:   11-0530      American BD Company -and- IBT 863
                        Withdrawal liability

Dear Gentlepeople:

Please be advised that Nicholas J Taldone has been designated to hear and decide the matter in dispute in the above captioned case. The arbitrator will contact you respecting date, time and place of hearing.

Pursuant to the Board's Arbitration Rules and Regulations, Section 12:105-5.4, "... It is the responsibility of the parties to inform the arbitrator of the names and addresses of the persons to be served the award. "

Very truly yours,

Ernest D. Whelan
Executive Secretary

# 21

## MEMORANDUM OF AGREEMENT

**MEMORANDUM OF AGREEMENT** made by and between AMERICAN B.D. COMPANY (herein referred to as "Company" or "Employer") and LOCAL UNION NO. 863, TEAMSTERS, affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA (herein referred to as "Local 863" or "Union")

WHEREAS, the Company and the Union have been parties to a number of collective bargaining agreements over the years covering the Company's drivers and warehousemen, the most recent one expiring April 24, 2011; and

WHEREAS, the Company and the Union have been desirous of amicable negotiating to reach a successor agreement to replace that which expired on April 24, 2011; and

WHEREAS, the Company and the Union met on numerous occasions since March 21, 2011; and negotiated in good faith in an effort to reach a successor agreement; and

WHEREAS, on October 25, 2012, the Company and the Union successfully reached agreement on all outstanding issues;

NOW THEREFORE, the Company and the Union have agreed to the following modifications to the collective bargaining agreement which expired on April 24, 2011:

1) Modify the WITNESSETH provision by substituting the following for the entire paragraph:

"THE COMPANY HEREBY AND HEREWITH recognizes the Union as the authorized Collective Bargaining Agent for all employees who are employed as Drivers and Warehousemen at the Company's 25 De Boer Drive, Glen Rock, New Jersey, facility in respect to wages, hours and all other terms and conditions of employment during the entire term of this agreement."

2) Modify Article I (UNION SECURITY) substituting "three hundred twenty (320)" for "four hundred eighty (480)" in the fifth line of the first paragraph. And adding the following as a new paragraph:

"Notwithstanding the foregoing, the Company may hire temporary seasonal employees for up to four hundred eighty (480) hours from October to mid-January. In addition, the Company may hire temporary employees for how many hours may be necessary to replace regular employees absent due to disability or workers compensation leave on a one-to-one basis (i.e., one temporary driver to replace one regular driver absent because of disability or workers compensation). Any employee hired between October

and mid- January will be designated by the Company as (a) a temporary seasonal employee; (b) a temporary replacement for a regular employee absent because of disability or workers compensation; or (c) a regular employee, and promptly inform the Union of such designation.

The foregoing temporary seasonal employees shall be subject to a Local 863 dues in an amount equivalent to the amount of monthly dues based upon the rate formula in effect. The Company shall have the obligation to inform the Union of any and all temporary seasonal employees utilized by the Company and to facilitate the Union's right to provide a dues check-off authorization form to the temporary seasonal employees, which shall be submitted to the Company within 31 days of hire, to be applied retroactively to date of hire. The Union agrees to waive an initiation fee. Local 863 will provide the Company with authorization forms signed by the temporary seasonal employees. Said deductions will be made in the first payroll week each and every month. Each month, the Company agrees to forward the amount due to the Union, together with a list setting forth the name of each temporary seasonal employee and the amount that is being remitted on their behalf.

Pursuant to the foregoing, the temporary seasonal employees shall not be permitted to continue to work unless they are paying the aforementioned dues in accordance with applicable law. The Union and Company agree that the terms and conditions of employment of the temporary seasonal employees shall be solely those in this Agreement. The employees shall have their rights under Sections 7 and 8 of the NLRA."

Add the following as new paragraphs:

"This Agreement shall be binding upon the parties hereto, their successors, administrators, executors, and assigns. In the event an Employer's business or license is sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, such operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof. The Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee, etc., of the business or license covered by this Agreement. Such notice shall be in writing with copy to the Union not later than forty-eight (48) hours after the signing of the agreement of sale of such Employer's business and/or license. The Employer shall give the Union the name and address of the purchaser, transferee, lessee, assignee, etc. In the event the Employer fails to give notice herein required, and/or fails to require the purchaser, transferee, lessee or assignee to assume the obligations of this Agreement, the Employer shall be liable to the Union and the employees covered for all damages sustained as a result of such failure to give notice, or such failure to acquire assumption of the terms of this Agreement Employees will

2

not suffer any loss of seniority, length of service, vacations, holidays, or, as to any other Article or Section of this Agreement, as the result of the sale, transfer, lease, assignment or purchase of the business and/or license."

3) Modify Article 3 (HOLIDAYS) by converting Lincoln's birthday to a switch holiday. Substitute the following for the second sentence of Section B:

"When an employee is required to work on a switch Holiday, he shall be paid at the straight time rate, but shall receive another day off with straight time pay with the Company's approval, except for the personal day, which will require no notice to the Employer."

4) Modify Article 4 (WORK HOURS by substituting "7:00 PM to 5:30 AM" for "9:00 PM to 7:30 AM" in line 4 of Section D. Substitute "15" for "12" in the first sentence of Section C. Eliminate the second sentence.

5) Modify Article 6 (VACATIONS) by adding the following to Section C:

"Except as hereinafter provided, an employee leaving the employment of the Company shall receive vacation pay, as has accrued to him, at the time or his leaving, based on the proportionate number of weeks that the employee has worked during that contract year. An employee leaving the Company who is retiring and is immediately eligible for a pension shall receive all contractual unused vacation."

6) Modify Article 8 (SICK DAYS) by adding the following as a new Section D.

"All employees on disability or worker's compensation leave are required to contact the office weekly to update progress."

7) Modify Article II (WAGES) by substituting the following for this Article:

"The Company shall establish and maintain through the term of this Agreement the following weekly rates of pay for the following job classifications:

A. For employees hired on or after April 25, 2011:

| Classification | Start Rate | 1st Anniv. | 2nd Anniv. |
|---|---|---|---|
| Driver | $16.00 | $16.25 | $16.50 |
| Warehouse | $14.00 | $14.25 | $14.50 |

3

B. For employees hired before April 25, 2011, hourly wage increases:

| Classification | 4-25-11 | 4-25-12 | 4-25-13 |
|---|---|---|---|
| Driver | 0 | 50 cents | 50 cents |
| Day warehouse | 0 | 50 cents | 50 cents |
| Mid-shift warehouse | 0 | 50 cents | 50 cents |
| Nite-shift warehouse | 0 | 50 cents | 50 cents |

C. Night-shift warehouse shall receive a night bonus of $35.00 per week. Midshift bonus to be $10.00.

D. Effective upon the signing of this agreement, all current employees who were hired prior to 4-25-11 shall receive $1,250.00 as a signing bonus:

E. Effective upon the signing of this agreement, all current employees who were hired on or after 4-25-11 shall receive $500.00 as a signing bonus:

F. Effective 4-25-12, all drivers on the lower tier with at least three (3) years of service shall be brought up to the top tier. Effective 4-25-13, all drivers on the lower tier with at least three (3) years of service shall be brought up to the top tier.

G. Effective 4-25-12, all nite-shift warehousemen with at least three (3) years of service shall be brought up to $19.00/hour. Effective 4-25-13, all nite-shift warehousemen with at least three (3) years of service shall be brought up to $19.00/hour.

H. Employees hired on or after 4-25-11 who transfer between driver and warehouse classification will be paid according to their classification taking into consideration their respective seniority. (For example, a driver with one year of seniority, being paid $16.25 per hour who transfers to a warehouse position would thereafter be paid $14.25 per hour.) Employees hired as drivers prior to 4-25-11 who transfer to the warehouse classification will continue to receive the drivers' hourly wage rate. Employees hired as warehousemen prior to 4-25-11 who transfer to the driver classification will be paid according to the driver classification."

8) Modify Article 12 (WELFARE) by adding the following:

"If the contributions to the Welfare Fund increase over the term of this Agreement less than Two Dollars ($2.00), the difference shall be added on April 24, 2014 to the contribution rate of the Retirement Savings Plan set forth in Article 21, Section B, in the following manner:

4

-retroactive to 4/25/11 at 25% of total savings for hours worked in 2011
-retroactive to 4/25/12 at 50% of total savings for hours worked in 2012
-retroactive to 4/25/13 at 100% of total savings for hours worked in 2013

(e.g., if the Welfare Fund contributions increase $1.00 over the term of this Agreement, an additional $1.00 will be contributed to the Retirement Savings Plan, as follows:

-effective 4/25/11, the contribution rate would be $.75 [$.50 + 25% of $1.00], not to exceed 40 hours per week
-effective 4/25/12. the contribution rate would be $1.50 [$1.00 + 50% of $1.00], not to exceed 40 hours per week
-effective 4/25/13, the contribution rate would be $2.00 [$1.00 + 100% of $1.00], not to exceed 40 hours per week)"

9) Modify Article 14 (GRIEVANCE PROCEDURE AND ARBITRATION) by inserting a 14 work day time limit to file and appeal grievances concerning payroll issues.

10) Modify Article 18 (SEVERANCE PAY) by substituting the following for this Article:

"It is agreed that should the Employer discontinue its operations and sever the employees from its payroll, the Employer will negotiate in good faith with the Union at that time the question of severance pay as it may then be required to do under the Federal or State laws then in force and effect."

11) Modify Article 21 (PENSION FUND) by changing the title of the Article to "Retirement Savings Plan" and substituting the following for this Article:

"A. As of August 25, 2011, the Employer withdrew from the Local 863 Pension Trust Fund. Concurrent with this withdrawal, the Employer began paying its withdrawal liability attributable to said Fund.



B. The I.B.T. Local 863 Retirement Savings Plan ("Retirement Plan") is a "defined contribution" pension plan governed by ERISA. In accordance with this Agreement, effective August 25, 2011, the Employer shall make contributions to the Retirement Plan, in the various amounts as set forth in Section H below, for each hour paid, including for sick days, holidays, vacation, and other entitlement days, for each employee covered by this Agreement, not to exceed forty (40) hours per week. The Employer shall commence making contributions for each employee upon his completion of the probationary period, retroactive to his date of hire. If an employee does not complete the probationary period, the employee shall not become a

participant in the Retirement Plan and no contributions will be made for such employee.

C. The Employer shall provide to the Retirement Plan a monthly report of all employees who worked in the prior month, the hours each employee worked, the hours for which contributions are made, the total amount of contribution owed for each employee, and the total amount paid by the Employer for the month. This report, and the payment for the total amount owed, shall be submitted to the Retirement Plan by the 15th day of the month after the end of the month in which the work for which the contributions are owed was performed. In addition, the Employer shall pay for each employee on the report the sum of Two Dollars ($2.00) for each week during which an employee was paid for any hours, such that if an employee was paid for 40 or less hours in a week, the Employer shall enter that it shall contribute $2.00 for each week for each such employee. The total amount due for this $2.00/week contribution shall be paid either by separate check, combining the $2.00/week for all employees on the report, or that total amount shall be included in the same check as the hourly contributions and the report shall set forth the amount being paid for the normal hourly contributions and the amount submitted or the $2.00/week contribution. Pursuant to the Retirement Plan, this $2.00/week contribution shall be credited to the employee's account, but shall subsequently be placed into an account to be used solely to pay and defray administrative costs incurred by the Retirement Plan. The Employer shall owe no other monies to the Retirement Plan for any administrative costs or expenses.

D. The Retirement Plan shall have the right to receive, collect, demand, sue, and institute proceedings in any court or other forum or tribunal for the purposes of enforcing payment of any of the contributions required to be made or that are owed under this Agreement. If the Employer is delinquent in the payment of contributions to the Retirement Plan, the delinquent Employer shall be further obligated to pay the Retirement Plan all costs and fees of collection, including but not limited to arbitration or court costs, arbitrator fees, and attorneys' fees, and interest on the amounts due and on costs and fees. Any action arising under, or involving interpretation or application of, or to enforce this Article shall be submitted in the first instance to the permanent arbitrator, Mr. J.J. Pierson, Esq. If he is unable to conduct the arbitration, it shall be submitted to the labor panel at AAA in New Jersey.

E. The Employer shall continue to pay the sums set forth above to the Retirement Plan, notwithstanding the fact that an employee may be out of work suffering from a job-related injury for a period of three (3) months from the date of the accident.

6

F. As of the effective date of this Agreement, the Employer will make the following contributions into the Retirement Plan as provided in Section B above:

| 4-25-11 | 4-25-12 | 4-25-13 |
|---------|---------|---------|
| $0.50   | $1.00   | $1.00   |

G. The Employer shall make a one-time lump sum contribution into the Retirement Plan for all drivers and warehousemen who, on the effective date of this Agreement, had at least twenty (20) but less than thirty (30) years of service in an amount equal to sixty-five dollars ($65.00) for each month of service between their actual years of service and thirty years. For example, an employee with twenty-five (25) years of service on the effective date of this Agreement would receive a $3,900.00 lump sum payment into the Retirement Plan [5 years x 12 months x $65.00].

H. The Employer shall make a one-time lump sum contribution into the Retirement Plan for all drivers and warehousemen who, on the effective date of this Agreement, had at least three (3) but less than five (5) years of service in an amount equal to sixty-five dollars ($65.00) for each month of service. For example, an employee with four (4) years of service on the effective date of this Agreement would receive a $3,120.00 lump sum payment into the Retirement Plan [4 years x 12 months x $65.00].

I. The contribution amounts set forth in Section F of this Article are subject to adjustment as set forth in Article 12 of this Agreement.

J. The Employer agrees that, after the termination of this Agreement and while the parties are negotiating a new contract or an extension of this contract, and further provided that the Union does not strike or the parties are not at impasse, the Employer will continue to make contributions to the Retirement Plan at the applicable rates in this Article pending consummation of a new contract."

12. Add a side letter to this Agreement that, if employees request training on any equipment used in the bargaining unit, the Company will provide same. Also, employees may take vacation in daily increments from January through April with Company approval, which shall not unreasonably be withheld.

13. Modify the term of the Agreement in Article 26 to commence April 25, 2011 and April 24, 2014.

7

IN WITNESS WHEREOF, the undersigned have executed this MEMORANDUM OF
AGREEMENT on the date set forth opposite their respective names.

DATE: 11 | 15 | 12

DATE: 11/19/12

AMERICAN B.D. COMPNAY

BY: _____

LOCAL UNION NO. 863, affiliated with
the INTERNATIONAL
BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN
AND HELPERS OF AMERICA

BY: _____

8

# 22

## MEMORANDUM OF AGREEMENT

MEMORANDUM OF AGREEMENT made by and between AMERICAN B.D. COMPANY (herein referred to as "Company" or "Employer") and LOCAL UNION NO. 863, TEAMSTERS, affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA (herein referred to as "Local 863" or "Union")

WHEREAS, the Company and the Union have been parties to a number of collective bargaining agreements over the years covering the Company's helpers, the most recent one expiring April 24, 2011; and

WHEREAS, the Company and the Union have been desirous of amicable negotiating to reach a successor agreement to replace that which expired on April 24, 2011; and

WHEREAS, the Company and the Union met on numerous occasions since March 21, 2011; and negotiated in good faith in an effort to reach a successor agreement; and

WHEREAS, on October 25, 2012, the Company and the Union successfully reached agreement on all outstanding issues;

NOW THEREFORE, the Company and the Union have agreed to the following modifications to the collective bargaining agreement which expired on April 24, 2011:

1)  Modify the <u>WITNESSETH</u> provision by substituting the following for the entire paragraph:

    "THE COMPANY HEREBY AND HEREWITH recognizes the Union as the authorized Collective Bargaining Agent for all employees who are employed as Full-time Helpers at the Company's 25 De Boer Drive, Glen Rock, New Jersey, facility in respect to wages, hours and all other terms and conditions of employment during the entire term of this agreement."

2)  Modify Article 1 (UNION SECURITY) by adding the following as new paragraphs:

    "This Agreement shall be binding upon the parties hereto, their successors, administrators, executors, and assigns.  In the event an Employer's business or license is sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, such operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof.  The Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee, etc., of the business

00219847.1 ]

or license covered by this Agreement. Such notice shall be in writing with copy to the Union not later than forty-eight (48) hours after the signing of the agreement of sale of such Employer's business and/or license. The Employer shall give the Union the name and address of the purchaser, transferee, lessee, assignee, etc. In the event the Employer fails to give notice herein required, and/or fails to require the purchaser, transferee, lessee or assignee to assume the obligations of this Agreement, the Employer shall be liable to the Union and the employees covered for all damages sustained as a result of such failure to give notice, or such failure to acquire assumption of the terms of this Agreement.

Employees will not suffer any loss of seniority, length of service, vacations, holidays, or, as to any other Article or Section of this Agreement, as the result of the sale, transfer, lease, assignment or purchase of the business and/or license."

3) Modify Article 3 (HOLIDAYS) by adding Lincoln's birthday as a paid switch holiday.

4) Modify Article 6 (VACATIONS) by adding the following to Section C:

"Except as hereinafter provided, an employee leaving the employment of the Company shall receive vacation pay, as has accrued to him, at the time of his leaving, based on the proportionate number of weeks that the employee has worked during that contract year. An employee leaving the Company who is retiring and is immediately eligible for a pension shall receive all contractual unused vacation."

5) Modify Article 8 (SICK DAYS) by adding the following as a new Section D.

"All employees on disability or worker's compensation leave are required to contact the office weekly to update progress."

6) Modify Article 11 (WAGES) by substituting the following for this Article:

"A.   The Company shall establish and maintain through the term of this Agreement the following weekly rates of pay:

| 4-25-11 | 4-25-12 | 4-25-13 |
|---------|---------|---------|
| $12.70  | $13.20  | $13.70  |

B.   Notwithstanding the foregoing, the new hire rate shall be $8.00 per hour.

00219847.12

Upon Union attainment, the employee shall receive the top rate in effect.

C.    Effective upon the signing of this Agreement, all current employees who were members of the bargaining unit prior to 4-25-11 shall receive $750.00 as a signing bonus.

D.    Effective upon the signing of this Agreement, all current employees who were hired on or after April 25, 2011, shall receive $500.00 as a signing bonus."

7) Modify Article 13 (GRIEVANCE PROCEDURE AND ARBITRATION) by inserting a 14 work day time limit to file and appeal grievances concerning payroll issues.

8) Modify Article 17 (PENSION FUND) by changing the title of the Article to "Retirement Savings Plan" and substituting the following for this Article:

"A.    As of August 25, 2011, the Employer withdrew from the Local 863 Pension Trust Fund. Concurrent with this withdrawal, the Employer began paying its withdrawal liability attributable to said Fund.

B.    The I.B.T. Local 863 Retirement Savings Plan ("Retirement Plan") is a "defined contribution" pension plan governed by ERISA. In accordance with this Agreement, effective August 25, 2011, the Employer shall make contributions to the Retirement Plan, in the various amounts as set forth in Section H below, for each hour paid, including for sick days, holidays, vacation, and other entitlement days, for each employee covered by this Agreement, not to exceed forty (40) hours per week. The Employer shall commence making contributions for each employee upon his completion of the probationary period, retroactive to his date of hire. If an employee does not complete the probationary period, the employee shall not become a participant in the Retirement Plan and no contributions will be made for such employee.

C.    The Employer shall provide to the Retirement Plan a monthly report of all employees who worked in the prior month, the hours each employee worked, the hours for which contributions are made, the total amount of contribution owed for each employee, and the total amount paid by the Employer for the month. This report, and the payment for the total amount owed, shall be submitted to the Retirement Plan by the 15th day of the month after the end of the month in which the work for which the contributions are owed was performed. In addition, the

Employer shall pay for each employee on the report the sum of Two Dollars ($2.00) for each week during which an employee was paid for any hours, such that if an employee was paid for 40 or less hours in a week, the Employer shall enter that it shall contribute $2.00 for each week for each such employee. The total amount due for this $2.00/week contribution shall be paid either by separate check, combining the $2.00/week for all employees on the report, or that total amount shall be included in the same check as the hourly contributions and the report shall set forth the amount being paid for the normal hourly contributions and the amount submitted for the $2.00/week contribution. Pursuant to the Retirement Plan, this $2.00/week contribution shall be credited to the employee's account, but shall subsequently be placed into an account to be used solely to pay and defray administrative costs incurred by the Retirement Plan. The Employer shall owe no other monies to the Retirement Plan for any administrative costs or expenses.

D.    The Retirement Plan shall have the right to receive, collect, demand, sue, and institute proceedings in any court or other forum or tribunal for the purposes of enforcing payment of any of the contributions required to be made or that are owed under this Agreement. If the Employer is delinquent in the payment of contributions to the Retirement Plan, the delinquent Employer shall be further obligated to pay the Retirement Plan all costs and fees of collection, including but not limited to arbitration or court costs, arbitrator fees, and attorneys' fees, and interest on the amounts due and on costs and fees. Any action arising under, or involving interpretation or application of, or to enforce this Article shall be submitted in the first instance to the permanent arbitrator, Mr. J.J. Pierson, Esq. If he is unable to conduct the arbitration, it shall be submitted to the labor panel at AAA in New Jersey.

E.    The Employer shall continue to pay the sums set forth above to the Retirement Plan, notwithstanding the fact that an employee may be out of work suffering from a job-related injury for a period of three (3) months from the date of the accident.

F.    As of the effective date of this Agreement, the Employer will make the following contributions into the Retirement Plan as provided in Section B above:

| 4-25-11 | 4-25-12 | 4-25-13 |
|---------|---------|---------|
| $0.25   | $0.50   | $0.50   |

G.    The Employer shall make a one-time lump sum contribution into the Retirement Plan for all helpers who, on the effective date of this Agreement, had at least twenty (20) but less than thirty (30) years of service in an amount equal to sixty-five dollars ($65.00) for each month of service between their actual years of service and thirty years. For example, an employee with twenty-five (25) years of service on the effective date of this Agreement would receive a $3,900.00 lump sum payment into the Retirement Plan [5 years x 12 months x $65.00].

H.    The Employer shall make a one-time lump sum contribution into the Retirement Plan for all helpers who, on the effective date of this Agreement, had at least three (3) but less than five (5) years of service in an amount equal to sixty-five dollars ($65.00) for each month of service. For example, an employee with four (4) years of service on the effective date of this Agreement would receive a $3,120.00 lump sum payment into the Retirement Plan [4 years x 12 months x $65.00].

I.    The Employer agrees that, after the termination of this Agreement and while the parties are negotiating a new contract or an extension of this contract, and further provided that the Union does not strike or the parties are not at impasse, the Employer will continue to make contributions to the Retirement Plan at the applicable rates in this Article pending consummation of a new contract."

9)  Add a new article with the title "Health Insurance":

"Employees shall be entitled to participate in the Company's medical and health insurance programs and plans which are offered to non-represented employees on the same terms and conditions, including employee contributions."

10)  Add a side letter that one (1) van driver will be added to this bargaining unit, with the Company retaining the discretion to assign work to that individual as a helper or as a van driver, provided that once each contract year, all employees may bid for the van driver position, provided further that to be eligible an employee must possess a valid driver's license and be approved by the Company, such approval not to be unreasonably withheld. Also employees may take vacation in daily increments from January through April with Company approval, which shall not unreasonably be withheld.

00219847.15

11) Modify the term of the Agreement in Article 21 to commence on April 25, 2011 and end on April 24, 2014.

IN WITNESS WHEREOF, the undersigned have executed this MEMORANDUM OF AGREEMENT on the date set forth opposite their respective names.

DATE: 11 15 12

AMERICAN B.D. COMPANY

BY: _____

DATE: 11 19 12

LOCAL UNION NO. 863, affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA

BY: _____

_____

00219847.16

**23**

DRIVERS AND WAREHOUSEMEN

## AGREEMENT

### between

## AMERICAN B.D. COMPANY

### and

## LOCAL 863, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA

### Effective: April 25, 2011

### To: April 24, 2014

1

## INDEX

| ARTICLE | PAGE |
|---|---|
| WITNESSETH | 4 |
| 1. UNION SECURITY | 4 |
| 2. PICKET LINE | 6 |
| 3. HOLIDAYS | 7 |
| 4. WORK HOURS | 8 |
| 5. OVERTIME | 9 |
| 6. VACATIONS | 10 |
| 7. DEATH LEAVE | 11 |
| 8. SICK DAYS | 11 |
| 9. JURY DUTY | 12 |
| 10. UNIFORMS | 12 |
| 11. WAGES | 13 |
| 12. WELFARE | 14 |
| 13. CHECK-OFF SYSTEM FOR DUES | 16 |
| 14. GRIEVANCE PROCEDURE AND ARBITRATION | 16 |

| **ARTICLE** | **PAGE** |
|---|---|
| 15. SENIORITY | 17 |
| 16. LAYOFF AND RECALL | 18 |
| 17. DISCHARGE OR SUSPENSION | 19 |
| 18. SEVERANCE PAY | 20 |
| 19. DELIVERIES | 20 |
| 20. BONUS LOAD | 21 |
| 21. RETIREMENT SAVINGS PLAN | 21 |
| 22. D.O.T. DRUG TESTING | 23 |
| 23. LEAVE OF ABSENCE | 24 |
| 24. MANAGEMENT RIGHTS CLAUSE | 24 |
| 25. CONTINUATION OF AGREEMENT | 24 |
| 26. TERM OF AGREEMENT | 24 |
| SIDE LETTER | 26 |

| **ARTICLE** | **PAGE** |
|---|---|
| 15. SENIORITY | 17 |
| 16. LAYOFF AND RECALL | 18 |
| 17. DISCHARGE OR SUSPENSION | 19 |
| 18. SEVERANCE PAY | 20 |
| 19. DELIVERIES | 20 |
| 20. BONUS LOAD | 21 |
| 21. RETIREMENT SAVINGS PLAN | 21 |
| 22. D.O.T. DRUG TESTING | 23 |
| 23. LEAVE OF ABSENCE | 24 |
| 24. MANAGEMENT RIGHTS CLAUSE | 24 |
| 25. CONTINUATION OF AGREEMENT | 24 |
| 26. TERM OF AGREEMENT | 24 |
| SIDE LETTER | 26 |

| **ARTICLE** | **PAGE** |
|---|---|

| 15. SENIORITY | 17 |
| 16. LAYOFF AND RECALL | 18 |
| 17. DISCHARGE OR SUSPENSION | 19 |
| 18. SEVERANCE PAY | 20 |
| 19. DELIVERIES | 20 |
| 20. BONUS LOAD | 21 |
| 21. RETIREMENT SAVINGS PLAN | 21 |
| 22. D.O.T. DRUG TESTING | 23 |
| 23. LEAVE OF ABSENCE | 24 |
| 24. MANAGEMENT RIGHTS CLAUSE | 24 |
| 25. CONTINUATION OF AGREEMENT | 24 |
| 26. TERM OF AGREEMENT | 24 |
| SIDE LETTER | 26 |

LOCAL 863
UNION CONTRACT AGREEMENT
<u>2011 - 2014</u>

AGREEMENT, by and between AMERICAN B.D. COMPANY (herein referred to as the "Company" or "Employer") and LOCAL UNION NO. 863, TEAMSTERS, affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA (herein referred to as the "Union")

<u>WITNESSETH:</u>

THE COMPANY HEREBY AND HEREWITH recognizes the Union as the authorized Collective Bargaining Agent for all employees who are employed as Drivers and Warehousemen at the Company's 25 De Boer Drive, Glen Rock, New Jersey, facility in respect to wages, hours and all other terms and conditions of employment during the entire term of this agreement.

THIS AGREEMENT shall apply to all present and future employees employed as Drivers and Warehousemen by the Company during the term of this Agreement.

1.    <u>UNION SECURITY</u>

It shall be a condition of employment that all employees of the Employer covered by this Agreement and who are members of the Union in good standing on the effective date of this Agreement, or the execution date, whichever is later, shall after three hundred twenty (320) straight time working hours following the effective date or execution date, whichever is later, of this Agreement become and remain members in good standing in the Union. It shall also be a condition of employment that all employees covered by this Agreement, and hired on or after its effective date or execution date, whichever is later, shall after three hundred twenty (320) straight time working hours following the beginning of such employment become and remain members in good standing, in the Union.

Notwithstanding the foregoing, the Company may hire temporary seasonal employees for up to four hundred eighty (480) hours from October to mid-January. In addition, the Company may hire temporary employees for how many hours may be necessary to replace regular employees absent due to disability or workers compensation leave on a one-to-one basis (i.e., one temporary driver to replace one regular driver absent because of disability or workers compensation). Any employee hired between October and mid-January will be designated by the Company as (a) a temporary seasonal employee; (b) a temporary replacement for a regular employee absent because of disability or workers compensation; or (c) a regular employee, and promptly inform the Union of such designation.

4

The foregoing temporary seasonal employees shall be subject to a Local 863 dues in an amount equivalent to the amount of monthly dues based upon the rate formula in effect. The Company shall have the obligation to inform the Union of any and all temporary seasonal employees utilized by the Company and to facilitate the Union's right to provide a dues check-off authorization form to the temporary seasonal employees, which shall be submitted to the Company within 31 days of hire, to be applied retroactively to date of hire. The Union agrees to waive an initiation fee. Local 863 will provide the Company with authorization forms signed by the temporary seasonal employees. Said deductions will be made in the first payroll week each and every month. Each month, the Company agrees to forward the amount due to the Union, together with a list setting forth the name of each temporary seasonal employee and the amount that is being remitted on their behalf.

Pursuant to the foregoing, the temporary seasonal employees shall not be permitted to continue to work unless they are paying the aforementioned dues in accordance with applicable law. The Union and Company agree that the terms and conditions of employment of the temporary seasonal employees shall be solely those in this Agreement. The employees shall have their rights under Sections 7 and 8 of the NLRA.

The failure of any person to become a member of the Union at the required time shall obligate the Employer, upon written notice from the Union to such effect and to the further effect that union membership was available to such person on the same terms and conditions generally available to other members to forthwith discharge such person. Any employee who fails to meet the requirements of Article 1 should not be retained in Company's Employ, provided that the Union notifies both the Company and the employee in writing of such default, and said employee fails to remedy same within ten (10) days after receipt of said written notice.

It is agreed that there shall be four (4) Union men in the warehouse at all times. Further, it is agreed that no supervisor shall perform any work which is normally done by drivers and warehousemen covered by this agreement unless unforeseen absenteeism requires it.

In the event of any change in the law during the term of this Agreement, the Employer agrees that the Union will be entitled to receive the maximum Union Security which may be lawfully permissible.

No provisions of this Article shall apply in any state to the extent that it may be prohibited by State law. If under applicable State law additional requirements must be met before any such provision may become effective, such additional requirements shall first be met.

5

If any provision of this Article is invalid under the law of any State wherein this Agreement is executed, such provision shall be modified in compliance with the requirements of State law or shall be renegotiated for the purpose of adequate replacements. If such negotiations shall not result in a mutually satisfactory Agreement, the Union shall be permitted all legal or economic recourse.

This Agreement shall be binding upon the parties hereto, their successors, administrators, executors, and assigns. In the event an Employer's business or license is sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, such operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof. The Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee, etc., of the business or license covered by this Agreement. Such notice shall be in writing with copy to the Union not later than forty-eight (48) hours after the signing of the agreement of sale of such Employer's business and/or license. The Employer shall give the Union the name and address of the purchaser, transferee, lessee, assignee, etc. In the event the Employer fails to give notice herein required, and/or fails to require the purchaser, transferee, lessee or assignee to assume the obligations of this Agreement, the Employer shall be liable to the Union and the employees covered for all damages sustained as a result of such failure to give notice, or such failure to acquire assumption of the terms of this Agreement Employees will not suffer any loss of seniority, length of service, vacations, holidays, or, as to any other Article or Section of this Agreement, as the result of the sale, transfer, lease, assignment or purchase of the business and/or license.

2.   PICKET LINE

A. It shall not be a violation of this Agreement and it shall not be a cause for discharge or basis of any disciplinary action (except that any damage to property or person of Company shall be cause for immediate discharge) in the event an employee refuses to enter upon any property involved in a Lawful primary labor dispute, or refuses to go through or work behind any lawful Primary Picket Line, including lawful Primary Picket Line of Union's party to this Agreement and including lawful primary Picket Lines at the Employer's places of business.

B. There shall be no strikes on the part of the Union or the Employees during the term of this Agreement. A violation of this paragraph will constitute, at Company's option, a basis for termination of this Agreement.

C. There shall be no lockouts on the part of the Company during the term of this Agreement.

6

3.   <u>HOLIDAYS</u>

The Following switch and non-switch holidays shall be observed and paid for at the straight time daily rate of each employee's current shift classification, even though no work is performed on said holiday.

\* Non-switch Holidays
\*\* Switch Holidays – Switch Holidays to remain Switch Days

| | |
|---|---|
| \* New Year's Day | \*\* Primary Election |
| \* President's Day | \*\* Lincoln's Birthday |
| \* Good Friday | \*\* Personal Day |
| \* Memorial Day | \*\* Election Day |
| \* Independence Day | \*\* Veteran's Day |
| \* Labor Day | |
| \* Columbus Day | |
| \* Thanksgiving Day | |
| \* Day After Thanksgiving | |
| \* Christmas Day | |

A. In order to be eligible for payment for Holidays not worked as hereinabove provided, a covered employee must work the scheduled working day before and the day after the Holiday unless excused by the Company, or unless the employee is prevented from working the day after the Holiday due to an act of God.

With respect to any employee whose regular work week is four (4) days, when any holiday falls on a Monday the employer shall have three (3) options as follows:

(1) Substitute the following Tuesday for the holiday.

(2) If work is performed on the Tuesday, pay an additional ten (10) hours at the regular straight-time rate to each qualifying employee, or

(3) Substitute a personal day off for each qualifying employee.

Holidays that fall on a Sunday shall be observed on Monday and the three (3) option rule stated above shall apply. However, if option three (3) is exercised, the substitute day shall be a sick day.

B. When an employee is required to work on the above-named non-switch Holiday, he shall be paid at the rate of double time, plus the day's pay. When an employee is required to work on a switch Holiday, he shall be paid at the straight time rate, but shall receive another day off with straight time pay with the Company's approval, except for the personal day, which

7

will require no notice to the Employer. There shall, however, be no accumulation of switch Holidays from one agreement year to the next, but all accumulated switch days shall be paid for at the end of each contractual year. Switch Holidays are not to be taken as sick days and Personal day may not be taken in conjunction with another holiday unless previously approved by shift supervisor.

C. Upon completion of work on Christmas Eve and New Year's Eve, an employee may leave work, but shall be entitled to be paid at the rate applicable to their job classification for that shift.

D. On Christmas Eve and New Year's Eve, drivers shall have the option to return to yard by 4:00 p.m.

4.   WORK HOURS

A. A work week for driver-warehousemen shall consist of two (2) shifts. Either one consisting of 10 hours per day, 40 hours per week, Tuesday through Friday guaranteed, or one consisting of 8 hours per day, 40 hours per week, Monday through Friday, guaranteed. The starting time for each shift will be 8 A.M. to 9 A.M. There may be earlier starting time necessitated for long distance deliveries, warehouse pick-ups and truck loading. In the event not enough 4x10 driver/warehousemen accept Company's offer to work Mondays, the Company may thereupon require the least senior men to perform Monday work.

B. The choice of shift will be bid on a seniority basis for a one year period from contract date, and the 5x8 hour shift will be limited to 15 men. The 5x8 shift numbers will be determined on a yearly basis by the Employer.

C. Bid Routes to be capped at 15.

D. A work week for night warehousemen shall consist of ten (10) hours per day, forty (40) hours per week, Monday through Thursday, guaranteed. The night warehousemen's shift shall be from 7:00 P.M. to 5:30 A.M. A work week for day warehouse work shall consist of 8 hours per day, 40 hours per week Monday through Friday, guaranteed, and beginning at 8:00 A.M. A work week for mid shift warehouse work shall consist of 10 hours per day, 40 hours per week, Monday through Thursday, guaranteed and beginning at 2:00 pm.

E. There shall be a thirty (30) minute lunch period for each day for the drivers-warehousemen's shifts defined above. Such lunch period will not be paid by the company.

F. A driver may turn around after 12 ½ hours on his daily route.

G. Each driver and warehouseman shall be granted two designated fifteen (15) minute breaks each day.

8

H. Driver/Warehousemen will have the ability to bid by seniority for fifteen (15) delivery bid routes a minimum of one (1) time per year. The company shall have the exclusive right to select the Tuesday through Friday routes subject to bid. Any Monday routes will be assigned only by the Company. Night warehousemen will be allowed to bid by seniority for six (6) bid positions for a period of one (1) year from contract date.

5. OVERTIME

A. Overtime at the rate of time and one-half the regular driver-warehousemen rate, regardless of shift classification, shall be paid for any work performed by driver-warehousemen in excess of their daily shift hours.

B. Overtime at the rate of time and one-half the regular hourly rate shall be paid for any work performed by night warehousemen after ten (10) hours and at double time in excess of twelve (12) hours in any one work day. The Company will first offer to night warehousemen the opportunity to perform warehouse work on Sunday. If not enough night warehousemen accept the Company's offer of Sunday work, or if additional men are needed, the Company shall offer such work to other shifts based on seniority.

C. The Company may offer to warehousemen, based on seniority, the opportunity to perform work on Saturdays. In the event not enough warehousemen accept Company's offer to work overtime, Company may thereupon compel the least senior driver/warehouseman to perform Saturday work. In the event of circumstances beyond Company's control, such overtime offer may be cancelled upon 24 hours notice.

All bids for shutdown, Saturday, Sunday or Monday holiday work will be posted Wednesday afternoon and will be finalized by 7:30am on Friday.

If a holiday falls Tuesday - Friday, the company will attempt to post bid within 48 hours prior to start of holiday week.

If an employee signs a bid sheet for shutdown, Saturday, Sunday, holiday work or a compelled day and fails to report on such day, the employee will be charged for an absence.

Such absence will be excused upon written proof or documentation to support the absence.

D. If any employee performs any work on Sunday, the Employer shall pay for such work at the rate of double time and one-half the regular hourly rate of pay.

E. Overtime performed by the 4 day x 10 hour shift class on any Monday, except a Holiday, will be paid at the rate of 1 ½ time times their hourly pay rate. Any other overtime is one and one-half times the 40 hour rate.

9

F. The Company has the right to require any employee to work at least one (1) hour overtime in warehouse if needed as long as two (2) hours verbal notice is given by Company.

G. Yard switcher work for Saturdays will be bid by seniority.

6.   <u>VACATIONS</u>

A. An employee's accrued time during first year at the time of the summer closing is as follows:

| LENGTH OF TIME ON EMPLOYER'S PAYROLL | VACATION ALLOWANCE |
|---|---|
| One (1) Year | 2 weeks |
| Five (5) Years | 3 weeks |
| Twelve (12) Years | 4 weeks |
| Twenty (20) Years | 5 weeks |

B. Company will close for two weeks at the same time that the majority of the wholesalers close. Employees who are entitled to a vacation shall take their vacation during this period. If the Company requests the employee to work during this two-week vacation period, the employee shall be entitled to his vacation period at another time that is mutually agreed to by both Company and Employee. There shall, however, be no accumulation of vacation time from one Agreement year to the next, but all accumulated vacation time shall be paid for at the end of each contractual year at the rate of pay in effect during the contractual year the vacation time is accumulated. Further, vacation time shall not be utilized as sick days unless mutually agreed upon by both Company and Employee. The Company will post a vacation schedule. Employees may take vacation in days, mutually agreed upon by Employer and Employee. The Company will post a vacation schedule each January. All requests for vacation must be submitted by March 17 or the Friday preceding if on a weekend.

C. An employee's vacation allowance will be based upon the length of time on the Company's payroll at the time of the summer closing. An employee with less than one year's service shall receive a vacation allowance on a pro rate basis computed on the length of service with Company. In the event that an employee either voluntarily resigns from the company due to gross misconduct or is discharged for gross misconduct, the employee shall receive only those vacation days that have accrued since the anniversary date of this contract. Except as hereinafter provided, an employee leaving the employment of the Company shall receive vacation pay, as has accrued to him at the time of his leaving, based on the proportionate number of weeks that the employee has worked during that contract year. An employee

leaving the Company who is retiring and is immediately eligible for a pension shall receive all contractual unused vacation.

Gross Misconduct - defined from those actions listed in Article 17(e) – use of narcotics, drinking any alcoholic beverages on the job, theft or conviction of a felony, being under the influence of narcotics, drugs or any alcoholic beverage, insubordination, assault, battery, defacing of company property, theft of company property, the failure of a driver to notify the employer of the fact that he is on the revoked list under the State Motor Vehicle laws, and the carrying by the employee of unauthorized passengers in a Company-owned vehicle.

7.   DEATH LEAVE

In the event of a death in an immediate family of any employee, the employee may have off with pay at his regular rate of pay per day, three days immediately following the day of death, provided these are regularly scheduled working days, and provided Company is notified of the death in the family so that Company can properly schedule or assign the employee's work. The employee shall furnish proof of death and proof of relationship if requested by Company. In the event if any of the aforesaid three days are not regularly scheduled working days, then the employee shall be paid for only those of the above three days which are regularly scheduled working days. However, in the event that the three day period included only one or two regularly scheduled working days, but the funeral occurs on a regular scheduled working day thereafter, the employee shall be entitled to take off an additional working day with pay only for the purpose of attending the funeral. "Immediate family" means the employee's parents, spouse, children, brothers, sisters, mother-in-law and father-in-law. In addition, the employee shall receive on day off with pay at his regular rate of pay, which day shall be the day of the funeral for the employee's current spouse's brothers and sisters. The employee shall receive two (2) days off with pay at his regular rate of pay for grandparents.

8.   SICK DAYS

A. All employees covered by this Agreement shall be entitled to receive a total of seven (7) sick days for each year of the term of this Agreement. There shall be no accumulation of sick days from one Agreement year to the next and all accumulated sick days shall be paid for at the end of the contractual year. In the event that an employee takes three (3) or more consecutive sick days, he should present Company with a doctor's letter establishing the validity of his illness or injury, if Company so requests. If an employee fails to present to Company the doctor's letter, employee shall not be entitled to compensation for the sick days taken in excess of two (2) sick days. Sick days shall be pro-rated from the date that the

employee is accepted into the Union. In the event that an employee either voluntarily resigns from the company due to gross misconduct or is discharged for gross misconduct, the employee shall receive only those sick days that have accrued since the anniversary date of this contract.

Gross Misconduct - defined from those actions listed in Article 17(e) - use of narcotics, drinking any alcoholic beverages on the job, theft or conviction of a felony, being under the influence of narcotics, drugs or any alcoholic beverage, insubordination, assault, battery, defacing of company property, theft of company property, the failure of a driver to notify the employer of the fact that he is on the revoked list under the State Motor Vehicle laws, and the carrying by the employee of unauthorized passengers in a Company-owned vehicle.

B. With respect to both day driver/warehousemen and night warehousemen, on the day the employee is excused because of illness, it is the employees responsibility to notify the Company by 5:00 P.M. as to his intentions of attendance on his next scheduled shift. In the event the employee does not notify the Company of his intentions, the Company is not obligated to provide work for the employee on his next scheduled shift.

C. The employee must, for all absences, except absent for an emergency that prevents his/her doing so, should notify the Company of his/her absence, a minimum of one (1) hour before the normal starting time.

D. All employees on disability or worker's compensation leave are required to contact the office weekly to update progress.

9.    JURY DUTY

Employees serving on jury duty will be compensated by the Company for the difference between the money he receives for jury duty and his basic daily straight time pay, calculated at his hourly rate. This shall apply only to time lost by the employee during the regularly scheduled work week. Said payments, however shall not be made for any period exceeding more than two (2) weeks in any one (1) calendar year. Jury duty will only be approved by the company upon receipt of a jury duty service verification issued by the Court.

10.    UNIFORMS

The Employer shall supply the employees with two (2) trousers, two (2) shirts and one (1) jacket or two (2) sweatshirts in May and October at no cost to employee. The drivers-

12

warehousemen, however, have the option of receiving appropriate rain gear once a year in lieu of a jacket. All employees agree to wear all the provided uniforms during work hours and the failure to do so shall be the basis for suspension as defined in Article 17 of this agreement.

11.  WAGES

The Company shall establish and maintain through the term of this Agreement the following hourly rates of pay for the following job classifications:

A. For employees hired on or after April 25, 2011:

| Classification | Start Rate | 1st Anniv. | 2nd Anniv. |
|---|---|---|---|
| Driver | $16.00 | $16.25 | $16.50 |
| Warehouse | $14.00 | $14.25 | $14.50 |

B. For employees hired before April 25, 2011, hourly wage increases:

| Classification | 4-25-11 | 4-25-12 | 4-25-13 |
|---|---|---|---|
| Driver | 0 | 50 cents | 50 cents |
| Day warehouse | 0 | 50 cents | 50 cents |
| Mid-shift warehouse | 0 | 50 cents | 50 cents |
| Nite-shift warehouse | 0 | 50 cents | 50 cents |

C. Night-shift warehouse shall receive a night bonus of $35.00 per week. Midshift bonus to be $10.00.

D. Effective upon the signing of this agreement, all current employees who were hired prior to 4-25-11 shall receive $1,250.00 as a signing bonus:

E. Effective upon the signing of this agreement, all current employees who were hired on or after 4-25-11 shall receive $500.00 as a signing bonus:

13

F.  Effective 4-25-12, all drivers on the lower tier with at least three (3) years of service shall be brought up to the top tier. Effective 4-25-13, all drivers on the lower tier with at least three (3) years of service shall be brought up to the top tier.

G.  Effective 4-25-12, all nite-shift warehousemen with at least three (3) years of service shall be brought up to $19.00/hour. Effective 4-25-13, all nite-shift warehousemen with at least three (3) years of service shall be brought up to $19.00/hour.

H.  Employees hired on or after 4-25-11 who transfer between driver and warehouse classification will be paid according to their classification taking into consideration their respective seniority. (For example, a driver with one year of seniority, being paid $16.25 per hour who transfers to a warehouse position would thereafter be paid $14.25 per hour.) Employees hired as drivers prior to 4-25-11 who transfer to the warehouse classification will continue to receive the drivers' hourly wage rate. Employees hired as warehousemen prior to 4-25-11 who transfer to the driver classification will be paid according to the driver classification.

12.  <u>WELFARE</u>

For the objects and purposes set forth in the Local 863 agreement and Declaration of Trust, executed between certain Employers and the Union, and any amendments or supplements thereto, all of which are incorporated herein by reference, the Employer shall pay to the Local 863 Welfare Fund the sum of Three Hundred Dollars ($300.00) per week for each full-time employee covered by this Agreement effective April 1, 2012.. The Employer will continue to pay the aforesaid sum of Three Hundred Dollars ($300.00) per week for each employee notwithstanding the fact that an employee may be out of work due to illness or injury. The said contributions shall continue on behalf of any sick or injured employee up to a maximum of six months.

All newly hired employees shall participate in the Welfare Plan (Plan 2) and payment shall be from the first day of employment.

Plan 2 rates: Effective 4/1/12 . . . . . . . . . . . . . . . . . . $250.00/week

Employees hired on or after April 24, 2006 shall go to 1st Tier Welfare Plan upon completion of three (3) full years from date of hire.

All other contractual language will conform, to the plan.

14

The Trustees of the Welfare Fund shall have the right to receive, collect, demand, sue and institute proceedings in any court or other tribunal for the purpose of enforcing payment of any of the contributions required to be made under the Welfare Fund, the delinquent Employer shall be further obligated to pay the Welfare Fund all collection costs, court costs, attorney's fees and interest and any other expenses incurred by the Trustees in enforcing or attempting to enforce payment of any of the contributions required to be made under this Agreement.

Steady employees who have steady and continuous service and while in the employ of an Employer making contributions to the Fund shall be eligible to participate in the benefits provided for and purchased by the Fund after they have been so employed for the period of time specified by the Welfare Plan. If an employee qualified to participate in the benefits provided for and purchased by the Fund shall cease to qualify due to lack of Employer contributions or for any other reason whatsoever, his and his dependents' rights to share in any benefits whatsoever, purchased and provided for by the Welfare Fund shall forthwith cease and terminate. Whatever reasonable expenses are necessary, in the discretion of the Trustees, to maintain and administer the Fund shall be paid out of the Fund. No employees shall have the option to receive, instead of the benefits provided for by the said Welfare Fund, any part of the amounts contributed by the Employer to the Fund, and no Employee shall have the right to assign any benefits to which he or his dependents may be entitled under any of the Agreements and Declarations of the Fund or to receive a cash consideration in lieu of the benefits established by the Fund either upon termination of the Fund created or through severance of his employment or likewise.

Title to all monies paid in the said Fund shall be vested in and remain exclusively in the Trustees and it is the intention of the parties hereto that said Fund shall constitute an irrevocable Trust and that no benefits of monies payable from this Fund shall be subject in any manner to alienation, sale, transfer, assignment, pledge, encumbrance or change and any attempt to do so shall be void.

The monies paid into said Fund shall not constitute or be deemed wages to the individual Employee nor shall said monies in any manner be liable for or subject to the debts, contracts, liabilities or torts of any of the Employees or parties entitled to such money, that is, any of the benefits provided for under the terms of this Agreement.

The Employer agrees that if the cost of the Health and Welfare insurance Coverage is increased, the Employer shall bear the increased coverage cost, upon notice by the Union of such increase, by remitting sufficient monies to the Fund, for said cost in addition to the regular contributions for each employee.

The Employer shall continue to make contributions on behalf of those employees who retire after the age of sixty-two (62) with a normal pension from the Local 863 Pension Fund. The contributions shall continue until the retiree reaches the age of sixty-five (65) or becomes eligible for Medicare, whichever, comes first.

15

If the contributions to the Welfare Fund increase over the term of this Agreement less than Two Dollars ($2.00), the difference shall be added on April 24, 2014 to the contribution rate of the Retirement Savings Plan set forth in Article 21, Section B, in the following manner:

-retroactive to 4/25/11 at 25% of total savings for hours worked in 2011
-retroactive to 4/25/12 at 50% of total savings for hours worked in 2012
-retroactive to 4/25/13 at 100% of total savings for hours worked in 2013

(e.g., if the Welfare Fund contributions increase $1.00 over the term of this Agreement, an additional $1.00 will be contributed to the Retirement Savings Plan, as follows:

-effective 4/25/11, the contribution rate would be $.75 [$.50 + 25% of $1.00], not to exceed 40 hours per week
-effective 4/25/12. the contribution rate would be $1.50 [$1.00 + 50% of $1.00], not to exceed 40 hours per week
-effective 4/25/13, the contribution rate would be $2.00 [$1.00 + 100% of $1.00], not to exceed 40 hours per week)

13.   CHECK-OFF SYSTEM FOR DUES

The Company agrees to deduct Union dues each and every month from the wages of each employee subject to this Agreement pursuant to a check-off authorization card by such employee to be delivered to the Company of the Union. The Union dues shall be the amount required to maintain the employee in good standing as a member of the Union. In the event there is a change in the amount necessary to maintain the employee in good standing in the Union, the Union will notify the Company forthwith of the correct amount and the Company herewith agrees to deduct the same.

14.   GRIEVANCE PROCEDURE AND ARBITRATION

Any dispute, difference or grievance regarding the interpretation, application of the provisions of this Agreement, shall be settled by conference with the duly authorized officials of the Union and a representative of the Company. All grievances concerning payroll issues must be filed and/or appealed within fourteen (14) workdays.

In the event that such dispute, difference or grievance shall not have been satisfactorily adjusted between the parties in the manner provided above, then such dispute, difference or grievance regarding the interpretation, or application of the provisions of this Agreement may be submitted to Arbitration at the request of either party to the New Jersey State Board of Mediation who shall designate an Arbitrator. The Parties further agree that the expense of the Arbitrator shall be borne equally among them.

16

The Arbitrator shall decide cases in issue solely upon the provisions of this Agreement, and shall have no power to add to, delete from, modify or alter the provisions of this Agreement.

15.   SENIORITY

The following rules shall govern the exercise of Seniority rights by the employee of the Company and the members of the Local Union No. 863.

A.   Definition of Seniority

1.   There shall be two (2) payroll seniority lists as follows: (1) all existing employees (no matter what job family he has been hired into) shall be deemed to have acquired seniority from his earliest date of hire in the Company: (2) all newly hired employees shall accumulate seniority from the date of hire in the job family that they are hired into. For the purpose of this Article, there shall be deemed to be two (2) job families, comprising of driver/warehousemen and night warehousemen. Each job family shall have their own separate seniority list.

2.   Terminal Seniority is defined as the Seniority which an employee acquires from his earliest date of hire at a specific terminal or branch of the Company.

B.   Opening New Branches:

1.   When a new branch or terminal is opened at any location, the Company shall offer to all employees covered by this Agreement the opportunity to transfer to the new branch or terminal in order of their company or payroll Seniority.

2.   The transferred employee shall, for a period of thirty (30) days following the transfer, have an unqualified right to return to their old terminal and carry with them their Seniority at that old terminal.

C.   Closing of Branches:

1.   When a branch or terminal is closed and the work of the branch or terminal is eliminated, an employee who was formerly employed at another branch or terminal shall have the right to transfer back and exercise his seniority based on the date of hire at the branch or terminal into which he is transferring.

2. When a branch or terminal is closed and the work of the branch or terminal is transferred to another branch or terminal, an employee employed at the closed-down branch or terminal shall have the right to transfer to the branch or terminal into which the work was transferred and to exercise his seniority on a company or payroll basis.

D.    Merger:

When two or more companies merge their operations, then the employees of the respective companies shall all be placed on one seniority roster in the order of the earliest date of hire of each of the employees with their respective Employer.

E.    Acquisition or Purchase:

When one company acquires or purchases controls of the business of another company, then the employees of the company so acquired or purchased shall be placed at the bottom of the acquiring or purchasing company's seniority roster in the order of their payroll of company seniority with the former company.

F.    Disputes Procedure:

If a dispute arises concerning the interpretation or application of the foregoing provisions, dealing with the Seniority, then the subject matter of such dispute may be taken up by the aggrieved party under the grievance arbitration procedure as provided herein.


16.    LAYOFF AND RECALL

A.    When it becomes necessary to reduce the working force, the last man on the appropriate seniority list should be laid off first and when the force is again increased, the men are to be returned to work in the reverse order in which they were laid off.

B.    In the event of a recall, the laid-off employee shall be given notice of recall by telegram, registered or certified mail, sent to the address last given the Employer by the Employee.  Within forty-eight (48) hours after tender of delivery at such address of the Employer's notice, the employee must notify the Employer by telegram, registered or certified mail, of his intent to return to work and must actually report to work within five (5) calendar days.  In the event the employee fails to comply with the above provisions, he shall lose all seniority rights under this Agreement and shall be considered as a voluntary quit.  After one hundred twenty (120) days from the date of layoff, the employee is considered to have been dropped from the seniority list.  At that time, he loses all seniority rights and the Employer is under no obligation to recall him.

18

17.   DISCHARGE OR SUSPENSION

The Employer shall not discharge nor suspend any employee without just cause. In all cases involving the discharge or suspension of any employee, the Company must immediately notify the employee in writing of his discharge or suspension and the reason therefore. Such written notice shall also be given to the shop steward, and a copy mailed to the Local Union Office, within one (1) working day from the time of the discharge or suspension.

A.     With respect to all discharges or suspensions (other than immediate discharges as defined in paragraph 17 (e) below, the employee must have received from the Company at least two (2) warning notices within the previous ninety (90) working days, which notices need not necessarily be for the same offense. All discharges or suspensions under this paragraph shall be subject to the grievance procedures as defined by this Agreement.

B.     Any employee discharged must be paid in full for all wages owed him by the Employer, including earned vacation pay, if any, within five (5) days from the date of discharge.

C.     A discharged or suspended employee must advise his Local Union in writing, within two (2) working days after receiving notification of such action against him, of his desire to appeal the discharge or suspension. Notice of appeal from discharge or suspension must be made to the Employer in writing within five (5) days from the date of discharge or suspension and/or return to his home terminal, whichever is later.

D.     Should it be proven that an injustice has been done to a discharged or suspended employee, he shall be fully reinstated in his position and compensated at his usual rate of pay for lost work opportunity. If the Union and the Employer are unable to agree as to the settlement of the case, then it may be referred to the grievance machinery as set forth in paragraph 14 within an agreed period of time between Employer and the Union.

E.     Just cause of immediate discharge is hereby defined as a violation of the contract, violation of Company rules, failure to meet work standards, use of narcotics, drinking any alcoholic beverages on the job, theft or conviction of a felony, being under the influence of narcotics, drugs or any alcoholic beverage, on or in company property or that any of its customers, insubordination, assault, battery, defacing of company property, theft of time, unauthorized or excessive absenteeism, patterned absenteeism, misconduct, proven negligence in the use of company's equipment and property, the failure of a driver to notify the Employer of the fact that he is on the revoked list under State Motor Vehicle laws, and/or the carrying by the Employee of unauthorized passengers in a Company-owned vehicle. Unauthorized or excessive absenteeism will be construed to be:

19

10th day, verbal notice, 11th day, written notice, 12th day, one (1) day suspension without pay; and 13th day, discharge. Any disability must be filed and collected from State Disability Insurance, otherwise, any absence will be chargeable days.

F.      Drivers will be required to use caution and exercise proper judgment in the operation of their vehicle and to avoid accidents and excessive unreported violations at all times. A continuous series of accidents and/or excessive unreported violations, traceable directly to negligence shall be just cause for dismissal.

G.      Where damage or lose of goods occurs through negligence of a driver or warehouseman, he shall be responsible for the same. Breakage, unavoidable or not inconsistent with normal and usual careful operation by an employee, will not be chargeable.

H.      Drivers assigned Company equipment are responsible for them. Any loss of or damage to Company equipment, due to a driver's/warehousemen's negligence, will be cause for the driver to pay for the replacement of said equipment. The employee shall have the option of utilizing either a Pager or Telephone to be supplied by the Company.

I.      All drivers are required to call in at their specified times and are responsible for ascertaining the correct count on delivery. Delivering properly addressed invoices to the wrong account will also be cause for disciplinary action.

18.    SEVERANCE PAY

It is agreed that, should the Employer discontinue its operations and sever the employees from its payroll, the Employer will negotiate in good faith with the Union at that time the question of severance pay as it may then be required to do under the Federal or State laws then in force and effect.

19.    DELIVERIES

A.      The Company agrees that deliveries to customer's cellars and attics shall be required of the drivers only when absolutely required by the customer.

B.      Upon a driver's written complaint stating a hazardous condition existing at a particular delivery, and after Employers inspection and concurrence of such condition existing, such attic or cellar delivery will not be required. Shop steward to accompany the Employer for inspection.

C.     It is mutually agreed that the Company may subcontract tractor trailer work provided all the Company's regular drivers are working.  The Company will not replace laid off or terminated drivers with subcontractors.

D.     In the event of absenteeism of the Company's regular drivers, the Company can employ from the labor force available.

E.     Drivers will not be required to pick up any cash payments.

F.     The Employer shall provide one (1) load bar to each driver.

G.     Most senior class A driver who is not signed to a bid route will receive first consideration for any trailer deliveries to accounts.

H.     All new purchased trucks are to be equipped with A/C.

20.   BONUS LOAD

A.     Drivers shall be paid additional salary compensation for bonus loads under the following schedule, unless not delivered due to no fault of driver.

| # of Cases | Amount |
|------------|--------|
| 300 | $20.00 |
| 325 | $22.50 |
| 350 | $25.00 |
| 375 | $27.50 |
| 400 | $30.00 |
| 425 | $32.50 |
| 450 | $35.00 |

*Club deliveries shall continue as per contractual schedule in effect prior to 4-24-01.

B.     The driver is entitled a helper at any time based on route condition and with supervisor approval.  In the event that the driver's request for a helper is granted by the Company, the driver shall not be entitled to any additional salary compensation.

C.     Helpers for New York City deliveries shall continue as per present practice.

21.   RETIREMENT SAVINGS PLAN

A.     As of August 25, 2011, the Employer withdrew from the Local 863 Pension Trust Fund. Concurrent with this withdrawal, the Employer began paying its withdrawal liability attributable to said Fund.

21

B. The I.B.T. Local 863 Retirement Savings Plan ("Retirement Plan") is a "defined contribution" pension plan governed by ERISA. In accordance with this Agreement, effective August 25, 2011, the Employer shall make contributions to the Retirement Plan, in the various amounts as set forth in Section H below, for each hour paid, including for sick days, holidays, vacation, and other entitlement days, for each employee covered by this Agreement, not to exceed forty (40) hours per week. The Employer shall commence making contributions for each employee upon his completion of the probationary period, retroactive to his date of hire. If an employee does not complete the probationary period, the employee shall not become a participant in the Retirement Plan and no contributions will be made for such employee.

C. The Employer shall provide to the Retirement Plan a monthly report of all employees who worked in the prior month, the hours each employee worked, the hours for which contributions are made, the total amount of contribution owed for each employee, and the total amount paid by the Employer for the month. This report, and the payment for the total amount owed, shall be submitted to the Retirement Plan by the 15th day of the month after the end of the month in which the work for which the contributions are owed was performed. In addition, the Employer shall pay for each employee on the report the sum of Two Dollars ($2.00) for each week during which an employee was paid for any hours, such that if an employee was paid for 40 or less hours in a week, the Employer shall enter that it shall contribute $2.00 for each week for each such employee. The total amount due for this $2.00/week contribution shall be paid either by separate check, combining the $2.00/week for all employees on the report, or that total amount shall be included in the same check as the hourly contributions and the report shall set forth the amount being paid for the normal hourly contributions and the amount submitted or the $2.00/week contribution. Pursuant to the Retirement Plan, this $2.00/week contribution shall be credited to the employee's account, but shall subsequently be placed into an account to be used solely to pay and defray administrative costs incurred by the Retirement Plan. The Employer shall owe no other monies to the Retirement Plan for any administrative costs or expenses.

D. The Retirement Plan shall have the right to receive, collect, demand, sue, and institute proceedings in any court or other forum or tribunal for the purposes of enforcing payment of any of the contributions required to be made or that are owed under this Agreement. If the Employer is delinquent in the payment of contributions to the Retirement Plan, the delinquent Employer shall be further obligated to pay the Retirement Plan all costs and fees of collection, including but not limited to arbitration or court costs, arbitrator fees, and attorneys' fees, and interest on the amounts due and on costs and fees. Any action arising under, or involving interpretation or application of, or to enforce this Article shall be submitted in the first instance to the permanent arbitrator, Mr. J.J. Pierson, Esq. If he is unable to conduct the arbitration, it shall be submitted to the labor panel at AAA in New Jersey.

E. The Employer shall continue to pay the sums set forth above to the Retirement Plan, notwithstanding the fact that an employee may be out of work suffering from a job-related injury for a period of three (3) months from the date of the accident.

22

F. As of the effective date of this Agreement, the Employer will make the following contributions into the Retirement Plan as provided in Section B above:

| 4-25-11 | 4-25-12 | 4-25-13 |
|---------|---------|---------|
| $0.50   | $1.00   | $1.00   |

G. The Employer shall make a one-time lump sum contribution into the Retirement Plan for all drivers and warehousemen who, on the effective date of this Agreement, had at least twenty (20) but less than thirty (30) years of service in an amount equal to sixty-five dollars ($65.00) for each month of service between their actual years of service and thirty years. For example, an employee with twenty-five (25) years of service on the effective date of this Agreement would receive a $3,900.00 lump sum payment into the Retirement Plan [5 years x 12 months x $65.00].

H. The Employer shall make a one-time lump sum contribution into the Retirement Plan for all drivers and warehousemen who, on the effective date of this Agreement, had at least three (3) but less than five (5) years of service in an amount equal to sixty-five dollars ($65.00) for each month of service. For example, an employee with four (4) years of service on the effective date of this Agreement would receive a $3,120.00 lump sum payment into the Retirement Plan [4 years x 12 months x $65.00].

I. The contribution amounts set forth in Section F of this Article are subject to adjustment as set forth in Article 12 of this Agreement.

J. The Employer agrees that, after the termination of this Agreement and while the parties are negotiating a new contract or an extension of this contract, and further provided that the Union does not strike or the parties are not at impasse, the Employer will continue to make contributions to the Retirement Plan at the applicable rates in this Article pending consummation of a new contract.

22.   D.O.T. DRUG TESTING

All D.O.T. Drug Testing will be at Company's cost and Company's direction. Drug testing is to be on Company's time. A company vehicle to be supplied if necessary. The substance abuse policy is attached as an addendum to this Agreement.

23.   <u>LEAVE OF ABSENCE</u>

A.     The Company agrees that a leave of absence without pay may be granted for any good and sufficient personal reason (employee's illness or injury are not "personal reasons" and are treated separately), at a time the employee can be spared, as follows:

5 Years and over                  Maximum of four (4) weeks

B.     Leave of absence will not be granted for the purpose of allowing any employee to take another position temporarily, try out new work, or venture into business for himself. An employee shall be entitled to only one leave of absence in any three year period.

C.     The employee shall not accrue any vacation, sick or personal time during leave of absence.

24.   <u>MANAGEMENT RIGHTS CLAUSE</u>

The operation of the Company's business and the direction of the working forces including but not limited to, the establishment of the opening and closing time of warehouses and departments, the right to hire, transfer, suspend, layoff, recall, promote, discharge for just cause, assign or discipline employees, to relieve employees from duty because of lack of work and to transfer employees from one location or classification to another, are vested exclusively in the Company, subject however to the provisions of this Agreement.

25.   <u>CONTINUATION OF AGREEMENT</u>

A.     Every employee shall continue to enjoy any and all benefits and working conditions heretofore enjoyed by him in connection with or pertaining to his job, and he shall not be deprived thereof as a result of or after the execution of this Agreement even though such benefits or working conditions are not expressly provided for herein.

B.     This Agreement is binding upon successors and assigns. The Employer agrees to provide written notice to Local 863 and any purchaser as to this Agreement.

26.   <u>TERM OF AGREEMENT</u>

This Agreement shall become effective on the 25th day of April 2011, and shall continue in full force and effect for a period of three (3) years expiring on the 24th day of April 2014. It shall thereafter automatically renew itself for an additional one (1) year period unless either party gives the other party at least sixty (60) days' notice in writing, prior to the date fixed for the expiration herein, that said party does not desire said Contract to automatically renew itself for an additional one (1) year period.

)F, THE PARTIES HERETO HAVE EXECUTED THIS AGREEMENT, THIS 25th DAY

y may be granted for any
: not "personal reasons"
ollows:

of allowing any employee
into business for himself.
e year period.

sonal time during leave of

in of the working forces
osing time of warehouses
romote, discharge for just
:y because of lack of work
her, are vested exclusively

all benefits and working
ng to his job, and he shall
s Agreement even though
rein.

s. The Employer agrees to
ement.

ril 2011, and shall continue
e 24th day of April 2014. It
) year period unless either
. prior to the date fixed for
) automatically renew itself

i3 TEAMSTER,
FERNATIONAL
EAMSTERS, CHAUFFEURS,
JD HELPERS OF AMERICA

_____   ATTEST: _____

LI
SURER

IPANY

_____   ATTEST: _____

25

23.    LEAVE OF ABSENCE

A.    The Company agrees that a leave of absence without pay may be granted for any good and sufficient personal reason (employee's illness or injury are not "personal reasons" and are treated separately), at a time the employee can be spared, as follows:

5 Years and over          Maximum of four (4) weeks

B.    Leave of absence will not be granted for the purpose of allowing any employee to take another position temporarily, try out new work, or venture into business for himself. An employee shall be entitled to only one leave of absence in any three year period.

C.    The employee shall not accrue any vacation, sick or personal time during leave of absence.

24.    MANAGEMENT RIGHTS CLAUSE

The operation of the Company's business and the direction of the working forces including but not limited to, the establishment of the opening and closing time of warehouses and departments, the right to hire, transfer, suspend, layoff, recall, promote, discharge for just cause, assign or discipline employees, to relieve employees from duty because of lack of work and to transfer employees from one location or classification to another, are vested exclusively in the Company, subject however to the provisions of this Agreement.

25.    CONTINUATION OF AGREEMENT

A.    Every employee shall continue to enjoy any and all benefits and working conditions heretofore enjoyed by him in connection with or pertaining to his job, and he shall not be deprived thereof as a result of or after the execution of this Agreement even though such benefits or working conditions are not expressly provided for herein.

B.    This Agreement is binding upon successors and assigns. The Employer agrees to provide written notice to Local 863 and any purchaser as to this Agreement.

26.    TERM OF AGREEMENT

This Agreement shall become effective on the 25th day of April 2011, and shall continue in full force and effect for a period of three (3) years expiring on the 24th day of April 2014. It shall thereafter automatically renew itself for an additional one (1) year period unless either party gives the other party at least sixty (60) days' notice in writing, prior to the date fixed for the expiration herein, that said party does not desire said Contract to automatically renew itself for an additional one (1) year period.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED THIS AGREEMENT, THIS 25th DAY OF APRIL 2011.

LOCAL UNION NO. 863 TEAMSTER,
affiliated with the INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA

BY: _____    ATTEST: _____

    ALPHONSE RISPOLI
    SECRETARY TREASURER
    LOCAL 863 I.B.T.


AMERICAN B.D. COMPANY


BY: _____    ATTEST: _____

[SIDE LETTER]

April 25, 2011

Mr. Alfonse Rispoli
Secretary-Treasurer
Local 863
International Brotherhood of Teamsters
209 Summit Road
Mountainside, NJ 07092

Dear Al:

In the negotiations that resulted in our new 2011-2014 collective bargaining agreement, we agreed that, if employees request training on any equipment used by the bargaining unit, the Company will provide same.

We further agreed that employees may take vacation in daily increments from January through April with Company approval, which shall not unreasonably be withheld.

Sincerely yours,

Dina Opici
President
American B.D. Company

APPROVED:

I.B.T., LOCAL 863

BY: _____
    Al Rispoli

DATE: _____

26

# 24

HELPERS

## AGREEMENT

### between

### AMERICAN B.D. COMPANY

### and

### LOCAL 863, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA

### Effective: April 25, 2011

### To: April 24, 2014

1

## INDEX

| **ARTICLE** | **PAGE** |
|---|---|
| WITNESSETH | 4 |
| 1. UNION SECURITY | 4 |
| 2. PICKET LINE | 6 |
| 3. HOLIDAYS | 6 |
| 4. WORK HOURS/WORK WEEK | 7 |
| 5. OVERTIME | 7 |
| 6. VACATIONS | 7 |
| 7. DEATH LEAVE | 9 |
| 8. SICK DAYS | 9 |
| 9. JURY DUTY | 10 |
| 10. UNIFORMS | 10 |
| 11. WAGES | 10 |
| 12. CHECK-OFF SYSTEM FOR DUES | 11 |
| 13. GRIEVANCE PROCEDURE AND ARBITRATION | 11 |

**ARTICLE**

**PAGE**

14. SENIORITY — 12

15. LAYOFF AND RECALL — 13

16. DISCHARGE OR DISCIPLINE — 13

17. RETIREMENT SAVINGS PLAN — 15

18. D.O.T. DRUG TESTING — 17

19. MANAGEMENT RIGHTS CLAUSE — 17

20. CONTINUATION OF AGREEMENT — 17

21. HEALTH INSURANCE — 17

22. TERM OF AGREEMENT — 17

SIDE LETTER — 19

LOCAL 863
UNION CONTRACT AGREEMENT-Helpers
<u>2011 - 2014</u>

AGREEEMENT, by and between AMERICAN B.D. COMPANY (herein referred to as the "Company" or "Employer") and LOCAL UNION NO. 863, TEAMSTERS, affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA (herein referred to as the "Union")

<u>WITNESSETH:</u>

THE COMPANY HEREBY AND HEREWITH recognizes the Union as the authorized Collective Bargaining Agent for all employees who are employed as Full-time Helpers at the Company's 25 De Boer Drive, Glen Rock, New Jersey, facility in respect to wages, hours and all other terms and conditions of employment during the entire term of this agreement.

THIS AGREEMENT shall apply to all present and future employees employed as Helpers by the Company during the term of this Agreement.

1.      <u>UNION SECURITY</u>

        It shall be a condition of employment that all employees of the Employer covered by this Agreement and who are members of the Union in good standing on the effective date of this Agreement, or the execution date, whichever is later, shall after four hundred eighty (480) straight time working hours following the effective date or execution date, whichever is later, of this Agreement become and remain members in good standing in the Union.  It shall also be a condition of employment that all employees covered by this Agreement, and hired on or after its effective date or execution date, whichever is later, shall after four hundred eighty (480) straight time working hours following the beginning of such employment become and remain members in good standing, in the Union.

        The failure of any person to become a member of the Union at the required time shall obligate the Employer, upon written notice from the Union to such effect and to the further effect that Union membership was available to such person on the same terms and conditions generally available to other members to forthwith discharge such person.  Any employee who fails to meet the requirements of Article 1 should not be retained in the Company's employ,

4

provided that the Union notifies both the Company and the employee in writing of such default, and said employee fails to remedy same within ten (10) days after receipt of said written notice.

In the event of any change in the law during the term of this Agreement, the Employer agrees that the Union will be entitled to receive the maximum Union Security which may be lawfully permissible.

No provisions of this Article shall apply in any state to the extent that it may be prohibited by State law. If under applicable State law additional requirements must be met before any such provision may become effective, such additional requirements shall first be met.

If any provision of this Article is invalid under the law of any State wherein this Agreement is executed, such provision shall be modified in compliance with the requirements of State law or shall be renegotiated for the purpose of adequate replacements. If such negotiations shall not result in a mutually satisfactory Agreement, the Union shall be permitted all legal or economic recourse.

This Agreement shall be binding upon the parties hereto, their successors, administrators, executors, and assigns. In the event an Employer's business or license is sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, such operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof. The Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee, etc., of the business or license covered by this Agreement. Such notice shall be in writing with copy to the Union not later than forty-eight (48) hours after the signing of the agreement of sale of such Employer's business and/or license. The Employer shall give the Union the name and address of the purchaser, transferee, lessee, assignee, etc. In the event the Employer fails to give notice herein required, and/or fails to require the purchaser, transferee, lessee or assignee to assume the obligations of this Agreement, the Employer shall be liable to the Union and the employees covered for all damages sustained as a result of such failure to give notice, or such failure to acquire assumption of the terms of this Agreement Employees will not suffer any loss of seniority, length of service, vacations, holidays, or, as to any other Article or Section of this Agreement, as the result of the sale, transfer, lease, assignment or purchase of the business and/or license.

2.     PICKET LINE

A. It shall not be a violation of this Agreement and it shall not be a cause for discharge or basis of any disciplinary action (except that any damage to property or person of Company shall be cause for immediate discharge) in the event an employee refuses to enter upon any property involved in a lawful primary labor dispute, or refuses to go through or work behind any lawful Primary Picket Line, including lawful Primary Picket Line of Union's party to this Agreement and including lawful primary Picket Lines at the Employer's places of business.

B. There shall be no strikes on the part of the Union or the Employees during the term of this Agreement.

C. There shall be no lockouts on the part of the Company during the term of this Agreement.

3.     HOLIDAYS

All full-time employees who have been employed by the Employer for three (3) months shall be entitled to the following holidays with pay.

* Non-switch Holidays

** Switch Holidays – Switch Holidays to remain Switch Days

|  |  |
|---|---|
| * New Year's Day | ** Lincoln's Birthday |
| * President's Day | |
| * Good Friday | |
| * Memorial Day | |
| * Independence Day | |
| * Labor Day | |
| * Columbus Day | |
| * Thanksgiving Day | |
| * Day After Thanksgiving | |
| * Christmas Day | |

A. An employee shall receive a total of two (2) times his regularly hourly rate of pay for all hours worked on a holiday, plus the holiday pay.

B. In order to be eligible for payment for Holidays not worked as hereinabove provided, a covered employee must work the scheduled working day before and the day after the Holiday unless excused by the Company, or unless the employee is prevented from working the day after the Holiday due to an act of God.

6

C. With respect to any employee whose regular work week is four (4) days, when any holiday either falls on a Monday or is generally observed on Monday, the Employer shall post the number of employees to work, and the Employer shall have three (3) options as follows:

(1) Substitute the following Tuesday for the Monday holiday.

(2) If work is performed on the Tuesday, pay an additional (10) hours at the regular straight-time rate to each qualifying employee, or

(3) Substitute a personal day off for each qualifying employee.

4.    WORK HOURS/WORK WEEK

A. A work week for Helpers shall consist of ten (10) hours per day. A work week for helpers shall be four (4) days per week. The starting time will be 8 A.M. There may be an earlier starting time necessitated for long distance deliveries.

B. There shall be a thirty (30) minute lunch period each day for helpers. Such lunch period will not be paid by the Company.

C. Each helper shall be granted two designated fifteen (15) minute breaks each day.

5.    OVERTIME

A. Overtime at the rate of time and one-half the regular hourly rate, shall be paid for any work performed by helpers after forty (40) hours worked in any one work week.

B. If any employee performs any work on Sunday, the Employer shall pay for such work at the rate of double time and one-half the regular hourly rate of pay.

6.    VACATIONS

A. An employee's accrued time during first year of employment shall be prorated to contract date.

7

| LENGTH OF TIME ON EMPLOYER"S PAYROLL | VACATION ALLOWANCE |
|---|---|
| One  (1 ) Year | 1 week |
| Two (2)  Years | 2 weeks |
| Ten (10)  Years | 3 weeks |
| Fifteen (15)  Years | 4 weeks |

B.    Company will close for two weeks at the same time that the majority of the wholesalers close.  Employees who are entitled to a vacation shall take their vacation during this period.  If the Company requests the employee to work during this two-week vacation period, the employee shall be entitled to his vacation period at another time that is mutually agreed to by both Company and Employee.  There shall, however, be no accumulation of vacation time from one Agreement year to the next, but all accumulated vacation time shall be paid for at  the end of each contractual year at the rate of pay in effect during the contractual year the vacation time is accumulated.  Further, vacation time shall not be utilized as sick days unless mutually agreed upon by both Company and Employee.  The Company will post a vacation schedule.  Employees may take vacation in days, mutually agreed upon by Employer and Employee.

C.  An employee's vacation allowance will be based upon the length of time on the Company's payroll at the time of the annual closing.  An employee with less than one year's service shall receive a vacation allowance on a pro rate basis computed on the length of service with Company.  In the event that an employee either resigns from the company due to gross misconduct or is discharged for gross misconduct, the employee shall receive only those vacation days that have accrued since the anniversary date of this contract.

Gross Misconduct  -  defined from those actions listed in Article 16(e) – use of narcotics, drinking any alcoholic beverages on the job, theft or conviction of a felony, being under the influence of narcotics, drugs or any alcoholic beverages, insubordination, assault, battery, defacing of company property, theft of company property.

Except as hereinafter provided, an employee leaving the employment of the Company shall receive vacation pay, as accrued to him at the time of his leaving, based on the proportionate number of weeks that the employee has worked during the contract year.  An employee leaving the Company who is retiring and is immediately eligible for a pension shall receive all contractual unused vacation.

| LENGTH OF TIME ON EMPLOYER"S PAYROLL | VACATION ALLOWANCE |
|---|---|
| One  (1 ) Year | 1 week |
| Two (2)  Years | 2 weeks |
| Ten (10)  Years | 3 weeks |
| Fifteen (15)  Years | 4 weeks |

B.    Company will close for two weeks at the same time that the majority of the wholesalers close.  Employees who are entitled to a vacation shall take their vacation during this period.  If the Company requests the employee to work during this two-week vacation period, the employee shall be entitled to his vacation period at another time that is mutually agreed to by both Company and Employee.  There shall, however, be no accumulation of vacation time from one Agreement year to the next, but all accumulated vacation time shall be paid for at  the end of each contractual year at the rate of pay in effect during the contractual year the vacation time is accumulated.  Further, vacation time shall not be utilized as sick days unless mutually agreed upon by both Company and Employee.  The Company will post a vacation schedule.  Employees may take vacation in days, mutually agreed upon by Employer and Employee.

C.    An employee's vacation allowance will be based upon the length of time on the Company's payroll at the time of the annual closing.  An employee with less than one year's service shall receive a vacation allowance on a pro rate basis computed on the length of service with Company.  In the event that an employee either resigns from the company due to gross misconduct or is discharged for gross misconduct, the employee shall receive only those vacation days that have accrued since the anniversary date of this contract.

Gross Misconduct  -  defined from those actions listed in Article 16(e) – use of narcotics, drinking any alcoholic beverages on the job, theft or conviction of a felony, being under the influence of narcotics, drugs or any alcoholic beverages, insubordination, assault, battery, defacing of company property, theft of company property.

Except as hereinafter provided, an employee leaving the employment of the Company shall receive vacation pay, as accrued to him at the time of his leaving, based on the proportionate number of weeks that the employee has worked during the contract year. An employee leaving the Company who is retiring and is immediately eligible for a pension shall receive all contractual unused vacation.

8

| LENGTH OF TIME ON EMPLOYER"S PAYROLL | VACATION ALLOWANCE |
|---|---|
| One (1) Year | 1 week |
| Two (2) Years | 2 weeks |
| Ten (10) Years | 3 weeks |
| Fifteen (15) Years | 4 weeks |

B.    Company will close for two weeks at the same time that the majority of the wholesalers close. Employees who are entitled to a vacation shall take their vacation during this period. If the Company requests the employee to work during this two-week vacation period, the employee shall be entitled to his vacation period at another time that is mutually agreed to by both Company and Employee. There shall, however, be no accumulation of vacation time from one Agreement year to the next, but all accumulated vacation time shall be paid for at the end of each contractual year at the rate of pay in effect during the contractual year the vacation time is accumulated. Further, vacation time shall not be utilized as sick days unless mutually agreed upon by both Company and Employee. The Company will post a vacation schedule. Employees may take vacation in days, mutually agreed upon by Employer and Employee.

C. An employee's vacation allowance will be based upon the length of time on the Company's payroll at the time of the annual closing. An employee with less than one year's service shall receive a vacation allowance on a pro rate basis computed on the length of service with Company. In the event that an employee either resigns from the company due to gross misconduct or is discharged for gross misconduct, the employee shall receive only those vacation days that have accrued since the anniversary date of this contract.

Gross Misconduct - defined from those actions listed in Article 16(e) – use of narcotics, drinking any alcoholic beverages on the job, theft or conviction of a felony, being under the influence of narcotics, drugs or any alcoholic beverages, insubordination, assault, battery, defacing of company property, theft of company property.

Except as hereinafter provided, an employee leaving the employment of the Company shall receive vacation pay, as accrued to him at the time of his leaving, based on the proportionate number of weeks that the employee has worked during the contract year. An employee leaving the Company who is retiring and is immediately eligible for a pension shall receive all contractual unused vacation.

8

7.  DEATH LEAVE

In the event of a death in an immediate family of any employee, the employee may have off with pay at his regular rate of pay per day, three days immediately following the day of death, provided these are regularly scheduled working days, and provided Company is notified of the death in the family so that Company can properly schedule or assign the employee's work. The employee shall furnish proof of death and proof of relationship if requested by Company. In the event if any of the aforesaid three days are not regularly scheduled working days, then the employee shall be paid for only those of the above three days which are regularly scheduled working days. However, in the event that the three day period included only one or two regularly scheduled working days, but the funeral occurs on a regular scheduled working day thereafter, the employee shall be entitled to take off an additional working day with pay only for the purpose of attending the funeral. "Immediate family" means the employee's parents, spouse, children, brothers, sisters, mother-in-law and father-in-law. The employee shall receive two (2) days off with pay at his regular rate of pay for grandparents.

8.  SICK DAYS

A.  All employees covered by this Agreement shall be entitled to receive a total of five (5) sick days for each year of the term of this Agreement. There shall be no accumulation of sick days from one Agreement year to the next and all accumulated sick days shall be paid for at the end of the contractual year. In the event that an employee takes three (3) or more consecutive sick days, he should present Company with a doctor's letter establishing the validity of his illness or injury, if Company so requests. If an employee fails to present to Company the doctor's letter, employee shall not be entitled to compensation for the sick days taken in excess of two (2) sick days.

Sick days shall be pro-rated from the date that the employee is accepted into the Union. In the event that an employee either voluntarily resigns from the company due to gross misconduct or is discharged for gross misconduct, the employee shall receive only those sick days that have accrued since the anniversary date of this contract.

Gross Misconduct - defined from those actions listed in Article 16(e) - use of narcotics, drinking any alcoholic beverages on the job, theft or conviction of a felony, being under the influence of narcotics, drugs or any alcoholic beverage, insubordination, assault, battery, defacing of company property, theft of company property.

9

B. The employee must, for all absences, except absent for an emergency that prevents his/her doing so, should notify the Company of his/her absence, a minimum of one (1) hour before the normal starting time.

C. All employees on disability or worker's compensation leave are required to contact the office weekly to update progress.

9.    JURY DUTY

Employees serving on jury duty will be compensated by the Company for the difference between the money he receives for jury duty and his basic daily straight time pay, calculated at his hourly rate.  This shall apply only to time lost by the employee during the regularly scheduled work week.  Said payments, however shall not be made for any period exceeding more than one (10) week in any one (1) calendar year

10.    UNIFORMS

Uniforms to be supplied by the Company to everyone covered by this Agreement.  All employees agree to wear all the provided uniforms during work hours and the failure to do so shall be the basis for suspension as defined in Article 16 of this agreement.

11.    WAGES

A.    The Company shall establish and maintain through the term of this Agreement

the following hourly rates of pay:

| 4-25-11 | 4-25-12 | 4-25-13 |
|---------|---------|---------|
| $12.70  | $13.20  | $13.70  |

B.    Notwithstanding the foregoing, the new hire rate shall be $8.00 per hour. Upon Union attainment, the employee shall receive the top rate in effect.

10

C.   Effective upon the signing of this Agreement, all current employees who were members of the bargaining unit prior to 4-25-11 shall receive $750.00 as a signing bonus.

D.   Effective upon the signing of this Agreement, all current employees who were hired on or after April 25, 2011, shall receive $500.00 as a signing bonus."

12.   <u>CHECK-OFF SYSTEM FOR DUES</u>

The Company agrees to deduct Union dues each and every month from the wages of each employee subject to this Agreement pursuant to a check-off authorization card by such employee to be delivered to the Company by the Union. The Union dues shall be the amount required to maintain the employee in good standing as a member of the Union. In the event there is a change in the amount necessary to maintain the employee in good standing in the Union, the Union will notify the Company forthwith of the correct amount and the Company herewith agrees to deduct the same.

13.   <u>GRIEVANCE PROCEDURE AND ARBITRATION</u>

Any dispute, difference or grievance regarding the interpretation, application of the provisions of this Agreement, shall be settled by conference with the duly authorized officials of the Union and a representative of the Company. All grievances concerning payroll issues must be filed and/or appealed within fourteen (14) workdays.

In the event that such dispute, difference or grievance shall not have been satisfactorily adjusted between the parties in the manner provided above, then such dispute, difference or grievance regarding the interpretation, or application of the provisions of this Agreement may be submitted to Arbitration at the request of either party to the New Jersey State Board of Mediation who shall designate an Arbitrator. The Parties further agree that the expense of the Arbitrator shall be borne equally among them.

The Arbitrator shall decide cases in issue solely upon the provisions of this Agreement, and shall have no power to add to, delete from, modify or alter the provisions of this Agreement.

11

14.    SENIORITY

The following rules shall govern the exercise of Seniority rights by the employee of the Company and the members of the Local Union No. 863.

A.    Definition of Seniority

Terminal Seniority is defined as the Seniority which an employee acquires from his earliest date of hire at a specific terminal or branch of the Company.

B.    Opening New Branches:

1. When a new branch or terminal is opened at any location, the Company shall offer to all employees covered by this Agreement the opportunity to transfer to the new branch or terminal in order of their company or payroll Seniority.

2. The transferred employee shall, for a period of thirty (30) days following the transfer, have an unqualified right to return to their old terminal and carry with them their Seniority at     that old terminal.

C.    Closing of Branches:

1. When a branch or terminal is closed and the work of the branch or terminal is eliminated, an employee who was formerly employed at another branch or terminal shall have the right to transfer back and exercise his seniority based on the date of hire at the branch or terminal into which he is transferring.

2. When a branch or terminal is closed and the work of the branch or terminal is transferred to another branch or terminal, an employee employed at the closed-down branch or terminal shall have the right to transfer to the branch or terminal into which the work was transferred and to exercise his seniority on a company or payroll basis.

D.    Merger:

When two or more companies merge their operations, then the employees of the respective companies shall all be placed on one seniority roster in the order of the earliest date of hire of each of the employees with their respective Employer.

E.   Acquisition or Purchase:

When one company acquires or purchases controls of the business of another company, then the employees of the company so acquired or purchased shall be placed at the bottom of the acquiring or purchasing company's seniority roster in the order of their payroll of company seniority with the former company.

F.   Disputes Procedure:

If a dispute arises concerning the interpretation or application of the foregoing provisions, dealing with the Seniority, then the subject matter of such dispute may be taken up by the aggrieved party under the grievance arbitration procedure as provided herein.

## 15.   LAYOFF AND RECALL

A. When it becomes necessary to reduce the working force, the last man on the helper seniority list should be laid off first and when the force is again increased, the men are to be returned to work in the reverse order in which they were laid off.

B. In the event of a recall, the laid-off employee shall be given notice of recall by telegram, registered or certified mail, sent to the address last given the Employer by the Employee. Within forty-eight (48) hours after tender of delivery at such address of the Employer's notice, the employee must notify the Employer by telegram, registered or certified mail, of his intent to return to work and must actually report to work within five (5) calendar days. In the event the employee fails to comply with the above provisions, he shall lose all seniority rights under this Agreement and shall be considered as a voluntary quit. After one hundred twenty (120) days from the date of layoff, the employee is considered to have been dropped from the seniority list. At that time, he loses all seniority rights and the Employer is under no obligation to recall him.

## 16.   DISCHARGE OR DISCIPLINE

The Employer shall not discharge suspend nor discipline any employee without just cause. In all cases involving the discharge or suspension of any employee, the Company must immediately notify the employee in writing of his discharge or suspension and the reason therefore. Such written notice shall also be given to the shop steward, and a copy mailed to the Local Union Office, within one (1) working day from the time of the discharge or suspension.

13

A.     With respect to all discharges, suspensions or discipline (other than immediate discharges as defined in paragraph 16 (e) below, the employee must have received from the Company at least two (2) warning notices within the previous ninety (90) working days, which notices need not necessarily be for the same offense. All discharges, suspensions or discipline under this paragraph shall be subject to the grievance procedures as defined by this Agreement.

B.     Any employee discharged must be paid in full for all wages owed him by the Employer, including earned vacation pay, if any, within five (5) days from the date of discharge.

C.     A discharged, suspended or disciplined employee must advise his Local Union in writing, within two (2) working days after receiving notification of such action against him, of his desire to appeal the discharge, suspension or discipline. Notice of appeal from discharge, suspension or discipline must be made to the Employer in writing within five (5) days from the date of discharge, suspension or discipline and/or return to his home terminal, whichever is later.

D.     Should it be proven that an injustice has been done to a discharged, suspended or disciplined employee, he shall be fully reinstated in his position and compensated at his usual rate of pay for lost work opportunity. If the Union and the Employer are unable to agree as to the settlement of the case, then it may be referred to the grievance machinery as set forth in paragraph 14 within an agreed period of time between Employer and the Union.

E.     Just cause of immediate discharge is hereby defined as a violation of the contract, violation of Company rules, failure to meet work standards, use of narcotics, drinking any alcoholic beverages on the job, theft or conviction of a felony, being under the influence of narcotics, drugs or any alcoholic beverage, on or in Company property or that any of its customers, insubordination, and/or assault, battery, defacing of company property, or theft of time, unauthorized or excessive absenteeism, patterned absenteeism, misconduct, proven negligence in the use of company's equipment and property. Unauthorized or excessive absenteeism will be construed to be:

8th day, verbal notice, 9th day, written notice, 10th day, one (1) day suspension without pay; and 11th day, discharge. Any disability must be filed and collected from State Disability Insurance, otherwise, any absence will be chargeable days.

14

17. RETIREMENT SAVINGS PLAN

A. As of August 25, 2011, the Employer withdrew from the Local 863 Pension Trust Fund. Concurrent with this withdrawal, the Employer began paying its withdrawal liability attributable to said Fund.

B. The I.B.T. Local 863 Retirement Savings Plan ("Retirement Plan") is a "defined contribution" pension plan governed by ERISA. In accordance with this Agreement, effective August 25, 2011, the Employer shall make contributions to the Retirement Plan, in the various amounts as set forth in Section H below, for each hour paid, including for sick days, holidays, vacation, and other entitlement days, for each employee covered by this Agreement, not to exceed forty (40) hours per week. The Employer shall commence making contributions for each employee upon his completion of the probationary period, retroactive to his date of hire. If an employee does not complete the probationary period, the employee shall not become a participant in the Retirement Plan and no contributions will be made for such employee.

C. The Employer shall provide to the Retirement Plan a monthly report of all employees who worked in the prior month, the hours each employee worked, the hours for which contributions are made, the total amount of contribution owed for each employee, and the total amount paid by the Employer for the month. This report, and the payment for the total amount owed, shall be submitted to the Retirement Plan by the 15th day of the month after the end of the month in which the work for which the contributions are owed was performed. In addition, the Employer shall pay for each employee on the report the sum of Two Dollars ($2.00) for each week during which an employee was paid for any hours, such that if an employee was paid for 40 or less hours in a week, the Employer shall enter that it shall contribute $2.00 for each week for each such employee. The total amount due for this $2.00/week contribution shall be paid either by separate check, combining the $2.00/week for all employees on the report, or that total amount shall be included in the same check as the hourly contributions and the report shall set forth the amount being paid for the normal hourly contributions and the amount submitted or the $2.00/week contribution. Pursuant to the Retirement Plan, this $2.00/week contribution shall be credited to the employee's account, but shall subsequently be placed into an account to be used solely to pay and defray administrative costs incurred by the Retirement Plan. The Employer shall owe no other monies to the Retirement Plan for any administrative costs or expenses.

D. The Retirement Plan shall have the right to receive, collect, demand, sue, and institute proceedings in any court or other forum or tribunal for the purposes of enforcing payment of any of the contributions required to be made or that are owed under this Agreement. If the Employer is delinquent in the payment of contributions to the Retirement Plan, the delinquent Employer shall be further obligated to pay the Retirement Plan all costs and fees of collection, including but not limited to arbitration or court costs, arbitrator fees, and attorneys' fees, and interest on the amounts due and on costs and fees. Any action arising under, or involving interpretation or

application of, or to enforce this Article shall be submitted in the first instance to the permanent arbitrator, Mr. J.J. Pierson, Esq. If he is unable to conduct the arbitration, it shall be submitted to the labor panel at AAA in New Jersey.

E. The Employer shall continue to pay the sums set forth above to the Retirement Plan, notwithstanding the fact that an employee may be out of work suffering from a job-related injury for a period of three (3) months from the date of the accident.

F. As of the effective date of this Agreement, the Employer will make the following contributions into the Retirement Plan as provided in Section B above:

| 4-25-11 | 4-25-12 | 4-25-13 |
|---------|---------|---------|
| $0.25   | $0.50   | $0.50   |

G. The Employer shall make a one-time lump sum contribution into the Retirement Plan for all drivers and warehousemen who, on the effective date of this Agreement, had at least twenty (20) but less than thirty (30) years of service in an amount equal to sixty-five dollars ($65.00) for each month of service between their actual years of service and thirty years. For example, an employee with twenty-five (25) years of service on the effective date of this Agreement would receive a $3,900.00 lump sum payment into the Retirement Plan [5 years x 12 months x $65.00].

H. The Employer shall make a one-time lump sum contribution into the Retirement Plan for all drivers and warehousemen who, on the effective date of this Agreement, had at least three (3) but less than five (5) years of service in an amount equal to sixty-five dollars ($65.00) for each month of service. For example, an employee with four (4) years of service on the effective date of this Agreement would receive a $3,120.00 lump sum payment into the Retirement Plan [4 years x 12 months x $65.00].

I. The Employer agrees that, after the termination of this Agreement and while the parties are negotiating a new contract or an extension of this contract, and further provided that the Union does not strike or the parties are not at impasse, the Employer will continue to make contributions to the Retirement Plan at the applicable rates in this Article pending consummation of a new contract.

16

18. D.O.T. DRUG TESTING

All D.O.T. Drug Testing will be at Company's cost and Company's direction. Drug testing is to be on Company's time. A company vehicle to be supplied if necessary.

19. MANAGEMENT RIGHTS CLAUSE

The operation of the Company's business and the direction of the working forces including but not limited to, the establishment of the opening and closing time of warehouses and departments, the right to hire, transfer, suspend, layoff, recall, promote, discharge for just cause, assign or discipline employees, to relieve employees from duty because of lack of work and to transfer employees from one location or classification to another, are vested exclusively in the Company, subject however to the provisions of this Agreement.

20. CONTINUATION OF AGREEMENT

Every employee shall continue to enjoy any and all benefits and working conditions heretofore enjoyed by him in connection with or pertaining to his job, and he shall not be deprived thereof as a result of or after the execution of this Agreement even though such benefits or working conditions are not expressly provided for herein.

21. HEALTH INSURANCE

Employees shall be entitled to participate in the Company's medical and health insurance programs and plans which are offered to non-represented employees on the same terms and conditions, including employee contributions.

22. TERM OF AGREEMENT

This Agreement shall become effective on the 25th day of April 2011, and shall continue in full force and effect for a period of three (3) years expiring on the 24th day of April 2014. It shall thereafter automatically renew itself for an additional one (1) year period unless either party gives the other party at least sixty (60) days' notice in writing, prior to the date fixed for the expiration herein, that said party does not desire said Contract to automatically renew itself for an additional one (1) year period.

17

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED THIS AGREEMENT, THIS 25th DAY OF APRIL 2011.

LOCAL UNION NO. 863 TEAMSTER,
affiliated with the INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA

BY: _____     ATTEST: _____

   ALPHONSE RISPOLI
   SECRETARY TREASURER
   LOCAL 863 I.B.T.


AMERICAN B.D. COMPANY


BY: _____     ATTEST: _____

18

[SIDE LETTER]

April 25, 2011

Mr. Alfonse Rispoli
Secretary-Treasurer
Local 863
International Brotherhood of Teamsters
209 Summit Road
Mountainside, NJ 07092

Dear Al:

In the negotiations which resulted in our new 2011-2014 collective bargaining agreement, we agreed that the Company would add one (1) van driver to the helpers bargaining unit, with the Company retaining the discretion to assign work to that individual as a helper or as a van driver, provided that once each contract year, all employees may bid for the van driver position, provided further that to be eligible an employee must possess a valid driver's license and be approved by the Company, such approval not to be unreasonably withheld. In addition, we agreed that employees may take vacation in daily increments from January through April with Company approval, which shall not unreasonably be withheld.

Sincerely yours,

Dina Opici
President
American B.D. Company

APPROVED:

I.B.T., LOCAL 863

BY: _____
    Al Rispoli

DATE: _____

19

# 25

NEW JERSEY STATE BOARD OF MEDIATION

In the matter of the Arbitration between

LOCAL 863, INTERNATIONAL BROTHERHOOD
OF TEAMSTERS PENSION PLAN

and                                                                          No. 11-0530

AMERICAN B.D. COMPANY

## OPINION AND AWARD

<u>For the Pension Plan:</u>
Kenneth Nowak, Esq.
Zazzali, Fagella, Nowak, Kleinbaum & Friedman
One Riverfront Plaza, Suite 320
Newark, New Jersey 07102

<u>For the Company:</u>
Douglas S. Brierley, Esquire
Scarinci & Hollenbeck, LLC
1100 Valley Brook Avenue
P. O. box 790
Lyndhurst, NJ 07071-0790

<u>Arbitrator:</u>
Nicholas J. Taldone

<u>Hearing Date:</u>
April 5, 2013

1

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

American B.D. Company, formally known as American Beverage Distribution Company ("ABD" or "Company), is a family owned and operated wine and spirits company headquartered in Glen Rock, New Jersey. The company operates distributorships in New Jersey and serves local restaurants, retailers, and wine shops there.

For over fifty years, the Company has been a party to many collective bargaining agreements with Local Union No. 863 of the International Brotherhood of Teamsters ("Local 863"). ABD employs approximately seventy members of Local 863.

Under a series of collective bargaining agreements with Local 863, the Company has been one of many employers to contribute to a defined benefit, multi-employer pension plan formed and maintained under ERISA, 19 U.S.C. §1301(a)(3), and designated as Local 863, International Brotherhood of Teamsters Pension Plan ( the "Fund"). This defined benefit plan is one in which the individual employee's benefits are fixed, but are not based only on the amount contributed by or for the employee/local union member. The plan is jointly trusteed and administered under the requirements of the Labor Management Relations Act, 29 U.S.C. §186.

ABD has contributed to the Fund in its current or prior form for many years. Annual payments by ABD to the Fund had grown to approximately $470,000.00 a year by 2011.

More particularly, pursuant to 2006 statutory amendments that introduced funding statutes classification and imposed notice requirements, ABD – along with other employers in the plan – received in September 2008 its first notice that the Fund was in the red zone or "critical status" for the fiscal year beginning September 1, 2008 in the amount of approximately $5 million. These deficiencies were masked by the Fund's unsuccessful requests for funding

2

waivers that delayed ABD's notice and knowledge of the Fund's financial deterioration until significant amounts of interest had accrued on the deficiencies.

Concerned about the Fund's future, ABD then requested from the Fund in 2010 an estimate of the company's withdrawal liability. ABD then received the Fund's withdrawal liability report in February 2011.

Commencing also in early 2011, ABD and Local 863 began negotiations on a successor collective bargaining agreement. At that time, the Company learned that its withdrawal liability had grown from $6 million in 2006 to $15 million for the Fund year ending August 31, 2010. After months of face-to-face negotiations and meetings with the Fund's actuaries, ABD provided notice of its intention to withdraw from the Fund. By letter dated August 26, 2011, ABD's counsel confirmed that

> American B.D. has informed the union that it is implementing its final offer to include withdrawing from the Pension Plan, effective immediately. I am sure you understand that this means that no further contributions will be made to the plan on behalf of employees.
>
> Our client is prepared to immediately contribute $140,649 as the first of 20 quarterly installments as determined by Segal [the Fund actuary] as per your letter of February 23, 2011. Please advise me to whom this should be addressed and we will arrange that this payment be sent to such person forthwith. Future quarterly payments will be made on December 1st, March 1st, June 1st, and September 1st until paid in full.
>
> As per today's letter, our client is prepared to pay the minimum funding deficiency of $5,898,317.60 as of August 31, 2011 (as calculated in my Memo to you of July 12, 2011) on or before August 31st. Please also advise as to whom this should be sent.
>
> We will immediately file Form 5530, and our client will pay the excise tax to the IRS as required by law.

On August 30, 2011, the Company transmitted its first quarterly payment of $140,649.00 to the Fund. It also paid the minimum funding deficiency of $5,898,317.60. And, on September 8, 2011, ABD paid to the Internal Revenue Service the required excise tax.

Notwithstanding ABD's statement at the August 25 meeting, which was confirmed in counsel's August 26th letter, the Fund refused to negotiate and cash the proffered withdrawal liability payment. By letter dated October 10, 2011, ABD's counsel again stated "[w]e previously notified you of our client's withdrawal from the Local 863 Pension Plan … as of August 25, 2011." In the same letter, ABD further asserted that the Segal Company's calculation of ABD's withdrawal liability was flawed because, *inter alia*, it wrongly added a ten percent surcharge to the withdrawal payments due.

By letter of October 21, 2011, counsel for the Fund and Local 863 advised ABD of the Fund's position: the ten percent surcharge could be included in determining the company's annual payment for purposes of the withdrawal liability schedule.

In reply, the Company advised the union and the Fund by letter dated November 11, 2011, that it would proceed to submit the surcharge dispute to the New Jersey State Board of Mediation for arbitration. ABD stated in the letter reply that it had received a Fund invoice for the regular September payment by letter post-marked October 27, 2011, and that the invoice ignored the company's prior withdrawal notice. Further, ABD asked why its check for the first quarterly payment of withdrawal liability in the amount of $140,649.00 had not been cashed. The Fund never responded to that question.

ABD submitted the matter to arbitration by letter dated December 2, 2011.

4

## PARTIES' POSITIONS

The parties do not dispute that there are two aspects to the computation of withdrawal liability against a former participating employer in a multiemployer pension plan. The first aspect is an actuarial determination of what portion of a plan's total unfunded vested benefit obligation is attributable to the withdrawn employer.  This first calculation is not in dispute. The second calculation establishes what annual (or, as used by the Fund, quarterly) amounts the employer must pay. This is the calculation in dispute. The parties do not disagree that under ERISA section 4219 (c )(1)(C),the amount of each annual payment in a withdrawal liability payment schedule shall be the product of "the average annual number of contribution base units (CBUs) for the period of 3 consecutive plan years during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest, and the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 years ending with the plan year in which the withdrawal occurs."

## THE FUND'S POSITION

The Fund's actuary appropriately calculated the annual/quarterly payments under ERISA section 4219 (c)(1)(C) as including the 10% surcharge.

## THE COMPANY'S POSITION

The Company challenges the Plan actuary's inclusion of the 10% surcharge in the calculation of the annual/quarterly payment under ERISA section 4219 (c) (1)(c). The Company contends the "obligation to contribute" under ERISA section 4219 (c )(1)(C) can only arise under a collective bargaining agreement or a labor management relations law, and the surcharge arises from neither.  At the arbitration hearing, the Company's expert witness Ethan Kra explained this position as follows. The calculation of the annual payment is based on the average of the highest three consecutive units in the past ten years times the highest contribution rate. The Fund's Plan

is also based on "contributions". An obligation to "contribute" is defined in ERISA as the amount owed under the collective bargaining agreement or labor laws. The "surcharge" is "10 percent of the contribution otherwise so required" per ERISA section 432(e)(7). Therefore, the surcharge is not a contribution and if Congress wanted to call it a "contribution", it could have done so, but it did not.

The Company further contends that in his arbitration award[1] regarding the precise issue in dispute here, Arbitrator Mark Irvings erroneously decided that the surcharge is properly included in the calculation of annual/quarterly payments for the following reasons. First, Arbitrator Irving's finding that there is no statutory provision or legislative history that addresses the issue is wrong because the reference in ERISA section 4212 to the term "obligation to contribute" is decisive[2]. Arbitrator Irvings erroneously concluded that because of the reference to an unpaid surcharge as a contribution in the delinquent contribution section of ERISA, the term "surcharge" should be treated as a contribution in all instances. Third, Arbitrator Irvings' reliance on the express exclusion of the surcharge from an unrelated ERISA section ignores that no express exclusion in necessary.

**DISCUSSION**

Under ERISA section 305(e)(7)(A)(29 U.S.C. section 1085), surcharges are statutorily prescribed additions to negotiated contributions to multi-employer plans in the "red zone" or

---

[1] In the matter of the Arbitration between IBT Local 863 Pension Fund and C&C Groceries, Inc. (Irvings, Arbitrator 2012)

[2] ERISA section 4212(a) provides:
(a)"Obligation to contribute" defined. For purposes of this part, the term "obligation to contribute" means an obligation to contribute arising-
1)under one or more collective bargaining (or unrelated) agreements, or
2)as a result of a duty under applicable labor-management relations law but
does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions

"critical status." Were that the only provision of ERISA dealing with surcharges, it would appear that the Company's position is correct as (e)(7)(A) does not seem to affect the withdrawal liability calculation of the annual/quarterly payment. Indeed, section 305 is entitled "Additional Funding Rules For Multiemployer Plans In Endangered Status of Critical Status" and ERISA section 4211 (29 U.S. C. 1391) which is titled "Methods of Computing Withdrawal Liability" does not mention surcharges. Thus, a reading of section 305(e)(7)(A) in isolation would seem to indicate that the surcharge is merely to help get plans in critical status out of critical status by additional infusions of cash.

But as noted above, there is additional mention of surcharges elsewhere, namely in 305 (e)(7)(B) providing that surcharges are "due and payable on the same schedule as the contributions on which the surcharges are based" and "(a)ny failure to make a surcharge payment shall be treated as delinquent contributions under section 1145 …and shall be enforceable as such." There is further mention later in that same section 305----section 305(e)(9)(B) indicating that surcharges do have a role not only during the "critical status" period but also in the calculation of withdrawal liability. This latter section provides that surcharges under 305(e)(7) "shall be disregarded in determining the allocation of unfunded vested benefits to an employer" under ERISA section 421 (29 U.S.C. 1391). This section and section 305(e)(9)(B) were amended in 2008. The amendment to section 305(e)(9)(B) substituted the term "unfunded vested benefits" for an "an employer's withdrawal liability".

So the issue is what to make of sections 305(e)(7) and (e)(9)(B). The legislative history on surcharges provides little assistance in the analysis. The Pension Protection Act (PPA) was enacted in 2006 to be effective for 2008 plan years. PPA added ERISA section 305 which provided more onerous funding rules for single and multiemployer plans. As noted previously,

7

Section 305 was further amended in 2008 via the Worker Retiree and Employer Recovery Act of 2008 (WRERA) which was part of efforts to combat what would soon become the "Great Recession." It is significant that WRERA substituted the term "unfunded vested benefits" for "an employer's withdrawal liability" in section 305(e)(9)(B), a section stating when surcharges "shall be disregarded". Congress thus specifically revisited the statute in 2008 and decided only to limit the surcharges in the first aspect of the formula, i.e. the one not in dispute here.

Without the guidance of determinative legislative history and therefore as a matter of pure statutory interpretation, the Arbitrator disagrees with the Company's argument that the term "obligation to contribute" under ERISA section 4219(c )(1)(C) can only arise under a collective bargaining agreement or a labor management relations law, and that the surcharge arises from neither in this case. Under section 305(e)(7)(B), unpaid surcharges are "treated as a delinquent contribution…. and shall be enforced as such" meaning that the surcharge is deemed a contribution under the statute. The Arbitrator rejects the Fund's contention that even if the surcharge is treated as a contribution under section 305(e)(7)(B), it should not be treated as such for all purposes. As further discussed below, there is no support that ERISA affirmatively prevents the inclusion of the surcharge in the annual/quarterly payment calculation.

With regard to the Company's argument that under the statute, the "contribution" is the amount stated in the collective bargaining agreement (CBA), and that the CBA does not incorporate the surcharge as an obligation thereunder, the Arbitrator disagrees. The CBA provides at Article 21 titled Pension Plan that "the Agreement and Declaration of Trust…. and any Amendments or Supplements thereto," are incorporated into the CBA. The Trust Agreement in Article II authorizes the Trustees to adopt a Plan, and thus the Plan is incorporated into the CBA.

8

In Section 2.13 of the Plan, a "Contributing Employer" is defined in a manner that includes the Company, and then states that the Contributing Employer has "all the obligations to make Employer Payments to this Pension Plan, to the full extent of the law, and shall cease to be obligated if it has fully complied with all legal requirements necessary to sever such obligation." Because the CBA incorporates the Plan as an obligation of the Company, and the Plan requires contributions owed to the full extent of the law, and because the surcharge is required by the law, the surcharge is required under the CBA. See Local 863 Pension Fund v. RLB Food Distributors, Inc., 2012 WL 27442 (D.N.J. 2012) cited by the Fund, wherein the court was asked to determine what was a "contribution" under the same Plan in this case. The Court construed the same Plan section 2.13 discussed above noting that the Plan imposes on the company an obligation to make "Employer Payments ... to the full extent of the law." The Court also noted that the Plan and Trust Agreement themselves provide that they shall comply with all requirements of federal laws.

Here, the Arbitrator finds that a participating employer's "obligations" to make "Employer Payments" includes ERISA's surcharge provisions, and as such, is an obligation under the CBA.

The structure of the ERISA statutes also appears to support the Fund's position. ERISA section 4211(29 U.S.C 1391) is appropriately titled "Methods for Computing Withdrawal Liability" and is separate from the section having to do with the annual payment calculation which is found in ERISA section 4219 ( 29 U.S.C. 1399). Against this structure it makes sense to place in section 305(9)(B) (enacted in 2006 and amended in 2008) a provision stating that the surcharge is excluded from the calculation of unfunded vested benefits allocable to a withdrawn employer (an original ERISA provision decades old).

9

The Company's expert's report and testimony also admitted that the Company's position that the surcharge not be included is the "minority" position among actuaries. The report and testimony indicate that the Multiemployer Subcommittee of the American Academy of Actuaries ("AAA") wrote to the PBGC and stated they understood the PBGC's position to be that the surcharge can be included in the calculation of the annual payment. Though the AAA asked that this be codified in the law, the AAA did not suggest that the PBGC's position was wrong.

Finally, as noted earlier, the Arbitrator finds it significant that as to section 305(e)(9)(B), Congress specifically revisited the statute in 2008 and decided only to limit the surcharges in the first aspect of the formula, i.e. the actuarial determination of what portion of a plan's total unfunded vested benefit obligation is attributable to the withdrawn employer, and not whether the surcharge should be in included in the annual/quarterly payment computation. Congress had the opportunity to clarify surcharges, and its action supports the Fund's position and not the Company's.

In sum, the Arbitrator concludes based on the statutes construed that the Company's assertion that the Fund miscalculated the annual/quarterly payment must be rejected. . Accordingly, the amount of surcharge added to a withdrawn employer's highest contribution rate must be taken into account in determining the payment schedule of a withdrawn employer and there is no statutory exclusion. This Arbitrator joins Arbitrator Irvings in upholding the Fund's view that the surcharge was properly included in the calculation of the annual payment due from the withdrawing employer.[3]

---

[3] Issuance of this Opinion and Award is particularly difficult for the Arbitrator because the Company and the Union have had a good relationship, the Company dutifully paid contributions to the Fund for many years, and the issuance of this Award only increases the onerous monetary obligations of the Company due to the withdrawal.

**AWARD**

American BD Company improperly rejected the Segal Company's calculation of the

Company's withdrawal liability on behalf of the Fund. The Fund properly calculated the

annual/quarterly payments of withdrawal liability for American BD Company as including the

10% surcharge.

May 16, 2013

_____
Nicholas J. Taldone, Arbitrator

11

# 26

NEW JERSEY STATE BOARD OF MEDIATION

In the matter of the Arbitration between

LOCAL 863, INTERNATIONAL BROTHERHOOD
OF TEAMSTERS PENSION PLAN

and                                                              No. 11-0530

AMERICAN B.D. COMPANY _____.

## CORRECTED OPINION AND AWARD

For the Pension Plan:
Kenneth Nowak, Esq.
Zazzali, Fagella, Nowak, Kleinbaum & Friedman
One Riverfront Plaza, Suite 320
Newark, New Jersey 07102

For the Company:
Douglas S. Brierley, Esquire
Scarinci & Hollenbeck, LLC
1100 Valley Brook Avenue
P. O. box 790
Lyndhurst, NJ 07071-0790

Arbitrator:
Nicholas J. Taldone

Hearing Date:
April 5, 2013

1

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

American B.D. Company, formally known as American Beverage Distribution Company ("ABD" or "Company), is a family owned and operated wine and spirits company headquartered in Glen Rock, New Jersey. The company operates distributorships in New Jersey and serves local restaurants, retailers, and wine shops there.

For over fifty years, the Company has been a party to many collective bargaining agreements with Local Union No. 863 of the International Brotherhood of Teamsters ("Local 863"). ABD employs approximately seventy members of Local 863.

Under a series of collective bargaining agreements with Local 863, the Company has been one of many employers to contribute to a defined benefit, multi-employer pension plan formed and maintained under ERISA, 19 U.S.C. §1301(a)(3), and designated as Local 863, International Brotherhood of Teamsters Pension Plan ( the "Fund"). This defined benefit plan is one in which the individual employee's benefits are fixed, but are not based only on the amount contributed by or for the employee/local union member. The plan is jointly trusteed and administered under the requirements of the Labor Management Relations Act, 29 U.S.C. §186.

ABD has contributed to the Fund in its current or prior form for many years. Annual payments by ABD to the Fund had grown to approximately $470,000.00 a year by 2011.

More particularly, pursuant to 2006 statutory amendments that introduced funding statutes classification and imposed notice requirements, ABD – along with other employers in the plan – received in September 2008 its first notice that the Fund was in the red zone or "critical status" for the fiscal year beginning September 1, 2008 in the amount of approximately $5 million. These deficiencies were masked by the Fund's unsuccessful requests for funding

waivers that delayed ABD's notice and knowledge of the Fund's financial deterioration until significant amounts of interest had accrued on the deficiencies.

Concerned about the Fund's future, ABD then requested from the Fund in 2010 an estimate of the company's withdrawal liability. ABD then received the Fund's withdrawal liability report in February 2011.

Commencing also in early 2011, ABD and Local 863 began negotiations on a successor collective bargaining agreement. At that time, the Company learned that its withdrawal liability had grown from $6 million in 2006 to $15 million for the Fund year ending August 31, 2010. After months of face-to-face negotiations and meetings with the Fund's actuaries, ABD provided notice of its intention to withdraw from the Fund. By letter dated August 26, 2011, ABD's counsel confirmed that

> American B.D. has informed the union that it is implementing its final offer to include withdrawing from the Pension Plan, effective immediately. I am sure you understand that this means that no further contributions will be made to the plan on behalf of employees.
>
> Our client is prepared to immediately contribute $140,649 as the first of 20 quarterly installments as determined by Segal [the Fund actuary] as per your letter of February 23, 2011. Please advise me to whom this should be addressed and we will arrange that this payment be sent to such person forthwith. Future quarterly payments will be made on December 1st, March 1st, June 1st, and September 1st until paid in full.
>
> As per today's letter, our client is prepared to pay the minimum funding deficiency of $5,898,317.60 as of August 31, 2011 (as calculated in my Memo to you of July 12, 2011) on or before August 31st. Please also advise as to whom this should be sent.
>
> We will immediately file Form 5530, and our client will pay the excise tax to the IRS as required by law.

3

On August 30, 2011, the Company transmitted its first quarterly payment of $140,649.00 to the Fund. It also paid the minimum funding deficiency of $5,898,317.60. And, on September 8, 2011, ABD paid to the Internal Revenue Service the required excise tax.

Notwithstanding ABD's statement at the August 25 meeting, which was confirmed in counsel's August 26th letter, the Fund refused to negotiate and cash the proffered withdrawal liability payment. By letter dated October 10, 2011, ABD's counsel again stated "[w]e previously notified you of our client's withdrawal from the Local 863 Pension Plan ... as of August 25, 2011." In the same letter, ABD further asserted that the Segal Company's calculation of ABD's withdrawal liability was flawed because, *inter alia*, it wrongly added a ten percent surcharge to the withdrawal payments due.

By letter of October 21, 2011, counsel for the Fund and Local 863 advised ABD of the Fund's position: the ten percent surcharge could be included in determining the company's annual payment for purposes of the withdrawal liability schedule.

In reply, the Company advised the union and the Fund by letter dated November 11, 2011, that it would proceed to submit the surcharge dispute to the New Jersey State Board of Mediation for arbitration. ABD stated in the letter reply that it had received a Fund invoice for the regular September payment by letter post-marked October 27, 2011, and that the invoice ignored the company's prior withdrawal notice. Further, ABD asked why its check for the first quarterly payment of withdrawal liability in the amount of $140,649.00 had not been cashed. The Fund never responded to that question.

ABD submitted the matter to arbitration by letter dated December 2, 2011.

4

**PARTIES' POSITIONS**

The parties do not dispute that there are two aspects to the computation of withdrawal liability against a former participating employer in a multiemployer pension plan. The first aspect is an actuarial determination of what portion of a plan's total unfunded vested benefit obligation is attributable to the withdrawn employer. This first calculation is not in dispute. The second calculation establishes what annual (or, as used by the Fund, quarterly) amounts the employer must pay. This is the calculation in dispute. The parties do not disagree that under ERISA section 4219 (c )(1)(C),the amount of each annual payment in a withdrawal liability payment schedule shall be the product of "the average annual number of contribution base units (CBUs) for the period of 3 consecutive plan years during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest, and the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 years ending with the plan year in which the withdrawal occurs."

**THE FUND'S POSITION**

The Fund's actuary appropriately calculated the annual/quarterly payments under ERISA section 4219 (c)(1)(C) as including the 10% surcharge.

**THE COMPANY'S POSITION**

The Company challenges the Plan actuary's inclusion of the 10% surcharge in the calculation of the annual/quarterly payment under ERISA section 4219 (c) (1)(c). The Company contends the "obligation to contribute" under ERISA section 4219 (c )(1)(C) can only arise under a collective bargaining agreement or a labor management relations law, and the surcharge arises from neither. At the arbitration hearing, the Company's expert witness Ethan Kra explained this position as follows. The calculation of the annual payment is based on the average of the highest three consecutive units in the past ten years times the highest contribution rate. The Fund's Plan

5

is also based on "contributions". An obligation to "contribute" is defined in ERISA as the amount owed under the collective bargaining agreement or labor laws. The "surcharge" is "10 percent of the contribution otherwise so required" per ERISA section 432(e)(7). Therefore, the surcharge is not a contribution and if Congress wanted to call it a "contribution", it could have done so, but it did not.

The Company further contends that in his arbitration award[1] regarding the precise issue in dispute here, Arbitrator Mark Irvings erroneously decided that the surcharge is properly included in the calculation of annual/quarterly payments for the following reasons. First, Arbitrator Irving's finding that there is no statutory provision or legislative history that addresses the issue is wrong because the reference in ERISA section 4212 to the term "obligation to contribute" is decisive[2]. Arbitrator Irvings erroneously concluded that because of the reference to an unpaid surcharge as a contribution in the delinquent contribution section of ERISA, the term "surcharge" should be treated as a contribution in all instances. Third, Arbitrator Irvings' reliance on the express exclusion of the surcharge from an unrelated ERISA section ignores that no express exclusion in necessary.

## DISCUSSION

Under ERISA section 305(e)(7)(A)(29 U.S.C. section 1085), surcharges are statutorily prescribed additions to negotiated contributions to multi-employer plans in the "red zone" or

---

[1] In the matter of the Arbitration between IBT Local 863  Pension Fund  and C&C Groceries, Inc. (Irvings, Arbitrator 2012).
[2] ERISA section 4212(a) provides:
(a)"Obligation to contribute" defined. For purposes of this part, the term "obligation to contribute" means an obligation to contribute arising-
1)under one or more collective bargaining (or unrelated) agreements, or
2)as a result of a duty under applicable labor-management relations law but
does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions

6

"critical status." Were that the only provision of ERISA dealing with surcharges, it would appear that the Company's position is correct as (e)(7)(A) does not seem to affect the withdrawal liability calculation of the annual/quarterly payment. Indeed, section 305 is entitled "Additional Funding Rules For Multiemployer Plans In Endangered Status of Critical Status" and ERISA section 4211 (29 U.S.C. 1391) which is titled "Methods of Computing Withdrawal Liability" does not mention surcharges. Thus, a reading of section 305(e)(7)(A) in isolation would seem to indicate that the surcharge is merely to help get plans in critical status out of critical status by additional infusions of cash.

But as noted above, there is additional mention of surcharges elsewhere, namely in 305 (e)(7)(B) providing that surcharges are "due and payable on the same schedule as the contributions on which the surcharges are based" and "(a)ny failure to make a surcharge payment shall be treated as delinquent contributions under section 1145 ...and shall be enforceable as such." There is further mention later in that same section 305----section 305(e)(9)(B) indicating that surcharges do have a role not only during the "critical status" period but also in the calculation of withdrawal liability. This latter section provides that surcharges under 305(e)(7) "shall be disregarded in determining the allocation of unfunded vested benefits to an employer" under ERISA section 421 (29 U.S.C. 1391). This section and section 305(e)(9)(B) were amended in 2008. The amendment to section 305(e)(9)(B) substituted the term "unfunded vested benefits" for an "an employer's withdrawal liability".

So the issue is what to make of sections 305(e)(7) and (e)(9)(B). The legislative history on surcharges provides little assistance in the analysis. The Pension Protection Act (PPA) was enacted in 2006 to be effective for 2008 plan years. PPA added ERISA section 305 which provided more onerous funding rules for single and multiemployer plans. As noted previously,

Section 305 was further amended in 2008 via the Worker Retiree and Employer Recovery Act of 2008 (WRERA) which was part of efforts to combat what would soon become the "Great Recession." It is significant that WRERA substituted the term "unfunded vested benefits" for "an employer's withdrawal liability" in section 305(e)(9)(B), a section stating when surcharges "shall be disregarded".  Congress thus specifically revisited the statute in 2008 and decided only to limit the surcharges in the first aspect of the formula, i.e. the one not in dispute here.

Without the guidance of determinative legislative history and therefore as a matter of pure statutory interpretation, the Arbitrator disagrees with the Company's argument that the term "obligation to contribute" under ERISA section 4219(c )(1)(C) can only arise under a collective bargaining agreement or a labor management relations law, and that the surcharge arises from neither in this case. Under section 305(e)(7)(B), unpaid surcharges are "treated as a delinquent contribution.... and shall be enforced as such" meaning that the surcharge is deemed a contribution under the statute. The Arbitrator rejects the  Company's contention that even if the surcharge is treated as a contribution under section 305(e)(7)(B), it should not be treated as such for all purposes. As further discussed below, there is no support that ERISA affirmatively prevents the inclusion of the surcharge in the annual/quarterly payment calculation.

With regard to the Company's argument that under the statute, the "contribution" is the amount stated in the collective bargaining agreement (CBA), and that the CBA does not incorporate the surcharge as an obligation thereunder, the Arbitrator disagrees.  The CBA provides at Article 21 titled Pension Plan that "the Agreement and Declaration of Trust.... and any Amendments or Supplements thereto," are incorporated into the CBA. The Trust Agreement in Article II authorizes the Trustees to adopt a Plan, and thus the Plan is incorporated into the CBA.

8

In Section 2.13 of the Plan, a "Contributing Employer" is defined in a manner that includes the Company, and then states that the Contributing Employer has "all the obligations to make Employer Payments to this Pension Plan, to the full extent of the law, and shall cease to be obligated if it has fully complied with all legal requirements necessary to sever such obligation." Because the CBA incorporates the Plan as an obligation of the Company, and the Plan requires contributions owed to the full extent of the law, and because the surcharge is required by the law, the surcharge is required under the CBA. See Local 863 Pension Fund v. RLB Food Distributors, Inc., 2012 WL 27442 (D.N.J. 2012) cited by the Fund, wherein the court was asked to determine what was a "contribution" under the same Plan in this case. The Court construed the same Plan section 2.13 discussed above noting that the Plan imposes on the company an obligation to make "Employer Payments … to the full extent of the law." The Court also noted that the Plan and Trust Agreement themselves provide that they shall comply with all requirements of federal laws.

Here, the Arbitrator finds that a participating employer's "obligations" to make "Employer Payments" includes ERISA's surcharge provisions, and as such, is an obligation under the CBA.

The structure of the ERISA statutes also appears to support the Fund's position. ERISA section 4211(29 U.S.C 1391) is appropriately titled "Methods for Computing Withdrawal Liability" and is separate from the section having to do with the annual payment calculation which is found in ERISA section 4219 ( 29 U.S.C. 1399). Against this structure it makes sense to place in section 305(9)(B) (enacted in 2006 and amended in 2008) a provision stating that the surcharge is excluded from the calculation of unfunded vested benefits allocable to a withdrawn employer (an original ERISA provision decades old).

9

The Company's expert's report and testimony also admitted that the Company's position that the surcharge not be included is the "minority" position among actuaries. The report and testimony indicate that the Multiemployer Subcommittee of the American Academy of Actuaries ("AAA") wrote to the PBGC and stated they understood the PBGC's position to be that the surcharge can be included in the calculation of the annual payment. Though the AAA asked that this be codified in the law, the AAA did not suggest that the PBGC's position was wrong.

Finally, as noted earlier, the Arbitrator finds it significant that as to section 305(e)(9)(B), Congress specifically revisited the statute in 2008 and decided only to limit the surcharges in the first aspect of the formula, i.e. the actuarial determination of what portion of a plan's total unfunded vested benefit obligation is attributable to the withdrawn employer, and not whether the surcharge should be in included in the annual/quarterly payment computation. Congress had the opportunity to clarify surcharges, and its action supports the Fund's position and not the Company's.

In sum, the Arbitrator concludes based on the statutes construed that the Company's assertion that the Fund miscalculated the annual/quarterly payment must be rejected. . Accordingly, the amount of surcharge added to a withdrawn employer's highest contribution rate must be taken into account in determining the payment schedule of a withdrawn employer and there is no statutory exclusion. This Arbitrator joins Arbitrator Irvings in upholding the Fund's view that the surcharge was properly included in the calculation of the annual payment due from the withdrawing employer.[3]

---

[3] Issuance of this Opinion and Award is particularly difficult for the Arbitrator because the Company and the Union have had a good relationship, the Company dutifully paid contributions to the Fund for many years, and the issuance of this Award only increases the onerous monetary obligations of the Company due to the withdrawal.

10

**AWARD**

American BD Company improperly rejected the Segal Company's calculation of the Company's withdrawal liability on behalf of the Fund. The Fund properly calculated the annual/quarterly payments of withdrawal liability for American BD Company as including the 10% surcharge.

May 17, 2013

Nicholas J. Taldone, Arbitrator

11

27

NEW JERSEY STATE BOARD OF MEDIATION

In the matter of the Arbitration between

LOCAL 863, INTERNATIONAL BROTHERHOOD
OF TEAMSTERS PENSION PLAN

and                                                                    No. 11-0530

<u>AMERICAN B.D. COMPANY</u>                                  .

<h2 style="text-align:center">SECOND CORRECTED OPINION AND AWARD</h2>

<u>For the Pension Plan:</u>
Kenneth Nowak, Esq.
Zazzali, Fagella, Nowak, Kleinbaum & Friedman
One Riverfront Plaza, Suite 320
Newark, New Jersey  07102

<u>For the Company:</u>
Douglas S. Brierley, Esquire
Scarinci & Hollenbeck, LLC
1100 Valley Brook Avenue
P. O. box 790
Lyndhurst, NJ  07071-0790

<u>Arbitrator:</u>
Nicholas J. Taldone

<u>Hearing Date:</u>
April 5, 2013

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

American B.D. Company, formally known as American Beverage Distribution Company ("ABD" or "Company), is a family owned and operated wine and spirits company headquartered in Glen Rock, New Jersey. The company operates distributorships in New Jersey and serves local restaurants, retailers, and wine shops there.

For over fifty years, the Company has been a party to many collective bargaining agreements with Local Union No. 863 of the International Brotherhood of Teamsters ("Local 863"). ABD employs approximately seventy members of Local 863.

Under a series of collective bargaining agreements with Local 863, the Company has been one of many employers to contribute to a defined benefit, multi-employer pension plan formed and maintained under ERISA, 19 U.S.C. §1301(a)(3), and designated as Local 863, International Brotherhood of Teamsters Pension Plan ( the "Fund"). This defined benefit plan is one in which the individual employee's benefits are fixed, but are not based only on the amount contributed by or for the employee/local union member. The plan is jointly trusteed and administered under the requirements of the Labor Management Relations Act, 29 U.S.C. §186.

ABD has contributed to the Fund in its current or prior form for many years. Annual payments by ABD to the Fund had grown to approximately $470,000.00 a year by 2011.

More particularly, pursuant to 2006 statutory amendments that introduced funding statutes classification and imposed notice requirements, ABD – along with other employers in the plan – received in September 2008 its first notice that the Fund was in the red zone or "critical status" for the fiscal year beginning September 1, 2008 in the amount of approximately $5 million. These deficiencies were masked by the Fund's unsuccessful requests for funding

2

waivers that delayed ABD's notice and knowledge of the Fund's financial deterioration until significant amounts of interest had accrued on the deficiencies.

Concerned about the Fund's future, ABD then requested from the Fund in 2010 an estimate of the company's withdrawal liability. ABD then received the Fund's withdrawal liability report in February 2011.

Commencing also in early 2011, ABD and Local 863 began negotiations on a successor collective bargaining agreement. At that time, the Company learned that its withdrawal liability had grown from $6 million in 2006 to $15 million for the Fund year ending August 31, 2010. After months of face-to-face negotiations and meetings with the Fund's actuaries, ABD provided notice of its intention to withdraw from the Fund. By letter dated August 26, 2011, ABD's counsel confirmed that

> American B.D. has informed the union that it is implementing its final offer to include withdrawing from the Pension Plan, effective immediately. I am sure you understand that this means that no further contributions will be made to the plan on behalf of employees.
>
> Our client is prepared to immediately contribute $140,649 as the first of 20 quarterly installments as determined by Segal [the Fund actuary] as per your letter of February 23, 2011. Please advise me to whom this should be addressed and we will arrange that this payment be sent to such person forthwith. Future quarterly payments will be made on December 1st, March 1st, June 1st, and September 1st until paid in full.
>
> As per today's letter, our client is prepared to pay the minimum funding deficiency of $5,898,317.60 as of August 31, 2011 (as calculated in my Memo to you of July 12, 2011) on or before August 31st. Please also advise as to whom this should be sent.
>
> We will immediately file Form 5530, and our client will pay the excise tax to the IRS as required by law.

3

On August 30, 2011, the Company transmitted its first quarterly payment of $140,649.00 to the Fund. It also paid the minimum funding deficiency of $5,898,317.60. And, on September 8, 2011, ABD paid to the Internal Revenue Service the required excise tax.

Notwithstanding ABD's statement at the August 25 meeting, which was confirmed in counsel's August 26th letter, the Fund refused to negotiate and cash the proffered withdrawal liability payment. By letter dated October 10, 2011, ABD's counsel again stated "[w]e previously notified you of our client's withdrawal from the Local 863 Pension Plan ... as of August 25, 2011." In the same letter, ABD further asserted that the Segal Company's calculation of ABD's withdrawal liability was flawed because, *inter alia*, it wrongly added a ten percent surcharge to the withdrawal payments due.

By letter of October 21, 2011, counsel for the Fund and Local 863 advised ABD of the Fund's position: the ten percent surcharge could be included in determining the company's annual payment for purposes of the withdrawal liability schedule.

In reply, the Company advised the union and the Fund by letter dated November 11, 2011, that it would proceed to submit the surcharge dispute to the New Jersey State Board of Mediation for arbitration. ABD stated in the letter reply that it had received a Fund invoice for the regular September payment by letter post-marked October 27, 2011, and that the invoice ignored the company's prior withdrawal notice. Further, ABD asked why its check for the first quarterly payment of withdrawal liability in the amount of $140,649.00 had not been cashed. The Fund never responded to that question.

ABD submitted the matter to arbitration by letter dated December 2, 2011.

4

**PARTIES' POSITIONS**

The parties do not dispute that there are two aspects to the computation of withdrawal liability against a former participating employer in a multiemployer pension plan. The first aspect is an actuarial determination of what portion of a plan's total unfunded vested benefit obligation is attributable to the withdrawn employer. This first calculation is not in dispute. The second calculation establishes what annual (or, as used by the Fund, quarterly) amounts the employer must pay. This is the calculation in dispute. The parties do not disagree that under ERISA section 4219 (c )(1)(C),the amount of each annual payment in a withdrawal liability payment schedule shall be the product of "the average annual number of contribution base units (CBUs) for the period of 3 consecutive plan years during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest, and the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 years ending with the plan year in which the withdrawal occurs."

**THE FUND'S POSITION**

The Fund's actuary appropriately calculated the annual/quarterly payments under ERISA section 4219 (c)(1)(C) as including the 10% surcharge.

**THE COMPANY'S POSITION**

The Company challenges the Plan actuary's inclusion of the 10% surcharge in the calculation of the annual/quarterly payment under ERISA section 4219 (c) (1)(c). The Company contends the "obligation to contribute" under ERISA section 4219 (c )(1)(C) can only arise under a collective bargaining agreement or a labor management relations law, and the surcharge arises from neither. At the arbitration hearing, the Company's expert witness Ethan Kra explained this position as follows. The calculation of the annual payment is based on the average of the highest three consecutive units in the past ten years times the highest contribution rate. The Fund's Plan

5

is also based on "contributions". An obligation to "contribute" is defined in ERISA as the amount owed under the collective bargaining agreement or labor laws. The "surcharge" is "10 percent of the contribution otherwise so required" per ERISA section 432(e)(7). Therefore, the surcharge is not a contribution and if Congress wanted to call it a "contribution", it could have done so, but it did not.

The Company further contends that in his arbitration award[1] regarding the precise issue in dispute here, Arbitrator Mark Irvings erroneously decided that the surcharge is properly included in the calculation of annual/quarterly payments for the following reasons. First, Arbitrator Irving's finding that there is no statutory provision or legislative history that addresses the issue is wrong because the reference in ERISA section 4212 to the term "obligation to contribute" is decisive[2]. Arbitrator Irvings erroneously concluded that because of the reference to an unpaid surcharge as a contribution in the delinquent contribution section of ERISA, the term "surcharge" should be treated as a contribution in all instances. Third, Arbitrator Irvings' reliance on the express exclusion of the surcharge from an unrelated ERISA section ignores that no express exclusion in necessary.

**DISCUSSION**

Under ERISA section 305(e)(7)(A)(29 U.S.C. section 1085), surcharges are statutorily prescribed additions to negotiated contributions to multi-employer plans in the "red zone" or

---

[1] In the matter of the Arbitration between IBT Local 863 Pension Fund and C&C Groceries, Inc. (Irvings, Arbitrator 2012)

[2] ERISA section 4212(a) provides:
(a)"Obligation to contribute" defined. For purposes of this part, the term "obligation to contribute" means an obligation to contribute arising-
1)under one or more collective bargaining (or unrelated) agreements, or
2)as a result of a duty under applicable labor-management relations law but
does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions

"critical status." Were that the only provision of ERISA dealing with surcharges, it would appear that the Company's position is correct as (e)(7)(A) does not seem to affect the withdrawal liability calculation of the annual/quarterly payment. Indeed, section 305 is entitled "Additional Funding Rules For Multiemployer Plans In Endangered Status of Critical Status" and ERISA section 4211 (29 U.S. C. 1391) which is titled "Methods of Computing Withdrawal Liability" does not mention surcharges. Thus, a reading of section 305(e)(7)(A) in isolation would seem to indicate that the surcharge is merely to help get plans in critical status out of critical status by additional infusions of cash.

But as noted above, there is additional mention of surcharges elsewhere, namely in 305 (e)(7)(B) providing that surcharges are "due and payable on the same schedule as the contributions on which the surcharges are based" and "(a)ny failure to make a surcharge payment shall be treated as delinquent contributions under section 1145 …and shall be enforceable as such." There is further mention later in that same section 305----section 305(e)(9)(B) indicating that surcharges do have a role not only during the "critical status" period but also in the calculation of withdrawal liability. This latter section provides that surcharges under 305(e)(7) "shall be disregarded in determining the allocation of unfunded vested benefits to an employer" under ERISA section 421 (29 U.S.C. 1391). This section and section 305(e)(9)(B) were amended in 2008. The amendment to section 305(e)(9)(B) substituted the term "unfunded vested benefits" for an "an employer's withdrawal liability".

So the issue is what to make of sections 305(e)(7) and (e)(9)(B). The legislative history on surcharges provides little assistance in the analysis. The Pension Protection Act (PPA) was enacted in 2006 to be effective for 2008 plan years. PPA added ERISA section 305 which provided more onerous funding rules for single and multiemployer plans. As noted previously,

7

Section 305 was further amended in 2008 via the Worker Retiree and Employer Recovery Act of 2008 (WRERA) which was part of efforts to combat what would soon become the "Great Recession." It is significant that WRERA substituted the term "unfunded vested benefits" for "an employer's withdrawal liability" in section 305(e)(9)(B), a section stating when surcharges "shall be disregarded". Congress thus specifically revisited the statute in 2008 and decided only to limit the surcharges in the first aspect of the formula, i.e. the one not in dispute here.

Without the guidance of determinative legislative history and therefore as a matter of pure statutory interpretation, the Arbitrator disagrees with the Company's argument that the term "obligation to contribute" under ERISA section 4219(c )(1)(C) can only arise under a collective bargaining agreement or a labor management relations law, and that the surcharge arises from neither in this case. Under section 305(e)(7)(B), unpaid surcharges are "treated as a delinquent contribution.... and shall be enforced as such" meaning that the surcharge is deemed a contribution under the statute. The Arbitrator rejects the Company's contention that even if the surcharge is treated as a contribution under section 305(e)(7)(B), it should not be treated as such for all purposes. As further discussed below, there is no support that ERISA affirmatively prevents the inclusion of the surcharge in the annual/quarterly payment calculation.

With regard to the Company's argument that under the statute, the "contribution" is the amount stated in the collective bargaining agreement (CBA), and that the CBA does not incorporate the surcharge as an obligation thereunder, the Arbitrator disagrees. The CBA provides at Article 21 titled Pension Plan that "the Agreement and Declaration of Trust.... and any Amendments or Supplements thereto," are incorporated into the CBA. The Trust Agreement in Article II authorizes the Trustees to adopt a Plan, and thus the Plan is incorporated into the CBA.

8

In Section 2.13 of the Plan, a "Contributing Employer" is defined in a manner that includes the Company, and then states that the Contributing Employer has "all the obligations to make Employer Payments to this Pension Plan, to the full extent of the law, and shall cease to be obligated if it has fully complied with all legal requirements necessary to sever such obligation." Because the CBA incorporates the Plan as an obligation of the Company, and the Plan requires contributions owed to the full extent of the law, and because the surcharge is required by the law, the surcharge is required under the CBA. See Local 863 Pension Fund v. RLB Food Distributors, Inc., 2012 WL 27442 (D.N.J. 2012) cited by the Fund, wherein the court was asked to determine what was a "contribution" under the same Plan in this case. The Court construed the same Plan section 2.13 discussed above noting that the Plan imposes on the company an obligation to make "Employer Payments ... to the full extent of the law." The Court also noted that the Plan and Trust Agreement themselves provide that they shall comply with all requirements of federal laws.

Here, the Arbitrator finds that a participating employer's "obligations" to make "Employer Payments" includes ERISA's surcharge provisions, and as such, is an obligation under the CBA.

The structure of the ERISA statutes also appears to support the Fund's position. ERISA section 4211(29 U.S.C 1391) is appropriately titled "Methods for Computing Withdrawal Liability" and is separate from the section having to do with the annual payment calculation which is found in ERISA section 4219 ( 29 U.S.C. 1399). Against this structure it makes sense to place in section 305(9)(B) (enacted in 2006 and amended in 2008) a provision stating that the surcharge is excluded from the calculation of unfunded vested benefits allocable to a withdrawn employer (an original ERISA provision decades old).

9

The Company's expert's report and testimony also admitted that the Company's position that the surcharge not be included is the "minority" position among actuaries. The report and testimony indicate that the Multiemployer Subcommittee of the American Academy of Actuaries ("AAA") wrote to the PBGC and stated they understood the PBGC's position to be that the surcharge can be included in the calculation of the annual payment.

Finally, as noted earlier, the Arbitrator finds it significant that as to section 305(e)(9)(B), Congress specifically revisited the statute in 2008 and decided only to limit the surcharges in the first aspect of the formula, i.e. the actuarial determination of what portion of a plan's total unfunded vested benefit obligation is attributable to the withdrawn employer, and not whether the surcharge should be in included in the annual/quarterly payment computation. Congress had the opportunity to clarify surcharges, and its action supports the Fund's position and not the Company's.

In sum, the Arbitrator concludes based on the statutes construed that the Company's assertion that the Fund miscalculated the annual/quarterly payment must be rejected. . Accordingly, the amount of surcharge added to a withdrawn employer's highest contribution rate must be taken into account in determining the payment schedule of a withdrawn employer and there is no statutory exclusion. This Arbitrator joins Arbitrator Irvings in upholding the Fund's view that the surcharge was properly included in the calculation of the annual payment due from the withdrawing employer.[3]

---

[3] Issuance of this Opinion and Award is particularly difficult for the Arbitrator because the Company and the Union have had a good relationship, the Company dutifully paid contributions to the Fund for many years, and the issuance of this Award only increases the onerous monetary obligations of the Company due to the withdrawal.

10

## AWARD

American BD Company improperly rejected the Segal Company's calculation of the Company's withdrawal liability on behalf of the Fund. The Fund properly calculated the annual/quarterly payments of withdrawal liability for American BD Company as including the 10% surcharge.

June 3, 2013

Nicholas J. Taldone, Arbitrator

11